**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE**

| | |
|---|---|
| CC FORD GROUP WEST, LLC, | CIVIL ACTION NO. 3:22-cv-04143 |
| Plaintiff, | |
| v. | |
| JENNIFER JOHNSON, CARRIE BICKING, BETH WEILER, PROJECT VELOCITY, INC. and JOHN DOES 1-10, | **VERIFIED FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiff CC Ford Group West, LLC ("**Plaintiff**" or the "**Company**") by and through its attorneys, by way of Verified First Amended Complaint against Defendants Jennifer Johnson ("**Johnson**"), Carrie Bicking ("**Bicking**"), Beth Weiler ("**Weiler**") (collectively, the **"Individual Defendants"**), Project Velocity, Inc. (**"PVI"**) and John Does 1-10 (the Individual Defendants, PVI and John Does 1-10 collectively, the **"Defendants"**) alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.     Plaintiff seeks relief against Defendants arising out of Defendants' willful, bad faith conduct in connection with, among other things, breaches of the parties' contractual agreements governing employment and consulting relationships, the Individual Defendants' conduct as faithless servants, Defendants' tortious interference with existing business relationships and prospective economic advantage and unfair competition.

<u>**PARTIES**</u>

2.     Plaintiff is a limited liability company organized under the laws of New Jersey and having a principal place of business at 150 Morristown Road, Suite 102, Bernardsville, NJ

4891-4781-5219, v. 2

07924 and an assignee of its parent company CC Ford Group, LLC., f/k/a CC Ford Marketing Group, LLC (**"CC Ford Group"**) (the Company and CC Ford Group together, **"CC Ford"**).

3.     Johnson is a natural person who resides at 78 Allview Avenue Brewster, NY 10509.

4.     Bicking is a natural person who resides at 3642 North Avondale Avenue, Chicago, IL 60618.

5.     Weiler is a natural person who resides at 1204 11th Avenue, Green Bay, WI 54304.

6.     PVI is a New York corporation formed by Johnson for purposes of competing with, among others, the Company.

7.     Defendants John Does 1-10 are individuals and/or companies, the identities of which currently are unknown, that, among other things, conspired with Defendants to steal and/or misappropriate Plaintiff's trade secrets and/or confidential and proprietary information, tortiously interfered with Plaintiff's contractual relationships and/or prospective economic advantage with the Individual Defendants and its clients and/or unfairly competed with Plaintiff.

## FACTUAL BACKGROUND

8.     This case arises as a result of, among other things, the following: Johnson's unlawful conduct committed while she was employed by, and serving as the Managing Director of, the Company, following her separation from the Company in March 2022 through July 2022 during which she served as an independent contractor performing work for the Company, and thereafter while performing services through PVI in wrongful competition with the Company; Weiler's disloyal and other unlawful conduct while she was employed by the Company as its  Project Manager;

Bicking's disloyal and other unlawful conduct while she was employed by the Company as its Senior Director of Client Services; and Johnson forming PVI to wrongfully and unlawfully compete with the Company.  CC Ford is a comprehensive medical communications firm engaged in the business of pharmaceutical marketing services, including advertising and promotion, web site development and management, medical education, meeting planning, and other related marketing services associated with the pharmaceutical industry.

9.    With more than 20 years' experience in, and an extensive history of, launching products for the world's largest pharmaceutical clients, up-and-coming biotechnology companies, and leading device manufacturers, CC Ford has spent countless dollars and hours to provide scientific and strategic support through all stages of a product's life cycle, from early-stage clinical trial results and market development, through launch and expanding indications, as well as final-stage evergreening opportunities. In this capacity, the Company has supported industry-leading product launches through a systematic process that provides a complete strategic solution with flawless implementation and has worked with leading companies to change the treatment paradigm in many significant markets including oncology, hematology, cardiovascular disease, diabetes, pain, neurology, infectious diseases, and many rare conditions.

10.    Johnson worked for CC Ford Group directly until about ten (10) years ago, at which point she was assigned to the Company.

11.    CC Ford Marketing Group, LLC is the former name by which CC Ford Group conducted business. Plaintiff ceased utilizing "Marketing" in its entity name in 2004.

12.    Bicking worked for the Company as its Senior Director of Client Services, reporting to Johnson.

13.    Weiler worked for the Company as its Project Manager, reporting to Bicking.

14.     Meredith Manning (**"Manning"**) is the President of PharmaEssentia USA Corporation (**"PEC"**), a United States based wholly owned subsidiary of PharmaEssentia Corporation, a Taiwanese company.  PEC is a former client of the Company serviced by Johnson, Bicking and Weiler.

## JENNIFER JOHNSON

15.     On or about August 31, 2003, Johnson signed an Employee Non-Competition, Non-Solicitation, Confidentiality and Dispute Resolution Agreement ("**Johnson's Non-Compete Agreement**") with CC Ford Group which has since been assigned to the Company.  A copy of Johnson's Non-Compete Agreement and the Assignment are annexed hereto and incorporated herein by reference as Exhibits **A** and **B,** respectively.

16.     Pursuant to Johnson's Non-Compete Agreement, Johnson agreed, among other things, not to compete or own, directly or indirectly, any "competitive business" (as defined in Johnson's Non-Compete Agreement) with CC Ford Group during Johnson's employment and for a period of one (1) year subsequent to her employment's termination.

17.     Specifically, Johnson's Non-Compete Agreement provides:

> *a. Restrictions on Competition.* During Employee's employment with the Company and for a period of one (1) year after termination of Employee's employment with the Company, Employee will not, directly or indirectly, own any equity interest or option or right to acquire an equity interest in any Competitive Business as defined in subsection (e) below (other than in Employee's capacity as a holder of not more than five percent (5%) of the combined voting power of the outstanding stock of a publicly-held company).

18.     Pursuant to Johnson's Non-Compete Agreement, Johnson agreed, among other things, not to, directly or indirectly, solicit, interfere with, hire, offer to hire or induce any employee of CC Ford Group to discontinue his or her employment with it during Johnson's

employment and for a period of one (1) year subsequent to her employment's termination. Specifically, Johnsons' Non-Compete Agreement provides:

> *b. Restrictions on Enticement.* During Employee's employment with the Company and for a period of one (1) year after termination of Employee's employment with the Company, Employee will not, directly or indirectly, solicit, interfere with, hire, offer to hire any employee of the Company, or induce any employee of the Company to discontinue his or her employment with the Company in order to become employed by or associated with any business with which Employee is employed or associated with in any capacity.

19.     Pursuant to Johnson's Non-Compete Agreement, Johnson agreed for a period of two years not to, solicit for any "competitive business" (defined therein), directly or indirectly, any account, client or customer with whom CC Ford Group had conducted business or for whom it had performed services during the one-year period prior to Johnson's termination.

20.     Specifically, Johnson's Non-Compete Agreement provides:

> *c. Restrictions on Customer Contact.* During Employee's employment with the Company and for a period of two (2) year after termination of Employee's employment with the Company, Employee will not solicit for any Competitive Business, directly or indirectly, any Account, client or customer with whom the Company has conducted any business or for whom the Company has performed any services during the one (1) year prior to the termination of Employee's employment with the Company, or any potential account, client or customer with whom the Company has had substantial contact during the one (1) year period prior to the termination of Employee's employment with the Company. For the purposes of this Section 1(c), the Company will be deemed to have had 'substantial contact' with a potential account, client or customer if it has identified a business opportunity and a contact person within the potential account, client or customer and has communicated with the potential account, client or customer concerning the identified business opportunity.

21.     Pursuant to Johnson's Non-Compete Agreement, Johnson agreed not disparage CC Ford Group in a manner resulting in harm to or loss of the CC Ford Group's business subsequent to her employment's termination.

22.     Specifically, Johnson's Non-Compete Agreement provides:

> d. *Non-Disparagement.* During Employee's employment with the Company, and at all times after termination of Employee's employment with the Company, Employee will not disparage the Company, and the Company's officers, directors, employees, shareholders, and agents, in any manner likely to be harmful to them or their business, business reputation, or personal reputation; provided that Employee shall respond accurately and fully to any question, inquiry or request for information when required by legal process.

23.     During the course of Johnson's employment with CC Ford Group and subsequently with the Company, Johnson had access to the Company's customer information and goodwill, existing business, equipment, confidential and proprietary information, and trade secrets, to use solely for the benefit of the Company.

