UNITED STATES DISTRICT COURT
FOR DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

CC FORD GROUP WEST, LLC,

        Plaintiff,

          v.

JENNIFER JOHNSON, CARRIE BICKING,
BETH WEILER, PROJECT VELOCITY, INC.,
and JOHN DOES 1-10

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

Case 3:22-cv-04143

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND FACTS ........................................................................................... 2

    Origins of the Relationship Between Johnson and Studdiford ........................... 2

    Formation of CC Ford ......................................................................................... 3

    CC Ford Group West LLC is Formed to Retain Johnson ................................... 5

    Johnson's Partnership Interest in CC Ford Group West ..................................... 7

    Johnson's Effort to Buy-Out Studdiford ............................................................ 7

    Johnson's Departure from CC Ford Group West LLC ....................................... 9

ARGUMENT .......................................................................................................... 10

    I.     Plaintiff Cannot Succeed on the Merits of its Claim ............................. 12

          A.     There is No Contractual Basis for Plaintiff's Non-Compete Claims ........ 12

                1.     The 2003 Agreement is Not Enforceable Against Defendants ..... 12

                2.     The 2022 Consulting Agreement Is Expired ................................ 14

          B.     Plaintiff Will Not Succeed on its Tortious Interference Claims .............. 15

          C.     The Faithless Servant Claim Cannot Support a Claim for Injunctive Relief ................................................................................ 16

          D.     Plaintiff Will Not Prevail On Its 'Misappropriation of Trade Secrets and Confidential Information' Claims ................................................................ 18

          E.     Plaintiff Cannot Succeed on Claims Against Bicking and Weiler .......... 19

    II.    Plaintiff Has Not Alleged Any Irreparable Harm ................................... 20

          A.     In the Absence of an Enforceable Non-Compete Agreement There Can Be No Risk of Irreparable Harm ................................................................ 21

          B.     In the Unlikely Event Plaintiff Prevails on Its Claim, It Can be Compensated With an Award of Damages ................................................ 21

          C.     Plaintiffs' Delay in Seeking Injunctive Relief Precludes a Showing of Irreparable Harm ..................................................................................... 22

          D.     Injunctive Relief Will Be Ineffective to Avoid Plaintiff's Loss of Clients ....................................................................................................... 23

    III.    The Balance of Equities Tips in Favor of Defendants .......................... 24

    IV.    The Public Interest Disfavors the Enforcement of Restrictive Covenants .......... 25

CONCLUSION ....................................................................................................... 26

## TABLE OF AUTHORITIES

**Case**                                                                                    **Page**

*Aetrex Worldwide, Inc. v Sourcing for You, Ltd.*,
    13-CV-1943 DMC MF, 2013 WL 1680258, 7 (D.NJ Apr. 16, 2013) ........................20, 22

*All Granite & Marble Corp. v. Deja*, No.
    A-1071-18T1, 2019 WL 7169131, 4 (N.J. Super. Ct. App. Div. Dec. 24, 2019)........17, 18

*Apollo Technologies Corp. v. Centrosphere Indus. Corp.*,
    805 F.Supp. 1157 (D.N.J. 1992) ......................................................................................24

*Balsamides v. Protameen Chems., Inc.*,
    160 N.J. 352 (1999) ........................................................................................................21

*Cap. Bakers, Inc. v. Townsend*,
    426 Pa. 188, 191 231 A.2d 292 (1967)..........................................................................19

*Colorcon, Inc. v. Lewis*,
    792 F. Supp 2d 786 (E.D. Pa. 2011) ..............................................................................24

*Constructors Association of Western Pennsylvania v. Kreps*,
    573 F.2d 811 (3d Cir. 1978)............................................................................................25

*Cont'l Grp., Inc. v. Amoco Chemicals Corp.*,
    614 F.2d 351 (3d Cir. 1980)............................................................................................25

*Dello Russo v. Nagel*,
    358 N.J. Super. 254 (App. Div. 2003) ............................................................................16

*Dorval v. Moe's Fresh Mkt.*,
    694 Fed Appx 92 (3d Cir 2017)......................................................................................11

*EnviroFinance Grp., LLC v. Envtl. Barrier Co.*,
    440 N.J. Super. 325, 113 A.3d 775 (App. Div. 2015) ....................................................12

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
    847 F.2d 100 (3d Cir. 1988)............................................................................................22

*Golden Fortune Import & Export Corp. v. Mei-Xin Limited.*,
    No. 22-1710, 2022 WL 3536494, 7 (3d Cir. Aug. 5, 2022) ............................................21

*Grant v. Coca-Cola Bottling Co. of New York*,
    780 F. Supp. 246 (D.N.J. 1991) .....................................................................................13

*Ingersoll-Rand Co. v. Ciavatta*,
    110 N.J. 609, 542 A.2d 879 (1988)................................................................................26

*In re Arthur Treacher's Franchisee Litig.,*
    689 F.2d 1137 (3d Cir. 1982)..................................................................11, 20

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,*
    882 F.2d 797 (3d Cir. 1989)............................................................................21

*Jurista v. Amerinox Processing, Inc.,*
    492 B.R. 707 (D.NJ 2013). ..............................................................12, 14, 23

*Kay v. Rosefielde*,
    N.J. 223 N.J. 218 (2015) ................................................................................22

*loanDepot.com v. CrossCountry Mortg., Inc.,*
    399 F. Supp.3d 226 (D.N.J. 2019) .................................................................16

*Logic Technology Development LLC v. Levy,* No.
    CV1704630MASTJB, 2021 WL 3884287, 2 (D.N.J. Aug. 31, 2021)............22

*Mallet & Co. Inc. v. Lacayo,*
    16 F.4th 364 (3d Cir. 2021) .....................................................................18, 19

*Matrix Distributors, Inc. v. N.A. of Boards of Pharm.,*
    34 F.4th 190 (3d Cir. 2022) .....................................................................15, 16

*Morton v. Beyer,*
    822 F.2d 364 (3d Cir. 1987)............................................................................22

*Nat'l Inst. of Science and Tech. v. Mohapara,*
    2020 WL 6323683 at 3 (D.N.J. 2020) ...........................................................11

*National Reprographics, Inc. v. Strom*,
    21 F. Supp.2d 204 (D.N.J. 2009) ...................................................................21

*NutraSweet Co. v. Vit-Mar Enterprises, Inc.,*
    176 F.3d 151 (3d Cir. 1999)....................................................11, 22, 24, 25

*Oburn v. Shapp*,
    521 F.2d 142 (3d Cir. 1975)............................................................................25

*Pharmacia Corp. v. Alcon Labs., Inc.,*
    201 F.Supp.2d 335 (D.N.J. 2002). ...........................................................21, 23

*Rohm and Haas Co. v. Adco Chemical Co.,*
    689 F.2d 424 (3d Cir.1982)............................................................................18

