UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CC FORD GROUP WEST, LLC,                           :
                                                   :
                              Plaintiff,           :    Civil Action No. 3:22-cv-04143
                    v.                             :
                                                   :    **SECOND AMENDED AND**
JENNIFER JOHNSON, CARRIE BICKING,                  :    **SUPPLEMENTAL COMPLAINT**
BETH WEILER, PROJECT VELOCITY, INC.,               :    **AND JURY DEMAND**
PROJECT VELOCITY PARTNERS, LLC,                    :    **(Proposed)**
MEREDITH MANNING, PHARMAESSENTIA                   :
USA CORP., MATTHEW ORNELAS-KUH, , and              :
JOHN DOES 1-10                                     :

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff CC Ford Group West, LLC ("**CCFW," "Plaintiff**" or the "**Company**"), by way of

Second Amended and Supplemental Complaint against Defendants Jennifer Johnson ("**Johnson**"),

Carrie Bicking **("Bicking"),** Beth Weiler **("Weiler"),** Project Velocity, Inc. **("PVI"),** Project

Velocity Partners LLC ("**PVP**"), Meredith Manning ("**Manning**"), PharmaEssentia USA

Corporation ("**PEC**"), Matthew Ornelas-Kuh ("**Ornelas-Kuh**"), and John Does 1-10[1]

(collectively, the "**Defendants**"), alleges and says:

---

[1] Defendants John Does 1-10 are individuals and/or companies, the identities of which currently are unknown, that, among other things, conspired with Defendants to steal and/or misappropriate Plaintiff's trade secrets and/or confidential and proprietary information, are members of an association-in-fact Enterprise (defined below), knowingly conducted the affairs of or knowingly participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activities, conspired to engage in a pattern of racketeering activities, aided and abetted said activities, tortiously interfered with Plaintiff's contractual relationships and/or prospective economic advantage with its clients and/or vendors, breached duties of undivided loyalty to Plaintiff and/or unfairly competed with it.

## INTRODUCTION

1.      CC Ford directors and staff reported over time that Johnson, a managing director and employee of CCFW, a subsidiary of CC Ford established in 2013, had become a mean and disgruntled employee and angry with CCFW's owner John Studdiford ("**Studdiford**") and his wife Cathleen Studdiford ("**Cathleen**") (together, the "**Studdifords**") although, at that time, the Studdifords were unaware that Johnson harbored ill will toward them and CCFW.

2.      CCFW and Studdiford recently discovered that, as early as February 2020, Johnson was conspiring with CCFW's V.P. of Client Services, Ornelas-Kuh, to form a company specifically to enable them to secretly transfer work being done by CCFW for one of its large and important pharmaceutical clients to their upstart business.  It was also recently discovered that a few months earlier, in September 2019, Ornelas-Kuh and Johnson, as part of their conspiratorial plot,  had begun stealing confidential and proprietary documents from pharmaceutical companies and CCFW to use in their proposed new enterprise.

3.      This appears to be the beginning of the conspiracy to harm CCFW and the Studdifords and open a new business that would illegally enjoy the fruits of Studdiford's and CCFW's hard work and financial commitment over the many years it took to build a successful pharmaceutical communications firm, something that Johnson and Ornelas-Kuh were going to great extremes to avoid.  Stealing the business and confidential information from CCFW was the only way Johnson and Ornelas-Kuh could ensure their own success and profit immediately from their illegal and nefarious actions.

4.      Despite their deceit and planning to steal business and confidential information, to CCFW's knowledge this new entity did not get off the ground at that time.  However, when Johnson learned in September 2021 that the owners of CC Ford Group ("**CC Ford")** sold an independent, unrelated entity for a significant sum and knowing that she was merely an employee of CC Ford's wholly owned subsidiary CCFW--albeit a highly compensated one despite her limited contributions to running the business--Johnson became even more jealous, angry and, vindictive. This fueled her fire to more quickly implement her direct theft of CCFW clients and property  and initiate her get rich quick scheme at the expense of the Studdifords and CCFW.

5.      Around that time, if not sooner, Johnson covertly discussed her desire to wrest control of  CCFW  from Studdiford with her close personal friend and business colleague, Manning, who was General Manager of PEC at the time and through May 2022, and who subsequently was named President of the Americas at PEC until she was abruptly fired in or about November 2023 (along with almost a dozen other employees when PEC "cleaned house"). The timing of the firing clearly aligns with PEC's acknowledgement of this lawsuit and understanding of Manning's and others' involvement in illicit activities described herein.

6.      After failing to underhandedly steal CCFW from Studdiford, in January of 2022, Johnson next plotted to appear as if she was actively trying to purchase CCFW from Studdiford. Although CCFW's owner would have considered selling the Company to Johnson for a reasonable price, Johnson could not have purchased the Company because she lacked the ability to obtain financing.  In reality, her ruse to try to purchase the Company was only a method for her to further align her co-conspirators and bluff Studiford while she prepped for her theft of the Company's clients, confidential and proprietary information, work product and trade secrets ("collectively,

4856-2212-7827, v. 1

CCFW's "**Confidential Information**"), and key vendor relationships, to advance Johnson's own start-up company, PVI.

7.    Once Johnson admitted that she could not afford to purchase the Company, she and Manning, and likely others, followed through on their  plan whereby Manning would use her unbridled power at PEC to drive business managed by CCFW to Johnson's new start-up agency PVI, that  PVI would use CCFW's Confidential Information that Defendants stole, and through which Johnson, Bicking and Weiler would do the work and be paid for it by PVI  despite them still being on CCFW's payroll, while actively covering up their devious scheme and actions from CCFW. All the while, Johnson, Bicking and Weiler were working for CCFW and under loyalty, consulting and/or confidentiality agreements and obligations with CCFW.

8.    Given Manning's position of ultimate decisionmaker with evidently rampant, uncontrolled and unchecked budgeting authority for PEC as its General Manager and later President, Manning plotted to use her power at PEC to effectively manipulate her employees and vast sums of budget dollars so that she could drive millions of dollars of PEC work previously committed and/or worked on by CCFW, directly to PVI for Johnson's and apparently her own and likely PEC's financial benefit, while simultaneously destroying CCFW.

9.    Upon information and belief, Janice Crum (**"Crum"**), an attorney with compliance/regulatory expertise in the pharmaceutical industry and a trusted paid advisor at PEC, as well as a close friend and colleague of Johnson and Manning, participated in this conspiracy and pattern of racketeering and otherwise tortious activity, and/or aided and abetted their pattern of racketeering and tortious activity, and provided legal and regulatory guidance to Manning/PEC, Johnson/PVI  and others to support their theft.

10.     The conspiracy and pattern of racketeering activity were well-planned both in timing and funding opportunities, because PEC's first FDA approved drug, BESREMi, a prescription medicine that is used by adults with polycythemia vera, a rare and chronic blood cancer, had just been approved by the FDA in November 2021, and tens of millions of dollars likely would be spent by PEC in the near term on its marketing and promotion.  As a result, Defendants knew that their plot would rake in millions of dollars and produce staggering profits and financial windfall for them.  PEC paid PVI close to $5 million, if not more, in just the first year, March 2022 – March 2023, and likely paid it close to $10 million prior to PVI being fired by PEC along with Manning and other PEC senior executives.

11.     Samuel Lin ("**Lin**"), PEC's Vice President of Business Operations and Strategies, and the son of PEC's founder and Chief Executive Officer Ko-Chung Lin ("**K.C. Lin**"), as well as others in PEC including its former General Counsel Sulin Shah ("**Shah**"), who also was abruptly fired in or about November 2023, should have acted as checks on Manning's unrestrained power but either knowingly and willingly participated in or acquiesced to Manning's drive to subvert ethical business practices.  At the very least, to the extent they were not fully aware, they were grossly negligent in the performance of their job duties as senior managing executives at PEC.

12.     Manning's and PEC's poisonous and deliberate actions delivered the plan, free-ranging and unchecked opportunity, as well as virtually unlimited funding for Johnson, Bicking and Weiler to leave CCFW, steal CCFW's Confidential Information, and for Johnson and likely others to create a shell company in PVI that would then receive millions in PEC payments for work that was supposed to be performed (and in part was actually performed) by CCFW.  Essentially Johnson, a single person, had immediate access to PEC monies to fund her or Defendant(s)' start-up illicit enterprise.

13.     Manning, as part of senior leadership at PEC, was the lynchpin of this plan and knew that her intentional and malicious conduct, with PEC's participation, would have significant repercussions for CCFW yet she obviously directed (apparently with Crum's significant assistance) Johnson, Bicking and/or Weiler, and the others described below, concerning steps they should take as part of this conspiracy, including their theft of CCFW Confidential Information before Johnson, Bicking and Weiler left the Company.

14.     This was standard operating procedure for Manning as she herself has stolen highly confidential information from previous employers, including Pfizer, Shire, and Vertex, and has shared lengthy and detailed internal corporate strategy documents with Johnson, to actively coopt the information for the explicit benefit of PEC, subsidize Manning's lack of knowledge and leadership, and advance the launch and profitability of BESREMi for PEC and its shareholders despite those documents clearly having been paid for by other leading drug companies and marked confidential and proprietary and/or for internal use only.

15.     Manning used corporate espionage to advance her own career and allowed PEC and PEC shareholders to profit while trespassing on competitors' property by accessing their confidential and proprietary information relating to previous drug launch data and marketing secrets without permission or payment.  The valuable competitive information utilized by Manning and PEC gave PEC and BESREMi a distinct competitive advantage due to the free access of confidential and proprietary information that was previously paid for and owned by other large pharmaceutical companies.

16.     Similarly, the use of this purloined information, the Confidential Information stolen from CCFW by Johnson and other Defendants enabled PVI and/or the other Defendants to illegally and unfairly compete with CCFW and otherwise profit at CCFW's great expense.

17.     Additionally, due to the close personal relationship between Johnson and Manning, Manning knew that PVI at the outset had no other employees or secure offices, and Johnson alone worked solely out of her home.  PVI utilized a "rent a desk" address at a type of location typically shared by a large volume of transient workers employed by various companies and not a secure location for pharmaceutical confidential and proprietary information, lacking any infrastructure, fire walls or secure systems, yet Manning acted with reckless disregard of PEC's corporate responsibilities by leading this plot and encouraging her close friend Johnson and the other participants/co-conspirators.  This included permitting her buddy Johnson, and PVI, to egregiously overcharge PEC substantially more in fees, at times double if not more, than what CCFW charged for the same or substantially similar services.

18.     Given the complete lack of any effective control system at PEC as is required by the government and universally implemented at pharmaceutical companies, combined with her unchecked ego and power at PEC, Manning concocted a devious scheme with PEC, Johnson, PVI, Bicking, Weiler  and others to purposely ignore and violate CCFW confidentiality and other agreements with its employees, and permit Johnson to set up a nascent one-person entity (PVI) in an attempt to destroy what Manning gratuitously referred to as her "favorite vendor CCFW," all while enriching   Defendants, tortiously interfering with CCFW's contracts and business relationships, stealing CCFW Confidential Information and covering up their actions from CCFW.

19.     Specifically, Defendants' fraudulent scheme was for PVI, Johnson, Bicking and Weiler to perform the work as if Johnson, Bicking and Weiler were acting in their roles at CCFW, trading off CCFW's good name, stellar reputation in the industry, strong balance sheet and large network of suppliers and experts, and for Manning to pressure various PEC employees to send additional PEC work to them at CCFW, all the while giving those PEC employees the mistaken

4856-2212-7827, v. 1

impression that the work would be performed by PEC's long-time and preferred partner CCFW. Their ultimate plan was to actively rip the work from CCFW and deliver it directly to the shell company PVI, which they subsequently accomplished.

20.     As part of the scheme, Manning/PEC, Johnson and others were conspiring and planning for Johnson's cronies, Bicking and Weiler, to continue to perform PEC work surreptitiously while at CCFW and while still on its payroll but for the benefit of PVI, in breach of their duties of loyalty, and for Manning/PEC to thereafter terminate PEC's relationship with CCFW (and not pay it for its services rendered), and only thereafter would Bicking and Weiler perform work on PVI's dime once they considered it "safe" to have PVI come out of the shadows and operate in the open.  Upon Bicking's and Weiler's departure in May 2022, Defendants then aggressively implemented their plan to take millions of dollars of guaranteed CCFW work, while Johnson, Bicking and Weiler were breaching their various agreements and obligations and stealing CCFW's Confidential Information,  all for their personal financial gain.

21.     PVI desperately needed guaranteed work from Manning and PEC, in addition to the other CCFW clients it stole, because PVI was an unproven entity with no secure office, no legitimate employees who were not engaged in the fraud, and extremely limited start-up funding. Upon information and belief, PVI was started as a sham company into which PEC could deposit funds for Johnson, Bicking and Weiler (in the form of payments for CCFW work that was remitted to PVI), even before they left CCFW.  The PEC business promised by Manning to PVI was a blatant violation of her fiduciary and other duties to PEC and was the only reason Defendants were able to steal CCFW's business with PEC while working for CCFW and begin funneling revenue directly to PVI to get it off to a flying start.

22.     Moreover, Manning and PEC were fully aware of the duties, restrictive covenants and confidentiality agreements the other individual Defendants had with CCFW that precluded them from taking Confidential Information, and from competing with CCFW for business, but they still actively pursued the plan to extract active PEC business from CCFW and deliver it to PVI, for the benefit of Defendants.

23.     Likewise, Johnson, PVI and others were fully aware of similar duties, agreements and obligations that Ornelas-Kuh had with CCFW, yet even after Johnson and PVI were sued in this litigation, they still had the audacity to have PVI hire Ornelas-Kuh as a Managing Director. To hide Johnson's malicious and tortious interference with CCFW's non-competition and confidentiality agreements with Ornelas-Kuh, and his own violations of same, Johnson and Ornelas-Kuh set up a shadow company, PVP, registered in Delaware on or about July 25, 2023, to hide Ornelas-Kuh's work with Johnson and PVI and their joint efforts to lure CCFW clients to PVI.   To further hide these violations Ornelas-Kuh uses a shadow PVI email address in his work for PVI and PVP; mornelas-Kuh@projectvelocitypartners.com.  And an online search of "Project Velocity Partners" takes a user to PVI's website, further confirming that PVP is connected to PVI.

24.     Johnson's claim that she funded PVI with $70,000 in capital contributions is telling, as this limited amount is grossly under even the minimum required to initiate any legitimate start-up to gain the necessary office space, hire legitimate employees not engaged in the tortious plot, acquire clients, and fund legal and accounting experts, as well as myriad other costs.  In reality, Defendants' scheme ensured Johnson would not need any funding to initiate her theft via PVI. PEC and Manning made sure Johnson and PVI were funded, as they immediately signed contracts and delivered payment to her while she was still a highly paid CCFW consultant and Bicking and Weiler were highly paid CCFW employees.

4856-2212-7827, v. 1

25.     Finally, to actively cover Defendants' tracks, PEC and Manning authorized, and Defendants schemed for, Johnson, Bicking and Weiler to use PEC email addresses to hide their illicit activities and issued PVI Statements of Work ("**SOWs**"), which likely did not go through the normal regulatory, legal and financial channels typically required at a pharmaceutical company, so that PVI could bill PEC for the work performed by Johnson, Bicking and Weiler while still employed by CCFW and thereafter.

26.     Defendants believed their illegal, self-serving and vindictive plot of egregious theft and illicit financial gains was airtight; that they could pull it off without CCFW and its owner Studdiford ever suspecting what they were doing, but they were wrong.  Defendants' devious plans, actions and cover-up were so egregious and flawed that Studdiford and other CCFW employees eventually uncovered their tortious and criminal activities.

27.     Despite Defendants' expansive actions to hide their ruthless and criminal conspiracy, like most cover-ups, evidence eventually came to light that exposed their nefarious conduct and confirmed how far Defendants were willing to go to hide their pattern of racketeering activities.   While it is obvious Bicking, Weiler, Johnson and PVI, and later Ornelas-Kuh, individually and/or through PVP, a recently discovered entity set up to hide his involvement,  were profiteers of this elaborate scheme, an unanswered question is precisely what was in it financially for Manning and PEC?  That will be learned by CCFW in discovery.

28.     In a desperate attempt to fend off CCFW's claims, set forth herein, and divert attention from them, Johnson asserted counterclaims against Studdiford, suggesting, without any basis, that he had agreed to make her a partner in CCFW and that she, in fact, has been a partner for years yet she never paid a penny for any ownership interest.  Johnson knows, however, that her claim to ownership is utterly false and frivolous and exposes her to significant sanctions in this

litigation.  Not only has she conceded that CCFW's parent, CC Ford, was her "employer" of twenty (20) years, she also admitted that she had no agreement with Studdiford, who she referred to as "this fucking asshole of an owner."

## FACTUAL BACKGROUND

### Manning Has a Close Personal Relationship with Johnson
### and a Close Relationship with Bicking

29.     CC Ford and Studdiford had an 18-year business relationship with Manning dating back to 2005 when Manning worked for Pfizer.

30.     Subsequently, Manning met Johnson years ago through Johnson's employment at CC Ford, due to CC Ford's and Studdiford's long history with Pfizer and relationship with Manning.

31.     Johnson regularly seemed to have issues in her life, and the Studdifords felt sorry for her circumstances to such an extent that CC Ford, and later CCFW, overpaid her for her contributions to the business.  In fact, Johnson spent all her career at CC Ford and CCFW working from her home in Brewster, New York, would rarely come to the Company offices in Bernardsville, New Jersey (despite the trip being less than 100 miles), and never took any initiative to learn the complexities of running the business or its finances.  Instead, Johnson focused on client services and sustaining existing business but did not significantly grow it.  Studdiford and other senior executives managed all the executive, financial, legal, regulatory and administrative aspects of the business.

32.     Nevertheless, in or about 2013 or early 2014, Johnson was made a Managing Director of CCFW.  She remained in that role as an employee until the first quarter of 2022, at

which time she became a consultant to CCFW.  Notably, Johnson understood and acknowledged that, throughout her employment with CCFW, she had no ownership interest in it.

33.     Over the course of her employment at CC Ford and CCFW, there were multiple times when Studdiford and a previous COO wanted to terminate Johnson for inappropriate behavior and inappropriate personal relationships, most egregiously with CCFW vendors, for lack of performance, and for creating a poor work environment but CCFW ultimately decided it would be better to try and coach/educate Johnson as well as find an appropriate client she could service considering she would often disappear for days on end with no communication with anyone at CCFW as she often flew off to Europe, Florida and other locations for her own personal endeavors. This was the nature of the Studdiford/Johnson relationship and how CC Ford and CCFW were always run as family-first companies.  The Studdifords believed Johnson was a friend and loyal employee, and they actively helped try to teach her the pharmaceutical agency business and coach her to succeed, while supporting her and her family.

34.     As Manning continued to be a friend of the Studdifords and a loyal client (most recently through PEC) to CCFW, Manning's and Johnson's relationship became a close, personal one that, as discussed in more detail below, in the past few years pervaded and corrupted their business judgment to the substantial detriment of CCFW and provided unfair advantages to PEC.

35.     Johnson's relationship with Manning is so close that Johnson blatantly lied in a certification filed in this litigation to protect Manning and herself, certifying that their relationship was "only professional."  This action by Johnson exhibits her compulsion to lie for financial gain and her belief that she is above the law.  It also demonstrates the deep level of deceit to which Defendants are willing to sink to hide their nefarious activities.

4856-2212-7827, v. 1

36.     Manning and Johnson have been extremely close for a long time and extensively vacation together.

37.     In July 2021, for example, Manning and Johnson traveled with a group of friends, including Manning's brother Geoff Manning (also a PEC employee), to Cabo San Lucas, Mexico, and stayed at a private resort where Manning is, or at the time was, a member of its golf club and where Johnson has or had a time-share.

38.     Manning appears to have used her personal Gmail account for her business communications and, at least at times, appears to have done so to shield PEC legal, compliance and other employees from knowing about her relationship and activities with Johnson and PVI, as well as her theft of competitive materials from previous employers.  Johnson often used her CCFW email address to plan these personal trips and to share golf schedules, shopping lists, restaurant reservations and travel plans with Manning.