24.     By virtue of her senior position at the Company, Johnson had the ability to access files containing virtually all of the Company's most sensitive documents including its competitively sensitive and confidential information, critical employee and customer information and vendor/supplier contacts.

25.     On or about February 28, 2022, Johnson informed the Company of her intention to resign.

26.     After informing the Company, Johnson did not execute a separation agreement with the Company.

27.     Instead, Johnson proposed that she and the Company agree on a message to share with employees and clients regarding her departure prior to anyone sharing any information concerning Johnson leaving the Company.

28.     Contrary to her representations, prior to her departure Johnson began contacting the Company's clients and employees to discuss her departure from the Company.

29.     In so doing, Johnson effectively co-opted the Company's customer goodwill, business opportunities, equipment, confidential and proprietary information, trade secrets and other resources she was exposed to in confidence during her employment with the Company.

30.     Johnson's final day with the Company in her role as Managing Director was March 25, 2022.

31.     Prior to her departure, the Company requested that Johnson return all Company items, including her laptop, keys, and American Express credit card by noon on her last day as an employee.

32.     Johnson did not return the above items, as requested.

33.     Subsequent to her separation as an employee, Johnson had agreed to work on certain defined projects as an independent contractor with CC Ford Group and the Company contingent upon a written Consulting Agreement ("**Johnson's Consulting Agreement**") entered into on March 26, 2022 between Johnson and CC Ford Group and its affiliated companies including, but not limited to, the Company.  A copy of Johnson's Consulting Agreement is annexed hereto and incorporated herein by reference as Exhibit **C**.

34.     The term of Johnson's Consulting Agreement was on or about March 26, 2022, to on or about July 17, 2022.

35.    Johnson's Consulting Agreement provided, among other things, that Johnson would perform the role of Consultant: Content Development and Strategic Consulting.

36.    Pursuant to Johnson's Consulting Agreement, she "agree[d] to maintain confidentiality of this work in accordance with the Confidentiality Agreement, and [was] forbidden/will refrain from communicating information, in any manner, about the project(s), or any related information, with all outside parties other than Company employees without written consent from the Company's President.

37.    In addition to confidentiality, pursuant to Johnson's Consulting Agreement, she was expressly forbidden to utilize the names of CC Ford Group or its affiliates, or CC Ford Group's clients' names, or any reference to the program at hand for promotional purposes without written permission from the Company.

38.    While Johnson's Consulting Agreement acknowledges that Johnson "would pursue other business opportunities during the term of this Agreement," Johnson also expressly "agree[d], for the duration of the term of…[Johnson's Consulting Agreement], not to pursue any business opportunities that will create a conflict of interest with the Company, and to notify the Company immediately, in writing, of any actual or potential conflict of interest."

39.    Pursuant to Johnson's Consulting Agreement she further "agree[d], for the duration of the term of… [Johnson's Consulting Agreement], not to solicit any client, customer, or employee of the Company to engage in any business relationship with Contractor other than in furtherance of the objectives of [Johnson's Consulting Agreement]."

40.    Moreover, as a condition of Johnson's Consulting Agreement, Johnson was required to sign a Confidentiality Agreement ("**Johnson's March 2022 Confidentiality**

**Agreement**"). A copy of Johnson's March 2022 Confidentiality Agreement is annexed hereto and incorporated herein by reference as Exhibit **D**.

41.     Johnson entered into Johnson's March 2022 Confidentiality Agreement with CC Ford Group and all subsidiary and affiliated companies including, but not limited to, CC Ford Group and the Company.

42.     Johnson's March 2022 Confidentiality Agreement requires Johnson to "retain in confidence all Confidential Information disclosed to Consultant by or on behalf of CC Ford Group, whether or not in writing or recorded in electronic or other format" for a period of ten (10) years following its effective date.

43.     Johnson's March 2022 Confidentiality Agreement further provides that Johnson "will not, either directly or indirectly, use any Confidential Information for any purpose other than to discharge her duties under the Consulting Agreement without the prior written consent of CC Ford Group."

44.     Prior to Johnson entering into Johnson's Consulting Agreement, Johnson was paid salary for her work on behalf of the Company during the relevant period of her employment.

45.     Since 2015 Johnson received over $3.3 million dollars of compensation from the Company.

46.     For fiscal year 2021 alone, Johnson was compensated in the amount of $562,538.73.

47.     Johnson's 2021 compensation was comprised of a base salary of $150,000 plus a commission bonus based upon the Company's profits in the amount of $412,538.64

48.     Johnson never made any capital contributions to the Company.

49.     Johnson was also paid a fee in connection with the services performed pursuant to Johnson's Consulting Agreement.

50.     During the term of Johnson's Consulting Agreement, Johnson was paid $52,887.50 for services rendered over a period of less than four (4) months beginning on March 26, 2022 and ending on July 17, 2022.

51.     Despite the foregoing contractual provisions, Plaintiff discovered subsequent to Johnson's resignation from the Company and initiation of the consulting arrangement, that Johnson had been a faithless servant, diverted business opportunities from the Company to PVI, a Competing Business (as defined in, among other documents, Johnson's Non-Compete Agreement), breached fiduciary duties and her duty of undivided loyalty owed to the Company, and otherwise damaged the Company.

**BETH WEILER**

52.     Until May 25, 2022, Weiler maintained an Executive, senior position at the Company as  a Project Manager.

53.     On or about November 27, 2020, Weiler signed a Duty of Loyalty Agreement with CC Ford Group and all owned, subsidiary and affiliated companies including, but not limited, to CC Ford Group, the Company, Index Medical Communications, LLC, and Decile Ten, LLC ("**Weiler's Loyalty Agreement**").  A copy of Weiler's Loyalty Agreement is annexed hereto and incorporated herein by reference as Exhibit **E**.

54.     Weiler's Loyalty Agreement was effective as of December 2, 2020.

55.     Pursuant to Section 2 of Weiler's Loyalty Agreement, Weiler agreed to keep confidential all Confidential Information (defined therein) of the Company for a period of one (1) year subsequent to her employment's termination.

56.    Specifically, Section 2 of Weiler's Loyalty Agreement provides:

Section 2. Executive will keep confidential all Confidential Information and will not without the prior written consent of the Board of Directors of Company:

(i) "use for [her] benefit or disclose at any time during his employment by Company, or thereafter, except to the extent required by the performance by [her] of [her] duties as an employee of Company, any Confidential Information obtained or developed by [her] while in the employ of Company, or"

(ii) "take any Confidential Information with [her] upon leaving the employ of the Company."

57.    Pursuant to Section 3 of Weiler's Loyalty Agreement, Weiler agreed to not interfere with the Company's business relationships, directly or indirectly, for a period of one (1) year subsequent to her employment's termination.

58.    Specifically, Section 3 of Weiler's Loyalty Agreement provides:

3. Non-Interference with Business Relationships. During the Restricted Period, Executive will not directly or indirectly, either as principal, manager, agent, consultant, officer, director, stockholder, partner, investor, lender, member or employee or in any other capacity:

a)      make any statements or perform any acts intended to advance, reasonably likely to advance or having the effect of advancing, an interest of any Competitor in any way that will or may injure an interest of Company or any of its Affiliates in its relationship and dealings with its grantors, sponsors, customers, clients or suppliers;

b)      discuss with any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates the present or future availability of any services or products of any business that are competitive with services or products which Company or any of its Affiliates provides;

c)      make any statements or do any acts intended to cause, reasonably likely to cause or having the effect of causing, any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates to make use of the services or purchase the products of any business in which Executive has or expects to acquire any interest, is or expects to become an employee, officer or director, or has received or expects to receive any remuneration, if such services or products in any way compete with the services or products sold or provided by Company or any of its Affiliates to any grantor, sponsor, customer, client or supplier (and for purposes of the foregoing, Executive shall be deemed to expect to acquire an interest in a business or to be made an officer or director of such business if such possibility has been discussed with any officer, director, employee, agent, or promoter of such business); or

d)      engage in any business with, own any interest in, perform any services for, participate in or be connected with the business of a Competitor; provided, however, that the provisions of this Section 3(d) shall not be deemed to prohibit Executive's ownership of not more than one percent (1%) of the total outstanding equity of any publicly held company.

59.     Pursuant to Section 4 of Weiler's Loyalty Agreement, Weiler agreed to be prohibited from soliciting the Company's clients or for a period of one (1) year subsequent to her employment's termination.