*Scholastic Funding Grp., LLC v. Kimble,*
    2007 U.S. Dist. LEXIS 30333, 14 (D.N.J. Apr. 24, 2007) .............................21

*Tiger Supplies Inc. v. MAV Associates LLC*,
  No. CV-20-15566 (SRC), 2022 WL 1830796 at 10 (D.N.J. June 3, 2022)......................17

*Torsiello v.  Strobeck*,
  955 F. Supp.2d 300 (D.N.J. 2013) .......................................................................................18

*Tracey v. Recovco Mortg. Mgmt. LLC*,
  451 F. Supp. 3d 337 (D.N.J. 2020) ......................................................................................21

**Statutes**                                                                                    **Page**

NJ Rev. Stat. § 14A:12-9 (2013). ............................................................................................14

Defendants Jennifer Johnson and Project Velocity, Inc. ("Defendants"), by undersigned counsel of Critchley Kinum & Luria, LLC and Slarskey LLC, submit this memorandum of law in opposition to Plaintiff's motion for a temporary restraining order.

## PRELIMINARY STATEMENT

In this action, Plaintiff CC Ford Group West LLC ("CC Ford Group West") contrives to seek enforcement of phantom non-compete/non-solicit agreements and conjures up other common law claims against Defendants Jennifer Johnson and Project Velocity, none of which warrants the extraordinary relief of an emergency injunction entered against Defendants. To impose such an order would be contrary to every applicable principle of law. To wit:

*First*, Plaintiff cannot establish a likelihood of success on the merits for *any* of its claims, much less establish a clear entitlement to emergency interim injunctive relief.  Among other deficiencies, the two "non-compete" contracts alleged by Plaintiff have both expired, and thus are wholly unenforceable against Ms. Johnson. In addition, Plaintiff has not identified nor defined any pertinent confidential information or trade secrets—only asserted in the most conclusory fashion that private information exists and has been misused. Plaintiff's other claims, also deficient on the merits, simply do not warrant injunctive relief, because they are all grounded upon allegations of damage from *past conduct* and could readily be remunerated with monetary damages in the very unlikely event the claims are proved.

*Second*, there has been no showing of irreparable injury, as is necessary to warrant imposing injunctive relief. Not only can there be no showing of irreparable injury when there is no showing of likelihood of success on the merits, but Plaintiff's bad faith tactical efforts and delay undercut any showing of irreparable harm. Defendants launched their business nearly seven months ago, after Ms. Johnson left CC Ford Group West. And this action was filed nearly

five months ago, at which time—if there truly were a likelihood of irreparable harm—Plaintiff should have sought the relief it now seeks. Instead, Plaintiff used the filing as an attempt to exert an *in terrorem* payment through failed mediation and through additional threats of dragging Defendants' clients into the lawsuit, based on a proposed amendment, similar to the amended complaint filed here, which Plaintiff delivered *months* ago. Only then—after Plaintiff's tactical efforts failed—did Plaintiff switch counsel and come back to this Court with a demand that the Court shut down Defendants' business on an emergency basis. The delay and tactics should be seen for what they are: an implicit admission of weakness, and an acknowledgement that there is no genuine threat of irreparable harm.

Finally, for similar reasons, the balance of equities and the public interest tips in favor of Defendants, and thus, against the issuance of an injunction.  Plaintiff's unsupportable claims, unreasonable delay in seeking relief, bad faith tactics, and the adverse impact that an injunction will have on free competition and Defendants' ability to earn a living, all weigh against the issuance of injunctive relief.

In sum, Plaintiff is asking the Court to do its dirty work, as Plaintiff—and its principal John Studdiford, are retaliating against Ms. Johnson for having the temerity to move on in her career from an exploitative professional relationship. Far from warranting injunctive relief, however, a preliminary evaluation of Plaintiff's claims heralds an *oncoming dismissal motion* from Defendants, which should narrow the dispute substantially or end it entirely. This Court should deny Plaintiff's application.

## **BACKGROUND FACTS**

## **Origins of the Relationship Between Johnson and Studdiford**

The relationship between defendant Jennifer Johnson and John Studdiford, the principal behind CC Ford Group West LLC's action, began in the early 00s. At that time, Ms. Johnson was a seasoned sales and client services representative, for an outside vendor agency that assisted pharmaceutical companies with digital animations to assist in their marketing promotions. (¶ 2.[1])

Ms. Johnson was introduced to Mr. Studdiford by his wife, Cathleen. At that time, Cathleen Studdiford worked for Pfizer, and was Ms. Johnson's client. Ms. Johnson understood that Cathleen held Ms. Johnson in high regard as extremely effective at her job. Ms. Studdiford suggested that Ms. Johnson should meet her husband, John, the global lead for Detrol at Parke-Davis, initially as a potential sales opportunity. (¶ 3.)

Though that introduction did not develop into a client relationship, Ms. Johnson continued to work with Ms. Studdiford and considered her a friend. Ms. Studdiford ultimately told Ms. Johnson that Mr. Studdiford was leaving Parke-Davis to launch a start-up in the pharmaceutical-marketing space, and suggested it was an opportunity for Ms. Johnson to get in on the ground level with the new business. Ms. Studdiford acknowledged Ms. Johnson's sales, client service, operational and creative expertise, and indicated her belief it would be valuable for her husband's new business. (¶ 4.)

**Formation of CC Ford**

In or around 2003, Ms. Johnson agreed to join Mr. Studdiford in launching CC Ford Marketing Group LLC. Ms. Johnson became Employee #2 in the company, which she understood was owned and capitalized by Mr. Studdiford. At that time, Ms. Johnson signed the

---

[1] Citations to "¶" refer to the corresponding paragraph of the Declaration of Jennifer Johnson, dated October 6, 2022 ("Johnson Decl.").

non-compete/non-solicitation agreement that provides the basis for the claims in the Complaint. (¶ 5.) Note, however, that it is not disputed that the counterparty to that agreement—CC Ford Marketing Group, LLC—**has not been her employer, and she had not provided any work for that company, since 2013**. Note, further that CC Ford Marketing Group LLC changed its name to CC Ford Group LLC in 2004, and subsequently was canceled by a filing with the State of New Jersey. (*See* Declaration of David Slarskey dated Oct. 7, 2022, Exs. 1 and 2.) The significance of these facts is discussed *infra*.

Between 2003 and 2013, Ms. Johnson was a force behind the growth of the CC Ford Marketing Group LLC business. She ran her book of business as if it were her own: without any meaningful oversight or contribution from Mr. Studdiford. She was solely responsible for attracting and managing my clients, setting (and exceeding) self-imposed performance goals, independently delivering on client requirements, and overseeing project operations for her book of business. Among the clients she developed was Allergan, a multi-billion-dollar pharmaceutical company, which she serviced for more than a decade—an unheard of achievement in the industry where clients are often transient. (¶ 6.)