39.     In September 2021, Johnson and Manning were planning another golf trip for December 2021.  At that time, Johnson sent an email to Manning's personal Gmail address forwarding a quote from an oceanfront resort in South Carolina for accommodations for four people.  Manning and Johnson had not yet decided who else would join them, but the email confirmed they would "find two other nut jobs and lock this in!"

40.     They ultimately chose Kiawah Island in South Carolina for the December 2021 golf trip (the "**Kiawah Island Trip**"), and they were joined by Crum.  Just three days after the Kiawah Island Trip, on December 20, 2021, Johnson emailed Manning and Crum regarding plans for another golf outing in March 2022 at Rancho Bernardo, San Diego and wrote that she was "looking into a Kiawah reboot! ( ⬤ ) We'll get that calendared as well post-ASH [a pharma convention].  SO MUCH FUN! JJ," to which Manning replied "1000000%.  I have missed you two."

4856-2212-7827, v. 1

41.     Manning also has a close, personal relationship with Bicking, with whom she has worked for many years.  Bicking worked with Manning as Senior Executive Assistant at Shire between 2015 and 2017.  Later, when CCFW was working with Manning while she was employed by resTORbio, Manning conspired with Johnson to pressure CCFW to hire Bicking even though Bicking lacked relevant experience.

42.     Manning's relationships with Johnson and Bicking are so close that she, and therefore PEC, knew they had various agreements with CCFW that precluded them from competing with it and from misappropriating its confidential and proprietary business information and trade secrets.

43.     After this lawsuit was filed, CCFW sent Manning and PEC litigation hold letters and a copy of the First Amended Complaint on September 22, 2022, to avoid any argument that they were unaware of the contractual restrictions on Johnson, Bicking and Weiler.  In the end, it did not matter to them because PEC and Manning did business with them anyway.  Furthermore, the bullying nature of PEC was harshly displayed to CCFW when PEC's outside counsel, upon seeing the details of the proposed Second Amended Complaint on or about July 27, 2023, seethed, stating "Your client (Studdiford) will be sorry, we will bury him!"

**Manning and Johnson Conspire Against CCFW**

44.     In September 2021, CC Ford sold an independent, unrelated entity for a significant sum and this caused Johnson to become extremely jealous of and more angry at the Studdifords. Johnson knew, however, that she was just an employee and became highly vindictive.  At the time, the Studdifords did not know Johnson harbored this anger and ill-will toward them and only learned this much later from CCFW employees.

14

45.     Rather than act like a leader and Managing Director to develop a plan to improve the profitability of CCFW and discuss opportunities for a similar sale with Studdiford, Johnson and Manning crafted, implemented and attempted to cover up the plot, with the other Defendants, to steal CCFW business for Defendants' financial gain, all in direct contravention of their CCFW agreements and obligations, as well as to Johnson's legal responsibilities to CCFW as its Managing Director.

46.     In or about mid-October 2021, Johnson sent Manning CCFW's budget estimates for the work CCFW would be performing for PEC in 2022.  The estimates were large as were the fees to be earned by CCFW.  Although this amount was a conservative budget estimate, it was significant enough to spur Manning and Johnson into thinking about how to keep that business for themselves and/or the other Defendants.  At that time, Johnson emailed Manning stating "[w]e don't want to miss the boat!" evidently referring to the two of them and PEC.  More importantly, with the pending potential approval of BESREMi during late 2021, Manning and Johnson knew that the flood gates of PEC cash would open, and they could fraudulently secure huge budgets for PVI due to the PEC launch of BESREMi – a standard pharmaceutical marketing approach of providing a high level of funding for marketing, sales and educational activities to improve drug launch awareness and success.  Thus, the conspiracy to steal CCFW's business through a pattern of racketeering activity and tortious misconduct clearly was underway by the Fall of 2021 but likely started a year or two earlier.

47.     Upon information and belief, this was a hot topic of discussion between Manning, Johnson and Crum when they were all on the Kiawah Island Trip in December 2021.

48.      Just weeks before the Kiawah Island Trip, Johnson emailed Manning that she was looking forward to their down-time and discussing work "WHILE we are golfing, spaiing [sic],

relaxing, friending and drinking…"  It is obvious that at this point their close, personal relationship was now focused on how to enrich themselves, but unfortunately their lack of ingenuity and entrepreneurship led them to a plan of theft and deception rather than setting up their own honest, above-board business venture.  That would be too difficult; instead, it was easier to deceive and steal from CCFW for their own financial gain.

49.     When on the Kiawah Island Trip, Manning and Johnson and presumably Crum sat at a meal and conspired on a plan, approach and communication strategy/points for Johnson to demand that she be given total control of CCFW from CC Ford, the owner of CCFW, and Studdiford.  This fact was discovered only after Johnson left CCFW, on an audio file on CCFW's computer.  Upon information and belief, Crum, an attorney and employee and/or consultant at PEC in 2021, who ironically had been responsible for preparing any compliance policies and procedures at PEC, was the one giving this "advice" and encouragement to Johnson on the recorded audio file.

50.     This audio file titled "Sanctuary_Beach_Dr. m4a" was sent directly from Manning's PEC email account to Johnson on Friday, December 17, 2021, with the Subject heading: "Janis [Crum's first name] amazing."

51.     This active participation and direction from Manning and Crum, both of whom were paid PEC executives, to advance Johnson's and PVI's theft of CCFW business, assets and Confidential Information clearly show the tight relationship of all three and their participation in the unlawful scheme.  Moreover, Crum would have been encouraging and facilitating the violation of routine, established compliance policies that should have existed at PEC, ones Crum may or should have drafted or overseen at PEC.

4856-2212-7827, v. 1

52.     Aware that she and PEC were the critical participants in their scheme, Manning, with Crum's participation and assistance, created a script for Johnson to use when communicating with Studdiford to allege that the CCFW business was somehow hers even though Johnson, Manning and Crum knew that was not the case.

53.     Crum and/or Manning also instructed Johnson to tell Studdiford that he should do what was in the best interests of CCFW's clients, contemplating Johnson would be able to wrest control of CCFW from Studdiford for her own, and possibly Manning's and Crum's gains.

54.     As memorialized on the audio file, Crum or Manning's conversation with Johnson went as follows:

> **Crum/Manning:** It's been an amazing ride; no, I think you start out with, you know what these two years have been like for me, both personally but also professionally.
>
> **Johnson:** Right.
>
> **Crum/Manning:** I've grown this business from A to B over the past twenty years that we've been working together.
>
> I was really excited when you made me the offer …offered to start this company for me.  I took the reins and I ran with it.
>
> **Johnson:** Nice.
>
> **Crum/Manning:** And so I'm so appreciative of you know, all the confidence you put in me, and I'm proud of what I've done here.  But I think it's time, if you look at what's really happening here.  I'm bringing in all the business and I'm working all the business. Essentially John, this is my business now.
>
> **Johnson:** Right.
>
> **Crum/Manning:** What is most important to me now, is that we do what is right by our clients, and we do what is right by ourselves.  And I feel like I deserve to have the full stake of the current set of business.  So, I want to leave you in a good place, and I want to leave myself in a good

17

place. But most importantly for our reputation, we want our clients to be in a good place as well.

So, here's my offer to you. Blah blah blah blah blah. I'm going to give you five days to think about it.  And I, you know, I want to keep this conversation open.  But I'm not going to wait another 30 days, I'm not going to wait another 90 days, I'm not going to wait another two years. Like, we need to make this change now.

**Johnson:** Mmhhhh.

Ha Ha Ha.  [all laughing.]

55.	Crum or Manning's recitations, quoted above, of Johnson's work for CCFW reflect nothing more than Johnson's exact job responsibilities at CCFW, as Johnson herself has admitted, for which she was paid $550,000 per year; that is, "bringing in business," and "working the business."

56.	Johnson was an overcompensated Managing Director with a demeanor that often pitted employees against each other, played favorites, and was unable to effectively grow the business during her employment with CCFW.

57.	CCFW was (and remains) a highly diversified business with numerous clients and industry veterans who ran the business with no input from Johnson.  In fact, Johnson was so out of touch with the majority of CCFW clients, that account directors preferred to have her stay away from the business given her hostile approach to client relationships and questionable behaviors and attitudes.  As a result, Johnson focused virtually all of her time on her relationship with and work for PEC, including the subsequent plot to conspire to and actually steal CCFW business for her own and the other Defendants' gains.

58.	Despite Johnson's proclamations of her leadership and success, her tenure as Managing Director of CCFW was, overall, a failure.  While the rest of the industry was booming and other agencies were expanding and growing in profitability, Johnson lost nearly 50% of

CCFW's gross revenue between 2015 to 2021, and she never grew overall profitability during her tenure. As just one example, in September 2021 Johnson admitted to Bicking that she had made a poor business decision that cost the Company $400,000 to $600,000 in revenue by not staffing for medical writers because she was too afraid to make that decision. In contrast, Studdiford's other business grew exponentially over this same period and culminated in a highly profitable sale to an industry-leading strategic partner.

59.     Moreover, while Defendants were secretly collaborating on their strategy, Johnson had the gall to charge or expense Manning's accommodations, food, drinks, incidentals, clothing, and gift shop purchases for the December 2021 Kiawah Island Trip as a business expense on Johnson's CCFW American Express card, all of which were reimbursed by CCFW / Studdiford.

60.     With their tortious scheme quickly advancing, on December 29, 2021, Johnson sent Manning an email to her personal Gmail account with the subject line "Review," containing draft language of an email to be sent to Studdiford demanding her sole ownership of CCFW. This was phase one of their conspiratorial plan to wrest control of CCFW from Studdiford.

61.     Much of Johnson's draft email was lifted verbatim from the language Crum and/or Manning had scripted for Johnson as heard in the audio file, and in it Johnson, in essence, admits that no partnership ever existed with Studdiford – thereby conceding that her Counterclaim in this litigation is frivolous and made up in a feeble attempt to obtain some leverage in this lawsuit.

62.     In preparation for Johnson sending this legally crafted and PEC-sanctioned demand, Manning – acting as the leading senior executive at PEC – utilized her PEC email and PEC Zoom account and sent a PEC Zoom invitation to Johnson and Crum after 11 p.m. on December 30, 2021, with the title, "LET'S GET THIS SHIT DONE." This Zoom call was the

19

concluding working strategy session where Crum, Manning and Johnson finalized the email Johnson ultimately sent to Studdiford demanding her control of the Company.

63.     That Zoom session further highlights the close, personal nature of the relationship between Manning and Johnson, as well as Manning's enmeshment in this plan to steal CCFW's business and clients.  And, just as they planned, on December 31, 2021, Johnson sent that scripted email to Studdiford and thereafter Defendants set their deceptive campaign into full gear with Bicking and Weiler on board.

64.     After receiving Johnson's email, Studdiford set up a call with Johnson to discuss her demands and offer her a number of positive alternatives, including a potential sale to her, the sale to a recent acquirer of an unrelated company, or engagement of his investment banker to prepare the Company for sale.  Realizing Studdiford was not going to just hand over CCFW, Johnson demanded that her only way forward would be for her to buy the Company, although she knew that she lacked the means to get this done, yet both CCFW and Johnson moved forward and allowed their respective lawyers to engage in the next steps.

65.     When Johnson and Manning realized that Studdiford was not going to just hand the keys of his Company over to Johnson, and always knowing Johnson would never be able to raise the funds for purchase (although, again, CCFW / Studdiford would have considered a purchase offer), Defendants led by Johnson and Manning shifted focus to Johnson starting another company, PVI, and to Manning diverting PEC's business away from CCFW to PVI, even as Johnson, Bicking and Weiler still were working for and being paid by CCFW.

66.     Johnson desperately needed PEC's revenues and those from other CCFW clients to start the PVI enterprise, as she had little to no direct relationship with other clients.  Rather than start up her own business from scratch and invest the time and money to be successful, as the

Studdifords had done 23 years earlier, Johnson's only option for an immediate financial windfall for herself and other Defendants was to steal from CCFW.

### Defendants Covertly Implement Their Plan

67.     Evidencing Manning's active leadership to deceive and hide from CCFW that PEC was planning to have its projects run under the CCFW banner without paying CCFW for the services, and with the intention that all the work would be awarded to PVI, on February 16, 2022 (prior to Johnson's resignation letter to CCFW on February 28, 2022), Manning sent an email to Johnson, Bicking and Weiler requesting that they restrict access to the PEC files on CCFW's SharePoint server to the three of them only, and also instructed them to tell Manning first if anyone else at CCFW requests access to those files.

68.     Next, to divert attention away from what Defendants were planning, and to steer active current business and additional future business to PVI, Manning advocated via email on Sunday, February 27, 2022, to her executive underlings at PEC, as set forth below, that they consider using CCFW for their projects. To do so, she not only manipulated CCFW and the PEC employees involved, but also leveraged her control of PEC finances.   Manning's email was sent the day before Johnson tendered her resignation to CCFW.

69.     Knowing that Johnson was going to advise CCFW the next day that she would be resigning, Manning sent a clear message in her February 27th email to six high-level executives with decision-making authority at PEC that she wanted them to consider CCFW for their PEC projects, writing:

> I have worked with many agencies in the past and very few operate [like CCFW] at the level [of] excellence I expect for conference planning, logistics and execution.  Additionally, JJ [Johnson] and her team is [sic] fully integrated and know all of the PEC Global and USA team members.

4856-2212-7827, v. 1

70.     Manning then "suggested" to her team that they "reach out to CC Ford to see if they have the capacity" to do additional projects for PEC such as booth design and build, sponsorships of CME (continuing medical education), abstract and/or poster development, investigator meetings and advisory boards, allowing it was up to them and their teams to decide.  By knowingly and falsely endorsing and recommending CCFW to others at PEC, specifically CCFW's work, employees, history and targeted knowledge and expertise – all the while knowing that payment for the work would be directly deposited into PVI – PEC and Manning provided incalculable benefit to PVI, ensuring PVI's future financial gain, while directly diverting those payments from CCFW.

71.     As the most powerful senior official at PEC, Manning was fully aware that her pressured suggestion to drive business for the benefit of Defendants would result in an active shift of business to PVI and in tremendous growth due to the huge budgets associated with the launch of BESREMi.  Employees typically do not say "no" to the top executive at their company.

72.     Of course, to shield her nefarious actions and manipulation, Manning deceitfully did not copy Johnson or anyone else from CCFW on her email, but Johnson nonetheless clearly received a copy of the email as she had it on her laptop.  Inherent in the nature of her executive position and power at PEC, Manning used her office and function to secretly send to Johnson PEC employees' positive confidential responses to highlight the "veiled endorsement of CCFW."  This knowingly misleading information was critical to their plan and allowed Johnson to witness first-hand how Manning was successfully encouraging her unwitting PEC team to continue to hire Johnson, and eventually PVI, to support PEC's business/sales efforts, under the false pretense of promoting CCFW.  Manning was deceiving her employees and grooming them to use CCFW for "everything," while clearly intending all that business would go directly to PVI.

73.     As set forth below, ultimately Manning, the leader of the conspiratorial den of thieves, weaponized Johnson and PVI with nearly $5 million of PEC's money in its first year, manipulated PEC employees and CCFW, and enriched Johnson, and likely herself and the other Defendants.

74.     Johnson responded to Manning that same day, writing "[t]his makes me happy (🟠)! THANK YOU. Thank you."  The plan was taking shape to the delight of Johnson as she responded to Defendants' devious plot to set up CCFW with more business and then steal it for Defendants' benefit.

75.     The next day, February 28, 2022, Johnson informed CCFW that she was resigning and did so with an apparent guaranty from her co-conspirator, Manning, that PEC would send her its business, and knowing the false representation made by Manning that CCFW would be PEC's "go to" agency in the future.  Manning's email to her PEC colleagues/reports was the final nail needed for Defendants to succeed in ensuring continuing work, and now Johnson could resign, set up PVI and steal CCFW business as Manning, Johnson and Crum had planned.  Johnson's negotiated departure date as CCFW's Managing Director was March 25, 2022, although, as discussed below, Johnson entered a consulting arrangement with CCFW through July 17, 2022.

76.     February 28, 2022, was the same day Johnson filed the certificate of incorporation for PVI offering as little information as possible in the filing so as not to provide evidence of Defendants' wrongdoing, company ownership or other critical information that would have exposed Defendants' plan while Johnson, Bicking and Weiler still worked for CCFW.

77.     In addition, while still the highly compensated Managing Director of CCFW, Johnson was actively soliciting other CCFW employees and/or clients and gathering and misappropriating all the CCFW Confidential Information she could get her hands on prior to her

departure from the Company. This included PEC confidential files as well as those of other active CCFW clients.  For example, on or about April 30, 2022, Bicking stole CCFW Confidential Information relating to multiple CCFW clients, and sent it via her personal email to Johnson at her personal email address. She also forwarded to Johnson CCFW's proprietary job descriptions.

78.     About a month or so earlier, in January 2022, Ornelas-Kuh, then a Vice President of CCFW, drove to Johnson's home in New York to support Defendants' plot to steal CCFW business and also plot his departure. This was evidenced by gas and toll information from his Company Amex account.

79.     On February 25, 2022, Johnson was emailing, from a personal Gmail account, with Ornelas-Kuh, and received from him a copy of his Duty of Loyalty Agreement, which barred him from competing with CCFW for one year from whatever date he left the Company.  Nevertheless, on or about February 27, 2022, March 18, 2022 and March 30, 2022, Ornelas-Kuh brazenly sent CCFW Confidential Information to Johnson while he knew she was leaving, and in or about mid-June 2022 set up a meeting between them at Johnson's house in Brewster, New York.

80.     Ornelas-Kuh gave notice in early 2023 that he would be leaving the Company to pursue other opportunities.

81.     At or about the time of Ornelas-Kuh's resignation notice, the Company performed an internal audit of Ornelas-Kuh's pass-through expenses to Janssen, one of CCFW's most important clients.  As a result of the audit, CCFW determined that Ornelas-Kuh stole approximately $85,000 for his personal benefit that he had inappropriately and fraudulently claimed were business expenses attributable to work on the Janssen account.

82.     Ornelas-Kuh's theft consisted of, but were not limited to, using his CCFW American Express card and coding the charges as pass-through expenses to Janssen project codes

for: (1) extravagant meals for himself and at times others; (2) throwing himself a birthday party; (3) personal items; (4) gifts for subordinates; (5) gift cards for personal use; and (6) plane/train tickets for personal trips. Specifically, these fraudulent charges submitted as pass-through expenses to Janssen included:

 a. In June 2022, he charged $1,626.47 to pay for a birthday party he threw for himself at Nido's Backyard, a restaurant in Oakland, CA. He coded the five-page invoice charged back to a Janssen project as a pass-through expense, listing on the invoice nine names, none of which were associated with the Janssen account. The total was charged by Ornelas-Kuh on two separate credit cards.

 b. In November 2022, he booked $1,284.60 for a first-class plane ticket for himself to travel from Palm Springs, CA to Philadelphia, PA (with a connecting flight to and from Phoenix, AZ), while the travel had no connection to Janssen work.

 c. In December 2022, he charged a $1,225.68 dinner at Barclay Prime in Philadelphia fraudulently claiming in expense records that nine Janssen employees attended a medical affairs "strategy team" dinner. Instead, only four people, including Ornelas-Kuh, attended the dinner, which did not concern Janssen business.

 d. In January 2023, Ornelas-Kuh dined alone at Jean Georges Restaurant at the Four Seasons Hotel in Philadelphia, PA. The hotel's check detail identifies the number of guests as one, yet Ornelas-Kuh racked up a $719.34 invoice, with at least $353.10 attributable to alcohol, which is prohibited from being passed through to the client, even if the meal was a legitimate pass-through expense (it was not). He coded the invoice and expenditure to a Janssen project account as a "Medical Strategy Team" dinner.

83. These are but a few examples of what appear to be a standard, criminal pattern of seeking (and obtaining) reimbursement for purported "Janssen-related expenses" that were not in any way related to or appropriately reimbursable by or on behalf of Janssen or appropriate or acceptable CCFW business expenses.