60.     Specifically, Section 4 of Weiler's Loyalty Agreement provides:

4. <u>Non-Solicitation</u>. During the Restricted Period, Executive will not, directly or indirectly, either as principal, manager, agent, consultant, officer, director, stockholder, partner, investor, lender or employee or in any other capacity:

a)      "employ, solicit for employment, or advise or recommend to any other person that they employ or solicit for employment, any employee of Company or any of its Affiliates or retain or attempt to retain the services of any independent Employees who provide independent Employee services to Company or any Affiliate on an exclusive or substantially full-time basis; or"

b)      "solicit or encourage any employee of Company or any of its Affiliates to leave the employ of Company or such Affiliate, to do any act that is disloyal to Company or any of its Affiliates, is inconsistent with the interests of Company or any of its Affiliates or violates any provision of this Agreement or any agreement such

employee has with Company or any Affiliate, or to do any of the foregoing with respect to any such independent Employees for Company or any Affiliate."

61.     Pursuant to Section 5 of Weiler's Loyalty Agreement, Weiler agreed to be prohibited from disparaging the Company in a manner resulting in harm to or loss of the Company's business subsequent to her employment's termination.

62.     Specifically, Section 5 of Weiler's Loyalty Agreement provides:

> 5. <u>Non-Disparagement</u>. Executive agrees that he will not, directly or indirectly, individually or in convert with others, engage in any conduct or make any statement that is likely to have the effect of undermining or disparaging the reputation of Company or any Affiliate, or their good will, products or business opportunities, or that is likely to have the effect of undermining or disparaging the reputation of any officer, director, agent, representative or employee, past or present, of Company or any Affiliate.

63.     Pursuant to Section 1(d) of Weiler's Loyalty Agreement, Weiler agreed to be bound by the restrictive covenants, and all provisions, contained within Weiler's Loyalty Agreement, for a period of twelve (12) months after the termination of her employment.

64.     Weiler's employment with the Company terminated as of May 25, 2022. Thus, her obligations under Weiler's Loyalty Agreement extend until May 24, 2023.

65.     On or about November 27, 2020, Weiler signed a Confidentiality Agreement with CC Ford Group and all owned, subsidiary and affiliated companies including, but not limited to, CC Ford Group, the Company, Index Medical Communications, LLC, and Decile Ten, LLC ("**Weiler's Confidentiality Agreement**").   A copy of Weiler's Confidentiality Agreement is annexed hereto and incorporated herein by reference as Exhibit **F**.

66.     Weiler's Confidentiality Agreement was effective as of December 2, 2020.

67.     Pursuant to Weiler's Confidentiality Agreement, Weiler agreed to not "either directly or indirectly, use Information" (as defined therein) for a non-Company purpose.

68.     Pursuant to Section 1 of Weiler's Confidentiality Agreement, Weiler agreed to be bound by these restrictive covenants, and all provisions, contained within Weiler's Confidentiality Agreement, for a period of ten (10) years after the agreement's Effective Date.

69.     The Effective Date of Weiler's Confidentiality Agreement was December 2, 2020. Thus, her obligations under Weiler's Confidentiality Agreement extend until December 1, 2030.

70.     During the course of Weiler's employment with the Company, by virtue of her employment as an executive (specifically, Project Manager), Weiler had access to the Company's customer information and goodwill, existing business, equipment, confidential and proprietary information, and trade secrets, to use solely for the benefit of the Company.

71.     By virtue of her executive position at the Company, Weiler had the ability to access files containing virtually all of the Company's most sensitive documents containing its competitively sensitive and confidential information, including critical employee and client information.

72.     On or about May 18, 2022, Weiler informed the Company of her intention to resign.

73.     Weiler's final day with the Company in her role as the Company's Project Manager was May 25, 2022.

74.     Prior to her departure, as a faithless servant and in breach of, among other things, her duty of undivided loyalty, Weiler continued to work with the Company's clients and diverted business from the Company including working on projects for which she knew the Company had not been paid.

75.     In so doing, Weiler effectively co-opted the Company's client goodwill, business opportunities, equipment, confidential and proprietary information, trade secrets, and other resources she encountered during her employment with the Company, while still employed at the Company.

76.     Despite the foregoing contractual provisions, Plaintiff has discovered that, during the course of her employment, Weiler had been a faithless servant, diverted business opportunities from the Company to PVI, a Competitive Business, breached her duty of undivided loyalty owed to the Company, and otherwise damaged the Company.

## CARRIE BICKING

77.     Until May 20, 2022, Bicking maintained an executive, senior position at the Company, specifically as Senior Director of Client Services.

78.     On or about February 19, 2019, Bicking signed a Duty of Loyalty Agreement with CC Ford Group and all owned, subsidiary and affiliated companies including, but not limited to, CC Ford Group, the Company, CC Ford Group North, LLC, and Decile Ten, LLC) ("**Bicking's Loyalty Agreement**").  A copy of Bicking's Loyalty Agreement is annexed hereto and incorporated herein by reference as Exhibit **G**.

79.     Bicking's Loyalty Agreement was effective as of February 19, 2019.

80.     Pursuant to Section 2 of Bicking's Loyalty Agreement, Bicking agreed to keep confidential all Confidential Information of the Company (as defined therein) for a period of one (1) year subsequent to her employment's termination.

81.     Specifically, Section 2 of Bicking's Loyalty Agreement provides:

Section 2. Executive will keep confidential all Confidential Information and will not without the prior written consent of the Board of Directors of Company:

(i)     "use for his benefit or disclose at any time during his employment by Company, or thereafter, except to the extent required by the performance by him of his duties as an employee of Company, any Confidential Information obtained or developed by him while in the employ of Company, or"

(ii)     "take any Confidential Information with him upon leaving the employ of the Company."

82.    Pursuant to Section 3 of Bicking's Loyalty Agreement, Bicking agreed to not interfere with the Company's business relationships, directly or indirectly, for a period of one (1) year subsequent to her employment's termination.

83.    Specifically, Section 3 of Bicking's Loyalty Agreement provides:

3. Non-Interference with Business Relationships. During the Restricted Period, Executive will not directly or indirectly, either as principal, manager, agent, consultant, officer, director, stockholder, partner, investor, lender, member or employee or in any other capacity:

a)     make any statements or perform any acts intended to advance, reasonably likely to advance or having the effect of advancing, an interest of any Competitor in any way that will or may injure an interest of Company or any of its Affiliates in its relationship and dealings with its grantors, sponsors, customers, clients or suppliers;

b)     discuss with any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates the present or future availability of any services or products of any business that are competitive with services or products which Company or any of its Affiliates provides;

c)     make any statements or do any acts intended to cause, reasonably likely to cause or having the effect of causing, any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates to make use of the services or purchase the products of any business in which Executive has or expects to acquire any interest, is or expects to become an employee, officer

or director, or has received or expects to receive any remuneration, if such services or products in any way compete with the services or products sold or provided by Company or any of its Affiliates to any grantor, sponsor, customer, client or supplier (and for purposes of the foregoing, Executive shall be deemed to expect to acquire an interest in a business or to be made an officer or director of such business if such possibility has been discussed with any officer, director, employee, agent, or promoter of such business); or

d) engage in any business with, own any interest in, perform any services for, participate in or be connected with the business of a Competitor; provided, however, that the provisions of this Section 3(d) shall not be deemed to prohibit Executive's ownership of not more than one percent (1%) of the total outstanding equity of any publicly held company.

84.    Pursuant to Section 4 of Bicking's Loyalty Agreement, Bicking agreed to be prohibited from soliciting the Company's clients or for a period of one (1) year subsequent to her employment's termination.

85.    Specifically, Section 4 of Bicking's Loyalty Agreement provides:

4. <u>Non-Solicitation</u>. During the Restricted Period, Executive will not, directly or indirectly, either as principal, manager, agent, consultant, officer, director, stockholder, partner, investor, lender or employee or in any other capacity:

a)    "employ, solicit for employment, or advise or recommend to any other person that they employ or solicit for employment, any employee of Company or any of its Affiliates or retain or attempt to retain the services of any independent Employees who provide independent Employee services to Company or any Affiliate on an exclusive or substantially full-time basis; or"

b)    "solicit or encourage any employee of Company or any of its Affiliates to leave the employ of Company or such Affiliate, to do any act that is disloyal to Company or any of its Affiliates, is inconsistent with the interests of Company or any of its Affiliates or violates any provision of this Agreement or any agreement such employee has with Company or any Affiliate, or to do any of the foregoing with respect to any such independent Employees for Company or any Affiliate."