By the same token, while Mr. Studdiford asserted himself in the business in the early years, he proved to be ineffective at best when it came to developing and servicing accounts—alienating clients with inferior service and out-of-touch practices that were out-of-step with market dynamics. On several occasions, Ms. Johnson received direct requests from clients asking her not to involve Studdiford in the business. Clients complained that he was not adding value to their business. (¶ 7.)

Studdiford's attempt to build CC Ford Marketing Group were similarly ineffective, with a revolving door of personnel he hired, including a disastrous "Executive Vice

President" who he run out of the company when auditors discovered that she and Studdiford had engaged in *substantial* billing improprieties, a black-eye on the company that led to its loss of Novartis, a major client, and a correspondingly significant contraction of the CC Ford Marketing Group business. (¶ 8.)

As time went on, and Ms. Johnson's success grew, Mr. Studdiford became more and more distant, focused on his outside business interests, while he collected the profits from CC Ford Marketing Group that had been earned by Ms. Johnson and her team. By 2013, it was common for Ms. Johnson to go many months, sometimes an entire year, without discussing business matters with him—their interaction primarily being through Mr. Studdiford's business manager, who became a conduit, of sorts, for their infrequent communication. Studdiford was utterly uninvolved in Ms. Johnson's work: there were no performance reviews; there was no joint goal setting; no joint strategic planning; and no joint budgeting.  (¶¶ 9-10.)

**CC Ford Group West LLC is Formed to Retain Johnson**

Also by 2013, Ms. Johnson had developed a very strong roster of clients and industry reputation, and was sought-after as a pharma executive. Specifically, in early 2013, she was approached by her client, Allergan, which was interested in hiring her as Vice President of Professional Relations. This would have been an apex career position, reporting directly to the CEO, with a base salary in the range of $250,000- $275,000, plus stock, pension, and other company benefits valued at more than $600,000 in earning potential. At the time, Ms. Johnson was earning from CC Ford Marketing Group West a $100,000 base salary, an amount that had not increased since she was hired in 2002, plus a discretionary commission on new business that was in the range of 1-1.5%. Mr. Studdiford only provided this payment to Ms. Johnson when she requested it. (¶ 11.)

Studdiford became aware that Ms. Johnson was being recruited by Allergan. As a way of retaining her for the business, Studdiford proposed to Ms. Johnson that he would make her a partner in a new entity, **CC Ford Group *West* LLC**, through which she could run her business. Ms. Johnson had an entrepreneurial spirit and appreciated the creative and operational control. She also saw this new company as a way to balance the inequity between her low compensation and huge contributions to the business. Due to Studdiford's representations, she was optimistic that this was a new step forward. With the commitment of partnership from Studdiford in CC Ford Group West, she turned down Allergan, declined to pursue other opportunities, and awaited a legal agreement. (¶ 12.)

Ms. Johnson's agreement to run her business through CC Ford Group West, and keep Studdiford on as an equal partner, was *generous* to Studdiford, given that by this point, Studdiford was simply collecting a royalty on the business, for which Ms. Johnson had provided all of the executive and professional value, leadership, and clients. Notably, Ms. Johnson *never* signed a non-compete agreement with the newly-formed entity, CC Ford Group West LLC, despite that others did, because the new company was formed to be her business. (¶ 13.) Furthermore, all of the non-compete provisions in the contract with CC Ford Marketing Group expired no more than two years after she ceased her employment with CC Ford Marketing Group, which occurred in 2013.

CC Ford Group West was explicitly created for Ms. Johnson's accounts, and was intended to be *her business*, with Studdiford having no operational involvement with clients. (¶ 14.) To the extent Ms. Johnson received payments based on a percentage of the company's profits, they were unverifiable. The percentage of fees paid was unverifiable because there was no reconciliation of the payments to her against the company's fees earned, and Mr. Studdiford

never opened up the books of the company to provide information on its finances—despite the fact that Ms. Johnson was, by that time, effectively its CEO. (¶ 14.)

**Johnson's Partnership Interest in CC Ford Group West**

Over the ensuing years, Studdiford made "profit share" payments to Ms. Johnson, based upon certain representations about the company's revenues and expenses that did not make sense to her. Studdiford eventually told her, with no written contracts in place, that she was receiving a 25% profit share, and provided her with summary descriptions of revenues and expenses, purportedly justifying the amount of the payments. (*See*, *e.g.*, Johnson Decl., Exs. A-B (emails from Studdiford with accounting disclosures).) Ms. Johnson believes these financial representations were false and misleading, based on the inclusion of extraordinary "COGS" deductions, *along with* the delineated expenses. (¶ 15.)

Each year, when the books closed, Ms. Johnson looked at her earnings, considered the revenues of the company that she knew had been earned, and renewed her demand that Studdiford complete the partnership documentation he had promised. And each year, Studdiford would make a year-end payment, and ignore her complaints. She would then dutifully refocus her attention on the business—a very busy enterprise that had her traveling around the world meeting with clients to execute deliverables on tight time-frames. The partnership documentation never materialized. Despite that, Ms. Johnson continued to drive revenues and significantly increase gross margins for CC Ford Group West. (¶ 16.)

**Johnson's Effort to Buy-Out Studdiford**

The "last straw" for Ms. Johnson came in 2020, when she tragically lost her son at the same time she was guiding the company through the covid pandemic. In the preceding years, Ms. Johnson had not taken *any* time off, including when she had knee-replacement surgery in

2017 and worked from her recovery bed just days after arriving home from the hospital. In 2020, however, with the terrible personal loss, Studdiford barely expressed his condolences, and never offered support to Ms. Johnson. He did not step up to run the business or provide her with time off to grieve. Nor did Studdiford recognize the hardship the business faced as a result of covid. Ms. Johnson—alone with her team—guided the company through the pandemic and took care of its employees (by that point a headcount of approximately 15), all while she was grieving. Studdiford, meanwhile, continued to collect the profits, and misrepresent and conceal the company's true financial condition. (¶ 17.)

2020 strengthened Ms. Johnson's resolve. In early 2021, after the 2020 books closed, and another year passed without Studdiford speaking to Ms. Johnson, she took a new tack: with counsel's advice, she decided to prepare for a buyout discussion. She prepared diligently for several months, to make an offer to purchase Studdiford's interest in CC Ford Group West, taking into account that she was responsible for generating 100% of the enterprise value. She no longer wanted to be Studdiford's partner: he had proved unreliable, untrustworthy, and—frankly—indecent in the manner that he exploited her and the business. (¶ 18.)