84. These fraudulent submissions for reimbursement by Ornelas-Kuh put in jeopardy CCFW's strong and long-standing relationship with Janssen, including existing work commitments and future work. Moreover, it appears that it was Defendants' intention to financially

harm CCFW while, at the same time, they were conspiring to wrongfully compete with, and already were wrongfully competing with, CCFW.

85.     In or about late April 2023, upon discovering this excessive fraud and before Ornelas-Kuh had left the Company, CCFW fired Ornelas-Kuh for engaging in this fraudulent conduct, in advance of his planned date of departure set forth in his resignation letter.

86.     At or about the same time, CCFW informed Janssen of what occurred and agreed to, and did, reimburse Janssen for the improper charges.  CCFW repaid Janssen in full for the fraudulent expenses posted by Ornelas-Kuh in the amount of $69,648.40.  The remainder of the fraudulently coded expenses were caught by CCFW before they were billed to Janssen but, nevertheless, were additional damages to CCFW because they were paid directly by CCFW to American Express.  Ornelas-Kuh has never repaid any of those fraudulent charges.

87.     Soon after Ornelas-Kuh departed CCFW, Johnson and/or PVI hired him despite their full knowledge of his non-competition and other obligations to CCFW, including in Ornelas-Kuh's his Duty of Loyalty Agreement (that he previously shared with Johnson in February 2022) and notwithstanding that CCFW had already filed suit against Johnson and PVI, violating her own non-compete and their other contractual and legal obligations.

88.     CCFW recently uncovered that Johnson's collusion with Ornelas-Kuh, in violation of both their duties of loyalty to CCFW, dates to before February 2020.

89.     At or about February 2020, there were communications between them wherein Ornelas-Kuh forwarded to Johnson an exchange he had with Janssen's vendor management affiliate, Worksense, where he inquired about the best way to change the name and entity of an account with minimal business disruption. Significantly, CCFW was not contemplating – and was certainly not discussing – changing its name or entity in any way.  Ornelas-Kuh wrote:

Hi Michelle,

I am hoping you're the right person to ask for this. CC Ford is potentially undergoing a name and entity change. We've been growing (yay!), and it's looking like some adjustments to the existing entity structure will help us operate better across the US.

My question is this – if we do change the entity and name, what do we need to do on the J&J side to carryover the MSA/projects we have in place? I'm wondering if WORKSENSE has experience or a standard way of accommodating this. Basically, we'd like to preserve the work we have with J&J with minimal administrative disruption.

Happy to talk!
Matt

90.     The Worksense representative responded and asked: Hi Matt – is it just a name change or will you be changing your tax ID numbers as well? To which Ornelas-Kuh responded: "I think the tax ID numbers would also change."

91.     The Worksense representative responded the same day as follows:

So if everything is changing then we would need to offboard the old company and onboard the new. Its [sic] kind of awkard [sic] because we really cannot offboard the old company until all current SOWs under that name have ended and all invoices have been paid. So its [sic] possible you will have to manage two accounts for a while until we can offboard the old one. Let me know when you are ready and have all the info to onboard the new one.

Ornelas-Kuh promptly forwarded this exchange to Johnson with an "fyi."

92.     Less than two weeks prior to that exchange, on February 15, 2020 Ornelas-Kuh had sent an email to Johnson about the work he was drumming up, stating:

Hi, I wanted to make your weekend 🟠 ~~Here~~ is the expected revenue for the three Actelion SOWs, based on Net 100 terms and less the WORKSENSE management fee: All of this work is slated to end mid year. I want to sell another ~350k worth of work for H2 2020… at least. POAs for sure, more TAMs? Bill PMO? … Excited to see how much the JJ + Matt partnership can generate (smiling winking emoji)
Matt

27

93.     At no point were CCFW or John Studdiford considering a change of the entity or name, but apparently Johnson and Ornelas-Kuh were already conspiring to steal CCFW business and start their own business for their own financial benefit and, notably, February 2020 is the month Manning began working at PEC.

94.     And in March 2021, Ornelas-Kuh sent Johnson a sample "Identity Proposal" from a vendor that provides assistance with developing or changing company logos when there were no plans for CCFW to change its identity, name, website or logos.

95.     Thus, it is now no surprise that in early 2022, Ornelas-Kuh, fully aware of Johnson's plans, began actively stealing and sending Johnson confidential CCFW and client information. For example, on February 26, and February 27 2022, two days before Johnson resigned from CCFW, and one day after Ornelas-Kuh forwarded his Duty of Loyalty agreement with CCFW to Johnson, he was sending Johnson confidential CCFW financial information and other details regarding Janssen's pending and ongoing work with CCFW.

96.     In early March 2022, after Johnson had informed Studdiford she was resigning and while still working as Managing Director of CCFW, but before she purportedly informed others in the Company she was leaving, Johnson sent an email to the CCFW leadership team, without copying Studdiford, requesting an accounting of all signed SOWs for 2022 by client and by project. Clearly this active theft of information, information Johnson knew she and the other Defendants were not entitled to, was to support her/PVI's theft of CCFW clients, Confidential Information, all in an effort to steal and leverage this highly business sensitive information to advance her own company, PVI, the other Defendants and engage in illegal and criminal unfair competitive practices through a pattern of racketeering activities.

97.     Fully on board with their plot and an active participant apparently from the beginning, Bicking responded to Johnson right away, sending her a highly confidential internal CCFW budget tracking spreadsheet with 2022 budgets for various CCFW clients including PEC and six others. Similarly on March 18, 2022, days before the last day of Johnson's tenure as Managing Director, Ornelas-Kuh sent Johnson a proprietary and confidential CCFW marketing presentation that Studdiford had recently sent him, as well as additional information on upcoming Janssen work. That day Ornelas-Kuh was also helping Johnson script her departure emails. In response to one of the draft departure emails Ornelas-Kuh sent her, Johnson responded, "Makes me smile and feel appreciated. We make a pretty AMAZING team."  It is unclear from Johnson's response whether she was referring just to herself and Ornelas-Kuh as a "team" or to the broader association-in-fact enterprise involved in the illicit and criminal activities.

98.     Valuable intellectual property and proprietary information and intelligence on CCFW's SOWs and their associated budgets, which include highly proprietary, competitive, business-sensitive information and trade secrets on pricing, vendors and processes, among other things, would allow Defendants to target clients and use pricing information to unfairly compete with and/or divert work from CCFW. All these materials and others were CCFW work product that were later found on Johnson's laptop that she took with her when she left CCFW. With the SOWs and budgets in hand and a plan to steal work from CCFW, Defendants began counting their ill-gotten gains before PVI was even established, and before one client was legitimately acquired or one stitch of work was performed by it.

99.     To further the subterfuge and deflect CCFW's attention away from Johnson's and the others' racketeering scheme and theft of Confidential Information Johnson sent a March 23, 2022, "CYA" email to high-level executives at PEC including Manning, and copying John

29

Studdiford, claiming that it was Johnson's wish that PEC continue its relationship with CCFW "as its execution partner," while Johnson knew full well that the work would actually go to her, PVI, Bicking and Weiler while they were still on CCFW's payroll – and that PVI would bill PEC, and receive payment from PEC, for that work.  Lin and Shah were two of the addressees on and recipients of Johnson's email.

100.    That same day, Manning directed CCFW to communicate only with her at PEC, obviously not wanting others to know what she and the Defendants had planned.  This attempt to quash Studdiford and all CCFW employees from interacting with others at PEC was a blatant effort by Defendants to control the narrative and perpetuate their overall plan; thus, the cover-up proceeded.

101.    Unfortunately, Studdiford had no suspicions of Defendants' devious plans at the time because of their long professional history and relationship, and he followed Manning's directive.

102.    In addition, given the email from Johnson requesting CCFW continue to lead PEC business, as well as the fact that Bicking and Weiler were still employed by CCFW, Studdiford continued to actively support Bicking, Weiler, Manning and PEC employees on PEC projects, including those projects already guaranteed by Manning/ PEC to go to Johnson/PVI.  Studdiford was fooled.

103.    Emails between Johnson and PEC, including Manning, in the days just prior to March 23, 2022, and even during the earlier part of that very day, make plain that Manning and Johnson had no intention that Johnson would be leaving the PEC business behind with CCFW once she left.

104.     Those emails make crystal clear that Johnson's work continued full force.  For example, on Monday March 21, 2022, Johnson emailed Manning to provide quick updates regarding biweekly issues, goal decks, their coffee-chat schedule, and her joining an upcoming meeting.  The same day Johnson was included in preparing a medical response letter.  Johnson also was leading discussions for a meeting on that same day regarding a payer taskforce and advancing key tactics.  And she was deeply involved concerning sensitive issues relating to medical goals for 2022.

105.     And prior to the above email to Manning and Studdiford on March 23, 2022, on the very same day, Johnson already had been emailing Manning and Anjana Pursnani, the PEC Head of Human Resources and Senior Vice President Head of People, about the 2022 goals indicating "As is[sic] you have not had enough fun on goals YET - - - we have been working this morning on clean ups overall and the one pager view to share this week. What do you think of this layout?" Manning responded, again before the email announcement, stating "Amazing."

106.     Also on March 23, 2022, Johnson's co-conspirator, Bicking, was emailing high-level PEC personnel, including Lin, Shah and Kevin Ma, the US Head of Compliance and Managing Counsel, to discuss upcoming regular meetings over the next three to four weeks on a key strategic initiative. The "team" listed in that email included these three executives.

107.     The next day, March 24, 2022, just one day after she had purportedly first told Manning and PEC that she was leaving CCFW, Johnson was in possession of an email from Manning to high level PEC individuals, not copied directly to her, discussing the highly sensitive medical goals for 2022, including plans well into the third quarter of the year.

108.     Johnson also had possession of an email from that same day from Manning to a high-level PEC individual regarding approval of an invoice for an upcoming Congress, which also had not been sent or copied directly to her.

109.     And on March 25, 2022, Johnson's last day as a CCFW employee, and one day before she signed consulting and confidentiality agreements with CCFW, Manning was sharing with Johnson a SharePoint link to PEC files.

110.     Given their close personal relationship and all the communications between them regarding Johnson's leaving CCFW, Manning certainly knew Johnson was leaving CCFW well before March 23, 2022, yet these emails reflect that Manning and PEC contemplated a continuing work relationship with Johnson going forward.  This is not the conduct and participation of someone who was about to stop working for PEC and transition the work to her CCFW colleagues, or of a General Manager of a company who was going to stop working with Johnson.

111.     But it was not enough for Johnson to know that she and other Defendants would soon rake in millions of dollars of PEC's business she was diverting from CCFW to PVI.  Her ego and greed got the best of her, and Johnson wanted more money from CCFW.

**Johnson Signs a Consulting Agreement and Confidentiality Agreement with CCFW, in Addition to her Restrictive Covenant Agreement with CCFW, with Full Knowledge that She Would Immediately Breach and Would Not Comply with Them Going Forward.**

112.     Not knowing what Johnson would be doing next to earn a living and being unaware at that time that Defendants were actively conspiring to steal business from CCFW and breach CCFW's confidentiality and non-competition agreements, the Studdifords again went overboard for their trusted and long-time employee, Johnson.  Not only did the Studdifords host a Goodbye Zoom call with all CCFW employees to thank Johnson for her service and give her the opportunity to say goodbye to everyone, but they also had CCFW give Johnson a lucrative consulting

32

agreement to help someone they believed to be a "friend" as she embarked on the next phase of her life.

113.    Despite knowing what Defendants did and were about to do, and to further divert CCFW's attention from their previous, current, and future criminal and tortious actions and give Defendants even more time to steal CCFW's Confidential Information, Johnson's greed again got in the way.  She grabbed the extra cash being offered and, on or about March 26, 2022, signed both a Consulting Agreement (with a term through July 17, 2022) and a Confidentiality Agreement (with a ten-year term), knowing full well at the time she signed them that she would not comply with their terms.

114.    In fact, just the day before, on March 25, 2022 (her last day as a CCFW employee), and with the hope that she could divert more business from CCFW to PVI, Johnson reached out to Pamela Stephenson, the COO of another important CCFW client, Albireo Pharmaceuticals, informing her that she was resigning from CCFW.

115.    The Consulting Agreement with CCFW that Johnson signed on March 26, 2022 provides, in pertinent part, as follows:

> Contractor agrees, for the duration of the term of this agreement, not to pursue any business opportunities that will create a conflict of interest with the Company, and to notify the Company immediately, in writing, of any actual or potential conflict of interest.  Contractor also agrees, for the duration of the term of this Agreement, not to solicit any client, customer, or employee of the Company to engage in any business relationship with Contractor other than in furtherance of the objectives of this Agreement.

116.    Meanwhile, the Confidentiality Agreement provides, in pertinent part, as follows:

> Consultant agrees, for a period of ten (10) years following the Effective Date, to retain in confidence all Confidential Information disclosed to Consultant by or on behalf of CC Ford Group, whether or not in writing or recorded in electronic of other format. Consultant further agrees that she "will not, either directly or indirectly, use any Confidential

Information for any purpose other than to discharge her duties under the Consulting Agreement without the prior written consent of CC Ford Group."

Confidential Information is defined in the Confidentiality Agreement as "All technical data, materials, and/or information, as well as all studies, analyses and/or copies derived therefrom, and any other nonpublic information of CC Ford Group provided to Consultant in the performance of her services." CC Ford Group includes all subsidiaries and affiliated companies including CCFW. The Confidentiality and Consulting Agreements are attached hereto and incorporated herein by reference as **Exhibits A and B**, respectively.

117. These agreements were in addition to an earlier restrictive covenant agreement that she also had violated and intended further to violate going forward. Specifically, since on or about August 31, 2003, when she began working for the Company's parent, CC Ford Group, Johnson was bound by an Employee Non-Competition, Non-Solicitation, Confidentiality and Dispute Resolution Agreement ("**Johnson's Non-Compete Agreement**") with CC Ford Group which was later assigned to the Company. Johnson remained bound by the Johnson Non-Compete Agreement when she was assigned to work for CCFW in 2013 and thereafter. CCFW is a wholly owned subsidiary of CC Ford Group, and Johnson continuously held herself out as a CC Ford Group employee in her emails, healthcare insurance, Amex business card, work signature blocks, and in her highly active and detailed LinkedIn account. When she left the Company, she asked Studdiford for copies of her non-compete agreements, clearly acknowledging she was bound by them.

118. Pursuant to Johnson's Non-Compete Agreement, Johnson agreed, among other things, not to compete or own, directly or indirectly, any "competitive business" (as defined in Johnson's Non-Compete Agreement) with CC Ford Group during Johnson's employment and for a period of one (1) year subsequent to her employment's termination. Specifically, Johnson's Non-Compete Agreement provides:

   *a. Restrictions on Competition.* During Employee's employment

34

with the Company and for a period of one (1) year after termination of Employee's employment with the Company, Employee will not, directly or indirectly, own any equity interest or option or right to acquire an equity interest in any Competitive Business as defined in subsection (e) below (other than in Employee's capacity as a holder of not more than five percent (5%) of the combined voting power of the outstanding stock of a publicly-held company).

119.    Pursuant to Johnson's Non-Compete Agreement, Johnson also agreed for a period of two years not to solicit for any "competitive business" (defined therein), directly or indirectly, any account, client or customer with whom CC Ford Group had conducted business or for whom it had performed services during the one-year period prior to Johnson's termination. Pursuant to Johnson's Non-Compete Agreement, Johnson also agreed not to solicit CCFW employees and not to disparage CC Ford Group in a manner resulting in harm to or loss of the CC Ford Group's business subsequent to her employment's termination.

120.    At no point did Johnson abide by these agreements.

### The Deception Continues

121.    In a Zoom meeting on or about March 28, 2022, Manning and PEC abused their relationship with CCFW and covered up that they had no intention of continuing to do business with CCFW.  Instead, during the meeting, Manning halted just one of the projects CCFW was working on, stating that other projects with CCFW would be sorted out.

122.    Manning was very positive on the call and, in an undeniably oleaginous and sleazy manner, proclaimed her active support for CCFW to continue to work for PEC.  In reference to Johnson's resignation from CCFW, Manning stated "This will be good for her." Clearly Manning was well aware and part of the scheme to ensure Johnson's and all Defendants' financial success.

123.    Trusting and believing Manning, on April 7, 2022, Studdiford checked in with Bicking on the status of outstanding PEC SOWs. Bicking responded positively that things were

moving forward with PEC and going well, and that they had secured three SOWs, the Field Training Project through December 2022, the POA2 Project Management for September 2022, and the 2023 President's Club.  Bicking had also sent over budgets for ASH 2022 and reported that an SOW that was also pending.  There was also discussion of a POA prep meeting that Bicking claimed CCFW would likely do, and there was also a contemplated People Function/New Hire Project.  Bicking was lying to Studdiford to cover not only her own but all co-conspirators' actions, reduce any potential suspicion from Studdiford, and allow Defendants to continue to steal business for the benefit of themselves while Johnson, Bicking and Weiler were being paid by CCFW.

124.    Ultimately on April 29, 2022, Manning initiated a Zoom call with Studdiford to tell him that all of the SOWs (that Bicking reported to Studdiford in early April) would not be finalized and PEC would enter no further SOWs with CCFW.  Amazingly, under the leadership and false guidance of Bicking, Weiler, Johnson and Manning, CCFW actively had been working on the projects detailed by Bicking, as Bicking led the PEC account and oversaw employee activities and client relationships.

125.    Thereafter, Johnson, while a CCFW consultant, and Bicking and Weiler, as CCFW employees, continued to clandestinely work on PEC projects that Manning and PEC had just terminated CCFW from performing.  Unbeknownst to the Studdifords, PEC and Manning directed Johnson, Bicking and Weiler to continue working on those very PEC projects on behalf of PVI even though all three remained on CCFW's payroll and continued to work at CCFW.

126.    Defendants knew that CCFW had been promised all SOWs but, because there were no signed SOWs for these projects, CCFW would never be paid by PEC.

127.    In furtherance of their RICO scheme, Bicking and Manning purposefully misled Studdiford and CCFW that the various SOWs would be completed by CCFW and they directed

CCFW employees to continue to work on these projects with full knowledge that all these projects were being shifted to PVI and Johnson.

128.    On Monday, May 2, 2022, Studdiford then updated Bicking about his call with Manning, telling Bicking that all of CCFW's work for PEC had been pulled and to stop working immediately and wrap-up billing.  None of this happened.  Instead, Bicking, an active conspirator to and participant in the plot, was already fully aware the projects would never be performed by Bicking for CCFW, but only for PVI.  And Bicking ruthlessly and secretly continued to work with Weiler (both on CCFW's payroll) on projects that CCFW was never, and never would be, paid for.

129.    For example, the very next day, May 3, 2022, after Bicking informed the Company to close all open PEC projects, Weiler sent PEC's Director of Sales Training and Development Kristin Page, an email from **Bicking's** PEC email address which stated that "(This is Beth, Carrie asked me to email you from her PEC account.)" The email goes on to discuss working on a PEC project, POA 2, workshop deck. There was no signed SOW for the POA 2 project.  Nonetheless, Weiler still opened up a workflow via Veeva for the project on May 5, 2022.

130.    On May 12, 2022, Weiler sent Rob Kavanaugh of PEC an email regarding her working on an ongoing PEC project.

131.    On May 16, 2022, Bicking emailed Weiler asking if "everything [was] all set" for workshops related to a PEC project POA 2 Workshops.

132.    On May 18, 2022, Rob Kavanaugh of PEC added Weiler to an email chain discussing a PEC project, MLR. Weiler indicated via a responsive email on the same date that she would start work on the project. Weiler informed Kristin Page that she created slides for PEC POA 2 project on May 23, 2022. As noted, there was no signed SOW for the POA 2 project.