86.     Pursuant to Section 5 of Bicking's Loyalty Agreement, Bicking agreed to be prohibited from disparaging the Company in a manner resulting in harm to or loss of the Company's business subsequent to her employment's termination.

87.     Specifically, Section 5 of Bicking's Loyalty Agreement provides:

> 5. <u>Non-Disparagement</u>. Executive agrees that he will not, directly or indirectly, individually or in convert with others, engage in any conduct or make any statement that is likely to have the effect of undermining or disparaging the reputation of Company or any Affiliate, or their good will, products or business opportunities, or that is likely to have the effect of undermining or disparaging the reputation of any officer, director, agent, representative or employee, past or present, of Company or any Affiliate

88.     Pursuant to Section 1(d) of Bicking's Loyalty Agreement, Bicking agreed to be bound by the restrictive covenants, and all provisions, contained within Bicking's Loyalty Agreement, for a period of twelve (12) months after the termination of her employment.

89.     Bicking's employment with the Company terminated as of May 20, 2022. Thus, her obligations under Bicking's Loyalty Agreement extend until May 20, 2023.

90.     On or about February 19, 2019, Bicking signed a Confidentiality Agreement with CC Ford Group and all owned, subsidiary and affiliated companies including, but not limited to, CC Ford Group, the Company, CC Ford Group North, LLC, and Decile Ten, LLC ("**Bicking's Confidentiality Agreement**").   A copy of Bicking's Confidentiality Agreement is annexed hereto and incorporated herein by reference as Exhibit **H.**

91.     Bicking's Confidentiality Agreement was effective as of February 19, 2019.

92.     Pursuant to Bicking's Confidentiality Agreement, Bicking agreed to not "either directly or indirectly, use Information" for a non-Company purpose.

93.    Pursuant to Section 1 of Bicking's Confidentiality Agreement, Bicking agreed to be bound by the restrictive covenants, and all provisions, contained within Bicking's Confidentiality Agreement, for a period of ten (10) years after the agreement's effective date.

94.    The effective date of Bicking's Confidentiality Agreement was February 19, 2019. Thus, her obligations under Bicking's Confidentiality Agreement extend until February 18, 2029.

95.    During the course of Bicking's employment with the Company, by virtue of her employment as an executive (specifically, Senior Director of Client Services), Bicking had access to the Company's client information and goodwill, existing business, equipment, confidential and proprietary information, and trade secrets, to use solely for the benefit of the Company.

96.    By virtue of her executive position at the Company, Bicking had the ability to access files containing virtually all of the Company's most sensitive documents containing its competitively sensitive and confidential information, including critical employee and client information.

97.    While employed by the Company, as a faithless servant and in breach of her duty of undivided loyalty, Bicking diverted business from the Company.

98.    While employed by the Company, Bicking directly worked on business, including for PEC, for which the Company had not been paid, and directed Weiler to work on projects for which she knew the Company had not been paid.

99.    On or about May 13, 2022, Bicking informed the Company of her intention to resign.

100.  Bicking's final day with the Company in her role as Senior Director of Client Services was May 20, 2022.

101.  Prior to her departure Bicking contacted the Company's clients, employees and vendors, to discuss her departure from the Company.

102.  During this time, Bicking continued to work with the Company's clients and diverted business from the Company.

103.  Also during this time period, Bicking directly worked on business, including for PEC, for which the Company had not been paid, and directed Weiler to work on projects for which she knew the Company had not been paid.

104.  In so doing, Bicking effectively co-opted the Company's customer goodwill, business opportunities, equipment, confidential and proprietary information, trade secrets, and other resources she encountered during her employment with the Company, while still employed at the Company. Despite the foregoing contractual provisions, Plaintiff has discovered, subsequent to Bicking's resignation from the Company, that Bicking had been a faithless servant, diverted business opportunities from the Company, breached her duty of undivided loyalty to the Company, and otherwise damaged the Company.

## ALL DEFENDANTS

105.  Johnson submitted her resignation from the Company on February 28, 2022.

106.  On or about the same date, Johnson registered PVI.

107.  PVI was incorporated with an address matching Johnson's home address, 78 Allview Avenue in Brewster, New York.

108.  The Company learned of the existence of PVI when it received an email that had been sent to Johnson's old CC Ford email address (jjohnson@ccfordgroup.com) by Meredith Burns of Sky Events Management, regarding "Project Velocity Inc. Executive Meeting/Canopy

by Hilton Portland Waterfront" on May 16, 2022. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **I**.

109.  Meredith Burns is the Owner of Sky Events Management, which is a long-time vendor of the Company used to find hotels, meeting spaces and support meeting management.

110.  The Company is aware of at least three Company clients with respect to which, while engaged in the consulting arrangement, Johnson used confidential and proprietary information relating to work for which clients sought to engage the Company to solicit those clients and induce them to terminate their relationships with the Company, in violation of, among other things, Johnson's Consulting Agreement, Johnson's March 2022 Confidentiality Agreement, and Johnson's Non-Compete Agreement.

111.  On March 25, 2022, Johnson emailed Pamela Stephenson ("**Stephenson**"), Chief Commercial Officer of Albireo Pharma, a pharmaceutical biotech company (NASDAQ: Albo) ("**Albireo**"), to inform Albireo of her departure from the Company. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **J**.

112.  Less than a week later, on March 30, 2022, Stephenson responded to Johnson's email indicating that the two active projects being handled by the Company, the President's Club Trip and Strategy Support project, would be ended and Albireo would instead reach out if future needs arose. Stephenson's email ends with a statement that "We appreciate you[r] continued support on the President's Club . . ." A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **K**.

113.  However, on June 2, 2022, Stephenson sent an email to Johnson's Company PVI email address regarding ongoing work being performed for the Albireo June Board meeting. Included in this email chain are other messages showing that Johnson continued to work on the

Albireo June Board meeting, a project which had formerly been the Company's, under the banner of her new company PVI, while actively consulting for the Company, having diverted the business to herself in violation of, among other things, Johnson's Consulting Agreement. A copy of this email is annexed hereto and incorporated herein by reference as Exhibit **L**.

114.  PEC is a client of the Company which, subsequent to Johnson's termination as an employee, reneged on an anticipated business relationship with the Company.

115.  For example, project Statements of Work ("SOWs") that were verbally committed to the Company were never signed by PEC and subsequently rescinded by Manning.

116.  On March 23, 2022, Johnson sent an email to Manning and others at PEC regarding her impending departure wherein Johnson stated "it is my wish that CC Ford will continue to be your execution partner." A copy of this email is annexed hereto and incorporated herein by reference as Exhibit **M**.

117.  On the same date Manning sent a reply email to set up a call to discuss SOWs and who at the Company would lead PEC projects. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **N**.  In the same March 23, 2022 email, Manning directs the Company to communicate only to her, and no one else at PEC who was copied on the email from Johnson.

118.  Despite this, on March 28, 2022 Manning held a Zoom meeting with the Company's President John Studdiford ("**Studdiford**") and Bicking, during which Manning halted a Company project with PEC, and indicated that other projects would need to be sorted out to decide if PEC would go forward to execute SOWs as it had previously agreed to.

119.  Bicking was in charge of this account.

120.  Weiler worked on this account.

121.   Despite Manning's statements during the March 28, 2022 Zoom meeting, subsequently both Bicking and Weiler continued to work on PEC projects that had been previously committed to the Company awaiting signed SOWs, with seemingly no regard for this directive from Manning. Numerous emails were exchanged between Bicking and Weiler after March 28, 2022 regarding various PEC projects.

122.   On April 7, 2022, Bicking sent Studdiford an email indicating that "Yes things are moving forward with PEC" and that "Things are going well [with PEC] and I am still working on some new opportunities to stay connected with the team." Bicking mentioned specifically various PEC projects for which she indicated the Company "ha[d] secured" SOWs. Those SOWs related to Field Training Project Management until December 2022, POA 2 Project Management-Operating in September 2022 and 2023 President's Club-Operations in May 2023.  A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **O**.

123.   However, the SOWs mentioned in Bicking's April 7, 2022 email were, in fact, never signed by PEC.

124.   On April 25, 2022, after having heard no further update regarding the SOWs Bicking indicated had been signed, Studdiford sent Manning an email regarding the status of the yet-unsigned SOWs. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **P**.