In December 2021, Ms. Johnson informed Studdiford of her desire to purchase his interest in the business, and requested financial information and other diligence material so that she could formalize a proposal. Studdiford blew up at her by telephone, yelling at Ms. Johnson about how much money she already had made, telling her that she had no idea what she was doing, and—significantly—telling Ms. Johnson that what she really needed to do was work much harder for three more years, and strategize with him on how to sell CC Ford Group West so that she could reap the benefit of a sale. Studdiford thus again acknowledged Ms. Johnson's

ownership interest in CC Ford Group West, even though they had never formalized the partnership agreement in writing because of Studdiford's delays. (¶ 19.)

After Studdiford calmed down, he directed Ms. Johnson and her counsel to his personal attorney to discuss the possibility of a transaction in early 2022. No financial information, however, was provided to Ms. Johnson. Studdiford stiff-armed any negotiations, simultaneously refusing to provide basic financial due diligence, while demanding that Ms. Johnson make an uninformed purchase offer, and arbitrarily dictating that unless she could provide proof of immediately available funds, he would not entertain further discussions. These were nonsensical positions, if one were looking to consummate a transaction, and indicated that the negotiations were not undertaken in good faith. (¶ 20.)

**Johnson's Departure from CC Ford Group West LLC**

By the end of February 2022, discussions broke off and any communication occurred only through counsel.  Ms. Johnson accordingly decided to leave and tendered her resignation, volunteering a one-month transition period, which she understood to be a courtesy, and in line with industry standards. She was *scrupulously* careful not to front-run her resignation with clients or personnel, or misappropriate materials from CC Ford Group West, LLC. Notably, even while attempting to negotiate a purchase offer and deciding to leave CC Ford Group West, she closed more than $2 million in business for CC Ford Group West during the first months of 2022—accounts that have *remained with the company*, and for which she never received any compensation. And from the time the buyout discussions began in the summer of 2021, Ms. Johnson continued to drive new business into CC Ford Group West. (¶ 21.)

Notably, Studdiford played *no role* in the transition of the business, despite Ms. Johnson's offer of services to aid in the transition. Studdiford declined to engage in the business,

even at the pivotal moment of transition when his engagement would be most necessary. He did not request account reviews, he did not request client introductions, he did not join client calls or interactions or engage in any projects. And ironically (but predictably) CC Ford Group West was unprepared to service all of the accounts Ms. Johnson left behind: in fact, CC Ford Group West *retained Ms. Johnson's services* after she resigned, to continue providing support—bizarrely while accusing her of violating her non-compete allegations. (¶ 22.)

Accordingly, Ms. Johnson became an independent contractor for CC Ford Group West, LLC for a finite period –from March 31, 2022 to July 17, 2022. As an independent contractor, Ms. Johnson signed two agreements with CC Ford Group West. The first was a non-compete agreement, which provided that CC Ford Group West "expect[ed] that Contractor [Ms. Johnson] will pursue *other business opportunities* during the term of this Agreement" and only limited her "*for the duration of this agreement*" against "pursu[ing] business opportunities that will create a conflict of interest with company…" (¶ 23.) Thus, Ms. Johnson's non-compete requirements expired on July 17, 2022.

The second agreement signed was a confidentiality agreement that prohibited Ms. Johnson, for a period of ten years, from using or disclosing any confidential CC Ford Group West information that she learned during her limited time as an independent contractor. (Doc. 9-1, Ex. C at 1-2.)

## **ARGUMENT**

"To obtain the extraordinary remedy of a [temporary restraining order or] preliminary injunction, plaintiff must demonstrate the following factors: (1) that he has "a reasonable probability of eventual success" on the merits; (2) that he "will be irreparably injured" absent injunctive relief; (3) that the balance of harms favors him; and (4) that the

requested relief is in the public interest. *Dorval v. Moe's Fresh Mkt.*, 694 Fed Appx 92, 93-94 (3d Cir 2017) (affirming the summary denial of a temporary restraining order and injunction). "A plaintiff's failure to establish *any* element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (emphasis supplied) (reversing and remanding with instructions to vacate injunction). However, the first two of the factors (likelihood of success and irreparable injury) are the most important, such that "[a] failure to show a likelihood of success *or* a failure to demonstrate irreparable injury, must necessarily result in the denial of injunctive relief." *Nat'l Inst. of Science and Tech. v. Mohapara*, 2020 WL 6323683 at *3 (D.N.J. 2020) (Shipp, J.) (emphasis supplied) (quoting *In re Arthur Treacher's Franchisee Litig.,* 689 F.2d 1137, 1143 (3d Cir. 1982)).

As set forth below, Plaintiff cannot obtain temporary or preliminary injunctive relief because it cannot succeed on *any* of its required showings: it will not prevail on the merits of its claims, because there is no valid contractual basis upon which to enjoin Project Velocity or Ms. Johnson from competing with CC Ford Group West, and because Plaintiff's generic and conclusory allegations do not adequately identify any misappropriated trade secrets or confidential information that could be the subject of relief.

And *even if* Plaintiff could show a likelihood of success on any of its remaining common law claims, such claims cannot support injunctive relief, because they all involve allegations of past misconduct, which can be adequately compensated with an award of monetary damages, and do not entail any risk of ongoing, or future, irreparable harm.

Finally, the balance of equities tips in favor of Defendants, and the public interest weighs against the issuance of injunctive relief, for any number of reasons—including the lack of

merit to the claims, Plaintiff's bad faith tactics, and delay in seeking purportedly emergency injunctive relief, and the general disfavor of restrictive covenants in trade.

In the final analysis, Plaintiff cannot even *sustain a claim* for breach of contract on its non-compete provisions,[2] let alone establish the "considerably higher standard for injunctive relief." *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 778 (D.NJ 2013). Accordingly, temporary and preliminary injunctive relief should be denied.

## I.     Plaintiff Cannot Succeed on the Merits of its Claim

CC Ford Group West cannot succeed on the merits of any of its claims to establish a right to injunctive relief.

### A.  There is No Contractual Basis for Plaintiff's Non-Compete Claims

It is axiomatic that to establish a breach of contract, a plaintiff must allege "a *valid contract* between the parties, the opposing party's failure to perform a defined obligation under the contract, and a breach causing the Plaintiff to sustain damages." *E.g.*, *EnviroFinance Grp., LLC v. Envtl. Barrier Co.*, 440 N.J. Super. 325, 345, 113 A.3d 775 (App. Div. 2015) (emphasis supplied).

Here, though CC Ford roots its claim for injunctive relief in supposed non-compete and non-solicitation agreements, *i.e.*, the 2003 Agreement (Doc. 9-1, Ex. A) and the 2022 Agreement (Doc. 9-1, Ex. B), neither agreement provides an enforceable basis for grounding an injunction. More specifically:

#### 1.     The 2003 Agreement is Not Enforceable Against Defendants

The 2003 Agreement is not enforceable against Ms. Johnson (none of the other Defendants are parties to that agreement) for at least three reasons.  *First*, Plaintiff CC Ford

---

[2] Indeed, Defendants intends to seek a Rule 12(b)(7) dismissal of Plaintiff's breach of contract claims.