133.    On June 6, 2022, after PEC employee Kristin Page, was called by CCFW about a project that was being handled by Bicking and Weiler on behalf of CCFW (up until they left in May 2022) without a signed SOW from PEC, Manning shot off an aggressive and unwarranted email to Studdiford and a CCFW employee directing that all questions only go to her. The email stated: "Can you direct all questions to me moving forward. Per my previous conversation with John, we are going to utilize other training agencies and our AOR (Agency of Record) for POA and other meetings."  Clearly the call from CCFW to understand what was occurring with its projects for PEC hit a raw nerve with Manning and her overly aggressive response sent off warning flares to Studdiford and other CCFW employees.

134.    This email was a clear misdirection and manipulation from Manning as she bullied and lied to convince Studdiford and CCFW that the work that was promised to, and then removed from, CCFW was going to "PEC's agency of record" while, in fact, it was all being shifted over to PVI.

135.    Manning purposefully lied to Studdiford, and co-opted CCFW's financial stability, history, and intellectual property to ramp up business for PVI by highly recommending CCFW to her colleagues and direct reports on February 27, 2022, the very day before Johnson resigned, with the full intention that the CCFW work-in-progress, along with the promised work, would all go to PVI.

136.    As if all that were not enough, and as explained more fully below, Manning also provided false information to CCFW and outside companies like Westin.  Manning also would not allow CCFW to communicate with PEC employees.

4856-2212-7827, v. 1

137.    For its part, CCFW acted with complete honesty and integrity, believing both Manning's representations and Johnson's announcement email to PEC suggesting (falsely) that she also expected PEC to continue working with CCFW.

138.    Studdiford had trusted Manning due to their long-term professional relationship and had no idea of the plan Defendants had concocted to steal CCFW business and enrich themselves.

139.    On a follow up Zoom call to the June 6th email, Studdiford and a CCFW employee spoke with Manning regarding billing and unsigned SOWs for work that was performed.

140.    During the call, which took place on Thursday June 9, 2022, when Studdiford brought up the issue of outstanding PEC invoices and the number of projects being worked on by CCFW for PEC that were not supported by signed SOWs, Manning became very anxious and agitated.  Manning must have suspected that CCFW was slowly uncovering the first few layers of her deceit but Manning nonetheless continued the charade to deceive Studdiford and CCFW while continuing her illicit actions with impunity.  Manning's actions and words were so bizarre that a CCFW employee called Studdiford afterwards and suggested that Manning was lying, covering up something and clearly got caught in her own web of lies.

141.    This work would be given by Manning and PEC to PVI despite apparently there being no proper request for proposal **("RFP")** or other internal PEC financial, legal or compliance review as is customary for any pharmaceutical company before any work on a project is approved or a new agency is engaged.

**PEC Issues PVI a Master Services Agreement Apparently Without Going Through
Proper Channels, and Johnson, Bicking and Weiler Heavily Make Use of
PEC Email Addresses to Mask What They Are Doing**

142.    Moreover, on or about March 29, 2022, just three days after Johnson entered into the Consulting Agreement and Confidentiality Agreement with CCFW, and without seeking

4856-2212-7827, v. 1

anyone's approval at CCFW despite it being required by her Consulting Agreement, Johnson, on behalf of PVI, entered into a master services agreement **("MSA")** with PEC.  The MSA had been sent to Johnson via email the day before she signed it.

143.    The MSA, a highly detailed and legally complex document that typically takes weeks, if not months, to negotiate and finalize, was already signed by Manning as PEC's "General Manager."  Clearly, given the usual time required to develop, review and finalize an MSA in the pharmaceutical industry, Manning would have had to direct PEC to actively begin the PVI MSA well in advance of the date on which she signed, and during the period while Johnson, Bicking and Weiler were all still active employees of CCFW. Given Lin's and Shah's executive roles in PEC, they would have endorsed PEC entering into the MSA.

144.    Upon information and belief, however, Manning signed the MSA without it going through proper channels at PEC, as well as all the necessary and proper vetting of a potential new vendor, including finance, legal and compliance departments, as is customary in the pharmaceutical industry.  While a March 29, 2022 email from Manning's Senior Administrative Assistant Rosen to Johnson indicates PVI would need to be approved as a new vendor, CCFW is unaware of any such approval process and, in fact, the MSA was signed by Manning and became effective on March 29, 2022.

145.    At the time the MSA was signed, PVI did not have office space, IT structure, insurance, financial backing, clients, or any employees except for Johnson.

146.    Just days after Johnson executed her Consulting Agreement with CCFW, Manning sent Bicking an email, dated March 31, 2022, requesting the most recent SOWs, and blind-copied Johnson, but did not send it to Johnson's CCFW email address, which Manning could have used given Johnson's role as a CCFW consultant.  Instead, to hide what they were doing, Manning

blind-copied Johnson at her new PEC email address (Jennifer_johnson@pharmaessentia-US.com) while purposely not copying Studdiford or anyone else at CCFW.  Manning clearly wanted to know the exact amount of project dollars she could immediately hand over to PVI and the other Defendants.

147.    In furtherance of Defendants' cover-up, Bicking and Weiler began to heavily use PEC email addresses while they were still being paid by, and working for, CCFW.  Johnson, Bicking and Weiler all delayed using any PVI email addresses to not draw attention to themselves and to allow them to advance their nefarious plot in secrecy as they never expected CCFW would be able to gain access to their PEC emails.

148.    The clear use of PEC emails, rather than the normal procedure of sending communications via CCFW emails to CCFW employees and a CCFW consultant, was just another blatant attempt to hide the illicit activities of Defendants as they continually conspired to implement their plan of breaking their agreements, working against CCFW's interests and/or ultimately stealing CCFW's Confidential Information and business.   Furthermore, PEC's allowance of Johnson, Bicking and Weiler to use PEC email addresses further implicates PEC and Manning and their active participation in the pattern of illegal activities and efforts to coverup their blatant and criminal wrongdoing. Plaintiffs cannot know the full extent of the relationship between PEC's leadership and Johnson, Bicking and Weiler until PEC's and the individual defendants' emails are obtained in discovery.

### Bicking and Weiler Resign from CCFW

149.    After working with her co-conspirators for months, and actively participating in their wrongdoing, Bicking gave notice of her resignation to CCFW on or about May 13, 2022, and her last day of employment was May 20, 2022.

150.     Similarly, after actively participating in Defendants' illicit activities for months, Weiler gave notice of her resignation to CCFW on or about May 18, 2022, and her last day of employment was on or about May 25, 2022.

151.     Bicking and Weiler both immediately went to work at PVI and continued working on the same PEC projects they were covertly working on while still at CCFW, as well as new PEC projects delivered to them on a silver platter by Manning and PEC. In SOWs entered in May 2022, Bicking was listed as Senior Director, Client Services, and Weiler as a Project Manager.

152.     To continue to benefit from CCFW's great reputation in the industry and continue to hide their actions and deceive clients, Bicking did not change her LinkedIn profile for many months after she left CCFW.

153.     Similarly, for six months after she left CCFW and two-and-a-half months after her Consulting Agreement with CCFW ended, Johnson postured to the entire pharmaceutical community in her LinkedIn profile that she remained Managing Director of CCFW and only updated her profile after the Court in this litigation ordered her to do so on September 28, 2022.

154.     Johnson set up Bicking at PVI with a salary and a profit-sharing component, presumably to ensure Bicking's loyalty to her and PVI in hiding their theft of CCFW clients and its Confidential Information.

155.     Johnson intended to set up PVI with that profit-sharing structure for other future employees as well. For example, to retain a consultant, Johnson indicated that once she was later retained as an employee Johnson hoped to align their interests by giving her a profit-sharing arrangement.

156.     Stated differently, Johnson was setting up a compensation plan just like the one she had at CCFW where she remained an employee despite sharing in profits.  Such a financial

4856-2212-7827, v. 1

arrangement would also motivate PVI employees and align their financial interests with the manner in which Defendants went about stealing from CCFW through their RICO enterprise.

### Manning and PEC Violate Industry-Standard Corporate Policies

157.   Given Manning's industry experience, education, and employment history with leading pharmaceutical companies, it is shocking that Manning would actively participate in a scheme to enrich Defendants while risking her career and reputation. Likewise, that PEC would be involved is also extremely troubling.

158.   Manning, an industry veteran who worked for many large pharmaceutical companies, knew her actions and participation in Defendants' plan were clearly in conflict with company and industry compliance standards.  None of her previous employers – Baxter, Shire, Vertex or Pfizer – with strict financial and legal controls - would have permitted or provided any opportunity for an individual to become part of a vindictive and financially lucrative plot to funnel company business and funds to a close, personal friend and a shell company with no other employees, shared office space, and no insurance or financial stability.

159.   In addition, pursuant to well-established, standard protocol for pharmaceutical companies, Manning should have been required to undertake compliance training at PEC as its General Manager and later President of the Americas, although she surely had to complete such training at her other employers to ensure she understood and complied with all governing corporate policies and federal and state laws and regulations.

160.   Compliance in the pharmaceutical industry is an absolute must, and it covers such far-reaching corporate and government areas as codes of conduct, conflicts of interest, cyber and data security, business ethics, gifts and expense reporting, anti-kickback, confidentiality, corporate espionage and other important laws, regulations, and policies that all pharmaceutical executives

and employees must adhere to under governing corporate policies and applicable laws and regulations.  In any event, based upon her work history as well as her relationship with her close friend Crum, who served as a legal compliance expert for PEC and who would have been involved in developing corporate compliance policies at PEC, Manning was fully aware that her activities as well as those of the others were illicit (as evidenced by her many efforts to conceal their activities) and her blatant disregard for industry legal, compliance and regulatory requirements is truly astounding.

161.    The routine systems of disclosure, review, and approval/denial that are standard fare at pharmaceutical companies certainly were not followed by Manning or PEC and/or Manning and the others involved actively worked to evade these systems through manipulation and deceit.

162.    Manning proceeded to cover up her role in steering work and PEC funds to her very close friend Johnson at an untested, unproven, brand-new entity PVI that was operating in contravention of legal obligations, was less than a month old, and with only one employee and no other clients. Perhaps it was not just the close, personal relationship that caused Manning and PEC to award almost $5 million in business to Johnson and PVI during the first year of PVI's operations. Perhaps there were other nefarious reasons that would explain this behavior.  In any event, and upon information and belief, PEC paid PVI significantly more fees to work on the same or substantially similar projects than it had paid to CCFW for such projects in the past.

163.    Other pharmaceutical companies comparable to PEC would never let a leading executive manipulate and abuse her professional position for personal gain – or to enrich family members, close friends, or the pharmaceutical company that employed them  – and would never retain such an inexperienced and underfunded start-up to perform all this critical work especially

after all of the glowing accolades from Manning and PEC about their then current agency, CCFW, as set forth above.

164.    Despite being K.C. Lin's son and PEC's VP of Business Operations and Strategies, Lin appears to have knowingly permitted Manning and PEC to exploit PEC's United States operations and whatever compliance protocols it may have had in place.  Lin clearly had knowledge of Johnson's continued involvement with PEC even as she was preparing to leave CCFW.  Presumably, Lin was sharing this information with his CEO father as well as other executives and shareholders of PEC.

165.    For example, in mid to late February 2022, long after Defendants hatched their plot for Johnson to leave CCFW and take all PEC business when she left and to start a competing pharmaceutical communications firm, Lin was involved and/or aware of Manning's inclusion of Johnson in high-level, strategic discussions and preparations for Board of Director meetings.

166.    Johnson was exposed to the highest level of confidential information at PEC despite never having been directly employed by  a pharmaceutical company, having no oncology-drug experience while at CCFW, absolutely no drug-launch experience beyond CCFW, no medical or life science degree, and no advanced business degree. This also is evidence of the close working relationship and PEC's likely involvement and knowledge of the wrongful activities described herein.

167.    Similarly, Shah had knowledge of Johnson's involvement in high level meetings and strategic discussions despite her limited expertise. Shah was also aware of the circumstances of Johnson's departure from CCFW and Manning's support of Johnson's continued work with PEC after she left the Company, and he was also on notice of this litigation at least as of September 2022.

168.     As set forth above, PEC had lax or nonexistent compliance policies, controls, and oversight at least regarding its dealings with PVI and the other Defendants to such an extent that it suggests PEC's and Manning's knowing involvement and participation in the RICO enterprise and that they were an integral part of the conspiracy to violate the law.

169.     At or about the same time, based on communications between Johnson and Bicking, regarding certain content approvals for sales meetings, PEC appears to have been similarly noncompliant in other important areas that often are the subject of government investigation of pharmaceutical companies.   Communications between Johnson and PEC personnel including Shah, also evidenced disorganization around compliance issues.

170.     Thus, it is evident by the documentary evidence created by Defendants that PEC was run, by Manning and others, without proper controls and that Lin and Shah allowed the malfeasance that is the subject of this Complaint to persist.

**Defendants' Conduct Is Egregious and Manning Allows PVI to Overcharge PEC for Defendants' Benefit**

171.     With the above groundwork in place, and as mentioned above, PEC issued PVI an MSA while Johnson was still working for CCFW.

172.     The MSA was signed on March 29, 2022, which was just days after Johnson's last day as a full-time CCFW employee; however, Johnson was still working for, and being paid by, CCFW under the Consulting Agreement until July 17, 2022.

173.      Manning signed the MSA for PEC on March 28, 2022, while Johnson signed for PVI on March 29, 2022.

174.     As of March 29, 2022, Johnson, Bicking and Weiler all were still employed by or consulting for CCFW.

4856-2212-7827, v. 1

175.    The work CCFW had been performing on behalf of PEC was then reflected in SOWs between PEC and PVI entered between approximately April 2022 and the end of June 2022 pursuant to the March 29, 2022 MSA.

176.    Johnson retained Bicking to work for PVI as Senior Director of Client Services and Bicking seamlessly moved to that position upon resigning from the Company. Upon information and belief, she is now a Vice President at PVI.

177.    However, while still working for CCFW at least in February and March 2022, Bicking used her personal Gmail account to set up LinkedIn job postings for Project Manager positions, purportedly for CCFW, but likely for PVI hires.  She had the temerity to pay for the LinkedIn postings with her CCFW American Express card.  To hide this activity, however, she classified it as a PEC expense.  This is further evidence of collusion between, among others, Johnson, Bicking, Manning and PEC.

178.    Johnson was deliberate in her deceit as further evidenced by emails from her personal email account where she corresponded with various potential vendors about her plans to take CCFW employees.  Specifically, on March 23, 2022 at 12:28 PM she emailed a vendor to provide her new contact information and forecasted her plans to hire Bicking.

> Hello Jackie,
>
> Here is my temporary contact information.  THANK YOU for your very kind words.
>
> I know you come to us through a personal relationship with Carrie – whom I ADORE and would unplug her immediately - but there are some steps I have to go through as I transition to protect myself.
>
> HOWEVER, with that said - if you can hold OUR non-CCF relationship in confidence - there are TWO things I would like to discuss with you on Monday.  Are you game??

179.    Once Bicking left CCFW in May 2022, she immediately began work on PVI projects for CCFW's former clients despite Johnson's knowledge that Bicking had both Loyalty and Confidentiality Agreements with CCFW, and Bicking accepted the position at PVI despite knowing that she had entered into those binding agreements with CCFW.

180.    Many of the SOWs PVI obtained from PEC were the very projects Bicking clandestinely had been working on while still at CCFW.

181.    Those include May 2022 POA 2 meetings, a POA pre-meeting in August 2022 in Chicago, POA3 meetings at the Revere Hotel in Boston in September 2022, and PEC ASH meetings in New Orleans in December 2022.  For some of these projects, the fees paid to PVI appear greater, and in some cases significantly greater, than those that were paid or in process when the work was still with CCFW.

182.    CCFW eventually discovered emails that were accidentally sent to Bicking's CCFW email address rather than her PEC address.  Those emails show that Bicking was working with CCFW's vendor, Sky Events Management, to book the Revere Hotel in Boston for the PEC POA Meeting in September 2022.

183.    To protect CCFW, Studdiford called the salesperson in charge of the event and asked for a copy of the CCFW contract for the upcoming meeting; the salesperson emailed the signed contract (now under PVI's name) to Studdiford.

184.    The contract shows that Bicking signed the Revere contract on behalf of PVI on May 20, 2022, while still employed by CCFW.

185.    That Defendants lifted various projects completely from CCFW to PVI is further evidenced by checks and invoices relating to the SOWs PVI entered with PEC and the related requests for payments.

186.    For example, PVI took over the POA 3 meetings in Boston in September 2022, using the Revere Hotel that Bicking had booked through CCFW.  The Revere Hotel invoices for meals and conference rooms list CCFW's address in Bernardsville, New Jersey, and Bicking as the contact.

187.    Similarly, while still employed by CCFW, Bicking was working with CCFW's vendor, Sky Events, in April 2022 to book the Westin Grand Central Hotel in New York City for a PEC event scheduled for June 16 and 17, 2022.

188.    The Westin contract lists CC Ford Healthcare as the organization contracting for this PEC event.  That it was actually signed on behalf of CCFW by a PEC employee, without CCFW's knowledge, is outrageous.

189.    CCFW discovered from a Westin Hotel employee that CCFW was responsible for the meeting, and he provided the event order showing same, but CCFW had no PEC SOW or contract for payment for this work.  While on site, CCFW uncovered the signage for the event that included the use of CCFW's name and identity.

190.    As it turned out, PEC had given PVI an SOW for this meeting despite Johnson still being under contract with CCFW.

191.    Johnson continued to assign Bicking to the "Project Velocity Team" on PVI / PEC SOWs for at least the full term of her Loyalty Agreement, and Bicking has continued to work on those matters.  Upon information and belief, Weiler also has worked on these matters despite her agreements with CCFW.

192.    As far back as March 23, 2022, Bicking had been emailing PEC employees, including Manning, about a PEC President's Club meeting scheduled for May 4-7, 2023.

4856-2212-7827, v. 1

193.     On May 11, 2022, despite Manning and PEC firing CCFW and directing it not to work on any matters on its behalf, including PEC's May 2023 President's Club trip, Manning signed a contract with the Ritz-Carlton related to accommodations arranged by Bicking with Bicking having a PEC email address as the contact even though Bicking remained a CCFW employee through May 20, 2022.  Bicking continued to work on the President's Club trip for PEC through her last day of employment at CCFW.

194.     The PEC President's Club trip in 2023 was another project for which PVI secured an SOW from PEC.  This was a direct flip of the project work CCFW was conducting, except that Manning allowed PVI to charge twice as much in fees as CCFW had agreed to charge PEC.

195.     Moreover, part of the work under that PVI SOW was explicitly work conducted by Bicking in April 2022, while she was employed by CCFW, yet the PVI SOW listed it as a task for PVI for April 2022.

196.     CCFW's SOW from PEC for this project was drafted in May 2022, while the PVI SOW was entered into just a few weeks later in June 2022.  Yet, as previously stated, the fees to be paid to PVI were significantly more than were to be paid to CCFW.  Moreover, in June 2022, Johnson was still working for CCFW as a consultant and Bicking was still bound by her Duty of Loyalty Agreement.

197.     PVI ran the May 2023 event for PEC with Johnson and Bicking being listed as the Project Team for PVI in the SOW.

198.     It is, thus, clear from the above that PVI and the other Defendants were trading off of the good name and reputation of CCFW to their financial benefit.  This also resulted in PVI obtaining business from at least two other CCFW clients, Merz and Albireo Pharmaceuticals, while Johnson, Bicking and Weiler still worked for CCFW.

**Manning's And Johnson's Other Inappropriate Business Practices –
Including Sharing Public Companies' Confidential Information and Trade Secrets**

199.     There is other compelling evidence that Manning's and Johnson's business ethics are not just highly questionable, they are unacceptable and criminal.

200.     Unbeknownst to CCFW/Studdiford, and against CCFW policies, Manning shared with Johnson confidential, internal documents from public companies where Manning worked previously and Johnson inappropriately shared confidential information of CCFW's other clients with Manning and others at PEC. Their criminal acts in stealing this highly confidential information and trade secrets and sharing them with Defendants for PVI to use, is further evidence of a pattern of racketeering activity involving Defendants.