125.   In response, Manning instead initiated a Zoom call, held on April 29, 2022, during which Manning confirmed that the SOWs mentioned by Bicking had not, in fact, ever been signed, and further that no SOWs would be signed for PEC work. Manning further

instructed the Company to finalize billing for all open PEC projects, essentially firing the Company from handling any PEC work.

126.   Just four days prior, on April 25, 2022, Bicking had sent an email to Connor Shoop, an account manager at Whova, Inc., and requested that he change the email address associated to her Whova account from her Company email address (cbicking@ccfordgroup.com) to a PEC email address (carrie_bicking@pharmaessentia.com). A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **Q**.

127.   Whova is an event software that would be used at meetings Bicking would run.

128.   This request, which would allow Bicking to prepare for future meetings under a PEC email address instead of a Company email address, was made shortly before Manning, PEC's President, the Americas, officially informed the Company that their relationship was over on April 29, 2022.

129.   In the April 25, 2022 email, Bicking indicated that there were "two more" PEC events in August and September.

130.   Bicking did eventually engage Whova for these August and September events.

131.   On August 1, 2022, more than two months after she resigned from the Company, Bicking was sent an email from Whova at her old Company e-mail address demonstrating that individuals had signed up on Whova to attend the PEC POA 3 Manager's Prep Meeting taking place at the Godfrey Hotel in Chicago from August 29, 2022 to September 1, 2022. A copy of this email is annexed hereto and incorporated herein by reference as Exhibit **R**.

132.   On July 31, 2022, Bicking was sent an email from Whova to her old email address demonstrating that individuals had signed up on Whova to attend the PEC POA

Meeting taking place at the Revere hotel in Boston from September 12, 2022 to September 15, 2022. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **S**.

133. On May 2, 2022, Studdiford informed Bicking that PEC had ended its relationship with the Company.

134. On the same day, Bicking informed the Company's accounting department to close all open PEC projects and finalize any billing, as there would be no new work.

135. Nonetheless, Bicking and Weiler continued to work on PEC projects using both their Company email addresses as well as their PEC email addresses.

136. The very next day, May 3, 2022, after Bicking informed the Company to close all open PEC projects, Weiler sent Kristin Page of PEC an email from Bicking's PEC email address which stated that "(This is Beth, Carrie asked me to email you from her PEC account.)" The email goes on to discuss working on a PEC project, POA 2, workshop deck. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **T**.

137. There was no signed SOW for the POA 2 project.

138. Nonetheless, Weiler still opened up a workflow via Veeva for the project on May 5, 2022.

139. On May 12, 2022, Weiler sent Rob Kavanaugh of PEC an email regarding her working on an ongoing PEC project. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **U**.

140. On May 16, 2022, Bicking emailed Weiler asking if "everything [was] all set" for workshops related to a PEC project POA 2 Workshops. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **V**.

141.  On May 18, 2022, Rob Kavanaugh of PEC added Weiler to an email chain discussing a PEC project, MLR. Weiler indicated via a responsive email on the same date that she would start work on the project. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **W**.

142.  Weiler informed Kristin Page that she created slides for PEC POA 2 project on May 23, 2022. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **X**.

143.  On April 6, 2022, Weiler emailed PEC, on behalf of Bicking, regarding the Company's budget as well as booth expenses for an ASH (American Society of Hematology Congress) 2022 project. This project entails running a number of events at the national association meeting that will be held in December 2022 in New Orleans, Louisiana. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **Y**.

144.  On April 11, 2022, Bicking sent an email to PEC following up on the ASH project. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **Z**.

145.  The ASH project was awaiting a signed SOW from PEC before the project was pulled from the Company by Manning on April 29, 2022.

146.  Despite the project being pulled from the Company by Manning, Bicking on May 12, 2022 -- the day before she informed the Company of her intention to resign -- forwarded to her PEC email, from her Company email, an invoice for PEC work connected with the 64th ASH Annual Meeting & Exposition, for booth rental costs set for a December 10-12 and December 10-13, 2022 convention in New Orleans, LA. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **AA**.

147. And, on June 20, 2022, Bicking received an email to her Company email address regarding continued work on the ASH 2022 annual meeting. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **BB**.

148. As far back as March 23, 2022, Bicking had been emailing PEC employees, including Manning, about a PEC President's Club meeting scheduled for May 4-7, 2023. A copy of such an email is annexed hereto and incorporated herein by reference as Exhibit **CC**.

149. Despite the knowledge that PEC was no longer a Company client, Bicking continued to work on the President's Club meeting. On May 16, 2022, Bicking sent an email to Meredith Burns of Sky Events Management regarding a deposit for accommodations at the Ritz-Carlton. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **DD**.

150. On May 11, 2022, despite Manning firing the Company from working on the President's Club meeting, Manning signed a contract with the Ritz-Carlton related to the accommodations set up by Bicking, with Bicking having an email address at PEC as the contact (although she still worked for the Company), for the PEC President's Club meeting in May 2023. The attached invoice, however, had Bicking's Company email address. A copy of that agreement and invoice are annexed hereto and incorporated herein by reference as one Exhibit **EE**.

151. On May 19, 2022, Johnson signed a credit card authorization bearing Bicking's name and Company email address for the Ritz-Carlton related to the President's Club meeting accommodations. A copy of that authorization is annexed hereto and incorporated herein by reference as Exhibit **FF**.

152. On April 7, 2022, Bicking sent Meredith Burns of Sky Events Management an email regarding a "new" PEC project, POA 3 Manager's Prep Meeting. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **GG**.

153. Between April 7, 2022 and April 12, 2022, Bicking and Weiler exchanged various emails with Meredith Burns regarding the POA 3 Meeting project. A copy of these emails are annexed hereto and incorporated herein by reference as Exhibit **HH**.

154. Bicking had been working on booking a hotel for PEC POA 3, using her Company's email address, as early as April 8, 2022. A copy of said document is annexed hereto and incorporated herein by reference as Exhibit **II**. This included reiterating on May 4, 2022 (after being informed that PEC was no longer a client of the Company) that a contract for hotel space at the Revere in Boston should indeed be forwarded to her. See Exhibit **JJ,** a copy of which is annexed hereto.

155. On May 11, 2022, Meredith Burns sent Bicking an email regarding the Revere contract to be executed on the Company's behalf. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **KK**.

156. The Revere contract originally included Bicking's name and her Company contact information. A copy of said contract is annexed hereto and incorporated herein by reference as Exhibit **LL**.

157. But, on May 20, 2022, the eve of Bicking's departure from the Company, the contract for POA 3 hotel space at the Revere was flipped to and executed instead by Bicking on behalf of PVI, Johnson's new company. A copy of said contract is annexed hereto and incorporated herein by reference as Exhibit **MM**.

158.   Bicking's last day with the Company was May 20, 2022, the same day she executed the contract with the Revere for PEC POA 3 hotel space in her capacity as the Senior Project Director of PVI.

159.   Despite executing contracts for Johnson's new competing company on May 20th, Bicking also was compensated for a day's work at the Company.

160.   On April 14, 2022, Weiler sent an email to LaToia Allen of PEC regarding the Regional Midyear Meetings, including travel for Manning, despite there being no SOW signed for this project. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **NN**.

161.   Bicking had James Nero, a PEC employee, sign a contract on the Company's behalf, against Company policy, on April 13, 2022, with Westin Hotels & Resorts ("**Westin**"), New York Grand Central, for a PEC meeting to be held from June 16, 2022 to June 17, 2022. A copy of those e-mails are attached here to as Exhibit **OO**.

162.   Westin had been booked and cancelled, and then Bicking re-booked the rooms for PEC by way of emails exchanged with employees of Westin between April 5, 2022 and April 14, 2022. On April 14, 2022 an employee of Westin sent back the contract, signed by James Nero of PEC, to Bicking. A copy of said agreement is annexed hereto and incorporated herein by reference as Exhibit **PP**.

163.   Prior to the meeting at Westin occurring, Plaintiff became aware of a Banquet Event Order which listed the "Organization" running the event to be the Company, and the "Customer" to be Bicking. A copy of same is annexed hereto and incorporated herein by reference as Exhibit **QQ**.

164.   The Company was not paid for this meeting at Westin.

165.  On April 19, 2022, Bicking emailed Cole Davis of PEC requesting a list of PEC employees who would be attending June regional meetings. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **RR**.

166.  Between May 5, 2022 and May 17, 2022, Bicking and Weiler exchanged emails with James Nero of PEC regarding hotel rooms and restaurants relating to this June 2022 meeting in New York. A copy of same is annexed hereto and incorporated herein by reference as Exhibit **SS**.