Group West LLC is not a party to the 2003 Agreement between Ms. Johnson and *CC Ford Marketing Group LLC*.  Thus, as a general rule, CC Ford Group West lacks standing to enforce the terms of the 2003 Agreement. This is because a party may not, as a general rule, assert rights under an agreement to which it is not a party. *See Grant v. Coca-Cola Bottling Co. of New York,* 780 F. Supp. 246, 249 (D.N.J. 1991) ("[f]oreseeability of a prospective benefit to a third party is not enough to establish a third party's rights").

*Second*, as Plaintiff acknowledges, Ms. Johnson has not worked for CC Ford Marketing Group LLC (which changed its name to CC Ford Group LLC in 2004) since 2013, when the parties formed a separate entity, Plaintiff CC Ford Group *West* LLC.  (*See* Doc. 9 (Am. Compl.) ¶ 11.)  Thus, the non-compete/non-solicit obligations under the 2003 Agreement expired at the latest in 2015. *See* Doc. 9-1 (2003 Agreement) §1.)

And *third*, Plaintiff implicitly acknowledges that Plaintiff, CC Ford Group West LLC, could not enforce the terms of the 2003 Agreement at the time that Ms. Johnson departed (or thereafter), because Plaintiff has now attempted to *take the 2003 Agreement by assignment dated September 11, 2022*—nine years after Ms. Johnson stopped working for CC Ford Marketing Group LLC a/k/a CC Ford Group LLC, seven years after any non-compete obligations expired, seven months after Ms. Johnson resigned from CC Ford Group West LLC, weeks after mediation between the parties failed, and just *days before* filing this request for injunctive relief. (*See* Doc. 9-1, Ex. B.) Insofar as Plaintiff now concedes that CC Ford Group West LLC lacked legal rights under the 2003 Agreement while Ms. Johnson worked for the company (why else contrive to assign the agreement in September 2022?), it cannot now *retroactively* enforce the agreement against Ms. Johnson, who departed CC Ford Group West LLC seven months earlier. Were the pretextual contrivance of the assignment not fatal, the

assignment is *also* a nullity because CC Ford Group LLC (as renamed in 2004 from CC Ford Marketing Group LLC) *filed a certificate of cancellation in 2004*. (Slarskey Decl. Ex. A.) As a canceled company, CC Ford Group LLC may "carry on no business" other than for the purpose of "winding up its affairs," undertaking certain specified actions. NJ Rev. Stat. § 14A:12-9 (2013). Executing an assignment to Plaintiff, eighteen years after cancellation, and for the purpose of curing the deficiency in Plaintiff's legal claims, surely does not constitute a legitimate act of "winding up" CC Ford Group LLC's affairs.

Based on the foregoing, Defendants intend to seek dismissal of all claims based on the 2003 Agreement. "[I]f a plaintiff cannot satisfy the more lax standards governing dismissal, he likewise cannot satisfy the considerably higher standard for injunctive relief." *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 778 (D.NJ 2013).

### 2.      The 2022 Consulting Agreement Is Expired

Plaintiffs secondarily root their purported contractual right to injunctive relief in the 2022 Consulting Agreement, which contains both non-compete and confidentiality provisions. (*See* Doc. 9-1, Ex. 3 (2022 Consulting Agreement) at 1-2.) But that agreement also provides no basis for prospective injunctive relief, because any non-compete restrictions imposed by the 2022 Agreement have expired, and because there has been no alleged violation of its confidentiality provisions.

With respect to the non-compete restriction, the 2022 Consulting Agreement was only effective from March 26, 2022, through July 17, 2022. (*See id.* at 1.) That agreement, on its face, expressly acknowledges that CC Ford Group West LLC "expect[ed] that Contractor [Ms. Johnson] will pursue other business opportunities during the term of this Agreement" and *only* limited Ms. Johnson "*for the duration of this agreement*" against "pursu[ing] business opportunities that will create a conflict of interest with company…" (*Id.* at 2.) Thus, even if

Plaintiff were to show some violation of the 2022 Consulting Agreement in the past, the 2022

Consulting Agreement provides *no basis*, after July 17, 2022, for imposing ongoing injunctive

relief against Ms. Johnson's competitive activities.

The 2022 Consulting Agreement (*see* Doc. 9-1, Ex. C at 1) also restricts Ms.

Johnson from using CC Ford's confidential information, pursuant to the terms of a

contemporaneously executed confidentiality agreement. (*See* Doc. 9-1, Ex. D ("Confidentiality

Agreement").) Under the Confidentiality Agreement, Ms. Johnson is restricted, for ten years,

from using confidential material as defined by that agreement. (*See id.* at ¶ 1.) Plaintiff, however,

has not identified any such "technical data, materials, and/or information," any "studies, analyses

and/or copies derived therefrom," or "any other nonpublic information of CC Ford Group" that

was provided to Ms. Johnson during the term of the agreement, and which is alleged to have

been improperly used. (*See id.* at 1 ("Confidential Information").) Just as Plaintiff has not (and

cannot) make out a misappropriation or theft of trade secrets claim, for the reasons set forth *infra*

at Argument I.D, Plaintiff has not specified any Confidential Information alleged to have been

improperly used. Bald allegations cannot suffice to support the issuance of injunctive relief.

**B.  Plaintiff Will Not Succeed on its Tortious Interference Claims**

Plaintiff's conclusory assertions that Defendants have engaged in tortious

interference—assertions made with *no analysis* of any underlying conduct—also provide no

basis for finding that Plaintiff is likely to succeed on the merits of its claim and warrant

injunctive relief. (*See* Doc. 9-6, Pl. Mem. at 9.)

A New Jersey tortious interference claim has four elements: (1) "a protected

interest," (2) "malice," (3) "a reasonable likelihood that the interference caused the loss of the

prospective gain," and (4) "resulting damages." *Matrix Distributors, Inc. v. N.A. of Boards of

Pharm.*, 34 F.4th 190, 200 (3d Cir. 2022) (dismissing claims for insufficient allegations of

malice. Advancement of one's own "interest and financial position" does not "establish the necessary malice or wrongful conduct." *Dello Russo v. Nagel,* 358 N.J. Super. 254, 268 (App. Div. 2003). *See also Matrix Distributors,* 34 F.4th at 200 (courts consider "whether the conduct was sanctioned by the rules of the game, for where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury.") Instead, courts look to see whether the means of competition were "fraudulent, dishonest, or illegal." *Id.*

        Plaintiff's allegations fail to support a claim for tortious interference—either with *existing contracts* or with *economic advantages*—for several reasons: first, there is no allegation of a *breach* by a third party, as is necessary to establish tortious interference with contract. *See*, *e.g.*, *loanDepot.com v. CrossCountry Mortg., Inc.,* 399 F. Supp.3d 226, 237 (D.N.J. 2019) (failure to allege "specific breach" was fatal to tortious interference with contract claim). Next, there is no allegation of a "reasonable expectation" of advantage from any "prospective economic relation"—only that, *with no valid contractual restrictions to preclude Ms. Johnson from competing with CC Ford*—certain CC Ford clients elected to work with Defendants on a going-forward basis. Mr. Studdiford may be upset that clients prefer to work with Ms. Johnson and her new company, but this is an "incident of healthy competition"—not a compensable tort injury. *Matrix Distributors*, 34 F.4th at 200. Finally, Plaintiff has alleged no "fraudulent, dishonest, or illegal" conduct by Defendants—nothing more than that they were pursuing their own financial interests, which is *not* tortious conduct. *See id.* All of this is fatal to Plaintiff's tortious interference claims.