201.     In addition, while working for PEC, Manning had a conflict-of-interest by engaging in work for Albireo.  Specifically, between late February 2020 and April 2020, Manning used her personal Gmail account to perform work for Albireo.  Similarly, on March 6, 2020, again using her personal Gmail account, Manning sent Johnson a 2018 Actelion Pharmaceuticals deck while employed by PEC.

202.     The lack of ethics of both Manning and Johnson is evident in an interaction that took place just prior to Manning joining PEC.  Specifically, on January 14, 2020, Johnson sent an email to Manning at her personal Gmail account, asking her to silently listen in on a call with Albireo so that she could then explain to Johnson what the issues were.  Johnson wanted to use Manning's "big COO brain and debrief."  Manning responded, stating "Fantastic. On it and a silent observer."

203.     Likewise, on February 10, 2020, Johnson sent Manning a confidential Baxalta Launch Playbook PowerPoint as part of an email related to PEC's planned product launch.

204.    Further evidencing Manning's inappropriate conduct, in July 2021, Manning forwarded to Bicking and Johnson internal performance review templates adding to the subject "DO NOT SHARE."  There were also more than a dozen internal emails Manning shared with Johnson where Johnson is not on the "to," "cc" or "bcc" lines.

205.    In the early Fall of 2021, according to information on Johnson's CCFW-issued laptop, she shared with PEC and Manning a Power Point presentation belonging to CCFW client Albireo, clearly marked "confidential" and for "Internal Publication Only."

206.    Similarly, in early February 2022, Manning/PEC shared with Johnson a confidential document belonging to Shire Pharmaceuticals ("**Shire**"), a public company where Manning previously worked, that also was marked "Confidential-Internal Only."  Manning obviously took the document when she left Shire, undoubtedly in violation of Shire's confidentiality policy.

207.    Manning also shared with Johnson highly confidential and lengthy Pfizer and Vertex presentations, two other public companies where Manning had previously worked.

208.    Specifically, in September 2021, Manning, from her personal Gmail account, emailed Johnson a 65-page highly confidential internal market-research presentation owned by Vertex summarizing market research commissioned by Vertex intended for its exclusive use.  The subject line was "What we showed for Vrtx-pre-launch – just ideas."  The document is clearly marked as confidential and for internal training purposes only.

209.    And in November 2021, Manning, from her PEC email account, shared with Johnson a 76-page confidential payer-strategy document owned by Pfizer, relating to its oncology products.  The document was clearly marked as intended for internal customer alignment discussions.

4856-2212-7827, v. 1

210.    The repeated theft and subsequent use of confidential documents from leading pharmaceutical companies clearly shows a pattern of illegal and unethical business practices by Manning whether to benefit PEC or PVI.  Furthermore, the fact that she was engaged in blatant acts of corporate espionage to clearly help advance the profitability of PEC and/or PVI is  equally disturbing.

211.    Johnson's conduct was similarly unethical and disloyal to CCFW and its clients. On one occasion, Johnson sent Manning an email suggesting that PEC "poach" a woman working at Janssen, indicating that CCFW works with Janssen but that she "like[s] PEC more (🟠):"

212.    When Johnson left CCFW, she elected COBRA coverage and CCFW made those monthly payments to ensure that Johnson did not lose her health insurance, but Johnson was required to reimburse those payments to CCFW.  Despite repeated requests, Johnson has failed to reimburse CCFW for the monthly premiums since January 2023 and through June 2023 when CCFW informed her counsel it was discontinuing coverage based on Johnson's non-payment.

**Manning and PEC Are (and Have Been) on Notice of the Contractual and Other Legal Obligations of Johnson, Bicking and Weiler to CCFW and Nevertheless Continued to Tortiously Interfere with CCFW's Rights Under those Agreements**

213.    Manning and PEC continue to disregard Johnson, Bicking and Weiler's obligations to CCFW despite receiving explicit notice from CCFW's counsel.  By letter, dated September 22, 2022, counsel for CCFW wrote to PEC, informed it of the instant litigation as well as the various agreements in place between the Company and Johnson, Bicking and Weiler.

214.    Along with the letter, CCFW's counsel sent PEC copies of the various agreements as well as a Litigation Hold letter, placing PEC on notice that it likely had various documents relevant to the claims herein. Said letter stated, among other things, as follows:

It is our legal opinion that the Company has enforceable, binding agreements with the Individual Defendants and that, pursuant to those agreements, the Individual Defendants are precluded from, among other things, working or providing services to PharmaEssentia. Moreover, to the extent PharmaEssentia was not on notice of the agreements prior to receipt of this letter-although we are sure from the exhibits to the First Amended Complaint that it was-this letter provides such notice and establishes that, should PharmaEssentia continue to do business with the Individual Defendants and/or Ms. Johnson's company, Defendant PVI, it will be tortiously interfering with the Company's contracts with the Individual Defendants and subject to liability and significant damages.

215.    On or about the same date, the Company's counsel sent the same, or substantially the same, letter to Manning.

216.    Notwithstanding the September 22, 2022 letters, placing PEC and Manning on notice of CCFW's claims, PEC and Manning continued to do substantial business with PVI. Moreover, as a direct and proximate result of Manning's and PEC's wrongful conduct, they assisted and/or enabled PVI and the other Defendants to do business with other clients of the Company in violation of, among other things, the other individual Defendants' agreements with CCFW.

**Johnson, Bicking and Weiler Mishandle CCFW's Confidential Information
and Johnson Finally Allows PVI to Emerge from the Shadows**

217.    An initial review of Johnson's CCFW laptop showed that over one thousand (1,000) files were deleted by her on March 25 and March 26, 2022 alone, around the time that Johnson signed her Consulting and Confidentiality Agreements with CCFW.

218.    Johnson did not seek permission to destroy these documents as she knew CCFW would never authorize these deletions.   Upon information and belief, Johnson deleted these documents in furtherance of the cover-up of Defendants' wrongdoing.

219.    Despite repeated demands to Johnson to return the CCFW-owned laptop it had issued her, Johnson illegally retained the laptop for six months, until finally she was ordered to return it by the Court in this litigation on September 28, 2022.

220.    Furthermore, a review of the laptop revealed the extensive theft of CCFW Confidential Information for Johnson's own gain and that of the other Defendants. Johnson reviewed about 670 files residing on a USB that Johnson owned but was at times attached to her CCFW laptop.  Most of those files were reviewed between March and May 2022, and close to 200 of them were in directories with such names as "Carrie Samples," "Albireo," "Merz," "PEC," "PharmaEssentia," and "Project Velocity."  The Carrie Samples directory included files such as: No 19_PEC-037-22_CC Ford Group West LLC SOW Field Training Project Management.docx; Versiti   Statement   of   Work_2022   Innovation   Summit.docx;   and   Copy   of Midwest_Account_Management  Tracker_MASTER.xls.  All  of  this  information  provided Defendants unfair advantages.

221.    Nearly half of the files on the USB drive at one point had been on Johnson's laptop and were CCFW's Confidential Information and proprietary client files, documents or trade secrets including Power Points, Excel files and other documents for CCFW clients including Actelion, PEC and Merz.  They also included CCFW SOWs, vendor forms and mutual NDAs.

222.    These documents contain commercial information, strategies and other valuable information that were not generally known to competitors, and not readily ascertainable through proper and lawful means.

223.    The documents contain information that was used in, or intended to be used in, interstate and/or foreign commerce.

224.    CCFW had taken various steps to maintain the confidentiality of this information including, among other things, limiting access to only those with a need to know the information as well as the use of confidentiality agreements and the like.

225.    Nevertheless, in addition to the theft through the external drive, in April 2022, Bicking was using her personal email account to steal CCFW's client lists and other Confidential Information sending them to Johnson and PVI.

226.    Johnson obviously stole these documents to quickly resume the work she had been performing for CCFW and its clients before she left CCFW, and she stole other documents to enable her to have PVI up and running much quicker than she otherwise could have without this information.  These documents obviously were valuable, or they would not have been treated as secret and Johnson would not have stolen and been accessing them if they lacked value to Defendants.

227.    Bicking and Weiler also knowingly misused CCFW Confidential Information to secretly work on matters for PEC.

228.    Finally, the piece de resistance of the evidence discovered by CCFW is Johnson's blatant admission on her LinkedIn page that PVI had been lurking in the shadows for some seven months before making its public "debut," which was plainly for the purpose of avoiding detection by CCFW that Johnson, Bicking and Weiler were willfully and wantonly breaching their agreements and obligations, and that Defendants were, among other things, conspiring to and knowingly participating, directly or indirectly, in a pattern of racketeering activities, tortiously interfering with CCFW's contracts and business, and unfairly competing.

229.    On her LinkedIn page in November 2022, and evidently referencing the association-in-fact enterprise,  Johnson wrote: **"we've operated in the background for the past**

**7 months**, and now I'm so excited that Project Velocity is finally MAKING ITS DEBUT." (emphasis added).

230.    Highlighting that Defendants initially hid PVI's launch, in March or April 2023, Johnson announced on her LinkedIn page PVI's one year anniversary indicating: "one year – big impact, 40+ projects completed, +10 large scale meetings 18+ ongoing strategic engagements and 80+ HCP Engagements managed," and touted a year of incredible growth.

**Defendants Also Interfere with CCFW's Relationship with its Vendors and Use CCFW's IT Vendor to Steal Valuable Confidential Information and Trade Secrets**

231.    Not only did Defendants steal work, and Confidential Information from CCFW, but they also began to purloin most, if not all, of CCFW's vendor and agency partners with arrogance and stealth.

232.     Intelligence on how CCFW identifies, retains, prices, coordinates with, deploys and otherwise leverages its vendors and partner relationships is a competitive advantage CCFW developed, and that Defendants coopted for themselves. This further illustrates Defendants' laziness, lack of ingenuity, and self-professed "superiority" and entitlement to steal proprietary relationships and information to easily advance their financial scheme with impunity.

233.    In fact, one such vendor was CCFW's outside information technology ("IT") consultant, Giuseppe Rodriguez ("**Rodriguez**"), CEO of RDCS Tech, which CCFW was working with in connection with this lawsuit to review Johnson's company-issued laptop as well as other evidence of wrongdoing.

234.     Johnson chose to use Rodriguez, who is located in Pennsylvania, despite the fact that she and PVI are located in New York state, either because she did not want to make any effort

to find her own IT consultant for PVI or may have retained the vendor to steal other documents or information regarding CCFW and/or its clients.

235.    In fact, CCFW learned that Johnson was colluding with Rodriguez since at least January 18, 2022, when she asked him for help creating archives of CCFW files, to be transferred to "a new laptop" that was not associated with CCFW.  Specifically, the IT vendor told Johnson: **"I need to put your archives on online archive so you don't lose them when we switch computers. I have in my notes that we did some but not all."** (Emphasis added).

236.    Johnson continued to work with Rodriguez while still employed at CCFW in February and March 2022, getting his help to purchase and set up her new PVI laptop and PVI's website domain.

237.    For example, in an exchange starting on February 28, 2022, Johnson communicated with Rodriguez to get his assistance not only to set up a laptop for PVI and purchase the PVI website domain, but also software, phone, storage and ongoing monthly support  and requested their interactions remain strictly confidential. She also expressed concern Studdiford would fire her.

238.    CCFW has since fired Rodriguez as its IT Vendor for facilitating Johnson's theft of files and working with Johnson and PVI, and that vendor admitted to  the Studdifords that Johnson never thought Defendants would be caught or that CCFW would ever sue her, PVI or PEC. Johnson also told Rodriguez that the lawsuit blindsided her and that she was "completely shocked" when CCFW and the Studdifords found out.

239.    Almost simultaneously with her resignation as an employee of CCFW, Johnson was communicating with CCFW vendors to work with them in her new business.  For example, on or about April 4, 2022, Johnson communicated with a CCFW vendor about working with Johnson's

new business on a confidential basis because Johnson knew of her own restrictions in her

agreements with CCFW and that she was still working full-time for it.

### Johnson Conspires with Co-Defendants to Steal
### CCFW Confidential Information and Business.

240. And more recently, Johnson, in an attempt to further destabilize CCFW and steal

Johnson & Johnson business from CCFW, conspired with Ornelas-Kuh, in or about April of 2023,

to set up meetings with Johnson & Johnson.

241. Further, as noted previously, shortly after Ornelas-Kuh's departure from CCFW, he

began to work for PVI. Johnson/PVI brazenly hired Ornelas-Kuh despite knowing full well that

he was bound by a Duty of Loyalty Agreement with CCFW to not compete or solicit CCFW clients

for one year after his separation from the Company and knowing that CCFW was already suing

Johnson and PVI for, among other things, breaches of contract, tortious interference, theft of

Confidential Information, and for having hired Bicking and Weiler despite their agreements with

CCFW.

242. Johnson/PVI and Ornelas-Kuh have presented Ornelas-Kuh as a Managing

Director of PVI in presentations to potential clients. However, to try to avoid linking him to PVI

publicly and avoid detection as a participant in the ongoing pattern of racketeering activities, he

has not updated his LinkedIn address since he left CCFW and, moreover, he uses a shadow PVI

email address from PVP: mornelas-kuh@projectvelocitypartners.com.

243. PVP is a limited liability company established in July 2023 in Delaware as part of

the scheme to avoid linking Ornelas-Kuh to PVI while positioning him to reap a piece of the

business Defendants stole and continue to try to steal from CCFW. Upon information and belief,

PVP is nothing more than a shell company and, as previously indicated, its website rolls over to

the main company website maintained by PVI.

244.    Plaintiff has also learned that the close relationship between Ornelas-Kuh and Johnson created the conduit for additional theft of CCFW proprietary information as Johnson and Ornelas-Kuh conspired to further spy on CCFW business activities, gather intelligence on clients and budgets and deliver to Johnson critical Confidential Information regarding CCFW business and legal proceedings.

245.    For example, in September 2019, Ornelas-Kuh sent Johnson proprietary documents he had fraudulently accessed without the knowledge or authorization of CCFW's client.  These documents were stored on a client's server.  Upon receiving and reviewing them, Johnson responded, "This is HOLY SHIT…..WOW. This is a GOLD MINE."

246.    In August 2021, as PEC was getting ready to launch BESREMi, Ornelas-Kuh resent Johnson the two emails attaching a launch playbook and related sensitive documents he had sent her in September 2019.  The same day, Johnson responded "OMGGGGGGGG.  This is amazing. THANK YOU THANK YOU!!!! Thank you. JJ."  Ornelas-Kuh then responded "I got you, gurl[sic]!! (winking emoji)."

247.    On Sunday August 22, 2021, Johnson emailed Ornelas-Kuh again relating to those documents and told him: "Hi Matt This is a treasure trove!!! There are some linked out documents maybe you can grab?? Thank you. JJ" On August 23, 2021, Ornelas-Kuh responds: "Sure thing! Can you send me the specific links?"

248.    Had Plaintiff known about these unethical practices as early as 2019, Johnson and Ornelas-Kuh would have been terminated immediately.

249.    Plaintiff considered Ornelas-Kuh a trusted employee but now have clarity that he was disloyal to CCFW for a long time, engaged in theft of Confidential Information from CCFW and its clients, and actively participated with Johnson to steal business from CCFW that was used

to start a new guaranteed prosperous company with PEC's, Manning's and the other Defendants' assistance.

250.     All Defendants communicated with each other and transacted the relevant acts set forth in this Complaint over email from their respective home or business locations in multiple states to other states as well as to Taiwan.  Specifically, over the relevant period, Johnson lives in New York and PVI is a New York company, Manning lived in Massachusetts and/or California, Bicking lived and worked in Illinois and Florida, Weiler lived and worked in Wisconsin, Ornelas-Kuh lived and worked from Pennsylvania and/or California, and PVP is a Delaware limited liability company.

**After Learning that CCFW Uncovered Defendants' Pattern of Tortious and Criminal Activities, PEC Cleans House and Fires High Level Executives in the US Involved in the Racketeering Activities and/or those Who Should Have Put a Stop to Them**

251.     After Plaintiff filed a motion in July 2023 to initially amend the complaint in this matter and add PEC and Manning as Defendants, PEC fired Manning.

252.     Manning was fired in or about November or December 2023.

253.     Sulin Shah, PEC's General Counsel, was also fired in or about November or December 2023.  Anjana Pursnani, Senior VP and Head of People for PEC, was also fired in or about November or December 2023.

254.     Upon information and belief, at least another five to eight high level PEC employees were fired at about the same time.

255.     Upon information and belief, PEC Taiwan decided to clean house at its highest levels in the Americas and  a reasonable inference is that it sought to manage risks it had learned about in the proposed second amended Complaint previously in this action.

4856-2212-7827, v. 1

**FIRST COUNT**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS**
**RICO ENTERPRISE (18 U.S.C. § 1962(c) & N.J.S.A. 2C:41-2(c))**
**(All Defendants)**

256.    Plaintiffs repeat and reallege all of the allegations in the previous paragraphs as if same were fully set forth herein at length.

257.    Pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1962 ("**RICO**") and N.J.S.A. 2C:41 ("**NJRICO**"), an "enterprise" can be a legal entity or a group of individuals associated in fact although not a legal entity.

258.    PVI, a corporation formed and doing business in the state of New York, is a legal entity engaged in the provision of marketing and communications services to companies within the healthcare industry, both domestic and international. PVI, therefore, qualifies as an "enterprise" within the meaning of N.J.S.A. 2C:41-1(c) and 18 U.S.C. § 1961(4).

259.    Likewise, Defendants, Crum, Rodriguez and John Does constitute a group associated-in-fact and, therefore, also constitute an "enterprise" within the meaning of RICO and NJRICO (hereinafter **"Enterprise"** refers to PVI and/or the association-in-fact enterprise),

260.    The Enterprise has engaged in, and its activities have affected, interstate and/or foreign commerce.  By way of example, but not limitation, PVI, various individual defendants and, upon information and belief, PVP, have provided marketing and communications services to various pharmaceutical companies, such as PEC, located in Massachusetts with its parent company located in Taiwan, Merz North America, Inc. ("Merz"), located in North Carolina with its parent company, Merz Pharmaceuticals GmbH, located in Germany, and Albireo Pharma, Inc. ("Albireo"), located in Massachusetts with its parent company, Ipsen Global, located in France. Moreover, various members of the association-in-fact Enterprise live in different states, including Johnson in New York, Manning in Massachusetts and California, Bicking in Illinois and Florida,

62

Weiler in Wisconsin and Ornelas-Kuh in Pennsylvania and/or California, Crum located in California and Rodriguez located in Pennsylvania. The Enterprise, therefore, engages in activities that involve the movement or transportation or flow of goods, merchandise, money or other property between two or more states or one or more states and a foreign country.

261.    The Enterprise has conducted both illegitimate activities, such as those set forth below, and has conducted some legitimate marketing and/or communications activities for clients. The Enterprise, therefore, has an existence beyond what was necessary merely to commit the racketeering activities.

262.    All Defendants in this matter are or were employed by and/or otherwise associated with the Enterprise.   For example, Johnson founded the Enterprise, holds a position in, performs services for and/or is on the payroll of the Enterprise. Similarly, Bicking, Weiler and Ornelas-Kuh perform and/or performed certain services for the Enterprise including, but not limited to, working with its clients, stealing CCFW's Confidential Information on its behalf and conducting mail and/or wire fraud, were or are on the Enterprise's payroll and/or held or hold positions in the Enterprise.  Manning and PEC were aware of the existence and nature of the Enterprise, as described above, and participated in, aided, abetted and/or furthered the Enterprise's activities by, among other things, funding and helping launch its business.

263.    All Defendants in this matter have knowingly participated, directly and/or indirectly, in the conduct of the Enterprise's affairs and take or took part in, and exerted control over, the operation or management of the Enterprise or a significant role in directing its affairs.

264.    Johnson, Bicking, Weiler, Ornelas-Kuh, Crum, Rodriguez and John Does all hold or held management level positions in the Enterprise and/or acted under the direction of upper management, knowingly furthering the aims of the Enterprise by, among other things,

implementing management decisions or carrying out the instructions of those in control and/or they knowingly performed acts, functions or duties that were necessary to, or helpful in, the operations of the Enterprise.