167.  On April 15, 2022, Bicking sent an email to Kristin Page, a PEC employee, copying Weiler, regarding a Field Training Overview Presentation for PEC to outline the Monthly Beat, Regional POA 2, and National POA 3 meetings. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **TT**.

168.  Between May 5, 2022 and May 17, 2022 -- after Studdiford informed Bicking that PEC would no longer do business with the Company -- Bicking exchanged emails with Kevin Ma of PEC, copying Weiler, regarding a May 17 monthly training call. A copy of those emails are annexed hereto and incorporated herein by reference as one Exhibit **UU**.

169.  The May 17, 2022 call with Bicking and PEC employees did occur. A copy is annexed hereto and incorporated herein by reference as Exhibit **VV**.

170.  On April 14, 2022, Bicking sent an email to Johnson at her PEC email address, even though she still worked for the Company, stating: "FYI. I emailed Joe [of PEC] to delete your CCF [CC Ford] email." A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **WW**.

171.  On June 28, 2022, Bicking sent an email to Johnson at her PVI email address about using one of the Company's vendors, an outside medical writer, to complete work on a

PEC project due in July. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **XX**.

172. Johnson also continued to do work with PEC, including having a discussion with Kristin Page on April 12, 2022. A copy of same is annexed hereto and incorporated herein by reference as Exhibit **YY**.

173. Plaintiff became aware of an April 7, 2022 email from Johnson sent from a PEC email address.

174. The April 7, 2022 email was sent during the time period in which Johnson was actively consulting for the Company and subject to, among other things, Johnson's March 2022 Confidentiality Agreement and Johnson's Consulting Agreement.

175. On April 14, 2022 Johnson received an email from Joe Loiars of PEC regarding booking restaurants for the ASH 2022 project. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **ZZ**.

176. Between May 24, 2022 and May 26, 2022 Johnson exchanged emails with PEC employees, on some of which Bicking was copied, regarding a Payer Approval Process presentation. A copy of said emails are annexed hereto as one Exhibit **AAA**.

177. Manning and Johnson are friends.

178. On December 29, 2021, Johnson sent Manning an email with the subject line "Review" containing draft language of an email to be sent to Studdiford requesting to purchase an interest in the Company. A copy of that email is annexed hereto and incorporated herein by reference as Exhibit **BBB**.

179.  Johnson, therefore, knew she had no ownership interest in the Company despite the position she has taken in this litigation; she was an employee who was compensated in part based upon Company profits.  Her email confirms the partnership "never materialized."

180.  There was never any agreement whereby Studdiford, or anyone else, ever agreed to make Johnson a member of the Company, and she never agreed to share in any Company losses.  In fact, she acknowledged in her December 29th email that only Studdiford took any risk when starting the Company.

181.  In or around the same timeframe as she sought guidance from Manning, unbeknownst to the Company, Johnson used the Company's American Express card to expense a hotel room in which Manning stayed in December 2021. A copy of that document is annexed hereto and incorporated herein by reference as Exhibit **CCC**.

182.  Manning and Bicking are also friends, with a historic working relationship when Bicking worked for Manning at Shire, a specialty biopharmaceutical company, as her executive assistant.

183.  Johnson also misrepresented herself to the Company's travel agent by having an assistant attempt to create an unapproved stop in Vienna during a consulting trip on behalf of the Company that was authorized to take place only in Dubai.

184.  Bicking and Johnson have continued to misrepresent themselves as Company employees on their LinkedIn pages to, upon information and belief, use that now non-existent relationship to Defendants' economic gain at the expense of the Company. A copy of that document is annexed hereto and incorporated herein by reference as Exhibit **DDD**.

185.  In so doing, as aforesaid, Bicking and Johnson intentionally are and/or have been co-opting the Company's goodwill by holding themselves out to be Company employees

and are able to continue to lure away existing customers with future business and divert prospective customers from the Company, contrary to the obligations set forth in their respective agreements.

186. The amount of lost PEC work improperly diverted away from the Company alone totals in the hundreds of thousands of dollars, if not more.

187. Just last week, Defendants were involved in the PEC POA meeting in Boston and are working on the ASH Annual Meeting and Expo in New Orleans in December.

188. Upon information and belief, Defendants are working on other projects with PEC and likely other clients or former clients of the Company.  Accordingly, a temporary restraining order is necessary and the Company does not have an adequate remedy at law.

**FIRST COUNT**
**BREACHES OF CONTRACT**
**(Johnson, Weiler and Bicking)**

189. Plaintiff repeats and realleges all of the statements made in each of the preceding paragraphs of the Verified First Amended Complaint as if same were fully set forth at length herein.

190. Johnson's Non-Compete Agreement, Johnson's Consulting Agreement, and Johnson's March 2022 Confidentiality Agreement constitute valid and enforceable contracts between Plaintiff and Johnson.

191. Johnson intentionally breached the aforementioned agreements as set forth above and herein and, in breach of the Consulting Agreement, failed to inform the Company that she was engaging in work during the Consulting period that was a conflict of interest with the work she was performing for the Company.

192.   Weiler's Loyalty Agreement and Weiler's Confidentiality Agreement constitute valid and enforceable contracts between Plaintiff and Weiler.

193.   Weiler intentionally breached the aforementioned agreements as set forth above and herein.

194.  Bicking's Loyalty Agreement and Bicking's Confidentiality Agreement constitute valid and enforceable contracts between Plaintiff and Bicking.

195.  Bicking intentionally breached the aforementioned agreements as set forth above and herein.

196. Johnson, Weiler, and Bicking threaten to inflict further real, imminent and irreparable harm to the Company in breaching the aforementioned agreements such that prompt action is necessary to protect the Company's rights.

197.  Johnson, Weiler, and Bicking are stealing the Company's customers, interfering with the Company's relationships with vendors and suppliers, and exploiting the Company's substantial investments in customer cultivation, market testing and promotion.

198.  As a direct and proximate result of Johnson, Weiler, and Bicking's breaches, as aforesaid, they have caused Plaintiff, and will cause Plaintiff irreparable loss of good will, profits, revenue and business opportunities, including the loss of customers and related business, unless they immediately are enjoined and restrained, and said Defendants also have caused Plaintiff other substantial damage.

**WHEREFORE**, Plaintiff demands judgment on this First Count of the Verified Amended Complaint against Johnson, Weiler, and Bicking, jointly, severally and/or in the alternative, as follows:

      (a)     Temporarily, preliminarily and permanently enjoining and restraining Johnson from, directly or indirectly, breaching or otherwise violating Johnson's Non-Compete Agreement, Johnson's Consulting Agreement, and Johnson's March 2022 Confidentiality Agreement;

      (b)     Temporarily, preliminarily and permanently enjoining and restraining Weiler from, directly or indirectly, breaching or otherwise violating Weiler's Loyalty Agreement and Weiler's Confidentiality Agreement;

      (c)     Temporarily, preliminarily and permanently enjoining and restraining Bicking from, directly or indirectly, breaching or otherwise violating Bicking's Loyalty Agreement and Bicking's Confidentiality Agreement;

      (d)     Temporarily, preliminarily and permanently enjoining and restraining Defendants from, directly or indirectly, performing any services for Albireo, PEC and any other Company clients who conducted business with the Company during the one-year period prior to the Individual Defendants' termination from the Company or with whom the Company had substantial contact during said period;

      (e)     Temporarily, preliminarily and permanently enjoining and restraining Defendants, directly or indirectly, from soliciting for hire any Company employees;

      (f)     Requiring Defendants not to share, and to return and/or destroy, any Confidential Information of the Company and/or of any of the Company's clients and not to retain any copies or excerpts thereof;

      (g)     Compensatory and consequential damages;

      (h)     Punitive damages;

(i)    Disgorgement compelling Johnson, Weiler, and Bicking to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's, Weiler's, and Bicking's disloyalty;

(j)    Reasonable Attorneys' fees;

(k)    Interest;

(l)    Costs of suit; and

(m)    Such other legal and equitable relief as the Court may deem just and proper.

**SECOND COUNT**
**BREACHES OF FIDUCIARY DUTY**
**(Johnson)**

199.  Plaintiff repeats and realleges all of the statements made in each of the preceding paragraphs of the Verified First Amended Complaint as if same were set forth at length herein.