### C.  The Faithless Servant Claim Cannot Support a Claim for Injunctive Relief

Plaintiff has provided *no authority* to support the issuance of injunctive relief based upon a faithless servant/duty of loyalty claims.[3] To the contrary, Plaintiff has *acknowledged* that *even if* it is successful in its claim for breach of the duty of loyalty and under the faithless servant doctrine, the Court may "compel disgorgement of compensation received by an employee during the period in which the employee acted in violation of the duty of loyalty." (Pl. Mem. at 11.) Accordingly, this retrospective claim, *i.e.*, based on past conduct during the period in which Ms. Johnson worked with CC Ford Group West, provides *no basis* for the forward-looking injunctive relief that Plaintiff seeks.

Moreover, to prevail on a faithless servant [or breach of duty] claim, Plaintiff must show 1) the existence of an employee-employer relationship, 2) the breach of the duty of loyalty and 3) resulting harm. *See Tiger Supplies Inc. v. MAV Associates LLC*, No. CV-20-15566 (SRC), 2022 WL 1830796 at 10 (D.N.J. June 3, 2022). Taking steps to start one's own business is not *itself* grounds for a faithless servant claim; rather, a party must show *facts* to establish wrongful conduct, such as the violation of a confidentiality agreement. *See*, *e.g.*, *All Granite & Marble Corp. v. Deja*, No. A-1071-18T1, 2019 WL 7169131 at 4 (N.J. Super. Ct. App. Div. Dec. 24, 2019) (granting summary judgment where defendant took steps to start their own business, but plaintiff did not show any *facts* establishing conduct in violation of confidentiality agreements).

Here, the emails Plaintiff has submitted to the Court—which Plaintiff does not analyze or address in its legal briefing—do not show the actions of a disloyal employee. To the contrary, Exhibits J and M show Ms. Johnson, upon resignation, telling clients that she was

---

[3] The two cases cited by Plaintiff (Pl. Mem. at 10-11), *i.e. Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 305 (2001) and *Kaye v. Rosefielde,* 223 N.J. 218 (2015), entail demands for money damages and equitable disgorgement. Neither case provides a basis for issuing an injunction.

leaving, and *handing over contacts to Mr. Studdiford*. Several of the emails show Ms. Johnson assuring clients that, notwithstanding her departure, "*it is my wish that CC Ford will continue to be your strategic execution partner*." (*E.g.*, Doc. 9-2, Exs. J and K.) The record thus demonstrates precisely the *opposite* of what is alleged: the behavior of a *consummate professional*, explaining to clients that she is leaving the business—not disloyal conduct alleged by Plaintiff. Plaintiff's claim, based on the record, provides no basis for injunctive relief; to the contrary, it is subject to dismissal. *See All Granite & Marble Corp.*, 2019 WL 7169131 at 4.

### D.  Plaintiff Will Not Prevail On Its 'Misappropriation of Trade Secrets and Confidential Information' Claims

Under New Jersey law, there are five basic elements that must be established to succeed on a claim for misappropriation of a trade secret: "(1) the existence of a trade secret, (2) communicated in confidence by the plaintiff to the employee, (3) disclosed by the employee in breach of that confidence, (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff." *Rohm and Haas Co. v. Adco Chemical Co.,* 689 F.2d 424, 429–30 (3d Cir.1982).

To succeed on such a claim, the party alleging misappropriation of a trade secret must *define* the trade secret with specificity and establish that the trade secret was maintained in confidence. *See Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 382 (3d Cir. 2021); *see also Torsiello v. Strobeck*, 955 F. Supp.2d 300, 314 (D.N.J. 2013) (requiring the Court to evaluate the alleged confidential information to determine whether it is protectable). General knowledge developed by a person experienced in the industry, including, even, the typical methods and practices used in that industry, or the names of commonly-known companies, are not protectable as trade secrets. *Id.* at 382. Where the allegations do not adequately allege the "boundaries within which the secret lies," *i.e.*, the specific trade secret or information alleged to have been

18

misappropriated, the claim will be dismissed. *Id.* at 382-383 (quotation omitted). *See also Torsiello*, 955 F. Supp.2d 300 at 314 (dismissing theft of proprietary information count from complaint where court could not establish from facts pleaded why "charts… notebooks containing accountant information and patient information" would be confidential to employer).

Plaintiff has not shown a likelihood of success on its misappropriation of trade secrets or confidential information claim: its allegations of trade secrets/confidential information misappropriation are wholly conclusory, and—amazingly—do not specify a *single trade secret or piece of confidential information* alleged to have been misappropriated. (*See* Pl. Mem. at 11-12.) It is not plausible that Plaintiff can do so, given the nature of the allegations and the business, *i.e.*, consulting with pharmaceutical companies to help them launch their own products, based on *their own information*. Because Plaintiff has not indicated what specific information was misappropriated, nor even the type or nature of the information, it cannot obtain injunctive relief based on this claim. *See, e.g., Cap. Bakers, Inc. v. Townsend*, 426 Pa. 188, 191 231 A.2d 292, 294 (1967) (reversing preliminary injunction where employer merely claimed "general bakery business" contained trade secrets and did not specify the secrets); *Mallet & Co Inc.* 16 F.4th at 383 (reversing preliminary injunction and invalidating District Court's findings that "pricing and volume data" and "[Plaintiff's] training materials showing how [it] markets and sells its products" were specific enough to establish sufficient existence of trade secrets").