265.    There were two (2) or more related acts of racketeering activity, with the last one being within a ten (10) year span after the commission of the previous act including, but not limited to:

a.    Manning and Johnson stealing and/or otherwise misappropriating, over a number of years and while Manning was employed at various pharmaceutical companies prior to PEC, various confidential and/or proprietary information and/or trade secrets belonging to various pharmaceutical companies that were used by the Enterprise to conduct its business in violation of, inter alia, N.J.S.A. 2C:20-3(b) (criminal theft of property, which includes trade secrets, information and data), and 18 U.S.C. 1832(a) (theft of trade secrets);

b.    Ornelas-Kuh, Johnson, Bicking and/or Weiler conspiring to steal and stealing CCFW's Confidential Information starting in or about 2019 including, inter alia, its budgets, vendor information, SOWs, and work product for which CCFW was not paid, as well as confidential information and trade secrets belonging to various CCFW clients, and misappropriating said information for the Enterprise's benefit, in violation of, inter alia, those same statutes;

c.    Johnson, Bicking, Weiler and/or Ornelas-Kuh purposely and/or knowingly and repeatedly accessing, obtaining, taking, using, recklessly altering, damaging and/or destroying CCFW's Confidential Information during the period from approximately 2019 through 2022 from one or more computers without authorization, or in excess of authorization, in violation of N.J.S.A. 2C:20-25 (computer criminal activity);

d.      The Enterprise utilizing CCFW's employees, resources, reputation and/or good will in or about 2022 to surreptitiously perform work on behalf of the Enterprise, and to provide services to, among others, PEC, knowing that CCFW would not be paid for same, in violation of N.J.S.A. 2C:20-4 (theft by deception);

e.      Obtaining or transferring CCFW's Confidential Information and utilizing CCFW's employees, resources, reputation and/or good will while denying CCFW due compensation for same, through use of the mail, in violation of, inter alia, 18 U.S.C. § 1341 (mail fraud);

f.      Obtaining or transferring CCFW's Confidential Information and utilizing CCFW's employees, resources, reputation and/or good will while denying CCFW due compensation for same, through use of email, in violation of 18 U.S.C. § 1343 (wire fraud);

g.      Ornelas-Kuh attempting to further harm CCFW (at or about the same time that other racketeering activities were taking place, such as the theft of CCFW's Confidential Information), by stealing approximately $85,000 beginning in or about January 2022 through mail and/or wire fraud, allegedly for reimbursement of business expenses from CCFW when, in fact, the expenses incurred were purely personal in nature, in violation of, inter alia, 18 U.S.C. 1341 and 1343, as well as theft by deception, in violation of N.J.S.A. 2C:20-4, by creating a false impression as to the value of what he allegedly was owed by CCFW;

h.      PVI, with the purpose to defraud or injure, or with knowledge that it was facilitating a fraud or injury to be perpetrated by anyone, altered and/or changed a contract with a hotel without authorization and/or executed it so that it purported to be the act of another who did not authorize it, in violation of, *inter alia*, N.J.S.A. 2C:21-1; and

i.      Agreeing to commit, and committing, the above predicate offenses, and performing overt acts in furtherance of same, in violation of 18 U.S.C. § 371 (conspiracy), and N.J.S.A. 2C:5-2 (conspiracy).

266.    The above-described acts were all clearly related, as they were committed for the purpose of damaging CCFW and/or funding, launching and/or operating the Enterprise, and involved the same victim, participants, methods of commission and results.

267.    Defendants' repeated racketeering activities as related to CCFW started from as far back as September 2019 when certain Defendants were already conspiring to steal and stealing CCFW's Confidential Information to unfairly compete with and go after CCFW's biggest clients and vendors (and earlier as it related to the theft of confidential information belonging to various pharmaceutical companies), and has continued well into 2023 when PVI and/or PVP hired Ornelas-Kuh and he assisted the Enterprise go after other CCFW clients, such as Jannsen and, in fact, to the present through the use of said illegally obtained information and other wrongdoing set forth throughout this complaint, such that there has been an extended period of time during which a pattern of racketeering activity has occurred.

268.    The above-described pattern of racketeering activity has included stealing CCFW's Confidential Information, clients and vendor relations, theft of immovable property, theft of trade secrets, computer crimes, and theft by deception. Since they were all carried out by use of the mail and/or electronic mail, they also constitute mail and wire fraud.

269.    There is a clear threat of continued criminal activity because the Enterprise continues to operate and benefit from its ill-gotten gains, with the support of officers and/or employees who have violated their respective duties of loyalty and confidentiality; Defendants continue to possess CCFW's Confidential Information, including SOWs and rates; and, having

66

stolen this information and obtained work from CCFW clients, and established important relationships with various CCFW go-to vendors, through unfair competition and tortious interference.

270.    The aforementioned racketeering activities were clearly related to the Enterprise, as it directly profited from same, and enabled it to immediately go from a shell company to one having immediate revenues despite the work having been performed by Johnson, Bicking and/or Weiler before they left CCFW.  Similarly, the theft of CCFW's Confidential Information allowed the Enterprise to immediately, and unfairly, compete with CCFW and use that information that otherwise would have taken them many years to develop on their own.

271.    The racketeering acts benefitted the Enterprise, as aforesaid, as it was related to its affairs, and was authorized by it, as it promoted and furthered the purpose of the Enterprise.

272.    This is evidenced by Johnson's communications with her co-conspirators when, for example, they sent her others' confidential information, or otherwise aided the Enterprise, and in which she comments about her "team" or similar terminology about the Enterprise.

273.    Accordingly, Defendants knowingly conducted or participated in the affairs of the Enterprise through a pattern of racketeering activities in violation of RICO and NJRICO.

274.    As a direct and proximate result thereof, CCFW has suffered, and continues to suffer, substantial damages.

275.    The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment on this First Count of the Second Amended Complaint against Defendants jointly, severally and/or in the alternative as follows:

A.    Punitive and/or treble damages;

B.      Damages;

C.      Interest;

D.      Reasonable attorneys' fees;

E.      Costs of suit;

F.      Such further relief as this Court deems just and equitable under the circumstances.

### SECOND COUNT
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
### RICO CONSPIRACY (18 U.S.C. § 1962(d) & N.J.S.A. 2C:41-2(d))
### (All Defendants)

276.    Plaintiff repeats and realleges all of the allegations in the previous paragraphs as if same were fully set forth herein at length.

277.    Defendants conspired and agreed to conduct or participate in the RICO Enterprise, as evidenced by the substantial electronic, written and oral record of their communications over several years as well as their various covert meetings, as aforesaid.

278.    Based on the foregoing, Defendants conspired with each other to conduct or participate in a RICO Enterprise as alleged in Count One, *supra*, and such conspiracy was in violation of RICO, 18 U.S.C. § 1962(d) and NJRICO, N.J.S.A. 2C:41-2(d).

279.    As a direct and proximate result thereof, Plaintiff has suffered, and continues to suffer, substantial damages.

280.    The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment on this Second Count of the Second Amended Complaint against Defendants jointly, severally and/or in the alternative as follows:

G.      Punitive and/or treble damages;

H.      Damages;

I.      Interest;

J.      Reasonable attorneys' fees;

K.      Costs of suit;

L.      Such further relief as this Court deems just and equitable under the circumstances.

4856-2212-7827, v. 1

### THIRD COUNT
### N.J. TRADE SECRETS ACT AND FEDERAL DEFEND TRADE SECRETS ACT
### (All Defendants)

281.    Plaintiff repeats and realleges all of the previous allegations as if same were fully set forth herein at length.

282.    CCFW's confidential and proprietary information constitute "trade secrets" under the New Jersey Trade Secrets Act **("NJTSA")** and the Defend Trade Secrets Act **("DTSA").**

283.    Defendants acquired, misappropriated, used and/or stole CCFW's trade secrets including, but not necessarily limited to, the documents and information described hereinabove as well as  budgets, vendor lists, SOWs and work product performed for CCFW clients, by improper means as described herein; disclosed and/or used CCFW's trade secrets without CCFW's express or implied consent; at the time of disclosure or use, knew or had reason to know that the trade secrets were derived or acquired through improper means; and otherwise converted said trade secrets for their economic benefit.

284.    CCFW had taken reasonable steps to keep the information secret including, but not necessarily limited to, making said information available only to those with a need to know said information for CCFW's business, by requiring employees and consultants to sign confidentiality agreements and the like, and by requiring non-competition agreements so that said information would not be disclosed to competitors.

285.    As a direct and proximate result thereof, CCFW has suffered substantial damages.

286.    The aforesaid actions of Defendants were willful, wanton, malicious and/or in reckless disregard of CCFW's rights and Defendants should be ordered to disgorge their ill-gotten gains.

**WHEREFORE**, Plaintiff demands judgment on this the Third Count of the Second Amended Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

    A.  Punitive damages;

    B.  Exemplary (double) damages;

    C.  Damages;

    D.  Disgorgement based upon Defendants' unjust enrichment;

    E.  Interest;

    F.  Reasonable attorneys' fees;

    G.  Costs of suit; and

    H.  Such further relief as this Court deems just and equitable under the circumstances.

## FOURTH COUNT
### NEW JERSEY COMPUTER RELATED OFFENSES ACT AND FEDERAL COMPUTER FRAUD AND ABUSE ACT
#### (All Defendants)

287.    Plaintiff repeats and realleges all of the previous allegations as if same were fully set forth herein at length.

288.    CCFW's confidential and proprietary information and trade secrets maintained on its computers and computer system constitute "data" within the meaning of the New Jersey Computer Related Offenses Act (the **"NJCROA"**) and the federal Computer Fraud and Abuse Act **("CFAA")**.

289.    By conspiring to destroy and/or take, and thereafter accessing, taking, altering, damaging, and destroying, purposefully and knowingly, directly or indirectly, without authorization, as aforesaid, and retaining said information from CCFW's computer and computer system, Defendants have violated, <u>inter alia</u>, the NJCROA and the CFAA.

71

290.    Each of the Defendants, through their purposeful, knowing and substantial involvement in the activities constituting or resulting from taking of data or altering, damaging and/or destroying it from, or accessing, CCFW's computers and computer system, was an "actor" within the meaning of and is subject to personal liability to Plaintiff under these statutes.

291.    As a direct and proximate result thereof, CCFW has been damaged and is entitled to damages, costs and other relief provided by said statutes.

292.    The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of CCFW's rights.

**WHEREFORE**, Plaintiff demands judgment on this the Fourth Count of the Second Amended Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

A.  Punitive damages;

B.  Damages;

C.  Interest;

D.  Reasonable attorneys' fees;

E.  Costs of suit; and

F.  Such further relief as this Court deems just and equitable under the circumstances.

## FIFTH COUNT
## BREACHES OF CONTRACT
### (Johnson, Weiler, Bicking and Ornelas-Kuh)

293.    Plaintiff repeats and realleges all of the statements made in each of the preceding paragraphs of the Second Amended Complaint as if same were fully set forth at length herein.

294.    As set forth above, Johnson's 2003 Non-Compete Agreement and 2003 Confidentiality Agreement, Johnson's March 2022 Consulting Agreement, and Johnson's March

2022 Confidentiality Agreement constitute valid and enforceable contracts between Plaintiff and Johnson.

295.    Johnson intentionally breached the aforementioned agreements as set forth above and herein and, in breach of the Consulting Agreement, failed to inform the Company that she was engaging in work during the Consulting period that was a conflict of interest with the work she was performing for the Company.

296.    Johnson also breached her agreement with CCFW by failing to reimburse it for up-front monthly payments it made for her COBRA coverage.  Despite repeated requests, Johnson has failed to reimburse CCFW for the monthly premiums since January 2023 and owes CCFW $7,331.22.

297.    Weiler's Loyalty Agreement and Weiler's Confidentiality Agreement constitute valid and enforceable contracts between Plaintiff and Weiler.

298.    On or about November 27, 2020, Weiler signed a Duty of Loyalty Agreement with CC Ford Group and all owned, subsidiary and affiliated companies including, but not limited, to CCFW, Index Medical Communications, LLC, and Decile Ten, LLC ("**Weiler's Loyalty Agreement**").

299.    Weiler's Loyalty Agreement was effective as of December 2, 2020.

300.    Pursuant to Section 2 of Weiler's Loyalty Agreement, Weiler agreed to keep confidential all Confidential Information (defined therein) of the Company for a period of one (1) year subsequent to her employment's termination.

301.    Specifically, Section 2 provides:

> Section 2. Executive will keep confidential all Confidential Information and will not without the prior written consent of the Board of Directors of Company:

(i) "use for [her] benefit or disclose at any time during his employment by Company, or thereafter, except to the extent required by the performance by [her] of [her] duties as an employee of Company, any Confidential Information obtained or developed by [her] while in the employ of Company, or"

(ii) "take any Confidential Information with [her] upon leaving the employ of the Company."

302. Pursuant to Section 3 of Weiler's Loyalty Agreement, Weiler agreed to not interfere with the Company's business relationships, directly or indirectly, for a period of one (1) year subsequent to her employment's termination.

303. Specifically, Section 3 provides:

3. <u>Non-Interference with Business Relationships</u>. During the Restricted Period, Executive will not directly or indirectly, either as principal, manager, agent, consultant, officer, director, stockholder, partner, investor, lender, member or employee or in any other capacity:

a) make any statements or perform any acts intended to advance, reasonably likely to advance or having the effect of advancing, an interest of any Competitor in any way that will or may injure an interest of Company or any of its Affiliates in its relationship and dealings with its grantors, sponsors, customers, clients or suppliers;

b) discuss with any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates the present or future availability of any services or products of any business that are competitive with services or products which Company or any of its Affiliates provides;

c) make any statements or do any acts intended to cause, reasonably likely to cause or having the effect of causing, any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates to make use of the services or purchase the products of any business in which Executive has or expects to acquire any interest, is or expects to become an employee, officer or director, or has received or expects to receive any remuneration, if such services or products in any way compete with the services or products sold or provided by Company or any of its Affiliates to any grantor, sponsor, customer, client or supplier (and for purposes of the foregoing, Executive shall be deemed to expect to acquire an interest in a business or to be made an officer or director of such business if such possibility has been discussed with any officer, director, employee, agent, or promoter of such business); or

d)     engage in any business with, own any interest in, perform any services for, participate in or be connected with the business of a Competitor; provided, however, that the provisions of this Section 3(d) shall not be deemed to prohibit Executive's ownership of not more than one percent (1%) of the total outstanding equity of any publicly held company.

304.    Pursuant to Section 4 of Weiler's Loyalty Agreement, Weiler agreed to be prohibited from soliciting the Company's clients for a period of one (1) year subsequent to her employment's termination.

305.    Specifically, Section 4 provides:

4. <u>Non-Solicitation</u>. During the Restricted Period, Executive will not, directly or indirectly, either as principal, manager, agent, consultant, officer, director, stockholder, partner, investor, lender or employee or in any other capacity:

a)     "employ, solicit for employment, or advise or recommend to any other person that they employ or solicit for employment, any employee of Company or any of its Affiliates or retain or attempt to retain the services of any independent Employees who provide independent Employee services to Company or any Affiliate on an exclusive or substantially full-time basis; or"

b)     "solicit or encourage any employee of Company or any of its Affiliates to leave the employ of Company or such Affiliate, to do any act that is disloyal to Company or any of its Affiliates, is inconsistent with the interests of Company or any of its Affiliates or violates any provision of this Agreement or any agreement such employee has with Company or any Affiliate, or to do any of the foregoing with respect to any such independent Employees for Company or any Affiliate."

306.    Pursuant to Section 1(d) of Weiler's Loyalty Agreement, Weiler agreed to be bound by the restrictive covenants, and all provisions contained within Weiler's Loyalty Agreement, for a period of twelve (12) months after the termination of her employment.

307.    Weiler's employment with the Company terminated as of May 25, 2022.  Thus, her obligations under Weiler's Loyalty Agreement extended until at least May 24, 2023.

308.     On or about November 27, 2020, Weiler signed a Confidentiality Agreement with CC Ford Group and all owned, subsidiary and affiliated companies including, but not limited to, CC Ford Group, the Company, Index Medical Communications, LLC, and Decile Ten, LLC ("**Weiler's Confidentiality Agreement**").

309.     Weiler's Confidentiality Agreement was effective as of December 2, 2020.

310.     Pursuant to Weiler's Confidentiality Agreement, Weiler agreed to not "either directly or indirectly, use Information" (as defined therein) for a non-Company purpose.

311.     Pursuant to Section 1 of Weiler's Confidentiality Agreement, Weiler agreed to be bound by these restrictive covenants, and all provisions, contained within Weiler's Confidentiality Agreement, for a period of ten (10) years after the agreement's Effective Date.

312.     The Effective Date of Weiler's Confidentiality Agreement was December 2, 2020. Thus, her obligations under Weiler's Confidentiality Agreement extend until at least December 1, 2030.

313.     During the course of Weiler's employment with the Company, by virtue of her employment as an executive (specifically, Project Manager), Weiler had access to the Company's customer information and goodwill, existing business, equipment, confidential and proprietary information, and trade secrets, to use solely for the benefit of the Company.

314.     By virtue of her executive position at the Company, Weiler had the ability to access files containing virtually all of the Company's most sensitive documents containing its competitively sensitive and confidential information, including critical employee and client information.

315.     On or about May 18, 2022, Weiler informed the Company of her intention to resign.

316.     Weiler's final day with the Company in her role as the Company's Project Manager was May 25, 2022.

317.     Weiler intentionally breached the aforementioned agreements as set forth above and herein.

318.     Bicking's Loyalty Agreement and Confidentiality Agreement constitute valid and enforceable contracts between Plaintiff and Bicking.

319.     Bicking's Loyalty Agreement was effective as of February 19, 2019.

320.     Pursuant to Section 2 of Bicking's Loyalty Agreement, Bicking agreed to keep confidential all Confidential Information of the Company (as defined therein) for a period of one (1) year subsequent to her employment's termination.

321.     Specifically, Section 2 of Bicking's Loyalty Agreement provides:

> Section 2. Executive will keep confidential all Confidential Information and will not without the prior written consent of the Board of Directors of Company:
>
> (i)     "use for his benefit or disclose at any time during his employment by Company, or thereafter, except to the extent required by the performance by him of his duties as an employee of Company, any Confidential Information obtained or developed by him while in the employ of Company, or"
>
> (ii)   "take any Confidential Information with him upon leaving the employ of the Company."

322.     Pursuant to Section 3 of Bicking's Loyalty Agreement, Bicking agreed to not interfere with the Company's business relationships, directly or indirectly, for a period of one (1) year subsequent to her employment's termination.

323.     Specifically, Section 3 of Bicking's Loyalty Agreement provides:

> 3. Non-Interference with Business Relationships. During the Restricted Period, Executive will not directly or indirectly, either as principal,

manager, agent, consultant, officer, director, stockholder, partner, investor, lender, member or employee or in any other capacity:

a)    make any statements or perform any acts intended to advance, reasonably likely to advance or having the effect of advancing, an interest of any Competitor in any way that will or may injure an interest of Company or any of its Affiliates in its relationship and dealings with its grantors, sponsors, customers, clients or suppliers;

b)    discuss with any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates the present or future availability of any services or products of any business that are competitive with services or products which Company or any of its Affiliates provides;

c)    make any statements or do any acts intended to cause, reasonably likely to cause or having the effect of causing, any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates to make use of the services or purchase the products of any business in which Executive has or expects to acquire any interest, is or expects to become an employee, officer or director, or has received or expects to receive any remuneration, if such services or products in any way compete with the services or products sold or provided by Company or any of its Affiliates to any grantor, sponsor, customer, client or supplier (and for purposes of the foregoing, Executive shall be deemed to expect to acquire an interest in a business or to be made an officer or director of such business if such possibility has been discussed with any officer, director, employee, agent, or promoter of such business); or

d)    engage in any business with, own any interest in, perform any services for, participate in or be connected with the business of a Competitor; provided, however, that the provisions of this Section 3(d) shall not be deemed to prohibit Executive's ownership of not more than one percent (1%) of the total outstanding equity of any publicly held company.