200.  Johnson, as the Company's Managing Director, owed certain fiduciary duties to the Company.

201.  As a fiduciary, Johnson owed Plaintiff the utmost duties of loyalty, honesty and care.

202.  Johnson violated the duties owed to Plaintiff by engaging in the wrongful conduct described herein.

203.  Johnson breached her fiduciary duties to Plaintiff by, inter alia, soliciting Plaintiff's customers and diverting their business from the Company on specific jobs for which those customers sought originally to engage the Company, while Johnson was still employed by and/or consulting for the Company.

204. Johnson also breached those fiduciary duties by, inter alia, using the Company's confidential and proprietary information, obtained in the course and scope of Johnson's employment and/or consulting arrangement with Plaintiff, to solicit the Company's customers to work with Johnson. As a direct and proximate cause of Johnson's breaches of her fiduciary duties, Plaintiff has suffered, and continues to suffer, irreparable harm and significant economic loss.

205. Furthermore, Johnson's breaches of her fiduciary duties were willful, wanton, and malicious.

206. Moreover, pursuant to the New Jersey Supreme Court's decision in *Kaye v. Rosefielde,* 223 N.J. 218 (2015), Plaintiff is entitled to the remedy of equitable disgorgement directing that all sums paid to Johnson, Weiler, and Bicking during the period they violated their duty of loyalty be repaid.

**WHEREFORE**, Plaintiff demands judgment against Johnson on this Second Count of the Verified Amended Complaint, as follows:

(a)    Temporarily, preliminarily and permanently enjoining and restraining Johnson, directly or indirectly, from breaching or otherwise violating Johnson's Non-Compete Agreement, Johnson's Consulting Agreement, and Johnson's March 2022 Confidentiality Agreement;

(b)    Temporarily, preliminarily and permanently enjoining and restraining Johnson, directly or indirectly, from doing business with Albireo, PEC and all other clients of the Company who conducted business with the Company during the one-year period prior to the Individual Defendants' termination from the Company or with whom the Company had substantial contact during the said one year period;

(c)    Temporarily, preliminarily and permanently enjoining and restraining Johnson from soliciting any Company employee for hire;

(d)      Requiring Defendants not to share, and to return and/or destroy, any confidential information of the Company and any of the Company's clients and not retain copies or excerpts thereof;

(e)      Compensatory and consequential damages;

(f)      Punitive damages;

(g)      Equitable disgorgement compelling Johnson to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's disloyalty;

(h)      Reasonable Attorneys' fees;

(i)      Interest;

(j)      Costs of suit; and

(k)      Such other legal and equitable relief as the Court may deem just and proper.

## THIRD COUNT
## BREACHES OF DUTY OF UNDIVIDED LOYALTY AND VIOLATIONS OF THE FAITHLESS SERVANT DOCTRINE
### (Johnson, Weiler, Bicking and John Does 1-10)

207.    Plaintiff repeats and realleges all of the statements made in each of the preceding paragraphs of the Verified Amended Complaint as if same were fully set forth herein at length.

208.    Johnson, Weiler and Bicking, and John Does 1-10 who were employees of the Company whose identities the Company is currently unaware of, owed Plaintiff, among other things, a common law duty of undivided loyalty.

209.    Johnson, Weiler, Bicking and John Does 1-10 willfully and repeatedly breached said duty to Plaintiff.

210.    Based upon said conduct, Johnson, Weiler, Bicking and John Does 1-10 also were faithless servants of Plaintiff and should be compelled to disgorge all of the compensation paid them by Plaintiff during the period of disloyalty.

211.   As a direct and proximate result of said breaches of undivided loyalty and said conduct as faithless servants, Plaintiff has suffered irreparable harm and other damage.

212.   The aforesaid conduct of Johnson, Weiler, Bicking and John Does 1-10 was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment on this Third Count of the Verified Amended Complaint against Johnson, Weiler, Bicking and John Does 1-10, jointly, severally and/or in the alternative, as follows:

(a)   Temporarily, preliminarily and permanently enjoining and restraining said Defendants from breaching their various agreements with Plaintiff;

(b)   Temporarily, preliminarily and permanently enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo, PEC and any other clients of the Company who conducted business with the Company during the one-year period prior to the termination of the Individual Defendants' relationship with the Company or with whom the Company had substantial contact during said one year period;

(c)   Requiring Defendants not to share, and to return or destroy, any confidential information of the Company or any of Company's clients and not to retain any copies or excerpts thereof;

(d)   Compensatory and consequential damages;

(e)   Punitive damages;

(f)   Equitable disgorgement compelling said Defendants to reimburse Plaintiff for all wages and other compensation received during the period of their disloyalty;

(g)   Reasonable attorneys' fees;

(h)   Interest;

(i)     Costs of suit; and

(j)     Such further relief as this Court deems just and equitable under the circumstances.

## FOURTH COUNT
## TORTIOUS INTERFERENCE WITH CONTRACTS/EXISTING BUSINESS RELATIONSHIPS
## (All Defendants)

213.    Plaintiff repeats and realleges the statements made in each of the preceding paragraphs of the Verified Amended Complaint as if same were set forth at length herein. Plaintiff maintains business and contractual relationships with its clients including, but not limited to Ilbireo, Merz and PEC, to provide consulting services when requested by clients.

214.    Plaintiff also maintains business relationships with vendors and suppliers.

215.    Johnson, Weiler, Bicking, PVI and John Does 1-10 were aware of those contracts and relationships and interfered with Plaintiff's business and contractual relationships with its clients and vendors by, inter alia, directly and/or indirectly, soliciting the Company's clients and vendors and diverting them from the Company to PVI on specific jobs for which those clients sought originally to engage the Company, and thereby also interfered with Plaintiff's ongoing business relationships with those clients and vendors.

216.    Johnson, Weiler, Bicking, PVI and John Does 1-10 wrongfully took these actions without privilege to do so, knowing the effect the actions would have on Plaintiff's existing business and contractual relationships.

217.    Johnson, Weiler, Bicking and John Does 1-10 were particularly able to interfere with the Company's existing clients, business relations and vendors by virtue of their employment as the Company's Managing Director, Project Manager and Senior Director of Client Services,

respectively, and by continuing to indicate on their LinkedIn pages that they remain employed by the Company.

218.   In the absence of Defendants' actions and interference, Plaintiff would have had a reasonable probability of economic gain from the clients who attempted to engage, or would have engaged, the Company for services but were diverted by Defendants.

219.   As a direct and proximate cause of Defendants' actions, Plaintiff has suffered, and continues to suffer, irreparable harm, damage to reputation, loss of good will as well as other damages, including but not limited to, contractual damages, consequential damages and lost profits.

220.   John Does 1-10 are persons or entities whose identities are currently unknown but who were aware of the contractual relationships the Company had with the Individual Defendants and who, despite knowing of said relationships, tortiously and intentionally interfered with same.

221.   As a direct and proximate result of said conduct, the Company suffered substantial damages.

222.   The aforesaid conduct of John Does 1-10 was willful, wanton, malicious and/or in reckless disregard of the Company's rights.

**WHEREFORE**, Plaintiff demands judgment on this Fourth Count of the Verified Amended Complaint against Johnson, Weiler, Bicking, PVI and John Does 1-10, jointly, severally and/or in the alternative, as follows:

(a)      Temporarily, preliminarily and permanently enjoining and restraining Johnson, Weiler and Bicking from breaching or otherwise violating their agreements with Plaintiff;

(b)     Temporarily, preliminarily and permanently enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo, PEC and all other clients of the Company with whom the Company conducted business during the one-year period prior to the Individual Defendants' separation from the Company or with whom the Company had substantial contact during the said one year period;

(c)     Requiring Defendants not to share, and to return or destroy, any confidential information of the Company and any of the Company's clients and not to retain any copies or excerpts thereof;

(d)     Compensatory and consequential damages;

(e)     Punitive damages;

(f)     Disgorgement compelling Johnson, Weiler, Bicking and John Does 1-10 to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's, Weiler's, Bicking's and John Does 1-10's disloyalty;

(g)     Reasonable attorneys' fees;

(h)     Interest;

(i)     Costs of suit; and

(j)     Such other legal and equitable relief as the Court may deem just and proper.

## FIFTH COUNT
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (All Defendants)

223.    Plaintiff repeats and realleges the statements made in each of the preceding paragraphs of the Verified Amended Complaint as if same were fully set forth at length herein.