### E.  Plaintiff Cannot Succeed on Claims Against Bicking and Weiler

While Ms. Bicking and Ms. Weiler have not yet appeared in this action[4] (and there is no indication they have even been served) Defendant notes that Plaintiff has not alleged *any ongoing conduct by either individual* to justify the imposition of injunctive relief. It simply

---

[4] Counsel for Defendants have not been retained to represent Ms. Bicking or Ms. Weiler.

isn't alleged in the Amended Complaint. Moreover, as with Ms. Johnson, the exhibits Plaintiff *has* offered do not evidence any disloyal conduct, but only evidence Ms. Bicking and Ms. Weiler continuing to close projects for CC Ford West LLC through the end of May 2022, while they remained employed by the company. (*See e.g.*, Doc. 9-3, Exs. O-Z.) Plaintiff's allegations that Ms. Bicking and Ms. Weiler misused trade secrets are equally vague and conclusory as the allegations against Ms. Johnson. (*See*, *e.g.*, Doc. 9 (Am. Compl.) ¶¶ 23, 29, 70, 75, 95, 104, 227, 241-251.)  Thus, for the same reason that the relief should be denied against Project Velocity and Ms. Johnson, the Court should deny any injunctive relief against Ms. Bicking or Ms. Weiler.

* * *

In the final analysis under this first, most important requirement for obtaining the relief Plaintiff seeks—*i.e.*, the likelihood of success on the merits—Plaintiff has not shown a likelihood of success on *any claim* that will entitle it to injunctive relief. The Court need go no further in evaluating this application; indeed, courts routinely note that the failure to show a likelihood of success on the merits (or irreparable injury) is fatal to an application for injunctive relief. *See*, *e.g.*, *In re Arthur Teacher's Franchisee Litig.,* 689 F.2d at 1140. Such is the case here, so as to defeat Plaintiff's application.

## II.      Plaintiff Has Not Alleged Any Irreparable Harm

Plaintiff must also show not just a *risk* of irreparable harm, but "a clear showing of immediate irreparable harm" that will result if no injunction is issued. *Aetrex Worldwide, Inc. v Sourcing for You, Ltd.*, 13-CV-1943 DMC MF, 2013 WL 1680258, at *7 (D.NJ Apr. 16, 2013). Note that "[i]rreparable harm cannot be presumed," and must be of the sort that "cannot be redressed by a legal or an equitable remedy," including disgorgement, "following a trial." *Id.* Thus, as in *Aetrex*, where a party alleges that an injunction is necessary to protect against its loss

of "current and future customers and goodwill," a potential loss of business or goodwill is not *inherently* irreparable harm. *Aetrex Worldwide, Inc.*, 2013 WL 1680258 at *8. Rather, if, "a monetary amount can be assessed" to compensate for a loss of customers or sales, injunctive relief should be denied. *Id. See also Golden Fortune Import & Export Corp. v. Mei-Xin Limited.*, No. 22-1710, 2022 WL 3536494 at 7 (3d Cir. Aug. 5, 2022) (denying injunction and finding no showing of irreparable harm where money damages were ascertainable and collectable); *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (same)*.*

In addition, a party's failure to promptly move for injunctive relief provides the basis for an inference that the Plaintiff will not suffer irreparable harm from the complained of conduct. *See Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F.Supp.2d 335, 383 (D.N.J. 2002).

### A. In the Absence of an Enforceable Non-Compete Agreement There Can Be No Risk of Irreparable Harm

The cases relied upon by Plaintiff all presume the existence of enforceable non-compete/non-solicit agreements, and that ongoing competition by the party to be enjoined is likely to injure the party seeking relief. *See, e.g.* Pl. Mem. at 7 (citing *Scholastic Funding Grp., LLC v. Kimble,* 2007 U.S. Dist. LEXIS 30333, at 14 (D.N.J. Apr. 24, 2007); *Balsamides v. Protameen Chems., Inc.,* 160 N.J. 352, 360 (1999); *National Reprographics, Inc. v. Strom*, 21 F. Supp.2d 204 (D.N.J. 2009)) (all of which note the existence of enforceable agreements). Here, however, the absence of any enforceable agreement to preclude Defendants from competing with CC Ford Group West precludes the finding of *irreparable harm* from Defendant's ongoing competition. *Tracey v. Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 341 (D.N.J. 2020) (failure to show likelihood of success precludes finding of irreparable harm).

### B. In the Unlikely Event Plaintiff Prevails on Its Claim, It Can be Compensated With an Award of Damages

To the extent Plaintiff has shown it experienced any harm at all, or it *may* experience any harm, such harm may be compensated by monetary damages. *See*, *e.g.*, *Aetrex Worldwide, Inc.*, 2013 WL 1680258 at *7-*8; *Morton v. Beyer,* 822 F.2d 364, 366 (3d Cir. 1987) (denying injunctive relief where disgorgement of profits adequate to compensate party). Plaintiff alleges, for example, that Defendants have earned or may unjustly earn profits through improper competition with Plaintiff; those profits could be disgorged if Plaintiff ultimately succeeds with its claim. *Kay v. Rosefielde*, N.J. 223 N.J. 218 (2015) (holding equitable disgorgement to be one of many potential remedies available to plaintiff in breach of duty claims); *Golden Fortune Import & Export Corp.*, 2022 WL 3536494 at 6-7. Where monetary damages or other corrective relief are available, "irreparable harm is *never* present." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.,* 847 F.2d 100, 101 (3d Cir. 1988).

**C.    Plaintiffs' Delay in Seeking Injunctive Relief Precludes a Showing of Irreparable Harm**

Where irreparable harm is alleged, an application for a temporary restraining order is expected to be filed expeditiously. *See Nutrasweet Co. v. Vit-Mar Enterprises, Inc.*, 112 F.3d 689, 691 (3d Cir. 1997) (application for temporary restraining order filed on same day as complaint). The failure to move promptly precludes a finding of irreparable harm. *See Pharmacia Corp.* 201 F.Supp.2d at 383; *See Logic Technology Development LLC v. Levy,* No. CV1704630MASTJB, 2021 WL 3884287, at *2 (D.N.J. Aug. 31, 2021) (noting approvingly that delays of even weeks or months to seek preliminary injunctions undercut a finding that there is irreparable harm).

The timing of Plaintiff's application for a temporary restraining order cannot be reconciled with its contention that it will be irreparably harmed in the absence of the emergency injunctive relief it now seeks. Plaintiff commenced this action in May 2022. It did not, however,

simultaneously, seek injunctive relief. Instead, it used the complaint as the basis for entering into mediation with Ms. Johnson, *without* any agreement by Ms. Johnson that the mediation would be pursued without prejudice to Plaintiff's right to seek injunctive relief. (*See* Declaration of David Slarskey, dated Oct. 8, 2022 ("Slarskey Decl.") ¶ 5.) Moreover, on August 9, 2022—prior to that mediation—Plaintiff served Ms. Johnson its proposed Amended Complaint, containing many of the same allegations as are alleged in the Amended Complaint. (*See* Slarskey Decl., ¶ 6)

Plaintiff thus waited for at least *five months* to seek "emergency" injunctive relief, five months during which it *knew* that Ms. Johnson was establishing a competitive business, and working with some of its former clients. During that period, Plaintiff had access to all of Ms. Johnson, Weilan, and Bicking's emails—which Plaintiff in fact reviewed, and used as the basis for developing a draft Amended Complaint provided to Ms. Johnson in August 2022, approximately a month before it made this application. *Now*, with the mediation having failed, and with its prior proposed amended complaint having failed to induce the intended *in terrorem* effect on Ms. Johnson (*i.e.*, Plaintiff had also threatened to sue *Defendant's clients* as a way of intimidating Ms. Johnson), *now* Plaintiff asks the Court to take the extraordinary act of enjoining Ms. Johnson from pursuing her business.