324.    Pursuant to Section 4 of Bicking's Loyalty Agreement, Bicking agreed to be prohibited from soliciting the Company's clients for a period of one (1) year subsequent to her employment's termination.

325.    Specifically, Section 4 of Bicking's Loyalty Agreement provides:

4. <u>Non-Solicitation</u>. During the Restricted Period, Executive will not, directly or indirectly, either as principal, manager, agent, consultant,

officer, director, stockholder, partner, investor, lender or employee or in any other capacity:

a)    "employ, solicit for employment, or advise or recommend to any other person that they employ or solicit for employment, any employee of Company or any of its Affiliates or retain or attempt to retain the services of any independent Employees who provide independent Employee services to Company or any Affiliate on an exclusive or substantially full-time basis; or"

b)    "solicit or encourage any employee of Company or any of its Affiliates to leave the employ of Company or such Affiliate, to do any act that is disloyal to Company or any of its Affiliates, is inconsistent with the interests of Company or any of its Affiliates or violates any provision of this Agreement or any agreement such employee has with Company or any Affiliate, or to do any of the foregoing with respect to any such independent Employees for Company or any Affiliate."

326.    Pursuant to Section 1(d) of Bicking's Loyalty Agreement, Bicking agreed to be bound by the restrictive covenants, and all provisions contained within Bicking's Loyalty Agreement, for a period of twelve (12) months after the termination of her employment.

327.    Bicking's employment with the Company terminated as of May 20, 2022. Thus, her obligations under Bicking's Loyalty Agreement extended until at least May 20, 2023.

328.    On or about February 19, 2019, Bicking signed a Confidentiality Agreement with CC Ford and all owned, subsidiary and affiliated companies including, but not limited to, CC Ford, CC Ford Group North, LLC, and Decile Ten, LLC ("**Bicking's Confidentiality Agreement**").

329.    Bicking's Confidentiality Agreement was effective as of February 19, 2019.

330.    Pursuant to Bicking's Confidentiality Agreement, Bicking agreed to not "either directly or indirectly, use Information" for a non-Company purpose.

331.    Pursuant to Section 1 of Bicking's Confidentiality Agreement, Bicking agreed to be bound by the restrictive covenants, and all provisions, contained within Bicking's Confidentiality Agreement, for a period of ten (10) years after the agreement's effective date.

332.     The effective date of Bicking's Confidentiality Agreement was February 19, 2019. Thus, her obligations under Bicking's Confidentiality Agreement extend until February 18, 2029.

333.     During the course of Bicking's employment with the Company, by virtue of her employment as an executive (specifically, Senior Director of Client Services), Bicking had access to the Company's client information and goodwill, existing business, equipment, confidential and proprietary information, and trade secrets, to use solely for the benefit of the Company.

334.     By virtue of her executive position at the Company, Bicking had the ability to access files containing virtually all of the Company's most sensitive documents containing its competitively sensitive and confidential information, including critical employee and client information.

335.     On or about May 13, 2022, Bicking informed the Company of her intention to resign.

336.     Bicking's final day with the Company in her role as Senior Director of Client Services was May 20, 2022.

337.     Bicking intentionally breached the aforementioned agreements as set forth above and herein.

338.     Ornelas-Kuh entered into a loyalty agreement (the **"Ornelas-Kuh Loyalty Agreement"**) and a confidentially agreement with CCF and all owned and affiliated companies and they constitute valid and enforceable contracts between Plaintiff and Ornelas-Kuh.

339.     The Ornelas-Kuh Loyalty Agreement was effective as of April 25, 2020.

340.     Pursuant to Section 2 of the Ornelas-Kuh Loyalty Agreement, Ornelas-Kuh agreed to keep confidential all Confidential Information of the Company (as defined therein) for a period of one (1) year subsequent to her employment's termination.

341.     Specifically, Section 2 of the Ornelas-Kuh Loyalty Agreement provides:

Section 2. (b) Executive will keep confidential all Confidential Information and will not without the prior written consent of the Board of Directors of Company:

    i. "use for his benefit or disclose at any time during his employment by Company, or thereafter, except to the extent required by the performance by him of his duties as an employee of Company, any Confidential Information obtained or developed by him while in the employ of Company, or"

    ii. "take any Confidential Information with him upon leaving the employ of the Company."

342.     Pursuant to Section 3 of the Ornelas-Kuh Loyalty Agreement, Ornelas-Kuh agreed, inter alia, not to interfere with the Company's business relationships, directly or indirectly, for a period of one (1) year subsequent to her employment's termination.

343.     Specifically, Section 3 of the Ornelas-Kuh Loyalty Agreement provides:

3. Non-Interference with Business Relationships. During the Restricted Period, Executive will not directly or indirectly, either as principal, manager, agent, consultant, officer, director, stockholder, partner, investor, lender, member or employee or in any other capacity:

a)     make any statements or perform any acts intended to advance, reasonably likely to advance or having the effect of advancing, an interest of any Competitor in any way that will or may injure an interest of Company or any of its Affiliates in its relationship and dealings with its grantors, sponsors, customers, clients or suppliers;

b)     discuss with any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates the present or future availability of any services or products of any business that are competitive with services or products which Company or any of its Affiliates provides;

c)     make any statements or do any acts intended to cause, reasonably likely to cause or having the effect of causing, any clients, grantors, sponsors, customers, or suppliers of Company or any of its Affiliates to make use of the services or purchase the

products of any business in which Executive has or expects to acquire any interest, is or expects to become an employee, officer or director, or has received or expects to receive any remuneration, if such services or products in any way compete with the services or products sold or provided by Company or any of its Affiliates to any grantor, sponsor, customer, client or supplier (and for purposes of the foregoing, Executive shall be deemed to expect to acquire an interest in a business or to be made an officer or director of such business if such possibility has been discussed with any officer, director, employee, agent, or promoter of such business); or

d) engage in any business with, own any interest in, perform any services for, participate in or be connected with the business of a Competitor; provided, however, that the provisions of this Section 3(d) shall not be deemed to prohibit Executive's ownership of not more than one percent (1%) of the total outstanding equity of any publicly held company.

344.     Pursuant to Section 4 of the Ornelas-Kuh Loyalty Agreement, Ornelas-Kuh agreed, inter alia, to be prohibited from soliciting the Company's clients or for a period of one (1) year subsequent to his employment's termination.

345.     Specifically, Section 4 of the Ornelas-Kuh Loyalty Agreement provides:

4. <u>Non-Solicitation</u>. During the Restricted Period, Executive will not, directly or indirectly, either as principal, manager, agent, consultant, officer, director, stockholder, partner, investor, lender or employee or in any other capacity:

a)     "employ, solicit for employment, or advise or recommend to any other person that they employ or solicit for employment, any employee of Company or any of its Affiliates or retain or attempt to retain the services of any independent Employees who provide independent Employee services to Company or any Affiliate on an exclusive or substantially full-time basis; or"

b)     "solicit or encourage any employee of Company or any of its Affiliates to leave the employ of Company or such Affiliate, to do any act that is disloyal to Company or any of its Affiliates, is inconsistent with the interests of Company or any of its Affiliates or violates any provision of this Agreement or any agreement such employee has with Company or any Affiliate, or to do any of the foregoing with respect to any such independent Employees for Company or any Affiliate."

4856-2212-7827, v. 1

346.     Pursuant to Section 1(d) of the Ornelas-Kuh Loyalty Agreement, Ornelas-Kuh agreed to be bound by the restrictive covenants, and all provisions, contained within the Ornelas-Kuh Loyalty Agreement, for a period of twelve (12) months after the termination of his employment.

347.     Ornelas-Kuh's employment with the Company terminated as of April 27, 2023. Thus, his obligations under the Ornelas-Kuh Loyalty Agreement extended until at least April 27, 2024.

348.     On or about April 25, 2020, Ornelas-Kuh signed a Confidentiality Agreement with CC Ford and all owned, subsidiary and affiliated companies including, but not limited to, CC Ford, the Company, CC Ford Group North, LLC, and Decile Ten, LLC (the "**Ornelas-Kuh Confidentiality Agreement**").

349.     The Ornelas-Kuh Confidentiality Agreement was effective as of April 25, 2020.

350.     Pursuant to the Ornelas-Kuh Confidentiality Agreement, Ornelas-Kuh agreed, inter alia, to not "either directly or indirectly, use Information" for a non-Company purpose.

351.     Pursuant to Section 1 of the Ornelas-Kuh Confidentiality Agreement, Ornelas-Kuh agreed to be bound by the restrictive covenants, and all provisions, contained within the Ornelas-Kuh Confidentiality Agreement, for a period of ten (10) years after the agreement's effective date.

352.     The effective date of the Ornelas-Kuh Confidentiality Agreement was April 25, 2020. Thus, his obligations under the Ornelas-Kuh Confidentiality Agreement extend until April 24, 2030.

353.     During the course of Ornelas-Kuh's employment with the Company, by virtue of his employment as an executive (specifically, Associate Director, Strategy and Planning, and later Director, Client Services and VP, Client Services), Ornelas-Kuh had access to the Company's client

information and goodwill, existing business, equipment, confidential and proprietary information, and trade secrets, to use solely for the benefit of the Company.

354.     By virtue of his executive position at the Company, Ornelas-Kuh had the ability to access files containing virtually all of the Company's most sensitive documents containing its competitively sensitive and Confidential Information, including critical employee and client information.

355.     For example, on February 27, 2022, the day before Johnson resigned from CCFW, and two days after Ornelas-Kuh forwarded his Duty of Loyalty to Johnson, he was sending Johnson confidential finance numbers regarding Janssen's ongoing and pending work.  This is especially concerning given his previous attempt in 2020 to actively steal all of CCFW active projects by falsely presenting to the Janssen finance vendor that CCFW was changing its name and EIN.

356.     On March 18, 2022, Ornelas-Kuh sent Johnson a proprietary CC Ford marketing presentation to Eyepoint, which Studdiford had recently sent him, as well as extensive additional information on upcoming Janssen work. That day Ornelas-Kuh was also helping Johnson script her departure emails. In response to one of the draft departure emails Ornelas-Kuh sent her, Johnson responded, "Makes me smile and feel appreciated. We make a pretty AMAZING team."

357.     Ornelas-Kuh engaged in fraudulent expense reporting to a major CCFW client and jeopardized a key client relationship for his own benefit.

358.     Ornelas-Kuh's final day with the Company in his role as Senior Director of Client Services was April 25, 2023.

359.     Ornelas-Kuh also entered into an Employee Confidentiality and Proprietary Rights Agreement with CCFW on May 20, 2022 (the **"2022 Ornelas-Kuh Confidentiality Agreement"**).

360.     The 2022 Ornelas-Kuh Confidentiality Agreement provides in relevant part, that:

- The Employee further understands and acknowledges that this Confidential Information and the Employer's ability to reserve it for the exclusive knowledge and use of the Employer is of great competitive importance and commercial value to the Employer, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Employer, for which remedies at law will not be adequate and may also cause the Employer to incur financial costs, loss of business advantage, liability under confidentiality agreements with third parties, civil damages, and criminal penalties.

- to treat all Confidential Information as strictly confidential;

- not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Employer) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Employer and, in any event, not to anyone outside of the direct employ of the Employer except as required in the performance of any of the Employee's authorized employment duties to the Employer and only with the prior consent of an authorized officer acting on behalf of the Employer in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and

- not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources, containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Employer, except as required in the performance of any of the Employee's authorized employment duties to the Employer and with the prior consent of an authorized officer acting on behalf of the Employer in each instance (and then, only within the limits and to the extent of such duties or consent). The Employee understands and acknowledges that the Employee's obligations under this Agreement regarding any particular Confidential Information begin immediately and shall continue during and after the Employee's employment by the Employer until the Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or a breach by those acting in concert with the Employee or on the Employee's behalf.

Duration of Confidentiality Obligations.

- The Employee understands and acknowledges that Employee's obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Employee first having access to such Confidential Information (whether before or after employee begins

85

employment by the Employer) and shall continue during and after Employee's employment by the Employer until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

361.    Ornelas-Kuh intentionally breached the aforementioned agreements as set forth above and herein.

362.    Johnson, Weiler, Bicking and Ornelas-Kuh were or are stealing CCFW's customers, interfering with its relationships with vendors and suppliers, and exploiting CCFW's substantial investments in customer cultivation, market testing and promotion.

363.    As a direct and proximate result of Johnson, Weiler, Bicking and Ornelas- Kuh's breaches, as aforesaid, they have caused Plaintiff, and will cause Plaintiff, irreparable loss of good will, profits, revenue and business opportunities, including the loss of customers and related business, unless they immediately are enjoined and restrained, and said Defendants also have caused Plaintiff other substantial damage.

**WHEREFORE**, Plaintiff demands judgment on this Fifth Count of the Second Amended Complaint against Johnson, Weiler, Bicking and Ornelas-Kuh, jointly, severally and/or in the alternative, as follows:

(a)    Enjoining and restraining Johnson from, directly or indirectly, breaching or otherwise violating Johnson's Non-Compete Agreement, Johnson's Consulting Agreement, and Johnson's March 2022 Confidentiality Agreement;

(b)    Enjoining and restraining Weiler from, directly or indirectly, breaching or otherwise violating Weiler's Loyalty Agreement and Weiler's Confidentiality Agreement;

(c)    Enjoining and restraining Bicking from, directly or indirectly, breaching or otherwise violating Bicking's Loyalty Agreement and Bicking's Confidentiality Agreement;

(d)      Enjoining and restraining Ornelas-Kuh from, directly or indirectly, breaching or otherwise violating the Ornelas-Kuh Duty of Loyalty Agreement, the Ornelas-Kuh Confidentiality Agreement and the Ornelas-Kuh Employee Confidentiality Agreement with Plaintiff;

(e)      Enjoining and restraining Defendants from, directly or indirectly, performing any services for Albireo, PEC and/or any other Company clients who conducted business with the Company during the one-year period prior to the Individual Defendants' termination from the Company or with whom the Company had substantial contact during said period;

(f)      Enjoining and restraining Defendants, directly or indirectly, from soliciting for hire any Company employees;

(g)      Requiring Defendants not to share, and to return and/or destroy, and if destroyed, certify thereto, any Confidential Information of the Company and/or of any of the Company's clients and not to retain any copies or excerpts thereof;

(h)      Damages;

(i)      Disgorgement compelling Johnson, Weiler, Bicking and Ornelas-Kuh to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's, Weiler's, Bicking's and/or Ornelas-Kuh's respective disloyalty;

(j)      Reasonable Attorneys' fees;

(k)      Interest;

(l)      Costs of suit; and

(m)      Such other legal and equitable relief as the Court may deem just and proper.

## SIXTH COUNT
## BREACHES OF FIDUCIARY DUTY
### (Johnson)

364.     Plaintiff repeats and realleges all of the statements made in each of the preceding paragraphs of the Second Amended Complaint as if same were set forth at length herein.

365.     Johnson, as the Company's Managing Director, owed certain fiduciary duties to, among others, the Company.

366.     As a fiduciary, Johnson owed Plaintiff the utmost duties of loyalty, honesty and care.

367.     Johnson violated the duties owed to Plaintiff by engaging in the wrongful conduct described herein.

368.     Johnson breached her fiduciary duties to Plaintiff by, inter alia, soliciting Plaintiff's customers and diverting their business from the Company on specific jobs for which those customers sought originally to engage the Company, while Johnson was still employed by and/or consulting for the Company.

369.     Johnson also breached those fiduciary duties by, inter alia, using the Company's confidential and proprietary information and trade secrets, obtained in the course and scope of Johnson's employment and/or consulting arrangement with Plaintiff, to solicit the Company's customers to work with Johnson.

370.     As a direct and proximate cause of Johnson's breaches of her fiduciary duties, Plaintiff has suffered, and continues to suffer, irreparable harm and significant economic loss.

371.     Furthermore, Johnson's breaches of her fiduciary duties were willful, wanton, malicious and/or in reckless disregard of CCFW's rights.

4856-2212-7827, v. 1

372.    Moreover, Plaintiff is entitled to the remedy of equitable disgorgement directing that all sums paid to Johnson starting from the period she first violated her duty of loyalty be repaid.

**WHEREFORE**, Plaintiff demands judgment against Johnson on this Sixth Count of the Second Amended Complaint, as follows:

(a)    Enjoining and restraining Johnson, directly or indirectly, from breaching or otherwise violating Johnson's Non-Compete Agreement, Johnson's Consulting Agreement, and Johnson's March 2022 Confidentiality Agreement;

(b)    Enjoining and restraining Johnson, directly or indirectly, from doing business with Albireo, PEC and all other clients of the Company who conducted business with the Company during the one-year period prior to the Individual Defendants' termination from the Company or with whom the Company had substantial contact during the said one year period;

(c)    Enjoining and restraining Johnson from soliciting any Company employee for hire;

(d)    Requiring Defendants not to share, and to return and/or destroy, and if destroyed, certify thereto, any confidential information of the Company and any of the Company's clients and not retain copies or excerpts thereof;

(e)    Punitive damages;

(f)    Damages;

(g)    Equitable disgorgement compelling Johnson to reimburse Plaintiff for all wages and other compensation paid by Plaintiff to her starting with the time Johnson was first disloyal to CCFW;

(h)    Reasonable Attorneys' fees;

(i)      Interest;

(j)      Costs of suit; and

(k)      Such other legal and equitable relief as the Court may deem just and proper.

**SEVENTH COUNT**
**BREACHES OF DUTY OF UNDIVIDED LOYALTY**
**AND VIOLATIONS OF THE FAITHLESS SERVANT DOCTRINE**
**(Johnson, Weiler, Bicking, Ornelas-Kuh and John Does 1-10)**

373.    Plaintiff repeats and realleges all of the statements made in each of the preceding paragraphs of the Second Amended Complaint as if same were fully set forth herein at length.

374.    Johnson, Weiler, Bicking, Ornelas-Kuh and John Does 1-10, who were employees of the Company whose identities the Company is currently unaware of, owed Plaintiff, among other things, a common law duty of undivided loyalty.

375.    Johnson, Weiler, Bicking, Ornelas-Kuh and John Does 1-10 willfully and repeatedly breached said duty to Plaintiff.

376.    Based upon said conduct, Johnson, Weiler, Bicking, Ornelas-Kuh and John Does 1-10 also were faithless servants of Plaintiff and should be compelled to disgorge all of the compensation paid them by Plaintiff during the period of disloyalty.

377.    As a direct and proximate result of said breaches of undivided loyalty and said conduct as faithless servants, Plaintiff has suffered irreparable harm and other damage.

378.    The aforesaid conduct of Johnson, Weiler, Bicking, Ornelas-Kuh and John Does 1-10 was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment on this Seventh Count of the Second Amended Complaint against Johnson, Weiler, , Ornelas-Kuh, Bicking and John Does 1-10, jointly, severally and/or in the alternative, as follows:

90

(a)     Enjoining and restraining said Defendants from breaching their various agreements with Plaintiff;

(b)     Enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo, PEC and any other clients of the Company who conducted business with the Company during the one-year period prior to the termination of the individual Defendants' relationships with the Company or with whom the Company had substantial contact during said one-year period;

(c)     Requiring Defendants not to share, and to return or destroy, and if destroyed, certify thereto, any confidential information of the Company or any of Company's clients and not to retain any copies or excerpts thereof;

(d)     Punitive damages;

(e)     Damages;

(f)     Equitable disgorgement compelling said Defendants to reimburse Plaintiff for all wages and other compensation received during the period of their disloyalty;

(g)     Reasonable attorneys' fees;

(h)     Interest;

(i)     Costs of suit; and

(j)     Such further relief as this Court deems just and equitable under the circumstances.


## EIGHTH COUNT
## TORTIOUS INTERFERENCE WITH CONTRACTS
## AND EXISTING BUSINESS RELATIONSHIPS
## (All Defendants)

379.    Plaintiff repeats and realleges the statements made in each of the preceding paragraphs of the Second Amended Complaint as if same were set forth at length herein.