224.    Plaintiff's retention of clients to pursue future business represents a cognizable, protectable interest.

225.   In the absence of Defendants' actions and interference, as aforesaid, Plaintiff would have had more than a reasonable probability of economic advantage from its clients and industry contacts, including prospective clients who attempted to engage the Company to perform services but were diverted by Defendants.

226.   Such clients include, but are not limited to, Albireo and PEC.

227.   Defendants have maliciously interfered with Plaintiff's interest in retaining and/or obtaining clients for future business and the economic advantages associated with same, based upon Defendants' obstructionist measures, including intentionally utilizing the Company's confidential and proprietary information, goodwill, and trade secrets to lure away existing clients with future business and prospective clients from the Company instead of securing their business for the Company, as they should have done given their duties and those within the scope of their consulting arrangements.

228.   Defendants' actions were taken intentionally, without justification, and with the knowledge and expectation that Plaintiff's rights and expectations would be adversely affected.

229.   Defendants' conduct as described above has resulted, and continues to result in, irreparable harm and material loss to Plaintiff in terms of prospective services diverted from the Company.

230.   As a direct and proximate result of Defendants' interference, Plaintiff has suffered, and will continue to suffer irreparable harm as well as substantial damages.

231.   Defendants' conduct was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment on this Fifth Count of the Verified Amended Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

(a)     Temporarily, preliminarily and permanently enjoining and restraining Johnson, Weiler and Bicking from breaching or otherwise violating, directly or indirectly, the terms of their agreements with Plaintiff;

(b)     Temporarily, preliminarily and permanently enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo, PEC and all other clients who conducted business with the Company during the one-year period prior to the separation of the Individual Defendants' relationship with the Company or with whom the Company had substantial contact during the said one year period;

(c)     Returning, not sharing, and destroying all confidential information of the Company and any of the Company's clients and to not retain copies or excerpts of same;

(d)     Compensatory and consequential damages;

(e)     Punitive damages;

(f)     Disgorgement compelling Johnson, Weiler, and Bicking to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's, Weiler's, and Bicking's disloyalty;

(g)     Reasonable attorneys' fees;

(h)     Interest;

(i)     Costs of suit; and

(j)     Such other legal and equitable relief as the Court may deem just and proper.

### SIXTH COUNT
### UNFAIR COMPETITION
### All Defendants)

232.   Plaintiff repeats and realleges the statements made in the preceding paragraphs of this Verified Amended Complaint as if same were fully set forth herein at length.

233.   The aforesaid conduct of Defendants constitutes, inter alia, unfair competition.

234.   As a direct and proximate result thereof, Plaintiff has suffered irreparable harm and other substantial damages.

235.   The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment on this Sixth Count of the Verified Amended Complaint against Defendants jointly, severally and/or in the alternative, as follows:

(a)   Temporarily, preliminarily and permanently enjoining and restraining Johnson, Weiler and Bicking from breaching or otherwise violating, directly or indirectly, the terms of their agreements with Plaintiff;

(b)   Temporarily, preliminarily and permanently enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo, PEC and all other clients who conducted business with the Company during the one-year period prior to the separation of the Individual Defendants' relationship with the Company or with whom the Company had substantial contact during the said one year period;

(c)   Returning, not sharing, and destroying all confidential information of the Company and any of the Company's clients and to not retain copies or excerpts of same;

(d)   Compensatory and consequential damages;

(e)   Punitive damages;

(f)   Disgorgement compelling Johnson, Weiler, and Bicking to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's, Weiler's, and Bicking's disloyalty;

(g)   Reasonable attorneys' fees;

4891-4781-5219, v. 2

(h)     Interest;

(i)     Costs of suit; and

(j)     Such other legal and equitable relief as the Court may deem just and proper.


## SEVENTH COUNT
## TRESPASS TO CHATTEL
## (Johnson)

236.   Plaintiff repeats and re-alleges the statements made in each of the preceding paragraphs of the Verified Amended  Complaint as if same were set forth at length herein.

237.   At all times relevant hereto, Plaintiff had possessory rights and/or interests in the Company laptop, keys, and American Express credit card, used by Johnson in connection with her employment with the Company.

238.   Johnson has deprived Plaintiff of the use and possession of said personal property for a substantial time, causing damages.

239.   To date, Johnson has not returned said personal property despite Plaintiff's multiple requests for same.

240.   Johnson's actions described hereinabove constitute trespass to chattels.


**WHEREFORE**, Plaintiff demands judgment on this Seventh Count against Johnson, as follows:

(a)     Ordering Johnson to return all Company property including, but not limited to, the Company laptop, keys, and American Express credit card;

(b)     Requiring Johnson not to share, and to return or destroy, any confidential information of the Company and any of the Company's clients and not to retain copies or excerpts thereof;

(c)      Compensatory and consequential damages;

(d)      Reasonable attorneys' fees;

(e)      Interest;

(f)      Costs of suit; and

(g)      Such other legal and equitable relief as the Court may deem just and proper.

**EIGHTH COUNT**
**THEFT OF TRADE SECRETS AND MISAPPROPRIATION OF CONFIDENTIAL**
**AND/OR PROPRIETARY INFORMATION**
**(All Defendants)**

241.    Plaintiff repeats and realleges the statements made in the preceding paragraphs as if same were fully set forth herein at length.

242.    The Company has developed various trade secrets and confidential and proprietary information including such things as, but not limited to, business data compilations, methods, techniques, designs, plans, procedures and processes that derive independent economic value for use in its business.

243.    The Company has taken reasonable steps to maintain the confidentiality of said trade secrets and confidential and proprietary information including requiring various employees, including the Individual Defendants, to sign agreements to protect said information.

244.    The Individual Defendants had access to said information as it was necessary to use same in relation to their job duties.

245.    The Individual Defendants had no right or permission to use said information for any purpose other than the work they performed on behalf of the Company.

246.    Subsequent to their employment relationship ending with the Company, and without permission or consent from the Company, Defendants improperly used said information on behalf of clients for whom they were providing services.

247.    Defendants knew that said information was confidential and that they had acquired said information through improper means and in violation of their Agreements.

248.    The aforesaid conduct of Defendants violates, inter alia, the New Jersey Trade Secrets Act, N.J.S.A. 56:15-1 et seq. (the "**NJTSA**"), as well as common law concerning the misappropriation of confidential and proprietary information.

249.    The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

250.    As a direct and proximate result thereof, Plaintiff has suffered substantial damages.

251.    The NJTSA permits the Court to grant injunctive relief with regard to the theft of trade secrets as well as any misappropriation being threatened by Defendants.

**WHEREFORE**, Plaintiff demands judgment on this Fifth Count of the Verified Amended Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

(a)    Temporarily, preliminarily and permanently enjoining and restraining Johnson, Weiler and Bicking from breaching or otherwise violating, directly or indirectly, the terms of their agreements with Plaintiff;

(b)    Temporarily, preliminarily and permanently enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo,  PEC and all other clients who conducted business with the Company during the one-year period prior to the

separation of the Individual Defendants' relationship with the Company or with whom the Company had substantial contact during the said one year period;

(c)     Returning, not sharing and destroying all confidential information of the Company and any of the Company's clients and to not retain copies or excerpts of same;

(d)     Compensatory and consequential damages;

(e)     Punitive damages;

(f)     Disgorgement compelling Johnson, Weiler, and Bicking to reimburse Plaintiff for all wages and other compensation  paid by Plaintiff during the period of Johnson's, Weiler's, and Bicking's disloyalty;

(g)     Reasonable attorneys' fees;

(h)     Interest;

(i)     Costs of suit; and

(j)     Such other legal and equitable relief as the Court may deem just and proper.


**MANDELBAUM BARRETT, P.C.**
Attorneys for Plaintiff

By:*/s/Steven I. Adler*
        Steven I. Adler, Esq.

Dated: September 20, 2022


## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

**MANDELBAUM BARRETT, P.C.**
Attorneys for Plaintiff

By:  /s/ Steven I. Adler
        Steven I. Adler

41

## **VERIFICATION**

JOHN STUDDIFORD, pursuant to 28 U.S.C. §1746, certifies as follows:

I am the owner of plaintiff in this matter. I have read the foregoing Verified First Amended Complaint. Except for facts specifically alleged upon information and belief, I have personal knowledge of the facts set forth therein and I verify that they are true and correct to the best of my knowledge.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**CC FORD GROUP WEST, LLC**

Dated: 9/19/2022

By: _____
      JOHN STUDDIFORD
      Managing Member

-1-