If actual irreparable harm were being caused by Defendants, or threatened by Defendants, then the appropriate time to bring this application would have been *immediately after Ms. Johnson left CC Ford Group West, or at the latest, upon filing the initial complaint in May 2022*. Strategic delay such as is on display here "knocks the bottom out of any claim of immediate and irreparable harm." *Pharmacia Corp.* 201 F.Supp.2d at 383

### D. Injunctive Relief Will Be Ineffective to Avoid Plaintiff's Loss of Clients

The Court should only issue an injunction if that injunction is reasonably targeted at preventing the irreparable harm asserted by the party seeking relief. *See*, *e.g.*, *Jurista v.*

*Amerinox Processing, Inc.*, 492 B.R. at 782 (Plaintiff has not, however, clearly articulated to the Court how Jermax's creditors continue to be irreparably harmed by these allegedly fraudulent transfers such that entry of an injunction is immediately necessary here.)

Here, however, injunctive relief will be ineffective to protect Plaintiff, because *regardless of whether an injunction is entered or not*, Plaintiff is going to lose the clients who no longer wish to work with Studdiford. To the extent those clients are now working with Defendants, there is no basis upon which to find they would have retained Plaintiff for the services that they are now seeking for Defendants. *To the contrary, those clients have indicated that they would not work with Mr. Studdiford under any circumstances.* (*See* Johnson Decl. ¶ 7.) Where the issuance of injunctive relief would not protect against the damage that a party asserts it is suffering, the injunction should not be issued. *See Apollo Technologies Corp. v. Centrosphere Indus. Corp.*, 805 F.Supp. 1157, 1209 (D.N.J. 1992) (movant's allegations of only speculated potential harm caused by defendant could not be addressed by preliminary injunction). Clients that are leaving Plaintiff are going to leave—regardless of whether an injunction is issued.

### III.       The Balance of Equities Tips in Favor of Defendants

Courts must also carefully assess the "substantial injury" that an unwarranted temporary restraining order can cause a defendant. *Nutrasweet Co.*, 112 F.3d at 692. Where a plaintiff seeks a preliminary injunction that would cause the defendant to lose their job, or work at a job outside of their regular field, the threat of harm is high and the balance of equities favor the defendant. *Colorcon, Inc. v. Lewis,* 792 F. Supp. 2d 786, 805 (E.D. Pa. 2011).

The ruinous impact of imposing a temporary restraining order on Defendants cannot be overstated. Defendants have spent *seven months* organizing and launching Project

Velocity—entering into agreements implicitly in *reliance* on the fact that Plaintiff did not seek injunctive relief. If this Court were to enter a restraining order, it would cause significant and likely permanent damage to Defendants' entrepreneurial efforts. It would put Defendants out of business. And it would prevent Defendants from working in the livelihood of their expertise and choosing. A temporary restraining order would harm Defendants' clients as well, who are relying upon Defendants to assist them in launching their pharmaceutical projects. And it would enjoin Defendants *despite* the thinly-merited claims and substantial delay of Plaintiff, and *despite* the fact that if Plaintiff can prove some legal claim, Plaintiff can be adequately compensated by an award of legal or equitable damages, including disgorgement. Under the circumstances, the balance of equities tips squarely in favor of Defendants, and *against* enabling Plaintiff's unsupportable and bad faith application. *See Nutrasweet Co.*, 112 F.3d at 692.

IV.     **The Public Interest Disfavors the Enforcement of Restrictive Covenants**

Generally, a preliminary injunction is more likely to impact the public interest when the lawsuit itself involves a state program or government entity. Where the government is a party to the litigation, or has intervened with an amicus brief, the potential for the injunction to promote or antagonize the public interest is most potent. *See Oburn v*. *Shapp*, 521 F.2d 142, 152 (3d Cir. 1975), (holding that requested interlocutory order would interfere with the training of police and therefore raise the chance of police understaffing which would harm the public); *Constructors Association of Western Pennsylvania v*. *Kreps*, 573 F.2d 811, 820 (3d Cir. 1978) (preliminary injunction, if granted, would have delayed federal funding of economic stimulus bill targeted at increasing public welfare). References to "the vindication of an abstract principle [of public interest]" usually are no substitute for a specific action involving a government actor or program. *Cont'l Grp*., *Inc*. *v*. *Amoco Chemicals Corp*., 614 F.2d 351, 358 (3d Cir. 1980).

But to the extent the Court will consider the public interest in this case, it is worth noting that New Jersey law disfavors restrictive covenants that suppress free trade and labor. *See*, *e.g.*, *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 542 A.2d 879 (1988) (finding courts will not enforce restrictive employment agreements merely to aid employers in extinguishing competition, albeit competition from former employees, without further basis).

Here, Plaintiff seeks to harness the power of the Court, on very dubious grounds, to enforce phantom restrictions against a competitor, thereby impeding free trade and competition. Plaintiff seeks to do so for improper reasons, grounded in bitterness, retribution, and retaliatory motive: Ms. Johnson built CC Ford, and only left after years of professional mistreatment, false promises, false representations, and exploitation by Mr. Studdiford. Prior to leaving, Ms. Johnson *offered to buy Mr. Studdiford's interest* in the business that she had built, but he undercut the negotiations with bad faith negotiating tactics. Then Studdiford turned around and *sued Ms. Johnson,* based on unenforceable agreements, seeking to leverage his complaint, mediation, and the threat of additional litigation against her clients, all into an *in terrorem* payment to which he is not entitled. When none of that worked, Studdiford then— seven months later—came back to this Court asking for a temporary restraining order to shut down Defendants' business. Not only is the restriction of trade generally disfavored, *see id.*, but the Court should simply not be so easily impressed into the service of such a party.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's application for injunctive relief.

Roseland, New Jersey
October 7, 2022

26

CRITCHLEY, KINUM & LURIA, LLC


___/s/ Amy Luria _____
Amy Luria
75 Livingston Ave., Suite 303
Roseland, NJ  07068
(973) 422-9200


SLARSKEY LLC
David Slarskey (*pro hac vice*)
Kimberly Grinberg (on the brief)
420 Lexington Avenue, Suite 2525
New York, NY  10170