4856-2212-7827, v. 1

380.     Plaintiff maintains business and contractual relationships with its clients, and did so, including, but not limited to, with Albireo, Merz and PEC, to provide consulting services when requested by clients.

381.     Plaintiff also maintains business relationships with vendors and suppliers.

382.     Defendants were aware of those contracts and relationships and interfered with Plaintiff's business and contractual relationships with its clients and vendors by, inter alia, directly and/or indirectly, soliciting the Company's clients and vendors and diverting them from the Company to PVI on specific jobs for which those clients sought originally to engage the Company and otherwise, and thereby also interfered with Plaintiff's ongoing business relationships with its clients and vendors.

383.     Defendants wrongfully took these actions without privilege to do so, knowing the effect the actions would have on Plaintiff's existing business and contractual relationships.

384.     Johnson, Weiler, Bicking, Ornelas-Kuh, PVI and John Does 1-10 were particularly able to interfere with the Company's existing clients, business relations and vendors by virtue of their employment as the Company's Managing Director, Project Manager, Senior Director of Client Services, and Vice President, respectively, and by continuing to indicate on their LinkedIn pages that they remained employed by the Company.

385.     Manning and PEC knew of, and also intentionally interfered with, Plaintiff's contractual relations with Johnson, Bicking, Weiler and Ornelas-Kuh, as well as with CCFW's contractual relations and prospective economic advantage with its clients.

386.     Similarly, Johnson and PVI were aware of Plaintiff's contractual relations with Bicking and Weiler yet knowingly and intentionally interfered with those contractual relations when hiring Bicking, Weiler and Ornelas-Kuh to work for PVI.

4856-2212-7827, v. 1

387.    Moreover, Johnson and PVI were aware of Plaintiff's contractual relations with Ornelas-Kuh, and were already defending this litigation and Plaintiff's claims that they tortiously interfered with Plaintiff's relationship with Bicking and Weiler, when they intentionally interfered with Plaintiff's relationship with Ornelas-Kuh by hiring Ornelas-Kuh to work for PVI.

388.    In the absence of Defendants' actions and interference, Plaintiff would have had a reasonable probability of economic gain from its employees and consultant, and from the clients who attempted to engage, or would have engaged, the Company for its services.

389.    As a direct and proximate cause of Defendants' actions, as aforesaid, Plaintiff has suffered, and continues to suffer, irreparable harm, damage to reputation, loss of good will as well as other damages, including but not limited to, contractual damages, consequential damages and lost profits.

390.    John Does 1-10 are persons or entities whose identities are currently unknown but who were aware of the contractual relationships the Company had with Johnson, Bicking, Weiler and Ornelas-Kuh and clients and who, despite knowing of said relationships, tortiously and intentionally interfered with same.

391.    As a direct and proximate result of all of said conduct, the Company suffered, and continues to suffer, substantial damages.

392.    The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of the Company's rights.

**WHEREFORE**, Plaintiff demands judgment on this Eighth Count of the Second Amended Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

(a)    Enjoining and restraining Johnson, Weiler, Bicking and Ornelas-Kuh from breaching or otherwise violating their agreements with Plaintiff;

(b)    Enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo, PEC and all other clients of the Company with whom the Company conducted business during the one-year period prior to the individual Defendants' separations from the Company or with whom the Company had substantial contact during the said one year period;

(c)    Requiring Defendants not to share, and to return or destroy, any confidential information of the Company and any of the Company's clients and not to retain any copies or excerpts thereof;

(d)    Punitive damages;

(e)    Damages;

(f)    Disgorgement compelling Johnson, Weiler, Bicking, Ornelas-Kuh, PVI and John Does 1-10 to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's, Weiler's, Bicking's, Ornelas-Kuh's and John Does 1-10's disloyalty;

(g)    Reasonable attorneys' fees;

(h)    Interest;

(i)    Costs of suit; and

(j)    Such other legal and equitable relief as the Court may deem just and proper.

## NINTH COUNT
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (All Defendants)

393.    Plaintiff repeats and realleges all of the statements made in each of the preceding paragraphs of the Second Amended Complaint as if same were fully set forth at length herein.

394.    Plaintiff's retention of clients to pursue future business represents a cognizable, protectable interest.

4856-2212-7827, v. 1

395.     In the absence of Defendants' actions and interference, as aforesaid, Plaintiff would have had more than a reasonable probability of economic advantage from its clients and industry contacts, including but not limited to prospective clients who attempted to engage the Company to perform services but were diverted by Defendants.

396.     Such clients include, but are not limited to, Albireo and PEC.

397.     Defendants have maliciously interfered with Plaintiff's interest in retaining and/or obtaining clients for future business and the economic advantages associated with same, based upon Defendants' obstructionist measures, including intentionally utilizing the Company's confidential and proprietary information, goodwill, and trade secrets to lure away existing clients with future business and prospective clients from the Company instead of securing their business for the Company, as they should have done given their duties and those within the scope of their consulting and/or contractual arrangements.

398.     Defendants' actions were taken intentionally, without justification, and with the knowledge and expectation that Plaintiff's rights and expectations would be adversely affected.

399.     Defendants' conduct, as described above, has resulted, and continues to result in, irreparable harm and material loss to Plaintiff in terms of prospective services diverted from the Company.

400.     As a direct and proximate result of Defendants' interference, Plaintiff has suffered, and will continue to suffer, irreparable harm as well as substantial damages.

401.     Defendants' conduct was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment on this Ninth Count of the Second Amended Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

(a)     Enjoining and restraining Johnson, Weiler, Bicking and Ornelas-Kuh from breaching or otherwise violating, directly or indirectly, the terms of their agreements with Plaintiff;

(b)     Enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo, PEC and all other clients who conducted business with the Company during the one-year period prior to the separation of the individual Defendants' relationships with the Company or with whom the Company had substantial contact during the said one year period;

(c)     Returning, not sharing, and destroying all confidential information of the Company and any of the Company's clients and to not retain copies or excerpts of same;

(d)     Punitive damages;

(e)     Damages;

(f)     Disgorgement compelling Johnson, Weiler, Bicking and Ornelas-Kuh to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's, Weiler's, Bicking's and Ornelas-Kuh's disloyalty;

(g)     Reasonable attorneys' fees;

(h)     Interest;

(i)     Costs of suit; and

(j)     Such other legal and equitable relief as the Court may deem just and proper.

4856-2212-7827, v. 1

## TENTH COUNT
## UNFAIR COMPETITION
## (All Defendants)

402.     Plaintiff repeats and realleges the statements made in the preceding paragraphs of this Second Amended Complaint as if same were fully set forth herein at length.

403.     Among other things, Johnson, Bicking and Weiler's use of the CCFW brand in their LinkedIn pages, and otherwise, was a palming and/or passing off of CCFW's good name and reputation to make it appear that PVI, PVP, Johnson, Bicking and Weiler would be providing services through the known entity CCFW and used that practice for their own benefit.

404.     The stealing of CCFW's confidential and proprietary information and trade secrets, and PVI's hiring of Ornelas-Kuh, also enabled Defendants to unfairly compete with Plaintiff.

405.     The aforesaid conduct of Defendants constitutes, inter alia, unfair competition and was otherwise wrongful.

406.     As a direct and proximate result thereof, Plaintiff has suffered irreparable harm and other substantial damages.

407.     The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment on this Tenth Count of the Second Amended Complaint against Defendants jointly, severally and/or in the alternative, as follows:

(a)     Enjoining and restraining Johnson, Weiler, Bicking and Ornelas-Kuh from breaching or otherwise violating, directly or indirectly, the terms of their agreements with Plaintiff;

(b)     Enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo, PEC and all other clients who conducted business with the Company during the

one-year period prior to the separation of the Individual Defendants' relationship with the Company or with whom the Company had substantial contact during the said one-year period;

(c)     Returning, not sharing, and destroying and if destroyed, certify thereto, all confidential information of the Company and any of the Company's clients and to not retain copies or excerpts of same;

(d)     Punitive damages;

(e)     Damages;

(f)     Disgorgement compelling Johnson, Weiler, Bicking and Ornelas-Kuh to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's, Weiler's, Bicking's and Ornelas-Kuh's disloyalty;

(g)     Reasonable attorneys' fees;

(h)     Interest;

(i)     Costs of suit; and

(j)     Such other legal and equitable relief as the Court may deem just and proper.

## ELEVENTH COUNT
## TRESPASS TO CHATTEL/CONVERSION
## (All Defendants)

408.    Plaintiff repeats and realleges the statements made in each of the preceding paragraphs of the Second Amended Complaint as if same were set forth at length herein.

409.    At all times relevant hereto, Plaintiff had possessory rights and/or interests in the Company laptop, keys, and American Express credit card used by Johnson, in connection with their employment with the Company.  Plaintiff also had possessory rights and/or interests in CCFW's confidential and proprietary information and trade secrets.

4856-2212-7827, v. 1

410.   Johnson has deprived Plaintiff of the use and possession of said personal property for a substantial time, converting same to their own and otherwise causing damages.

411.   To date, Johnson, has not returned to CCFW all of said personal property despite Plaintiff's multiple requests for same.

412.   Ornelas-Kuh has taken confidential documents from CCFW belonging to it and its clients and has not returned same despite repeated requests.

413.   Said individual Defendants' actions described hereinabove constitute, among other things, a trespass to chattel and conversion.

414.   Defendants have also taken CCFW's confidential and proprietary information and trade secrets without permission and have deprived CCFW of same.

415.   The aforesaid action of Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

416.   As a direct and proximate result thereof, Plaintiff has suffered substantial damages.

 **WHEREFORE**, Plaintiff demands judgment on this Eleventh Count in the Second Amended Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

(a)   Ordering Defendants to return all Company property including, but not limited to, all Company laptops, keys, and American Express credit cards;

(b)   Requiring Defendants not to share, and to return or destroy, and if destroyed, certify thereto, any confidential information of the Company and any of the Company's clients and not to retain copies or excerpts thereof;

(c)   Punitive damages;

(d)   Damages;

(e)   Reasonable attorneys' fees;

(f)      Interest;

(g)      Costs of suit; and

(h)      Such other legal and equitable relief as the Court may deem just and proper.


## TWELFTH  COUNT
## THEFT OF TRADE SECRETS AND MISAPPROPRIATION
## OF CONFIDENTIAL INFORMATION
## (All Defendants)

417.    Plaintiff repeats and realleges the statements made in the preceding paragraphs as if same were fully set forth herein at length.

418.    The Company has developed various trade secrets and confidential and proprietary information including such things as, but not limited to, business data compilations, methods, techniques, designs, plans, procedures and processes that derive independent economic value for use in its business.

419.    The Company has taken reasonable steps to maintain the confidentiality of said trade secrets and confidential and proprietary information including, among other things, requiring various employees, including Johnson, Bicking, Weiler and Ornelas-Kuh, to sign agreements to protect said information.

420.    Johnson, Bicking, Weiler and Ornelas-Kuh had access to said information as it was necessary to use same in relation to their job duties.

421.    Said Defendants had no right or permission to use said information for any purpose other than the work they performed on behalf of the Company.

422.    Subsequent to their employment relationship ending with the Company, and without permission or consent from the Company, the individual Defendants improperly used said

information on behalf of themselves and/or clients for whom they were providing services including, but not limited to, PEC.

423.    Defendants knew that said information was confidential and that they had acquired said information through improper means and in violation of their Agreements.

424.    The aforesaid conduct of Defendants violates, inter alia, the common law concerning the misappropriation of confidential and proprietary information and trade secrets.

425.    The aforesaid conduct of Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiff's rights.

426.    As a direct and proximate result thereof, Plaintiff has suffered substantial damages.

427.    The NJTSA permits the Court to grant injunctive relief regarding the theft of trade secrets as well as any misappropriation being threatened by Defendants.

**WHEREFORE**, Plaintiff demands judgment on this Twelfth Count of the Second Amended Complaint against Defendants, jointly, severally and/or in the alternative, as follows:

(a)    Enjoining and restraining Johnson, Weiler, Bicking and Ornelas-Kuh from breaching or otherwise violating, directly or indirectly, the terms of their agreements with Plaintiff;

(b)    Enjoining and restraining Defendants, directly or indirectly, from doing business with Albireo, PEC and all other clients who conducted business with the Company during the one-year period prior to the separation of the Individual Defendants' relationships with the Company or with whom the Company had substantial contact during the said one year period;

(c)    Returning, not sharing and destroying all confidential information of the Company and any of the Company's clients and to not retain copies or excerpts of same;

(d)    Punitive damages;

4856-2212-7827, v. 1

(e)     Damages;

(f)     Disgorgement compelling Johnson, Weiler, Bicking and Ornelas-Kuh to reimburse Plaintiff for all wages and other compensation paid by Plaintiff during the period of Johnson's, Weiler's, Bicking's and Ornelas-Kuh's disloyalty;

(g)     Reasonable attorneys' fees;

(h)     Interest;

(i)     Costs of suit; and

(j)     Such other legal and equitable relief as the Court may deem just and proper.

### THIRTEENTH COUNT
### TORTIOUS INTERFERENCE
### (Johnson, PVI and PVP)

428.     Plaintiff repeats and realleges the statements made in the preceding paragraphs as if same were fully set forth herein at length.

429.     Johnson's, PVI's and PVP's actions leading up to and/or after Johnson left the Company involved inducing Bicking, Weiler and Ornelas-Kuh to breach their duty of undivided loyalty to Plaintiff, to leave Plaintiff, take Plaintiff's Confidential Information and/or to obtain and/or work on business for clients of Plaintiff.

430.     Johnson, PVI and/or PVP also, among other things, hired Bicking, Weiler and/or Ornelas-Kuh to work on, or continue to work on, matters for the Company's clients and/or former clients in breach of, inter alia, their Loyalty and/or Confidentiality Agreements.

431.     Johnson, PVI and/or PVP also, among other things, maliciously encouraged CCFWs former employee Ornelas-Kuh to introduce Johnson to CCFW's clients in violation of his Duty of Loyalty Agreement with the Company, and then solicited and later hired him to go work for them,

including, upon information and belief, on projects for CCFW's former clients, also in violation of his agreements with CCFW.

432.     As their former supervisor, Johnson was aware of the existence and terms of those agreements and acted in willful disregard of said agreements.

433.     As a direct and proximate result of said tortious interference with those agreements, Plaintiff has suffered substantial damages.

**WHEREFORE**, Plaintiff demands judgment on this Thirteenth Count of the Second Amended Complaint against Johnson, PVI and PVP, jointly, severally and/or in the alternative, as follows:

(a) Punitive damages;

(b) Damages;

(c) Reasonable attorneys' fees;

(d) Interest;

(e)  Costs of suit; and

(f) Such other legal and equitable relief as the Court may deem just and proper.

### FOURTEENTH COUNT
### TORTIOUS INTERFERENCE WITH CONTRACT AND
### PROSPECTIVE ECONOMIC ADVANTAGE
### (PEC and Manning)

434.     Plaintiff repeats and realleges the statements made in the preceding paragraphs as if same were fully set forth herein at length.

435.     Manning and PEC were aware of Johnson's, Bicking's, Ornelas-Kuh's and Weiler's various agreements with Plaintiff.

436.     Nevertheless, Manning and/or PEC provided advice to Johnson concerning how she should go about resigning from Plaintiff to perform work for PEC in violation of said agreements and, upon information and belief, hire Bicking, Weiler and/or Ornelas-Kuh to work for PVI and/or PVP, and how to hide from the Company their wrongful conduct, both before and after they left, in violation of their various agreements.

437.     In reliance upon said advice, Johnson resigned from the Company, opened PVI and, upon information and belief, PVP, and hired Bicking, Weiler and Ornelas-Kuh notwithstanding knowledge of their contractual obligations to the Company.

438.     Further, Manning contacted Bicking and/or Weiler after Johnson's departure from the Company to provide information related to CCFW's open projects with PEC, including Johnson on the emails (at her PEC e-mail address) and excluding Studdiford.

439.     Bicking and/or Weiler provided this information and continued to perform work on PEC projects (at the direction of Johnson, Manning and/or PEC) even though she/they knew that the work by the Company had been halted by Manning and/or PEC and that the work was being done on Johnson's and/or PVI's behalf even though Bicking and Weiler were still employed by the Company.

440.     The work performed by Bicking and Weiler on these Projects was then converted to PVI and/or PVP upon PVI and/or PVP being hired by PEC.

441.     As a direct and proximate result of the aforesaid wrongful actions, PEC and Manning tortiously interfered with Johnson's Non-Compete Agreement, Consulting Agreement and Confidentiality Agreement with the Company as well as with the Loyalty and Confidentiality Agreements between Weiler and Bicking, on the one hand, and the Company on the other.

442.     Moreover, as a result of the wrongful conduct of PEC and Manning, Johnson, Bicking, Weiler, Ornelas-Kuh, PVI and/or PVP were able to unfairly compete against Plaintiff and tortiously interfered with Plaintiff's relationships with other clients.

443.     As a direct and proximate result thereof, Plaintiff has suffered, and continues to suffer, substantial damages.

444.     The aforesaid conduct of PEC and Manning was willful, wanton, malicious and/or in reckless disregard of the Company's rights.

**WHEREFORE**, Plaintiff demands judgment on this Fourteenth Count of the Second Amended Complaint against PEC and Manning, jointly, severally and/or in the alternative, as follows:

(a)     Punitive damages;

(b)     Damages;

(c)     Reasonable attorneys' fees;

(d)     Interest;

(e)     Costs of suit; and

(f)     Such other legal and equitable relief as the Court may deem just and proper.

## FIFTEENTH COUNT
## MISAPPROPRIATION AND FRAUD
### (Ornelas-Kuh and PVP)

445.   Plaintiff repeats and realleges the statements made in the preceding paragraphs as if same were fully set forth herein at length.

446.   Ornelas-Kuh stole CCFW funds through misappropriation and/or a fraudulent scheme where he charged personal expenses to CCFW and/or CCFW clients falsely claiming they were legitimate business expenses.

447.   Some of the inappropriate expenses Ornelas-Kuh charged were for personal trips, his birthday party and expensive meals not properly chargeable to either CCFW or its clients.

448.   Ornelas-Kuh and/or PVP also misappropriated confidential CCFW information including sales pitch presentations, budgets, and other documents.

449.   As a direct and proximate result thereof, Plaintiff was damaged and Plaintiff had its relationship with its customer(s) damaged.

WHEREFORE, Plaintiff demands judgment on this Fifteenth Count of the Second Amended Complaint against Ornelas-Kuh and PVP, jointly, severally and/or in the alternative, as follows:

(b)   Punitive damages;

(b)   Damages;

(g)    Reasonable attorneys' fees;

(h)   Interest;

(i)   Costs of suit; and

(j)   Such other legal and equitable relief as the Court may deem just and proper.

4856-2212-7827, v. 1

### SIXTEENTH  COUNT
### (Unjust Enrichment – All Defendants)

450.    Plaintiff repeats and realleges all of the previous allegations as if same were fully set forth herein at length.

451.    Defendants received benefits from Plaintiff including, inter alia, income and COBRA payments, access to Company documents including client and vendor lists and proprietary pricing and marketing information, and thus were unjustly enriched.

452.    As a direct and proximate result thereof, Plaintiff was damaged.

WHEREFORE, Plaintiff demands judgment on this Sixteenth Count of the Second Amended Complaint against all Defendants, jointly, severally and/or in the alternative, as follows:

(a)    Punitive damages;

(b)    Damages;

(c)     Reasonable attorneys' fees;

(d)    Interest;

(e)    Costs of suit; and

(f)    Such other legal and equitable relief as the Court may deem just and proper.


**MANDELBAUM BARRETT, P.C.**

Attorneys for Plaintiff


By:*/s/Steven I. Adler*
Steven I. Adler, Esq.

July 26, 2024

4856-2212-7827, v. 1

## JURY DEMAND

Plaintiff hereby demands a jury on all issues so triable.

**MANDELBAUM BARRETT P.C.**

Attorneys for Plaintiff


By: */s/Steven I. Adler*

_____

Steven I. Adler

4856-2212-7827, v. 1