## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CC FORD GROUP WEST, LLC,

            *Plaintiff*,

v.

JENNIFER JOHNSON, CARRIE BICKING,
BETH WEILER, PROJECT VELOCITY, INC.,
PROJECT VELOCITY PARTNERS, LLC,
MEREDITH MANNING,
PHARMAESSENTIA USA CORP.,
MATTHEW ORNELAS-KUH, and JOHN
DOES 1-10,

            *Defendants*.

No. 3:22-cv-04143 (MAS/TJB)

Hon. Michael A. Shipp

ORAL ARGUMENT REQUESTED

**DEFENDANTS PHARMAESSENTIA USA CORP.'S AND MEREDITH MANNING'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR INDIVIDUAL MOTIONS TO
DISMISS PLAINTIFF'S SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

I.   PEC's Non-Exclusive Contractual Relationship with CC Ford Under Their Master Services Agreement .............................................................................. 3

   A.   The MSA Expressly Limited CC Ford's Work and Compensation to Its Executed SOWs ................................................................................................... 4

   B.   The MSA Expressly Allowed PEC to Terminate the MSA and Suspend Services Under Any SOW, at Any Time For Any Reason ...................................... 4

   C.   The MSA Was Non-Exclusive: It Expressly Gave PEC Discretion to Hire Any Vendor ... 5

II.   After Johnson Left CC Ford, PEC and Manning Transitioned Work from CC Ford to PVI.. 6

III.   The Instant Litigation ................................................................................. 7

LEGAL STANDARD .............................................................................................. 8

ARGUMENT ....................................................................................................... 8

I.   The SAC Should be Dismissed Pursuant to Rule 12(b)(5) Because it was Served in Violation of this Court's August 22, 2024 Order .............................................. 8

II.   The SAC is Devoid of Plausible Allegations Regarding PEC or Manning .......................... 9

   A.   Virtually all of CC Ford's claims against PEC and Manning Rely on Impermissible Group Pleading and Should Be Dismissed ........................................ 9

   B.   CC Ford's Conspiracy Allegations Are Implausible ........................................ 11

III.   CC Ford's RICO Claims Fail As to PEC and Manning (Counts 1 and 2) ...................... 13

   A.   Count 1. The Section 1962(c) New Jersey RICO Claims Fail ........................... 13

      1.   CC Ford Fails to Allege Sufficient Predicate Acts Against PEC or Manning ............. 13

      2.   The RICO Enterprise is Insufficiently Pled ................................................ 19

   B.   Count 2:  The Section 1962(d) and New Jersey RICO Conspiracies Fail as to PEC and Manning ................................................................................. 22

      1.   CC Ford Fails to Allege that PEC or Manning Agreed to the Commission of Two Predicate Acts ..................................................................... 23

      2.   CC Ford Fails to Allege that PEC or Manning were Aware of a Pattern of Racketeering Activity .................................................................. 23

IV.   CC Ford's Trade Secrets and Confidential Information Claims Fail (Counts 3 & 12)..... 24

V.   CC Ford's Computer Claims Fail (Count 4) ................................................... 27

VI.   The Tortious Interference Claims Fail (Counts 8, 9, & 14) .............................. 30

A.   PEC and Manning's Engagement of PVI and Former CC Ford Employees was Expressly Authorized by the MSA So Cannot be Tortious.................................................. 30

B.   CC Ford Otherwise Fails to State a Tortious Interference Claim Against PEC or Manning ........................................................................................................ 31

   1.   There Are No Allegations that PEC or Manning Interfered with CC Ford's Client and Vendor Business Relationships ............................................ 32

   2.   There Is No Plausible Theory that PEC or Manning Interfered with CC Ford's Contracts with Jennifer Johnson ............................................... 33

   3.   There Was No Interference with CC Ford's Contracts with Ornelas-Kuh, Bicking or Weiler ........................................................................... 37

   4.   PEC and Manning Did Not Tortiously Interfere with Bicking's or Weiler's Non-Compete Provisions While They Were Employed By CC Ford................... 40

   5.   PEC and Manning Did Not Tortiously Interfere with the Non-Solicit Provisions of Ornelas-Kuh's, Bicking's, or Weiler's Contracts................................ 41

VII.   CC Ford's Unfair Competition Claim Fails (Count 10)................................... 42

VIII.   CC Ford's Trespass to Chattel and Conversion Claims Fail (Count 11) ......................... 43

IX.   CC Ford's Unjust Enrichment Claim Fails (Count 16).................................. 43

X.   Leave to Replead Should be Denied, and the Case Should be Dismissed With Prejudice... 45

CONCLUSION.............................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Power Sys., Inc. v. Cummins, Inc.*,
  No. 15-cv-8539, 2016 WL 6897782 (D.N.J. Nov. 23, 2016) .............................................8, 14

*Acrison, Inc. v. Rainone*,
  No. 22-3274, 2023 WL 8166786 (3d Cir. Nov. 24, 2023) ......................................................30

*Aguilar v. Ken's Marine & Oil Serv., Inc.*,
  No. 14-cv-6735, 2017 WL 2312358 (D.N.J. May 25, 2017)...................................................21

*Allstate N.J. Ins. Co. v. Summit Pharmacy, Inc.*,
  No. 13-cv-5809, 2014 WL 1767528 (D.N.J. May 2, 2014).....................................................22

*Argush v. LPL Fin. LLC*,
  No. 13-cv-7821, 2014 WL 3844822 (D.N.J. Aug. 5, 2014) ....................................................43

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................................8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................................8

*Boyle v. United States*,
  556 U.S. 938 (2009)...........................................................................................................15, 21

*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006)..............................................................................................3, 7, 9

*Cafaro v. HMC*,
  No. 07-cv-2793, 2008 WL 4224801 (D.N.J. Sept. 8, 2008).............................................44, 45

*Capers v. FedEx Ground*,
  No. 02-cv-535, 2012 WL 2050247 (D.N.J. June 6, 2012).........................................14, 17, 24

*CC Ford v. Johnson*,
  SOM-L-541-22 (Super. Ct. N.J. Somerset County)...............................................................7, 37

*Chey v. LaBruno*,
  608 F. Supp. 3d 161 (D.N.J. 2022) .................................................................................13, 21

*Christie v. Nat'l Inst. for Newman Stud.*,
  No. 16-cv-6572, 2019 WL 1916204 (D.N.J. Apr. 30, 2019)..................................................29

*Connelly v. Lane Const. Corp.*,
809 F.3d 780 (3d Cir. 2016)....................................................................................12

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009) ..................................................................................20

*Dahlgren v. First Nat. Bank of Holdrege*,
533 F.3d 681 (8th Cir. 2008) ..................................................................................20

*DiGiorgio Corp. v. Mendez and Co., Inc.*,
230 F. Supp. 2d 552 (D.N.J. 2002) .........................................................................35

*Dougherty v. Adams-Dougherty*,
No. 15-cv-8541, 2016 WL 5219460 (D.N.J. Sept. 21, 2016)..................................14

*Duffy v. Charles Schwab & Co.*,
97 F. Supp. 2d 592 (D.N.J. 2000) ...........................................................................42

*Dzielak v. Whirlpool Corp.*,
26 F. Supp. 3d 304 (D.N.J. 2014) ...........................................................................34

*Fagan v. Fischer*,
No. 14-cv-7013, 2015 WL 4321989 (D.N.J. July 14, 2015) .....................................3

*Fairway Dodge, Inc. v. Decker Dodge, Inc.*,
No. A-1736-03T2, 2005 WL 4077532
(N.J. Super. Ct. App. Div. June 12, 2006) ..............................................................28

*Falat v. Cnty. of Hunterdon*,
No. 12-cv-6804, 2013 WL 1163751 (D.N.J. Mar. 19, 2013) ..................................10

*Fishkin v. Susquehanna Partners, G.P.*,
340 F. App'x 110 (3d Cir. 2009) .............................................................................26

*Florian Greenhouse, Inc. v. Cardinal IG Corp.*,
11 F. Supp. 2d 521 (D.N.J. 1998) ...............................................................30, 35, 36

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009)....................................................................................40

*Friedland v. Unum Group*,
50 F. Supp. 3d 598 (D. Del. 2014)...........................................................................20

*Gasoline Sales, Inc. v. Aero Oil Co.*,
39 F.3d 70 (3d Cir. 1994) ........................................................................................45

*Giovinazzo v. Deangelo*,
No. 20-cv-15894, 2022 WL 795713 (D.N.J. Mar. 16, 2022) ..................................18

*Goydos v. Rutgers, State Univ.*,
No. 19-cv-08966, 2024 WL 1329253 (D.N.J. Mar. 28, 2024) ...............................27

*Graham Eng'g Corp. v. Adair*,
No. 16-cv-2521, 2021 WL 9204331 (M.D. Pa. Feb. 10, 2021) .............................29

*Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*,
988 F.2d 476 (3d Cir. 1993) ...............................................................................9

*Grant v. Turner*,
505 F. App' x 107 (3d Cir. 2012) ..............................................................17, 22, 24

*Green v. Izod Corp. Off. & Headquarters*,
No. 22-cv-6380, 2023 WL 2992674 (D.N.J. Apr. 18, 2023) .................................22

*H.K. Co. v. Mori Lee Assocs., Inc.*,
No. 85-cv-9929, 1989 WL 297953 (S.D.N.Y. June 28, 1989) ..............................35

*Hafner v. Menendez*,
No. 23-cv-22557, 2024 WL 1795360 (D.N.J. Apr. 25, 2024) ...............................18

*Higgins v. Route 17 Auto., LLC*,
No. 11-cv-6240, 2012 WL 3284846 (D.N.J. Aug. 10, 2012) ...............................45

*Ho-Ho-Kus, Inc. v. Sucharski*,
No. 23-cv-01677, 2023 WL 7403539 (D.N.J. Nov. 9, 2023) ...............................25

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*,
90 F.3d 737 (3d Cir. 1996) ...............................................................................13

*In re Aetna UCR Litig.*,
No. 07-cv-3541, 2015 WL 3970168 (D.N.J. June 30, 2015) ..........................19, 21

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ..............................................................3, 34, 35, 37

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ..........................................................................17, 19

*In re Refco Inc. Sec. Litig.*,
826 F. Supp. 2d 478 (S.D.N.Y. 2011) ................................................................23

*In re Riddell Concussion Reduction Litig.*,
77 F. Supp. 3d 422 (D.N.J. 2015) ......................................................................18

*In re Vertis Holdings, Inc.*,
536 B.R. 589 (Bankr. D. Del. 2015), *aff'd*, No. AP 12-51176,
2016 WL 7031282 (D. Del. Nov. 30, 2016) ........................................................28

*iPurusa, LLC v. Bank of N.Y. Mellon Corp.*,
   No. 22-cv-00966, 2023 WL 3072686 (D.N.J. Apr. 25, 2023)................................43

*Kaul v. Christie*,
   372 F. Supp. 3d 206 (D.N.J. 2019) .......................................................................18

*KBS Pharmacy, Inc. v. Patel*,
   No. 21-cv-1339, 2021 WL 2351961 (E.D. Pa. June 9, 2021)...............................29

*Kerrigan v. Visalus, Inc.*,
   112 F. Supp. 3d 580 (E.D. Mich. 2015)................................................................20

*Kolar v. Preferred Real Estate Invs., Inc.*,
   361 F. App'x 354 (3d Cir. 2010) ...........................................................................18

*Lard-Vid, LLC and Visual Image Display UK, Ltd. v.
   Ground Support Labs, LLC, et al.*,
   BER-L-5929-20, 2021 WL 2396576 (N.J. Super. Ct. Feb. 26, 2021)...................26

*Lenchitz v. Cenlar FSB*,
   No. 22-cv-07216, 2024 WL 1052000 (D.N.J. Mar. 11, 2024) ..............................32

*Lentini v. McDonald's USA*,
   No. 19-cv-4596, 2019 WL 4746420 (D.N.J. Sept. 30, 2019)...............................21

*Levin v. Kuhn Loeb & Co.*,
   417 A.2d 79 (N.J. App. Div. 1980)........................................................................30

*Lightning Lube, Inc. v. Witco Corp.*,
   4 F.3d 1153 (3d Cir. 1993)...............................................................................38, 39

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004)..................................................................................17

*Luttmann v. Tiffany & Co.*,
   No. 07-cv-3521, 2009 WL 197520 (D.N.J. Jan. 26, 2009)...................................40

*LY Berditchev, Corp. v. Truss Cosms. Corp.*,
   No. 22-cv-04242, 2023 WL 334539 (D.N.J. Jan. 20, 2023)..................................33

*M.W. Widoff, P.C. v. Encompass Ins. Co. of Am.*,
   No. 10-cv-8159, 2012 WL 769727 (N.D. Ill. Mar. 2, 2012) ................................20

*MacDougall v. Weichert*,
   144 N.J. 380 (N.J. 1996)........................................................................................30

*Magnesita Refractories Co. v. Tianjin New Century Refractories Co.*,
   No. 17-cv-1587, 2019 WL 1003623 (M.D. Pa. Feb. 28, 2019)............................16

*Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*,
    729 F. Supp. 1035 (D.N.J. 1990) ...................................................................30, 31

*Mallet & Co. Inc. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021) ........................................................................25, 26

*Marina Dist. Dev. Co., LLC v. Ivey*,
    93 F. Supp. 3d 327 (D.N.J. 2015) ....................................................................23

*Mason v. Coca-Cola Co.*,
    No. 09-cv-0220, 2010 WL 2674445 (D.N.J. June 30, 2010)...............................44

*Mayer v. Mayer*,
    No. 23-cv-2272, 2024 WL 1283826 (D.N.J. Mar. 26, 2024) ...............................32

*MB Imports, Inc. v. T & M Imports, LLC*,
    No. 10-cv-3445, 2012 WL 5986454 (D.N.J. Nov. 28, 2012) ..........................32, 37

*McCray v. UNITE HERE*,
    No. 13-cv-6540, 2014 WL 3519098 (D.N.J. July 16, 2014) ................................23

*Miller v. P.G. Lewis & Assoc.*,
    No. 05-cv-5641, 2007 WL 316446 (D.N.J. Jan. 30, 2007).................................23

*Montich v. Miele USA, Inc.*,
    849 F. Supp. 2d 439 (D.N.J. 2012) ....................................................................44

*Mu Sigma, Inc. v. Affine, Inc.*,
    No. 12-cv-1323, 2013 WL 3772724 (D.N.J. July 17, 2013) .............................11, 28

*Mylan Inc. v. SmithKline Beecham Corp.*,
    723 F.3d 413 (3d Cir. 2013).............................................................33, 36, 38

*Nash v. New Jersey*,
    No. 22-cv-1804, 2022 WL 4111169 (D.N.J. Sept. 8, 2022)................................10

*New Jersey Optometric Ass'n v. Hillman-Kohan Eyeglasses, Inc.*,
    365 A.2d 956 (N.J. Ch. Div. 1976),
    *aff'd*, 388 A.2d 1299 (N.J. App. Div. 1978) .......................................................43

*Newport Cap. Grp., LLC v. Loehwing*,
    No. 11-cv-2755, 2013 WL 1314737 (D.N.J. Mar. 28, 2013) ...............................31

*Oakwood Lab'ys LLC v. Thanoo*,
    999 F.3d 892 (3d Cir. 2021).......................................................................25, 26

*Ottilio v. Valley Nat. Bancorp*,
    591 F. App'x 167 (3d Cir. 2015) ..............................................................8, 16, 17

*OWAL, Inc. v. Caregility Corp.*,
  No. 21-cv-13407, 2022 WL 890182 (D.N.J. Mar. 25, 2022) ................................26

*Palmer v. United States*,
  No. 21-cv-11721, 2022 WL 310208 (D.N.J. Feb. 1, 2022) ....................................10

*Papasan v. Allain*,
  478 U.S. 265 (1986) ................................................................................................8

*Par Pharm., Inc. v. QuVa Pharma, Inc.*,
  764 F. App'x 273 (3d Cir. 2019) ..........................................................................25

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) .....................................................................................8

*Printing Mart-Morristown v. Sharp Elecs. Corp.*,
  563 A.2d 31 (N.J. 1989) ........................................................................................33

*Radhakrishnan v. Pugliese*,
  No. 20-cv-220, 2021 WL 11593799 (D.N.J. May 21, 2021) ................................10

*Rao v. BP Prod. N. Am., Inc.*,
  589 F.3d 389 (7th Cir. 2009) .................................................................................21

*Ricale Assocs., LLC v. McGregor*,
  No. 15-cv-541, 2015 WL 5781063 (D.N.J. Sept. 30, 2015) ...........................14, 16

*Robert Edward Auctions, LLC v. Nash*,
  No. 10-cv-3759, 2010 WL 11695034 (D.N.J. Nov. 5, 2010) ................................39

*Rothermel v. Int'l Paper Co.*,
  394 A.2d 860 (N.J. App. Div. 1978) ......................................................................30

*Schwartz v. Laws. Title Ins. Co.*,
  970 F. Supp. 2d 395 (E.D. Pa. 2013) .....................................................................24

*Sharp v. Kean Univ.*,
  153 F. Supp. 3d 669 (D.N.J. 2015) ........................................................................13

*Shaw v. Hous. Auth. of Camden*,
  No. 11-cv-4291, 2012 WL 3283402 (D.N.J. Aug. 10, 2012) ................................10

*Sheeran v. Blyth Shipholding S.A.*,
  No. 14-cv-5482, 2015 WL 9048979 (D.N.J. Dec. 16, 2015) ................................10

*State v. Ball*,
  661 A.2d 251 (N.J. 1995) ..................................................................................22, 24

*Steinhardt v. Bernardsville Police Dep't*,
No. 17-cv-2169, 2020 WL 5204066 (D.N.J. Aug. 31, 2020),
*aff'd*, No. 20-2825, 2021 WL 3929321 (3d Cir. Sept. 2, 2021)..............................27

*Tedeschi v. Smith*,
No. 09-cv-03134, 2010 WL 148424 (D.N.J. Jan. 12, 2010).....................................14

*Thomas v. Keough*,
No. 20-cv-05758, 2024 WL 414041 (D.N.J. Feb. 5, 2024) ......................................29

*United States v. De Peri*,
778 F.2d 963 (3d Cir. 1985).....................................................................................24

*University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*,
996 F.2d 1534 (3d Cir. 1993).....................................................................................20

*Van Buren v. United States*,
141 S. Ct. 1648 (2021)..............................................................................................29

*Vaswani, Inc. v. Manjunathamurthy*,
No. 20-cv-20288, 2022 WL 844438 (D.N.J. Mar. 22, 2022) ..................................21

*Vickers Stock Research Corp. v. Quotron Sys., Inc.*,
No. 96-cv-2269, 1997 WL 420265 (S.D.N.Y. July 25, 1997)..................................20

*Villarreal v. United Airlines Inc.*,
No. 19-cv-10580, 2023 WL 9510576 (D.N.J. June 6, 2023)....................................12

*Voorhees v. Tolia*,
No. 16-cv-8208, 2022 WL 18024216 (D.N.J. Dec. 31, 2022)..................................42

*VRG Corp. v. GKN Realty Corp.*,
641 A.2d 519 (N.J. 1994)..........................................................................................44

*Zavala v. Wal-Mart Stores, Inc.*,
393 F. Supp. 2d 295 (D.N.J. 2005) .....................................................................23, 45

**Statutes**

18 U.S.C. § 371................................................................................................................18

18 U.S.C. § 1030(g)........................................................................................................29

18 U.S.C. § 1832(a) ........................................................................................................16

18 U.S.C. § 1839(3) ........................................................................................................26

18 U.S.C. § 1962............................................................................................... *passim*

x

N.J. Stat. Ann. § 2A:38A-3 ......................................................................................27

N.J. Stat. Ann. § 2C:5-2 ..........................................................................................18

N.J. Stat. Ann. § 2C:41-1(a) ...................................................................................18

N.J. Stat. Ann. § 2C:41–2(d) ...........................................................................22, 24

N.J. Stat. Ann. § 56:15-2 .........................................................................................26

NJ Rev. Stat. § 14A:12-9 .........................................................................................35

**Other Authorities**

Federal Rule of Civil Procedure 8 .....................................................................10, 11

Federal Rule of Civil Procedure 9 ...........................................................................17

Federal Rule of Civil Procedure 12 .......................................................................8, 9

Restatement (Second) of Torts § 766 (1977)............................................................39

Restatement (Second) of Torts § 772 (1977)............................................................40

## **PRELIMINARY STATEMENT**

The Second Amended and Supplemental Complaint's ("SAC") claims against PharmaEssentia USA Corp. ("PEC") and its former president, Meredith Manning, should be dismissed with prejudice. After nearly three years of revised pleadings and fact discovery, this case remains what it always has been—a routine employment dispute between CC Ford Group West, LLC ("CC Ford") and its former employees Jennifer Johnson, Carrie Bicking, Beth Weiler, and Matthew Ornelas-Kuh (together, "Former CC Ford Employees"). PEC and Manning are not involved in that dispute. Yet, inexplicably, CC Ford imagines a vast, muti-year criminal conspiracy wherein nearly a dozen of CC Ford's employees, customers, and vendors schemed to destroy CC Ford's business by contributing to the success of a start-up competitor.

While this lawsuit is overbroad as to all Defendants, the facial implausibility of CC Ford's allegations against PEC and Manning particularly warrant dismissal. Not only does CC Ford fail to plead a coherent rationale for *why* PEC or Manning would enter into such a bizarre conspiracy— it expressly admits the fact-free irrationality of this *fourth* attempt at a complaint, conceding: "an unanswered question is precisely what was in it financially for Manning and PEC?" SAC ¶ 27. The answer is simple—there was nothing "in it" for PEC or Manning.

PEC and Manning are not and never were *competitors* of CC Ford, and there is no dark conspiracy in the fact that PEC and Manning retained CC Ford as a vendor, but stopped doing so when Johnson, the business lead with PEC, left CC Ford to start her own business. This was not "corporate espionage" or an effort to "destroy" CC Ford: PEC and Manning had hired CC Ford as a vendor under a contract (incorporated by reference in the SAC) that expressly and plainly (i) permitted PEC to terminate any vendor, at any time, for any purpose, (ii) guaranteed no work to CC Ford, and (iii) allowed PEC to unilaterally decide to stop sending work to CC Ford or move

any ongoing projects to another vendor for any reason or no reason at all.  PEC's and Manning's

decision to stop working with CC Ford was an entirely valid exercise of those contractual rights.

     In addition to the implausibility of CC Ford's conspiracy allegations, all eleven counts

against PEC and Manning fail for myriad reasons, including (but not limited to) the following:

- CC Ford fails to plead any predicate acts against PEC, and only one infirm predicate act against Manning, in support of its RICO claims.

- CC Ford fails to plead any legally cognizable "enterprise" underlying its RICO claims.

- CC Ford's broad claims that the defendants misappropriated its "trade secrets" and otherwise stole or hacked CC Ford's computer in violation of the Computer Fraud and Abuse Act and New Jersey Computer Related Offenses Act include no allegations related to PEC or Manning, nor could they—neither were ever CC Ford employees or ever had access to CC Ford's trade secrets or computers.

- CC Ford's tortious interference claims regarding Johnson either rely on a non-operative employment agreement between Johnson and a different CC Ford entity, or on agreements that were not operative when PEC began working with PVI—as it was entitled to do under the MSA.

- CC Ford fails to plead that PEC or Manning had any knowledge of the contracts among CC Ford, Bicking, Weiler, and Ornelas-Kuh.  PEC and Manning could not "tortiously interfere" with contracts they did not know about, nor is there any plausible allegation of inducement or intent.  Therefore, the tortious interference claims fail on their face.

- CC Ford's unfair competition and unjust enrichment claims fail because they are premised on competitive action between the "Defendants" and CC Ford—and PEC and Manning do not compete with CC Ford in any way.

     Despite its conspiratorial rhetoric and pitched tone, the SAC fails to plead *any* claim against

PEC or Manning.  The case against PEC and Manning should be dismissed in its entirety.

## FACTUAL BACKGROUND

**I.    PEC's Non-Exclusive Contractual Relationship with CC Ford Under Their Master Services Agreement**

PEC is a biopharmaceutical company that develops innovative treatments for patients with rare blood cancer.  *See* SAC ¶ 10.  Manning began working at PEC in February 2020 as its General Manager and was subsequently promoted to serve as President.  *Id*. ¶¶ 5, 93.

CC Ford is a medical communications agency involved in "strategic consulting, project management, marketing and promotional services, communications support, and medical content development."  *See* CC Ford and PEC Master Services Agreement ("MSA") (attached as Exhibit ("Ex.") A to Declaration of Samuel Lin ("Lin Decl.")), p. 1 (recitals).[1]  Some examples of CC Ford's work in the "pharmaceutical agency business" (SAC ¶ 33) include "booth design and build[ing]," organizing sponsorship for "continuing medical education" (*id*. ¶ 70), and booking hotels for conferences (*id*. ¶ 182).

On April 21, 2021, PEC and CC Ford entered into the MSA, which established the terms and conditions under which CC Ford worked for PEC as an independent contractor for discrete projects.  The MSA has several key provisions relevant to this dispute.

---

[1]  When evaluating a motion to dismiss, a court may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, and items appearing in the record of the case."  *Buck v. Hampton Twp. Sch. Dist*., 452 F.3d 256, 260 (3d Cir. 2006) (citation omitted).  The Court can consider the MSA because it is "integral to or explicitly relied upon" in the SAC, which directly refers to and repeatedly misrepresents the MSA's provisions.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *see Fagan v. Fischer*, No. 14-cv-7013, 2015 WL 4321989, at *4 (D.N.J. July 14, 2015) (considering on dismissal motion "agreement 'integral to' factually framing the allegations in the Complaint" unattached to complaint).  *See e.g.*, SAC ¶¶ 20 (alleging a plan to take "guaranteed [CC Ford] work"), 26 ("Defendants knew that [CC Ford] had been promised all SOWs"), 397 (alleging that Defendants owed duties to CC Ford based on alleged "contractual arrangements" to "secur[e] business for [CC Ford].").

3

**A.      The MSA Expressly Limited CC Ford's Work and Compensation to Its Executed SOWs**

The MSA explicitly stated that CC Ford would provide services to PEC on a project-by-project basis, with each project being contracted for and specifically described in a separate Statement of Work ("SOW").[2]  *See* MSA at Recitals ("PEC, at its discretion, may hire Service Provider from time to time to provide Services (as defined below) for studies/projects by executing separate Statements of Work (as defined below) specifying the details of the Services to be rendered."); *id*. ¶ 2.1 (CC Ford "shall provide the Services according to SOW").  Each CC Ford SOW described "the specific Services to be provided" and "the fees and expenses applicable to the Services."  *Id*. ¶ 1.2.  The MSA also provided that PEC would pay CC Ford only the "amounts due under each SOW as provided in such SOW" and any out-of-pocket expenses incurred in rendering services under an SOW.  *Id*. ¶¶ 4.1-4.2.

In other words, CC Ford was not authorized to do work for PEC unless that work was described and memorialized in an executed SOW, and CC Ford would be paid only the funds due under an executed SOW.

**B.      The MSA Expressly Allowed PEC to Terminate the MSA and Suspend Services Under Any SOW, at Any Time For Any Reason**

The MSA also expressly authorized PEC to terminate the Agreement or any SOW, without cause, so long as notice was given to CC Ford.  *See id*. ¶¶ 8.3 (Termination of the Agreement), 8.4 (Termination of an SOW).  In the event that the MSA or any SOW was terminated, the MSA provided that CC Ford would be entitled only to those fees and expenses "incurred prior to notice of termination."  *Id*. ¶ 8.7.  CC Ford is obligated to keep confidential "all information and data"

---

[2]  The MSA superseded any prior agreements between PEC and CC Ford, and there are no allegations related to any work done by CC Ford for PEC prior to the MSA.  *See* MSA ¶ 22.

disclosed by PEC, including PEC's business, operations, marketing plans, the MSA, and any

"written work product or deliverables" at all times during the Term of the MSA and for "five (5)

years following the termination or expiration of this Agreement." *Id*. ¶¶ 6.1, 6.3.

### C. The MSA Was Non-Exclusive: It Expressly Gave PEC Discretion to Hire Any Vendor

The MSA made clear in multiple provisions that it did not "obligate PEC to hire [CC Ford]

to perform any Services or to enter into any Statement of Work with [CC Ford]." *Id*. ¶ 1.1; *see

also id*. at Recitals ("PEC, at its discretion, may hire Service Provider from time to time"). The

MSA also made clear that CC Ford was acting as an independent contractor, with no agency

relationship with PEC. *Id*. ¶ 14 ("Nothing in this Agreement shall be construed to create an

employment relationship between Service Provider and PEC. Service Provider shall be an

independent contractor ….").

Furthermore, the MSA explicitly stated that "PEC does not grant exclusivity to Service

Provider for any of the Services. PEC is free to obtain the services of any third party to perform

any or all of the Services." *Id*. ¶ 2.6. The MSA's termination clause even contemplates that a third

party may take over a CC Ford SOW. *See id*. ¶ 8.7 (upon termination, CC Ford "shall use all

reasonable efforts to . . . transfer the affected SOW" and "negotiate in good faith a wind-down

plan, including the tasks to be undertaken").

*       *       *

Between April 2021 and March 2022, PEC entered into multiple SOWs with CC Ford.

Jennifer Johnson and her team members, Carrie Bicking and Beth Weiler, worked on these SOWs,

as the CC Ford point-people for the PEC relationship. *See, e.g.*, SAC ¶¶ 69, 123, 125, 166.

The SAC makes no allegation that PEC or Manning substantively interacted with CC

Ford's president John Studdiford, nor that he did any work on the PEC SOWs prior to March 2022

when Johnson left CC Ford.  Nor are PEC or Manning alleged to have had any relationship with

Matthew Ornelas-Kuh.

## II.     After Johnson Left CC Ford, PEC and Manning Transitioned Work from CC Ford to PVI

On February 28, 2022, Johnson filed the certificate of incorporation for Project Velocity,

Inc. ("PVI"), her new business venture.  SAC ¶ 76.  After Johnson founded PVI, PEC and Manning

began working with PVI on projects.  On March 25, 2022, Johnson resigned from CC Ford.  *See*

SAC ¶¶ 109, 113.  After Johnson ended her full-time employment with CC Ford, but before she

signed a consulting agreement with CC Ford on March 31, 2022,[3] PEC signed an MSA with PVI

(the "PVI MSA").  SAC ¶¶ 172-173; *see also* SAC ¶¶ 109, 113.  The PVI MSA was substantively

similar to the MSA signed between CC Ford and PEC.  *See* PVI MSA (attached as Lin Decl. Ex.

B).[4]  Bicking resigned from CC Ford on or about May 13, 2022, and then began working at PVI.

SAC ¶¶ 149-51.  Weiler resigned on or about May 18, 2022.  *Id.*

For some time thereafter, PEC and Manning used the services of both CC Ford and PVI.

During this time, as emails attached to CC Ford's prior pleadings reflect, Studdiford acknowledged

that CC Ford was not entitled to "continue work" for PEC unless it executed new SOWs for

---

[3]  There is no allegation that PEC or Manning were aware of the terms of any of the Former CC Ford Employees' employment agreements with CC Ford until September 22, 2022.  *See* SAC ¶¶ 213-14 (on September 22, 2022, CC Ford "informed [PEC] of the instant litigation as well as the various agreements in place between the Company and Johnson, Bicking and Weiler," which were also sent to PEC at that time).

[4]  The Court is also permitted to consider the PVI MSA because it is "integral to" and "explicitly relied upon" in the SAC, the claims in which expressly discuss the business relationship between PEC and PVI.  *See e.g.*, SAC ¶¶ 142-143, 171-173, 175, 185, 194-197.  *See also supra note* 1 (discussing permissibility of considering the MSA between CC Ford and PEC).

additional projects. ECF No. 9-3 (attached as Ex. A to Declaration of Samuel Lonergan ("Lonergan Decl.")).[5] PEC eventually stopped using CC Ford's services. SAC ¶¶ 171-175.

## III.    The Instant Litigation

On May 16, 2022, CC Ford commenced the progenitor of this action, *CC Ford v. Johnson*, SOM-L-541-22 (Super. Ct. N.J. Somerset County), solely against Johnson. The case was removed to federal court in June 2022 (ECF No. 1), and CC Ford filed its First Amended Complaint ("FAC") adding Bicking, Weiler, and PVI as defendants on September 20, 2022. ECF No. 9. CC Ford also moved for a temporary restraining order to bar the then-defendants from allegedly violating restrictive covenants and compelling them to return or destroy CC Ford's trade secrets. ECF Nos. 9, 20, 28. The Court denied that motion in October 2022. ECF No. 31.

In July 2023, CC Ford filed a motion to amend the FAC (ECF No. 52), which it then superseded with a second motion to amend in July 2024 (ECF No. 85).[6] The Court granted the latter motion and ordered CC Ford to serve the new defendants by September 6, 2024 (the "August 22 Order"). ECF No. 90. On September 6, 2024, CC Ford filed the SAC, adding PEC, Manning, Ornelas-Kuh, and Project Velocity Partners LLC ("PVP") as defendants (ECF No. 92), but it did not timely serve any of them. Instead, on September 9, 2024, counsel for CC Ford contacted counsel for PEC and Manning to ask whether they would accept service of the SAC on behalf of their respective clients. Counsel reserved their objections to untimely service.

---

[5] The Court may take notice of this exhibit, which was filed on the docket and placed into the record of the case by Plaintiff. *See Buck*, 452 F.3d at 260 (finding appropriate to take judicial notice of items in the "record of the case").

[6] Discovery was ongoing throughout this period. *See* ECF No. 82 (summarizing ongoing status of discovery, including CC Ford's collection of hundreds of thousands of documents and multiple productions by both sides)). Fact discovery ended on January 29, 2024. ECF No. 68.

**LEGAL STANDARD**

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is to "accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). All allegations, however, must be facially plausible and "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Ottilio v. Valley Nat. Bancorp*, 591 F. App'x 167, 168 (3d Cir. 2015) (dismissing RICO claims supported by "bare allegations" that were insufficient to show plaintiff had "plausible claim for relief"). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted); *see Absolute Power Sys., Inc. v. Cummins, Inc.*, No. 15-cv-8539, 2016 WL 6897782, at *5 (D.N.J. Nov. 23, 2016) (dismissing RICO claims and observing that crediting conclusory allegations "would create a strange state of affairs in which a complaint could withstand a motion to dismiss simply through plaintiff's formulaic recitation of the statutory RICO elements"). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

**ARGUMENT**

I.    **The SAC Should be Dismissed Pursuant to Rule 12(b)(5) Because it was Served in Violation of this Court's August 22, 2024 Order**

The SAC was not timely served. The August 22 Order directed that "Plaintiff shall file *and serve* its Second Amended Complaint by 09/06/2024." *See* ECF No. 90 (emphasis added). CC Ford did not meet that court-imposed deadline; it waited until September 9, 2024 to contact counsel for PEC and Manning—both of whom CC Ford already knew represented PEC and Manning—

8

inquiring as to whether PEC and Manning would agree to accept service.[7]  Under Federal Rule of

Civil Procedure 12(b)(5), "the party asserting the validity of service bears the burden of proof."

*Grand Ent. Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 488 (3d Cir. 1993).  Dismissal with

prejudice is warranted here because of CC Ford's bad faith litigation conduct following this Court's

order.  First, CC Ford was alerted to its deficiency of service, but simply ignored the Court's Order,

rather than following proper procedure (*i.e.*, alerting the Court to its non-compliance and asking

the Court to amend its order to grant additional time to serve the SAC).  Second, while failing to

timely serve the SAC, CC Ford litigated its claims in the press, including by feeding multiple

statements to media outlets and publishing an article on its own website touting its lawsuit against

PEC and Manning.[8]

## II.    The SAC is Devoid of Plausible Allegations Regarding PEC or Manning

### A.    Virtually all of CC Ford's claims against PEC and Manning Rely on Impermissible Group Pleading and Should Be Dismissed

All but one of CC Ford's claims against PEC and/or Manning lack specific allegations as

to either of them, relying instead on impermissible group pleading about the purported conduct of

"Defendants," without itemizing any individual acts.[9]

---

[7]  Counsel for PEC and Manning promptly objected to the service as improperly untimely; CC Ford offered no explanation for its noncompliance.

[8]  *See* Jack O'Brien, *Med comms shop CC Ford files racketeering complaint against PharmaEssentia*, Medical Marketing & Media (Sept. 6, 2024 10:09 AM) (attached as Lonergan Decl. Ex. B); George Woolston, *NJ Medical Co. Claims Ex-Employees Conspired to Form Rival*, Law360 (Sept. 6, 2024, 8:24 PM) (attached as Lonergan Decl. Ex. C); Mandelbaum Barret PC, *Mandelbaum Barrett Files Amended Complaint for CC Ford Seeking Close to $100MM Against the Largest Taiwanese Biopharma Company PharmaEssentia and its Former President*, (Sept. 6, 2024 6:26 PM) (attached as Lonergan Decl. Ex. D).  These articles are "matters of public record." *Buck*, 452 F.3d at 260.

[9]  *E.g.*, SAC ¶¶ 283 ("Defendants acquired, misappropriated, used and/or stole [CC Ford]'s trade secrets"), 382 ("Defendants were aware of [CC Ford's] contracts and relationships [with Albireo, Merz, and PEC] and interfered with [CC Ford's] business and contractual relationships with its clients and vendors[.]"), 397 ("Defendants have maliciously interfered with Plaintiff's interest in

Such pleadings do "not satisfy Rule 8, because [they do] not place Defendants on notice of the claims against each of them."[10] *Sheeran v. Blyth Shipholding S.A.*, No. 14-cv-5482, 2015 WL 9048979, at *3 (D.N.J. Dec. 16, 2015); *see Shaw v. Hous. Auth. of Camden*, No. 11-cv-4291, 2012 WL 3283402, at *2 (D.N.J. Aug. 10, 2012) (referring to all defendants collectively as "Defendants" fails to put the various defendants on notice of the allegations against them). "Without knowing exactly what wrongful conduct they are alleged to have engaged in, the individual Defendants have not been given fair notice of the allegations against them." *Falat v. Cnty. of Hunterdon*, No. 12-cv-6804, 2013 WL 1163751, at *3 (D.N.J. Mar. 19, 2013). This is particularly the case where, as here, there are multiple defendants "who occupied different positions and presumably had distinct roles in the alleged misconduct." *Id.* Accordingly, "[a] complaint that contains impermissibly vague group pleading will be dismissed." *Palmer v. United States*, No. 21-cv-11721, 2022 WL 310208, at *6 (D.N.J. Feb. 1, 2022).

Here, there are eight defendants (plus ten "John Doe" defendants) who represent a mix of individuals and companies, including former CC Ford employees, former PEC employees, and current PVI/PVP employees. It is not possible to deduce whether allegations concerning the purported conduct of "Defendants" writ large applies to all defendants, or some subset of

---

retaining and/or obtaining clients for future business and the economic advantages associated with [the] same"), 414 ("Defendants have also taken [CC Ford]'s confidential and proprietary information and trade secrets without permission and have deprived [CC Ford] of same.").

[10] Group pleading is a form of "shotgun pleading." *Radhakrishnan v. Pugliese*, No. 20-cv-220, 2021 WL 11593799, at *1 (D.N.J. May 21, 2021) (citations omitted). Other forms of shotgun pleading that CC Ford engages in are (i) pleading "multiple counts where each count adopts the counts of all preceding counts" (*e.g.*, SAC ¶¶ 276, 281, 434, 450), (ii) not pleading different causes of action as distinct counts, and (iii) pleading "conclusory, vague, and immaterial facts." *Id.* Courts generally dismiss complaints that are "insufficiently vague and an impermissible shotgun pleading." *Nash v. New Jersey*, No. 22-cv-1804, 2022 WL 4111169, at *3 (D.N.J. Sept. 8, 2022).

defendants, including a subset that does not include PEC or Manning.[11]  Indeed, many of the SAC's allegations cannot possibly be attributed to PEC or Manning.

Further, there is no allegation (or plausible argument that can be made) that the other defendants were acting as agents of PEC or Manning warranting vicarious liability.  *See Mu Sigma, Inc. v. Affine, Inc.*, No. 12-cv-1323, 2013 WL 3772724, at *10 (D.N.J. July 17, 2013) (under federal and New Jersey law, vicarious liability requires the existence of an agency relationship, which in turn requires the principal to exert control over "time, manner, and method of executing the work").  Here, the Former CC Ford Employees were never PEC employees; PEC and Manning are not alleged to have ownership interests in any of the other parties; and Manning was never employed by CC Ford, PVI, or PVP.  Contractually, the MSA and the PVI MSA provide that CC Ford and PVI are independent contractors, not PEC's agents.  *See* PVI MSA ¶ 13 (PVI is an independent contractor and "shall have no authority to … act as an agent on behalf of PEC in any way"); MSA ¶ 14 (same for CC Ford).

In sum, Counts 1-4, 8-12 and 16 should be dismissed because the SAC's group pleading fails to put PEC and Manning on notice of their purported wrongful conduct, and thus fails to satisfy Rule 8's pleading standard.

### B.    CC Ford's Conspiracy Allegations Are Implausible

The SAC's allegations regarding PEC's and Manning's participation in a conspiracy to destroy CC Ford and prop-up CC Ford's competitor are implausible, contradicted by the SAC itself, and fail to state a claim.  "Although the plausibility standard does not impose a probability

---

[11]  *E.g.*, SAC ¶¶ 283 ("Defendants acquired, misappropriated, used and/or stole CCFW's trade secrets"); 397 ("Defendants have maliciously interfered with Plaintiff's interest in retaining and/or obtaining clients for future business"); 404 ("The stealing of CCFW's confidential and proprietary information and trade secrets… enabled Defendants to unfairly compete with Plaintiff."), 451 ("Defendants received … COBRA payments" from CC Ford.").

requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully.  Accordingly, a plaintiff must 'allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims.'" *Villarreal v. United Airlines Inc.*, No. 19-cv-10580, 2023 WL 9510576, at *2 (D.N.J. June 6, 2023) (cleaned up), *report and recommendation adopted*, No. 19-cv-10580, 2024 WL 357812 (D.N.J. Jan. 31, 2024).

*First*, CC Ford alleges no remotely plausible business or financial motive for PEC or Manning to conspire against CC Ford.  PEC is a pharmaceutical company, Manning is a senior pharmaceutical executive, and CC Ford is a medical communications and marketing firm.  None of them compete or occupy similar market positions—and CC Ford does not allege otherwise. MSA ¶ 2.6.  Furthermore, CC Ford alleges that the conspiracy involved directly harming PEC— including that Johnson purportedly stole PEC's confidential files from CC Ford.[12]  *See* SAC ¶¶ 77, 220-21.  There is no articulated (or logical) reason for PEC and Manning to harm themselves. Tellingly, and despite having the benefit of fact discovery, CC Ford concedes the implausibility of its conspiracy allegations: "an unanswered question is precisely what was in it financially for Manning and PEC?  That will be learned … in discovery."  SAC ¶ 27.  This admission is fatal: there is no "reasonable expectation" or common sense reasoning to indicate that, nearly a year after discovery closed, reopening it will uncover proof of CC Ford's claims.  *Connelly v. Lane Const. Corp.,* 809 F.3d 780, 786-87 (3d Cir. 2016) ("The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" (citing *Iqbal*, 556 U.S. at 679)).

---

[12] All nonpublic "information and data" disclosed by PEC to CC Ford, in addition to work product completed by CC Ford on PEC's behalf, constitute "Confidential Information," which is the "sole property of PEC."  MSA ¶ 6.1, 6.3.  CC Ford is obligated to "exercise all reasonable precautions" to protect PEC's Confidential Information.  *Id.* ¶ 6.3.

*Second*, the SAC makes clear that PEC commonly hires vendors like CC Ford and PVI to provide support services. As reflected in the MSA and the PVI MSA, PEC's vendor contracts ensure that it has the flexibility to work with any vendor, based on PEC's needs, and to terminate any vendor in its sole discretion. PEC had no obligation to continue working with CC Ford (MSA ¶ 1.1), was empowered to use multiple vendors at any time or switch from working with CC Ford to "any third party" at any time (*id.* ¶¶ 2.6, 8.7), and could terminate services with CC Ford at will for any reason (*id.* ¶¶8.3, 8.4). What the SAC describes as a conspiracy is nothing more than the exercising of PEC's rights under the MSA to work with a vendor other than CC Ford—and does not give rise to any facially plausible theory that PEC or Manning acted unlawfully.

## III.    CC Ford's RICO Claims Fail As to PEC and Manning (Counts 1 and 2)

CC Ford alleges a § 1962(c) RICO claim and a § 1962(d) RICO conspiracy claim against all defendants, as well as a corresponding New Jersey RICO claim for each. All are deficient and should be dismissed.

### A.    Count 1.  The Section 1962(c) New Jersey RICO Claims Fail

The elements of a § 1962(c) RICO claim are: (1) conduct (*i.e.*, predicate acts) (2) of an enterprise (3) through a pattern (4) of racketeering activity. [13]  *Chey v. LaBruno*, 608 F. Supp. 3d 161, 184 (D.N.J. 2022). CC Ford fails to plead these elements as to PEC or Manning. Accordingly, Count 1 should be dismissed against PEC and Manning in its entirety.

#### 1.    CC Ford Fails to Allege Sufficient Predicate Acts Against PEC or Manning

CC Ford's RICO claims should be dismissed against PEC and Manning for failure to allege either committed the requisite two related predicate racketeering acts. *See Ideal Dairy Farms, Inc.*

---

[13]  The federal and New Jersey RICO statutes are substantively similar. *Sharp v. Kean Univ.*, 153 F. Supp. 3d 669, 674 (D.N.J. 2015) (listing the elements of a New Jersey RICO claim).

13

*v. John Labatt, Ltd.*, 90 F.3d 737, 747 (3d Cir. 1996) ("Without a predicate act, [a plaintiff] cannot possibly succeed on its federal and state RICO claims."). "To set forth a pattern of racketeering activity, a plaintiff must show that *each defendant has committed* at least two acts of racketeering activity[.]" *Dougherty v. Adams-Dougherty*, No. 15-cv-8541, 2016 WL 5219460, at *6 (D.N.J. Sept. 21, 2016) (emphasis added); *Ricale Assocs., LLC v. McGregor*, No. 15-cv-541, 2015 WL 5781063, at *6 (D.N.J. Sept. 30, 2015) (complaint must allege "each defendant committed at least two acts of racketeering activity"). Failure to allege a defendant committed two predicate acts is fatal to a RICO claim. *See Tedeschi v. Smith*, No. 09-cv-03134, 2010 WL 148424, at *3 (D.N.J. Jan. 12, 2010) (dismissing RICO claim because the complaint did not adequately allege defendant committed two predicate acts). Furthermore, these predicate acts must be "related to the enterprise" and may not be "isolated events." *Absolute Power*, 2016 WL 6897782, at *6.

### a.    CC Ford Fails to Allege Any Predicate Acts Against PEC

The SAC does not allege that PEC committed *any* predicate act. *See* SAC ¶¶ 265(a)-(i). Accordingly, Count 1 must be dismissed as to PEC. *See Capers v. FedEx Ground*, No. 02-cv-535, 2012 WL 2050247, at *4 (D.N.J. June 6, 2012) (dismissing RICO claims for pleading deficiencies, including "not adequately alleg[ing] that each member committed at least two acts of racketeering activity … [and] which predicate acts they committed").

### b.    CC Ford's Allegations of a Predicate Act By Manning Are Insufficient As a Matter of Law

The SAC alleges only one predicate act attributed to Manning: "stealing and/or misappropriating, over a number of years and *while Manning was employed at various pharmaceutical companies prior to PEC*, various confidential and/or proprietary information and/or trade secrets belonging to various pharmaceutical companies that were used by the

Enterprise to conduct its business[.]"  SAC ¶ 265(a) (emphasis added).  This allegation is entirely infirm, for a variety of reasons.

At the outset, CC Ford does not have a good faith basis for pleading that Manning engaged in any such "theft."  CC Ford has no authority to speak for any of the "various pharmaceutical companies" it mentions and has no good faith basis to allege anything about the terms of Manning's employment or the alleged secrecy of their documents.  Even if, however, this Court were to accept the "theft" allegation against Manning as true, it still would not qualify as a predicate act for three facially apparent reasons.

*First*, as discussed in further detail below, CC Ford alleges that the RICO enterprise was either PVI or an association in fact involving PVI.  As pled, neither enterprise existed until September 2021 *at the very earliest*.  *See* SAC ¶¶ 44–45 (alleging that following CC Ford's sale of an "unrelated entity," in September 2021 "Johnson and Manning crafted" a plan "to steal CCFW business"), 76 (PVI incorporated in February 2022).  However, Manning's alleged "theft" occurred years *before* PVI came into existence—and in fact, *before* Manning began working at PEC in February 2020 and *before* PEC began to do business with CC Ford in April 2021.  *See* SAC ¶¶ 93, 201-210.  Therefore, there is no plausible grounds to argue that Manning's alleged "theft" was committed in furtherance of the enterprise or in coordination with the enterprise's other members—because the enterprise simply did not exist at the time.[14]  *See Boyle v. United States*, 556 U.S. 938, 947 n.4 (2009) (proof that "individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates" "would not be enough to show that the individuals were members of an enterprise").

---

[14] It is for this same reason that Manning's purported conduct cannot be attributed to PEC, since it is alleged to have taken place prior to her employment with PEC.  *See* SAC ¶ 265(a) ("while Manning was employed at various pharmaceutical companies *prior to PEC*" (emphasis added)).

*Second*, the supposed "theft" concerns years-old information belonging to non-competitor pharmaceutical companies, related to their specific products. CC Ford is not a pharmaceutical company, nor is PVI. The SAC makes no specific allegation as to how the supposed "theft" of materials belonging to other companies could have harmed CC Ford (or boosted PVI).[15] Nor are there any allegations or suggested theory of anticompetitive behavior, since none of Manning's previous employers work in the same market as CC Ford or PVI. Therefore, there is no rationale to suggest that Manning's alleged conduct would benefit any alleged enterprise, taking place years later, to harm CC Ford. *Cf. Ottilio*, 591 F. App'x at 169 (3d Cir. 2015) ("Merely pointing out that a bank employee has accepted bribes, without averring any facts linking that crime to the alleged RICO violations, falls short of the 'facial plausibility' needed to withstand a motion to dismiss.").

*Third*, the SAC's allegations of "theft" fail to plead the elements of the criminal stealing of trade secrets in violation of 18 U.S.C. § 1832(a). *Ricale*, 2015 WL 5781063, at *5 ("Merely listing … predicate acts is not sufficient to state a RICO claim. Plaintiff must adequately plead the elements of each predicate act."). Among other things, a § 1832(a) violation requires proving "intent to convert a trade secret," knowledge or intent to injure the owner of the trade secret, that the theft/misappropriation was done "knowingly," and that the act was performed without authorization. S*ee* 18 U.S.C. § 1832(a).[16] Here, the allegations are devoid of these elements.

---

[15] CC Ford cannot plausibly claim injury from this alleged conduct not directed at it.

[16] This claim is also deficient for the independent reason that CC Ford fails to allege that the purported theft/misappropriation occurred after May 11, 2016, when violations of § 1832(a) became a predicate act. *See Magnesita Refractories Co. v. Tianjin New Century Refractories Co.*, No. 17-cv-1587, 2019 WL 1003623, at *11 (M.D. Pa. Feb. 28, 2019) (dismissing RICO claim for, *inter alia*, not alleging that the theft of trade secrets occurred after May 11, 2016). As any basic research or inquiry would show, Manning worked for Pfizer until 2009, Vertex until 2013, and Baxalta until June 2016. Crediting Plaintiff's (specious) allegations as true for the purposes of this motion to dismiss, any purported theft related to these companies would likely be untimely.

*Fourth*, CC Ford is required to plead that Manning engaged in *two* specific predicate acts in order to support its RICO claim.  *See Alitsource*, 2022 WL 909872, at *8 (dismissing RICO claim for not alleging two predicate acts).  It fails to do so, hobbling its claim out of the gate.

For all these reasons, the SAC fails to allege that Manning engaged in predicate acts of racketeering activity to support a RICO claim.

> **a.    The Three Supposed "Predicate Acts" That Are Not Attributed to Any Particular Defendant Are Insufficient to Support CC Ford's RICO Claim**

The SAC also contains three predicate acts—mail fraud, wire fraud, and conspiracy—that are not attributed to any particular defendant.  *See* SAC ¶¶ 265(d), (e), (i).  As discussed above, these allegations fail because they rely on improper group pleading.  *See Capers*, 2012 WL 2050247, at *4 (requiring plaintiff to allege "which predicate acts [each member] committed").  They are also insufficient because the mail and wire fraud pleadings fail to satisfy Rule 9(b) and conspiracy does not qualify as a predicate act.

To allege mail and wire fraud as predicate acts, the SAC must satisfy Rule 9(b)'s heightened pleading standard.  *See Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004), *abrogation on other grounds recognized by In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010); *Ottilio*, 591 F. App'x at 168 ("Bare allegations such as these are insufficient to survive a motion to dismiss, especially given that a RICO predicate act of mail or wire fraud must be pleaded with even greater particularity.").  Under Rule 9(b), "[p]laintiffs are required to state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged."  *Grant v. Turner*, 505 F. App' x 107, 111 (3d Cir. 2012) (cleaned up).  "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it."  *Kolar v. Preferred Real Estate Invs., Inc.*, 361 F. App'x

354, 363 (3d Cir. 2010). Allegations like the SAC's that fail to allege who committed the fraud, how it was done, when it happened, or what the purported misrepresentation was, are insufficient to meet the heighted pleading requirement and cannot be considered as predicate acts.[17] *See In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 433 (D.N.J. 2015) (requiring a plaintiff to "plead the date, time, and place of the alleged fraud, or otherwise inject precision into the allegations by some alternative means"); *see also Giovinazzo v. Deangelo*, No. 20-cv-15894, 2022 WL 795713, at *7 (D.N.J. Mar. 16, 2022) (dismissing RICO claim based on predicate acts of wire fraud where "the Court is left guessing what material misstatement of fact [defendant] made to [plaintiff] that could support his claims").

Further, violations of 18 U.S.C. § 371 (conspiracy) and N.J. Stat. Ann. § 2C:5-2 (conspiracy) are not RICO predicate acts. SAC ¶ 265(i). *See Kaul v. Christie*, 372 F. Supp. 3d 206, 250 (D.N.J. 2019) (§ 371 is not a RICO predicate); N.J. Stat. Ann. § 2C:41-1(a) (not including violations of N.J. Stat. Ann. § 2C:5-2 in the list of predicate acts).[18] Mentioning these statutes in passing without providing factual support is also insufficient to plead a predicate act.[19] *Hafner v. Menendez*, No. 23-cv-22557, 2024 WL 1795360, at *2 (D.N.J. Apr. 25, 2024) ("[V]iolations of statutes that are mentioned in 'passing,' or merely referenced in the complaint without factual support, are not sufficient to raise a claim.").

For these reasons alone, Count 1 should be dismissed as to PEC and Manning.

---

[17]  Indeed, the SAC does not even attempt to allege the requisite elements of mail or wire fraud. *See* Third Circuit Model Criminal Jury Instructions, §§ 6.18.1341, 6.18.1343

[18]  Mail and wire fraud conspiracies are not RICO predicate acts. *See Kaul*, 372 F. Supp. at 250.

[19]  These conspiracies cannot save the alleged predicate act as to Manning, as there is no allegation or plausible theory that she conspired with anyone as part of the alleged misappropriation.

### 2.    The RICO Enterprise is Insufficiently Pled

CC Ford also fails to plead a sufficient RICO enterprise.  The SAC alleges two "Enterprises": (i) PVI as an enterprise and (ii) an association-in-fact enterprise.  *See* SAC ¶¶ 258, 259.  Both theories are fatally flawed.

### a.    The Claim Premised Upon PVI as the Enterprise Fails

PVI cannot be the Enterprise under § 1962(c) because the SAC alleges that PVI is a RICO person (*i.e.*, a participant to the RICO conspiracy) and, as a matter of law, PVI cannot be both the RICO Enterprise and a RICO person that is part of the RICO Enterprise.  *See Alitsource*, 2022 WL 909872, at *5 ("A RICO person must be distinct from the RICO enterprise because a person cannot 'associate' with themself.").  *See, e.g.*, SAC ¶¶ 258 (alleging PVI is the Enterprise); 265(d) (alleging "[t]he Enterprise" did predicate acts); 265(h) (alleging PVI did predicate acts).

CC Ford's RICO claim premised upon PVI as the Enterprise also fails because PEC and Manning did not conduct or participate in PVI's affairs, and there are no allegations of such.  Under the conduct or participation element, "[a] defendant must 'conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'"  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 370 (quoting 18 U.S.C. § 1962(c)); *see* Third Circuit Model Criminal Jury Instructions, § 6.18.1962C-5.  This is "a very difficult test to satisfy," *In re Aetna UCR Litig.*, No. 07-cv-3541, 2015 WL 3970168, at *28 (D.N.J. June 30, 2015) (citation omitted), and "[m]ere association with a RICO enterprise does not violate § 1962(c)," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 370.  An outsider to the enterprise must have "conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs."  *Reves*, 507 U.S. at 185 (1993).  "[W]hen the defendants are non-employee 'outsiders,' the requirement that they actively direct the affairs of the enterprise is 'rigorously enforced.'"  *Alitsource*, 2022 WL 909872, at *6 (citation omitted).

19

PEC and Manning are outsiders of PVI. Neither is alleged to have had "exercised decision making authority or discretion on behalf of [PVI]." *Alitsource*, 2022 WL 909872, at *8. PVI was merely a vendor to PEC, just as CC Ford was before it. All that is alleged is that PEC and Manning "were aware of the existence and nature of the Enterprise … and participated in, aided, abetted and/or furthered the Enterprise's activities by, among other things, funding and helping launch its business." SAC ¶ 262. This is nothing more than a threadbare recital of the elements. At most, the only thing that PEC is alleged to have done is move its business from CC Ford to PVI—a move it was contractually authorized to make—which is insufficient as "[a]llegations that a defendant had a business relationship with the putative RICO enterprise … do not suffice." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009).[20]

### b. The Claim Premised Upon an Association-in-Fact Enterprise Fails

CC Ford also fails to plead the required features of an association-in-fact enterprise. "An association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct, and is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. *Aguilar v.*

---

[20] *See Friedland v. Unum Group*, 50 F. Supp. 3d 598, 605 (D. Del. 2014) (business using vendors as part of its own business affairs could not satisfy RICO's enterprise requirement); *M.W. Widoff, P.C. v. Encompass Ins. Co. of Am.*, No. 10-cv-8159, 2012 WL 769727, at *5 (N.D. Ill. Mar. 2, 2012) (alleging a "customer-supplier relationship" is insufficient); *Kerrigan v. Visalus, Inc.*, 112 F. Supp. 3d 580, 603 (E.D. Mich. 2015) (alleging a vendor relationship with the enterprise is insufficient); *Vickers Stock Research Corp. v. Quotron Sys., Inc.*, No. 96-cv-2269, 1997 WL 420265, at *4 (S.D.N.Y. July 25, 1997) ("[A] defendant will not be found to participate in the management or operation of the enterprise simply because he enjoys substantial persuasive power to induce the alleged enterprise to take certain actions."); *University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534 (3d Cir. 1993) ("Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO."); *see also Alitsource*, 2022 WL 909872, at *8 ("Bankers do not become racketeers by acting like bankers." (quoting *Dahlgren v. First Nat. Bank of Holdrege*, 533 F.3d 681, 690 (8th Cir. 2008))).

*Ken's Marine & Oil Serv., Inc.*, No. 14-cv-6735, 2017 WL 2312358, at *2 (D.N.J. May 25, 2017)

(citation and internal quotation marks omitted).  An association-in-fact enterprise must also have

three structural features: "a purpose, relationships among those associated with the enterprise, and

longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S.

at 946; *Chey v. LaBruno*, 608 F. Supp. 3d 161, 184 (D.N.J. 2022) ("[A] plaintiff must explicitly

plead these three features to plausibly allege an association in fact enterprise") (citation omitted) .

The purported association-in-fact enterprise here is thinly described as "Defendants, Crum,

Rodriguez and John Does constitute a group associated-in-fact."  SAC ¶ 259.  This description

"fail[s] to demonstrate the most basic requirement of an association-in-fact enterprise: that the

components function as a unit, that they be put together to form a whole."[21]  *Vaswani, Inc. v.*

*Manjunathamurthy*, No. 20-cv-20288, 2022 WL 844438, at *10 (D.N.J. Mar. 22, 2022) (citation

and internal quotation marks omitted).  There are no allegations regarding "planning, cooperation,

or coordination" among the members of the Enterprise, nor are there allegations regarding any

decision-making ability or any concerted decision made by the Enterprise as "a whole."[22]  *Allstate*

---

[21]  This is fatal to the RICO claim.  *See Boyle*, 556 U.S. at 947 n.4 (RICO violation would not be
established by a showing that various defendants engaged in RICO predicate crimes
"independently and without coordination"); *In re Aetna UCR Litig.*, 2015 WL 3970168, at *31
("RICO does not penalize parallel, uncoordinated fraud" (quoting *United Food & Com. Workers
Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir.
2013))); *Rao v. BP Prod. N. Am., Inc.*, 589 F.3d 389, 400 (7th Cir. 2009) (plaintiff failed to plead
association-in-fact enterprise because "allegations do not indicate how the different actors are
associated and do not suggest a group of persons acting together for a common purpose or course
of conduct"); *Lentini v. McDonald's USA*, No. 19-cv-4596, 2019 WL 4746420, at *6 (D.N.J. Sept.
30, 2019) (same)

[22]  CC Ford does not attempt to distinguish between PVI as the alleged enterprise and an
association-in-fact enterprise.  Virtually all of the allegations regarding the "Enterprise" logically
relate to PVI only, not any "association-in-fact."  *See, e.g.*, SAC ¶¶ 262 ("Johnson founded the
Enterprise, holds a position in it, performs services for it and/or is on the payroll of the Enterprise"),
264 ("Johnson, Bicking, Weiler, Ornelas-Kuh, Crum, Rodriguez and John Does all hold or held
management level positions in the Enterprise and/or acted under the direction of upper

*N.J. Ins. Co. v. Summit Pharmacy, Inc.*, No. 13-cv-5809, 2014 WL 1767528, at *10 (D.N.J. May 2, 2014).

Therefore, Count 1 should also be dismissed because the SAC fails to adequately plead an RICO enterprise, under either the PVI theory or the association-in-fact theory.

**B.    Count 2:  The Section 1962(d) and New Jersey RICO Conspiracies Fail as to PEC and Manning**

CC Ford's RICO pleading failures doom Count 2, its 18 U.S.C. § 1962(d) and N.J. Stat. Ann. § 2C:41–2d RICO conspiracy claims.

The elements for a RICO conspiracy are (1) an agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were a part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b) or (c).  *Grant*, 505 F. App'x at 112.  The elements of a New Jersey RICO conspiracy are substantively the same: (1) an agreement to violate RICO, which requires (a) an agreement to conduct or participate in the conduct or the affairs of the enterprise, and (b) an agreement to the commission of at least two predicate acts; and (2) the existence of an enterprise.  *State v. Ball*, 661 A.2d 251, 268 (N.J. 1995).  In all instances, "[t]he allegations must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy."  *Green v. Izod Corp. Off. & Headquarters*, No. 22-cv-6380, 2023 WL 2992674, at *4 (D.N.J. Apr. 18, 2023) (citation and internal quotation marks omitted).  The SAC fails in this regard.

---

management"), 270 (the Enterprise went "from a shell company to one having immediate revenue" and that the Enterprise was competing with CC Ford).

### 1.   CC Ford Fails to Allege that PEC or Manning Agreed to the Commission of Two Predicate Acts

For a RICO conspiracy claim a plaintiff must sufficiently allege that each defendant agreed to the commission of at least two predicate acts.  *Marina Dist. Dev. Co., LLC v. Ivey*, 93 F. Supp. 3d 327, 341 (D.N.J. 2015); *McCray v. UNITE HERE*, No. 13-cv-6540, 2014 WL 3519098, at *4 (D.N.J. July 16, 2014) (dismissing RICO conspiracy count for failure to plead agreement to two predicate acts).[23]

The SAC alleges only that "Defendants conspired and agreed to conduct or participate in the RICO Enterprise, as evidenced by the substantial electronic, written and oral record of their communications over several years as well as their various covert meetings, as aforesaid."  SAC ¶ 277.  This is patently deficient because it does not identify PEC or Manning as specifically agreeing to any (let alone two) predicate acts.  Where, as here, a plaintiff "only alleges agreement to the commission of the predicate acts 'in a conclusory fashion,' that alone will result in a dismissal of a RICO conspiracy cause of action."  *McCray*, 2014 WL 3519098, at *4 (quoting *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 317 (D.N.J. 2005)).

### 2.   CC Ford Fails to Allege that PEC or Manning were Aware of a Pattern of Racketeering Activity

A § 1962(d) RICO conspiracy also requires "knowledge that [the] acts were a part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b) or (c)."[24]

---

[23] *See Miller v. P.G. Lewis & Assoc.*, No. 05-cv-5641, 2007 WL 316446, at *7 (D.N.J. Jan. 30, 2007) (finding New Jersey RICO claim insufficient to "survive the Rule 12(b)(6) standard and … therefore futile" where plaintiff failed to plead agreement to the commission of two predicate acts); *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 540 (S.D.N.Y. 2011) (dismissing New Jersey RICO claim where plaintiff failed to provide factual assertions supporting an agreement to commit predicate acts); *see also supra*, Section II.A.

[24] The corresponding requirement for a N.J. Stat. Ann. § 2C:41–2(d) RICO conspiracy is that the defendant must know "the general nature of the enterprise and know that the enterprise extends beyond his individual role."  *Ball*, 661 A.2d at 268 (citation omitted).

23

*Grant*, 505 F. App'x at 112.  To satisfy this element, a defendant must have "understood the essential nature of the plan and knowingly agreed to participate in the plan." *Schwartz v. Laws. Title Ins. Co.*, 970 F. Supp. 2d 395, 405 (E.D. Pa. 2013); *see United States v. De Peri*, 778 F.2d 963, 975 (3d Cir. 1985) (same).  The SAC is devoid of any specific factual allegations concerning PEC's or Manning's awareness of a broader plan to damage CC Ford or to support PVI by criminal means, beyond conclusory allegations such as Manning being the "leader of a conspiratorial den of thieves."  SAC ¶ 73.  This pleading failure constitutes an independent ground for dismissal of Count 2.  *Capers*, 2012 WL 2050247, at *4.

For the above reasons, Count 2 must also be dismissed.

## IV.    CC Ford's Trade Secrets and Confidential Information Claims Fail (Counts 3 & 12)

Counts 3 (New Jersey Trade Secrets Act ("NJTSA") and Federal Defend Trade Secrets Act ("DTSA")) and 12 (NJTSA and common law theft of trade secrets)[25] are premised on the claim that all the defendants misappropriated CC Ford's trade secrets "including, but not necessarily limited to ... budget, vendor lists, SOWs, and work product performed for CCFW clients."  SAC ¶ 283 (Count 3); *see id.* ¶ 418 (Count 12, alleging improper access to CC Ford's "business data compilations, methods, techniques, designs").    These trade secret claims require the misappropriation of a trade secret and the "the knowing improper acquisition, or use or disclosure of the secret."  *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 278 (3d Cir. 2019); *Ho-Ho-Kus, Inc. v. Sucharski*, No. 23-cv-01677, 2023 WL 7403539, at *16 (D.N.J. Nov. 9, 2023).

*First*, the SAC fails to state viable claims against PEC or Manning because it does not contain any allegation that PEC or Manning *were aware* of the theft of any CC Ford trade secrets—

---

[25]  It is not entirely clear whether Count 12 actually intends to assert a violation of the NJTSA. *See* SAC ¶ 427 (requesting relief pursuant to the NJTSA, but omitting it from the heading).

let alone participated in such theft.  The only allegations of trade secret theft or misappropriation

implicate conduct by the Former CC Ford Employees, not PEC or Manning.[26]  This alone dooms

CC Ford's claim.  *Ho-Ho-Kus*, 2023 WL 7403539, at *16 (requiring allegations that defendants

"have knowledge or reason to know, of the improper acquisition of the secrets").

     *Second*, the SAC lacks "adequate identification of what [CC Ford] contends to be its trade

secret."  *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 381 (3d Cir. 2021) (a plaintiff "must sufficiently

identify the information it claims as a trade secret" to "plead the existence of a trade secret in a

misappropriation claim"); *see Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021)

(pleadings must permit defendants to "ascertain at least the boundaries within which the secret

lies").  A "trade secret" is defined under the statute as:

> "Trade secret" means information, held by one or more people, without regard to
> form, including a formula, pattern, business data compilation, program, device,
> method, technique, design, diagram, drawing, invention, plan, procedure,
> prototype or process, that: (1) Derives independent economic value, actual or
> potential, from not being generally known to, and not being readily ascertainable
> by proper means by, other persons who can obtain economic value from its
> disclosure or use; and (2) Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

N.J. Stat. Ann. § 56:15-2; *see also* 18 U.S.C. § 1839(3) (defining "trade secret" in the DTSA).

Trade secrets are substantially more than "matters of general knowledge in the trade or of special

knowledge of those persons who are skilled in the trade," and substantively more than simply

"confidential information."  *Oakwood*, 999 F.3d at 906; *see also Mallet*, 16 F.4th at 383 ("A

plaintiff that simply '[w]ith a wave of the hand,[] declares everything to be secret know-how' fails

---

[26]  The allegations in Count 12 refer only to Former CC Ford Employees and the remedies appear
to refer only to them.  *See* SAC ¶¶ 421, 422, p. 101 (requesting that PEC somehow be enjoined
from doing business with itself).  There is no mention of Manning in Count 12, and the only
allegation that mentions PEC is that "the individual Defendants improperly used said information
on behalf of themselves and/or clients for whom they were providing services, including but not
limited to, PEC."  SAC ¶ 422.

to plead protectable trade secrets." (citation omitted)); *Fishkin v. Susquehanna Partners, G.P.*, 340 F. App'x 110, 119 (3d Cir. 2009) (enumerating factors, including "the extent to which [the trade secret] is known by employees" and "the amount of effort or money expended by the owner").

Here, the SAC contains only a "generic list of categories of business and technical information which could be used to describe documents found in any number of corporations." *OWAL, Inc. v. Caregility Corp.*, No. 21-cv-13407, 2022 WL 890182, at *7 (D.N.J. Mar. 25, 2022) (rejecting generic description) (cleaned up); *see, e.g.*, SAC ¶ 283 ( "budgets, vendor lists, SOWs and work product performed for [CC Ford] clients"). None of this constitutes "a formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process." This is not sufficient to support a trade secret claim. *See Lard-Vid, LLC and Visual Image Display UK, Ltd. v. Ground Support Labs, LLC, et al.*, BER-L-5929-20, 2021 WL 2396576, at *11 (N.J. Super. Ct. Feb. 26, 2021) (dismissing trade secrets act claim and finding standard sales information, budgets, and customer data did not qualify as trade secret).

*Third*, to the extent that CC Ford tries to identify PEC-related documents (allegedly) misappropriated by the Former CC Ford Employees, that information is *PEC's trade secrets or confidential information*, not CC Ford's secrets.[27] *See, e.g.*, SAC ¶¶ 220 (files misappropriated by Johnson included folders and files with the names "PEC"; "PharmaEssentia"; and "No 19_PEC-037-22_CC Ford Group West LLCSOW Field Training Project Management.docx"), 221 (documents taken by Johnson include "documents for CCFW clients including … PEC"). It is axiomatic that CC Ford cannot maintain a claim against PEC or its employees for stealing PEC's own property—or for CC Ford's failure to prevent the misappropriation of PEC's trade secrets.

---

[27] Under the MSA, any work performed for PEC is PEC's property. MSA ¶¶ 6.1, 6.3, 7.2

For each of these reasons, CC Ford's trade secret claims (Counts 3 and 12) should be dismissed.

## V.    CC Ford's Computer Claims Fail (Count 4)

Count 4 alleges violations of the federal Computer Fraud and Abuse Act ("CFAA") and the New Jersey Computer Related Offenses Act ("CROA").[28]  SAC ¶¶ 287-292.  The "essential element" of both these statutory claims is the "'unauthorized' access of information in connection with computers."  *Steinhardt v. Bernardsville Police Dep't,* No. 17-cv-2169, 2020 WL 5204066, at *6 (D.N.J. Aug. 31, 2020) (Shipp, J.), *aff'd*, No. 20-2825, 2021 WL 3929321 (3d Cir. Sept. 2, 2021); *see also* N.J. Stat. Ann. § 2A:38A-3 ("A person or enterprise damaged in business or property as a result of any of the following actions may sue [for] … The purposeful or knowing, and unauthorized altering, damaging, taking or destruction of any data ….").

Count 4 fails to plead this element, and is otherwise deficient for several reasons.

*First*, there is no allegation that PEC or Manning ever accessed, or even had access to, any CC Ford computer or server, nor that either altered, damaged, accessed, or obtained data from any CC Ford computer without authorization.[29]  Instead, the allegations concern the Former CC Ford Employees and their purported conduct with regard to information located on their work computers or CC Ford's SharePoint server.  *See* SAC ¶¶ 217, 265(c).

*Second*, the only allegation that could conceivably pertain to PEC or Manning in this regard is a threadbare, group-pleading that all Defendants "conspire[ed]" together.  *Id.* ¶ 289.  But without factual support, such an allegation is insufficient.  *See supra*, Section II.A; *Mu Sigma*, 2013 WL

---

[28]  "Courts have interpreted CROA 'in harmony with its federal counterpart,' the CFAA[.]"  *Goydos v. Rutgers, State Univ.*, No. 19-cv-08966, 2024 WL 1329253, at *6 (D.N.J. Mar. 28, 2024) (quoting *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 278 (3d Cir. 2016)).

[29]  CC Ford does not have standing to sue on another company's behalf, so any allegations that Manning accessed sensitive documents from other pharmaceutical companies is wholly irrelevant.

3772724, at *10 (bare allegations of CFAA and CROA violations insufficient where "Plaintiff does not specify how or whether Defendants allegedly stole its data or what in particular was stolen, much less alleged that Defendants did so with purpose or knowledge"). And even if a conspiracy were adequately alleged (it is not), there is no CROA cause of action for conspiracy. *In re Vertis Holdings, Inc.*, 536 B.R. 589, 619 (Bankr. D. Del. 2015) ("[A] plain reading of the statute supports the conclusion that the New Jersey legislature intended that the statute covered only those 'actors' who directly accessed the computer at issue[.]"), *aff'd*, No. AP 12-51176, 2016 WL 7031282 (D. Del. Nov. 30, 2016); *see Fairway Dodge, Inc. v. Decker Dodge, Inc.*, No. A-1736-03T2, 2005 WL 4077532, at *13 (N.J. Super. Ct. App. Div. June 12, 2006) (dismissing CROA conspiracy claim).

*Third*, the CFAA and CROA apply only where access was unauthorized, but CC Ford concedes that the Former CC Ford Employees *were* authorized to access the information they allegedly took or destroyed.[30] This admission is fatal to CC Ford's claim because "an employee who accesses a computer by the terms of his or her employment is 'authorized' to use that computer for purposes of the CFAA even if the purpose in doing so is to misuse or misappropriate the information." *Christie v. Nat'l Inst. for Newman Stud.*, No. 16-cv-6572, 2019 WL 1916204, at *8-11 (D.N.J. Apr. 30, 2019) (disposing of both CFAA and CROA claims because employee was authorized to use the computer and misused or misappropriated the information that the employee had access to); *KBS Pharmacy, Inc. v. Patel*, No. 21-cv-1339, 2021 WL 2351961, at *3 (E.D. Pa.

---

[30] *See* SAC ¶¶ 420 ("Johnson, Bicking, Weiler, and Ornelas-Kuh had access to [CC Ford's trade secrets and confidential information] as it was necessary to use [the] same in relation to their job duties."); 421 ("Said Defendants had no right or permission to use said information for any purpose other than the work they performed on behalf of the Company."); *see also id.* ¶¶ 314, 334, 354 (alleging Weiler, Bicking, and Ornelas-Kuh, "by virtue of [their] executive position[s]" had "access [to] files containing virtually all of the Company's most sensitive documents"); 220 (alleging Johnson viewed documents on her CC Ford issued laptop while she was a consultant); 217 (alleging Johnson deleted documents from her CC Ford-issued laptop while a consultant).

28

June 9, 2021) ("[T]he CFAA simply does not encompass the employees' misuse of the information

if the employee had authorized access to the information in the computer in the first place."); *see

also Van Buren v. United States*, 141 S. Ct. 1648, 165 (2021) ("[The CFAA] does not cover those

who … have improper motives for obtaining information that is otherwise available to them.").

*Fourth*, the CFAA and CROA claims fail insofar as they allege unauthorized access of

information stored on CC Ford's SharePoint server, which is a web-based account, because "the

[CFAA] only protects the 'unauthorized' access of *computers*, … 'not unauthorized access to web-

based accounts.'"[31] *Christie*, 2019 WL 1916204, at *6 (quoting *Owen v. Cigna*, 188 F. Supp. 3d

790, 793 (N.D. Ill. 2016)); *id*. at *11 (rejecting CROA claim "for the same reasons" as CFAA

claim); *Thomas v. Keough*, No. 20-cv-05758, 2024 WL 414041, at *26 (D.N.J. Feb. 5, 2024).[32]

*Finally*, the CFAA is subject to a two-year statute of limitations. 18 U.S.C. § 1030(g). All

potential CFAA conduct is alleged to have taken place between 2019 and the first half of 2022.

*See, e.g.*, SAC ¶¶ 217 (files deleted off Johnson's laptop in March 2022); 220 (Johnson reviewed

files on a USB from March to May 2022); 245 (Ornelas-Kuh sent Johnson documents in September

2019); 265(c) (Johnson, Bicking, Weiler, and/or Ornelas-Kuh accessed documents between 2019

and 2022). The SAC was filed on September 6, 2024, and the motion to amend on July 24, 2024.

Accordingly, CC Ford's CFAA claim is, on the face of the SAC, time-barred. *See Acrison, Inc. v.

Rainone*, No. 22-3274, 2023 WL 8166786, at *2 (3d Cir. Nov. 24, 2023).

---

[31]  CC Ford's server is a SharePoint server (SAC ¶ 67) and SharePoint servers are web-based
accounts so fall outside of the CFAA's ambit. *Graham Eng'g Corp. v. Adair*, No. 16-cv-2521,
2021 WL 9204331, at *21 (M.D. Pa. Feb. 10, 2021).

[32]  To the extent the data accessed and/or deleted was on a computer rather than a web-based
account, such as the allegations regarding Johnson's CC Ford-issued laptop, there is no
allegation—and it would be implausible to allege in any event—that the Former CC Ford
Employees did not have authorization to access data on their own work computers.

## VI.    The Tortious Interference Claims Fail (Counts 8, 9, & 14)

CC Ford claims that PEC and Manning tortiously interfered with (1) its contractual relationships with clients, vendors, and suppliers, and with potential future relationships with clients and vendors (Counts 8 and 9); (2) its employment contracts with Johnson (Counts 8 and 14); and (3) its employment contracts with Bicking, Weiler, and Ornelas-Kuh (Counts 8 and 14). These claims fail for a myriad of reasons.

### A.    PEC and Manning's Engagement of PVI and Former CC Ford Employees was Expressly Authorized by the MSA So Cannot be Tortious

As an initial matter, exercising a right under a contract "cannot result in the imposition of tort liability." *Levin v. Kuhn Loeb & Co.*, 417 A.2d 79, 86 (N.J. App. Div. 1980). "[S]omething that a person has a legal right to do cannot serve as the basis for a malicious interference with contract claim when it is done." *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035, 1052 (D.N.J. 1990); *see Rothermel v. Int'l Paper Co.*, 394 A.2d 860, 864 (N.J. App. Div. 1978) ("Basic to our free enterprise system is the right to enter or to refrain from entering or continuing a contractual relationship. Rejection of an offer, or termination of a contract in accordance with its express terms, is a right the exercise of which is unencumbered by the threat of tort liability."); *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 525 (D.N.J. 1998); *MacDougall v. Weichert*, 144 N.J. 380, 404 (N.J. 1996). In particular, "[t]he nature of the consulting business involves close contact between the consultants and the ... employees of the client. It is a personalized service giving rise to an interest in the public to choose among competing providers." *Newport Cap. Grp., LLC v. Loehwing*, No. 11-cv-2755, 2013 WL 1314737, at *10 (D.N.J. Mar. 28, 2013) (refusing to enforce non-solicitation covenant that would impair prospective consulting clients), *adhered to on reconsideration*, No. 11-cv-2755, 2013 WL 1704884 (D.N.J. Apr. 19, 2013).

30

Here, CC Ford's tortious interference claims against PEC and Manning are premised on PEC's and Manning's hiring PVI and/or the Former CC Ford Employees working on PEC projects.[33]  But these engagements were authorized under the MSA, under which CC Ford agreed that (i) it was not guaranteed any work or designated as PEC's exclusive vendor for any services, (ii) PEC could use the services of "any third party" to work on any Services, including Services subject to active (or hoped for) SOWs, and (iii) PEC was permitted to terminate the MSA at any time for any reason (or no reason).  MSA ¶¶ 1.1, 2.6, 8, 8.3, 8.4.

Therefore, PEC and Manning were fully authorized "to obtain the services *of any third party*"—including any Former CC Ford Employee or PVI—"to perform any or all of the Services" that CC Ford hoped to work on.  MSA ¶ 2.6 (emphasis added).  PEC and Manning were also fully authorized to stop working with CC Ford, even on SOWs that CC Ford hoped to work on.  *Major League*, 729 F. Supp. at 1052  ("[T]he termination of an existing contract according to its own terms cannot give rise to a malicious interference with contract claim.").

For this reason alone, CC Ford's tortious interference claims cannot survive.

### B.    CC Ford Otherwise Fails to State a Tortious Interference Claim Against PEC or Manning

CC Ford also fails to sufficiently plead the elements of its tortious interference claims. "Under New Jersey law, to state a prima facie case for tortious interference with both an existing contract and a prospective economic advantage, a plaintiff must show that (1) the plaintiff had an existing contract or reasonable expectation of economic benefit or advantage, (2) the defendant

---

[33] The SAC also references interference with CC Ford's relationships with other (unnamed) "vendors and suppliers."  SAC ¶ 381.  But it appears that those allegations relate to the Former CC Ford Employees, and not to PEC or Manning.  *See id.* ¶ 385 (alleging only that PEC and Manning interfered with CC Ford's contracts with the Former CC Ford Employees, as well as with CC Ford's "contractual relations and prospective economic advantage with its clients").

knew of the contract or expectancy, (3) the defendant wrongfully interfered with that contract or expectancy, (4) it is reasonably probable that the loss of the contract or prospective economic gain was a result of the interference, and (5) damages resulted from the interference." *Mayer v. Mayer*, No. 23-cv-2272, 2024 WL 1283826, at *6 (D.N.J. Mar. 26, 2024) (citation and internal quotation marks omitted). For interference to be wrongful, it must be done "intentionally and without justification or excuse." *MB Imports, Inc. v. T & M Imports, LLC*, No. 10-cv-3445, 2012 WL 5986454, at *8 (D.N.J. Nov. 28, 2012). It must also be done with "specific knowledge of the contract right upon which [defendant's] actions infringe" and specific knowledge "that the interference is certain or substantially certain to occur as a result of [defendant's] action." *Lenchitz v. Cenlar FSB*, No. 22-cv-07216, 2024 WL 1052000, at *7 (D.N.J. Mar. 11, 2024) (quoting *DiGiorgio Corp. v. Mendez and Co., Inc.*, 230 F. Supp. 2d 552, 558 (D.N.J. 2002)).

### 1. There Are No Allegations that PEC or Manning Interfered with CC Ford's Client and Vendor Business Relationships

The SAC contains threadbare, group allegations that all Defendants interfered with CC Ford's "contractual relations and prospective economic advantage" (SAC ¶ 385), by "diverting" the business of CC Ford's clients and vendors from CC Ford to PVI, and utilizing CC Ford's "confidential and proprietary information, goodwill, and trade secrets to lure away existing clients with future business and prospective clients from [CC Ford]" (SAC ¶ 397). As discussed *supra* Section II.A., these group pleadings are insufficient.[34]

---

[34] The literal application of CC Ford's group pleadings results in absurd positions. For example, CC Ford alleges that "Defendants" should have worked to "secur[e] [the] business [of current and prospective clients] for [CC Ford]." SAC ¶ 397. But PEC and Manning—who were CC Ford's clients and company outsiders—cannot plausibly have any duty to help "secur[e] … business for [CC Ford]." SAC ¶ 397. Additionally, CC Ford alleges that "Defendants" solicited three pharmaceutical companies, including PEC—but PEC cannot solicit itself and tortiously interfere with its own contracts and business relationships, nor could Manning acting as PEC's president. *See Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989).

Moreover, there are no allegations that PEC or Manning had actual knowledge of any of CC Ford's other client contracts, or any prospective relationships, to have been able to "interfere" with them.  *See Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013) ("Actual knowledge of the contract with which a defendant supposedly interfered is a prerequisite to making out a claim for tortious interference."); *LY Berditchev, Corp. v. Truss Cosms. Corp.*, No. 22-cv-04242, 2023 WL 334539, at *6 (D.N.J. Jan. 20, 2023) ("To state a claim for tortious interference [with prospective economic advantage] under New Jersey law, a plaintiff must allege … the defendant's knowledge of that expectancy.").

Accordingly, CC Ford fails to state a claim as to PEC or Manning for tortious interference with its business relationships with other companies.

### 2.    There Is No Plausible Theory that PEC or Manning Interfered with CC Ford's Contracts with Jennifer Johnson

Counts 8 and 14 allege interference with Johnson's 2003 employment agreement ("Johnson Employment Agreement") (attached as Lonergan Decl. Ex. E), 2022 consulting agreement ("Johnson Consulting Agreement") (SAC Ex. B (ECF No. 92-2)), and 2022 confidentiality agreement ("Johnson Confidentiality Agreement") (SAC Ex. A (ECF No. 92-1)).  *See* SAC ¶¶ 385, 436-437, 441.[35]

---

[35] The Court may consider these agreements as they are attached to the SAC and/or "integral to or explicitly relied upon in the complaint."  *Burlington*, 114 F.3d at 1426.  The agreements form the basis of some of CC Ford's allegations—they are agreements that were allegedly tortiously interfered with—and portions of them are quoted in the SAC.  *See, e.g.*, SAC ¶ 115-118.  The agreements not attached to the SAC were attached as exhibits to the FAC.  *See* ECF No. 9-1.

a.    **Claims Based on Johnson's 2003 Employment Agreement Fail Because the Agreement Was Not Operative**

CC Ford's claims based on the one-year noncompete and two-year non-solicitation provisions in the Johnson Employment Agreement fail.  *See* SAC ¶¶ 118, 119.  This Court has already concluded that this 2003 agreement was not operative, or timely to support a claim:

> [T]he Court is not convinced that any enforceable agreement currently exists to preclude [Johnson] from competing with the company, thus precluding a finding of irreparable harm from defendants' ongoing competition.  Defendants point out that plaintiff is not even a party to the 2003 agreement, which is between Johnson and CC Ford Marketing Group, LLC, a different entity than plaintiff, and in any event, the non-compete/non-solicit obligations under that agreement expired at the latest in 2015.  The fact that plaintiff attempted to take this 2003 agreement by assignment dated September 11, 2022, presumably in anticipation of filing this request for injunctive relief, calls into serious question its enforceability.

Transcript, Motion for an Order to Show Cause, October 24, 2022 (ECF No. 31).

As the Court identified, Johnson's non-compete was part of her 2003 employment agreement with CC Ford Marketing Group, LLC ("CC Ford Marketing"), a different legal entity than the plaintiff in this case, CC Ford Group West, LLC.  SAC ¶ 117; *see also* Johnson Employment Agreement.  CC Ford Marketing—renamed CC Ford Group LLC—filed a certificate of cancellation in 2004.[36]  *See* Certificate of Cancellation (May 7, 2004) (attached as Lonergan Decl. Ex. F).  As a canceled company, CC Ford Marketing could "carry on no business" other than for the purpose of "winding up its affairs," and undertaking certain specified actions.  NJ Rev. Stat. § 14A:12-9.  CC Ford was not established until 2013, and Johnson began working for CC Ford in that same year.  *See* SAC ¶¶ 1, 117.  Thus, because the non-compete provision lasted for one year

---

[36]  The Court may take judicial notice of the Certificate of Cancellation, as it is a public record. *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 319 (D.N.J. 2014) (citing *Buck,* 452 F.3d at 260).

and the non-solicit provision lasted for two years, any enforceability of Johnson's Employment Agreement had ended by (at the latest) 2015. *See* SAC ¶¶ 118, 119.

Additionally, the September 2022 assignment of the Johnson Employment Agreement by CC Ford Marketing—a company that had not existed for 18 years—to CC Ford—a company Johnson was no longer employed by—was invalid, ineffectual, and the term of any non-compete and non-solicitation provisions that it purported to assign had long ago lapsed. *See* September 2022 Assignment (attached as Lonergan Decl. Ex. G).[37]  *H.K. Co. v. Mori Lee Assocs., Inc.*, No. 85-cv-9929, 1989 WL 297953, at *1 (S.D.N.Y. June 28, 1989) ("[A] New Jersey corporation dissolved in accordance with NJ Rev. Stat. § 14A:12-9 'may not transfer its assets or sue as a means of continuing its business; it may only do so pursuant to winding up procedures.'").

Even assuming, *arguendo*, that the September 2022 Assignment was valid and its provisions effective, PEC and Manning cannot have tortiously interfered before the assignment was made, nor before CC Ford notified them of the assignment—and there is no allegation that CC Ford notified them of the assignment until September 22, 2022. *See* SAC ¶ 213; *see also Florian*, 11 F. Supp. 2d at 525 ("A person cannot intentionally interfere with a contract that he knows nothing about."); *DiGiorgio*, 230 F. Supp. 2d at 564 ("General knowledge of a business relationship is not sufficient; the defendant must have specific knowledge of the contract right.").

   **b.    PEC and Manning Could Not Have Tortiously Interfered with the Non-Solicitation Provision of Johnson's 2022 Consulting Agreement**

CC Ford's claim that PEC and Manning tortiously interfered with the Johnson Consulting Agreement also fails. *See* SAC ¶ 114-115.  The Johnson Consulting Agreement does not contain

---

[37]  The Court may consider the September 2022 assignment, as it is "integral to or explicitly relied upon in the complaint." *Burlington*, 114 F.3d at 1426. *See* SAC ¶ 117. The assignment was also an exhibit to the FAC. *See* ECF No. 9-1.

a non-compete provision and, in fact, specifically provides that "[CC Ford] expects that [Johnson] will pursue other business opportunities during the term of this Agreement." Johnson Consulting Agreement. And there cannot have been a violation of the non-solicitation provision of the Johnson Consulting Agreement, because it was executed *after* Johnson's alleged solicitation of PEC: PEC and PVI signed the PVI MSA on March 28 and 29, 2022 (*see* SAC ¶ 173), and the Johnson Consulting Agreement became binding subsequently on March 31, 2022 (the date Johnson signed it). *See* Johnson Consulting Agreement. Any solicitation by Johnson, then, necessarily occurred *before* the non-solicitation provision became effective.

Additionally, CC Ford does not allege that PEC or Manning had knowledge of the terms of Johnson's Consulting Agreement at the time of any purported solicitation—a necessary element of a tortious interference claim under New Jersey law. *Mylan*, 723 F.3d at 422 (requiring "[a]ctual knowledge of the contract with which a defendant supposedly interfered"). Again, the SAC alleges that PEC was informed of the terms of the Consulting Agreement on September 22, 2022, six months after PEC signed the PVI MSA and any purported solicitation occurred. *See* SAC ¶ 213. Without a copy of Johnson's Consulting Agreement (which did not even exist at the time), PEC and Manning could not have been aware of its terms, and "[a] person cannot intentionally interfere with a contract that he knows nothing about." *Florian*, 11 F. Supp. 2d at 525; *Mylan*, 723 F.3d at 422 ("[W]ithout knowledge of the specific contractual right, [defendant] cannot be deemed to have intentionally interfered with that right.").

Finally, even if Johnson solicited PEC in violation of her Consulting Agreement, that does not constitute tortious interference by PEC or Manning. The non-solicitation provision bars *Johnson* from soliciting PEC; it does not prohibit PEC or Manning from being solicited by Johnson (nor could it, given that PEC and Manning are not parties to Johnson's Consulting Agreement).

36

Being subjected to the solicitation of another cannot constitute tortious interference by the recipient of the solicitation. *See MB Imports*, 2012 WL 5986454, at *8 (requiring interference be "intentional[] and with malice").[38]

### 3. There Was No Interference with CC Ford's Contracts with Ornelas-Kuh, Bicking or Weiler

Counts 8 and 14 allege that PEC and Manning interfered with the non-compete, non-solicit, and confidentiality provisions in CC Ford's employment contracts with Bicking, Weiler, and Ornelas-Kuh. *See* Weiler Duty of Loyalty and Confidentiality Agreements (together, "Weiler Employment Agreements") (attached as Lonergan Decl. Exs. H & I, respectively); Bicking Duty of Loyalty and Confidentiality Agreements (together, "Bicking Employment Agreements") (attached as Lonergan Decl. Exs. J & K, respectively).[39] These claims fail for numerous reasons.

#### a. CC Ford Fails to Allege that PEC or Manning had Knowledge of Bicking's, Weiler's, or Ornelas-Kuh's Employment Agreements

CC Ford concedes that, at the time PEC began using PVI as a vendor, Manning and PEC were unaware of the terms of the non-compete provisions in Bicking's and Weiler's Duty of

---

[38]  CC Ford also claims in passing that PEC and Manning tortiously interfered with Johnson's, "Confidentiality Agreement with [CC Ford]" (*see* SAC ¶ 441), but similar to CC Ford's claims concerning the Johnson Consulting Agreement, this claim fails because there are no allegations regarding how Manning or PEC interfered with the agreement, nor are there any allegations distinguishing the information that is the purported subject of the alleged violation from Confidential Information that is the rightful property of PEC. *See* MSA ¶ 6.3. Further, PEC and Manning cannot have tortiously interfered with it before the date Johnson signed it or before they were aware of its terms, and there are no allegations that PEC or Manning were aware of the Confidentiality Agreement prior to September 2022—long after any tortious interference could have occurred. SAC ¶¶ 173, 213.

[39]  The Court may consider Bicking's and Weiler's Employment Agreements as they are "integral to or explicitly relied upon in the complaint." *Burlington*, 114 F.3d at 1426. CC Ford alleges that they were tortiously interfered with, and portions of the agreements are quoted in the SAC. *See* SAC ¶¶ 297-312, 318-332. The Employment Agreements were attached as exhibits to the FAC. *See* ECF Nos. 9-1, 9-2. Additionally, Ornelas-Kuh's employment agreements are not alleged to have been sent to PEC or Manning and have not been filed on the public docket.

Loyalty Agreements. *See* SAC ¶ 213. It was not until months after PEC started working with PVI that CC Ford provided notice of its Employment Agreements with Bicking and Weiler in a September 22, 2022 letter. *Id.*

As a result, any tortious interference claim must be limited to events *after* September 22, 2022—and there are no specific allegations in the SAC regarding conduct during that period. *See Mylan*, 723 F.3d at 422 (requiring "actual knowledge" of the contract); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1170 (3d Cir. 1993) (finding it "axiomatic that a defendant cannot be liable for interfering" with an unknown contract). CC Ford's claim also fails because it has not (and cannot) allege any damages caused by PEC and Manning based on Bicking or Weiler (as opposed to another PVI employee) working on PEC projects during this period.

With regard to Ornelas-Kuh, there is no allegation that PEC or Manning ever had any interaction with him or were aware of the terms of his employment contract prior to (at the earliest) plaintiff's filing of its motion to amend in 2024, which was after the non-compete in the agreement had expired.[40] *See* SAC ¶¶ 213 (not alleging any notice regarding agreements with Ornelas-Kuh); 342, 358. This alone is sufficient grounds to dismiss CC Ford's claims regarding Ornelas-Kuh.

> **b.    PEC and Manning, as Customers, Were Not Responsible for Policing Bicking's, Weiler's, and Ornelas-Kuh's Adherence to their Employment Agreements**

The central premise of CC Ford's tortious interference claim with respect to Bicking, Weiler, and Ornelas-Kuh rests on the faulty premise that PEC and Manning—as CC Ford's customers—were responsible for ensuring that PVI's employees did not breach their contractual obligations to their prior employer, CC Ford. This theory is entirely backwards.

---

[40] There are also no allegations that he ever worked on any projects for PEC.

PEC and Manning are not alleged to have engaged PVI with the intent of affecting Weiler's, Bicking's, or Ornelas-Kuh's specific contracts.[41] *Lightning Lube*, 4 F.3d at 1170 ("To subject the actor to liability, his conduct must be intended to affect the contract of a specific person." (citing *Restatement (Second) of Torts* § 766, comment p)). Instead, the main allegation against PEC and Manning is that they entered into an MSA with PVI, for work to be done by PVI—that happened to involve former CC Ford employees. *See, e.g.*, SAC ¶¶ 171-172, 179, 191. PEC did not contract with Bicking, Weiler, or Ornelas-Kuh, specifically, nor did the PVI MSA specify that any of PEC's work was to be done by these individuals. Nor is it alleged that PEC or Manning knew of the non-competes in the former CC Ford employees' contracts with CC Ford. *See Robert Edward Auctions, LLC v. Nash*, No. 10-cv-3759, 2010 WL 11695034, at *3 (D.N.J. Nov. 5, 2010) ("a defendant cannot be liable for interfering with a contract or relationship of which the defendant is unaware"). It is entirely ungrounded to expect PEC and Manning to police PVI or the contracts of its affiliates' employees. *See id.* (defendants not responsible for non-party's debt to plaintiff where there was no allegation of knowledge). To the extent CC Ford has a claim related to these Employment Agreements, it is against the former employee and/or her new employer—not each and every customer of the new employer. To hold otherwise would be akin to holding that medical patients are liable for tortious interference if they are treated by a doctor who is bound by a restrictive covenant to a former medical practice.

The SAC also alleges that PEC and Manning tortiously interfered with CC Ford's contracts with Ornelas-Kuh, Bicking, and Weiler by advising "Johnson concerning how she should go about … hir[ing] Bicking, Weiler, and/or Ornelas-Kuh to work for PVI and/or how to hide from [CC Ford] their wrongful conduct, both before and after they left, in violation of their various

---

[41] In fact, Ornelas-Kuh is not alleged to have worked for PVI or worked for PEC.

agreements." SAC ¶ 436. This allegation fails because it lacks any factual support and is premised exclusively "upon information and belief." Speculation amounting to no "more than the mere possibility of misconduct" is not sufficient to state a tortious interference claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citation omitted).[42]

### 4.    PEC and Manning Did Not Tortiously Interfere with Bicking's or Weiler's Non-Compete Provisions While They Were Employed By CC Ford

CC Ford also alleges that Bicking and Weiler performing work for PEC on PVI's behalf while they were still employed by CC Ford constitutes tortious interference by PEC and Manning.[43] *See* SAC ¶¶ 438-40. This claim fails for two reasons.

*First*, the non-compete provisions in Bicking's and Weiler's Duty of Loyalty Agreements applied only "[d]uring the Restricted Period," which is the "twelve (12) months *after* Executive's employment with the Company terminates[.]" Weiler Duty of Loyalty Agreement ¶ 1(d) (emphasis added); Bicking Duty of Loyalty Agreement ¶ 1(d) (same). As such, CC Ford cannot sustain a claim for tortious interference of these provisions based on conduct that occurred prior to the termination of their employment.[44]

---

[42] Further, "a party may not be held liable for tortious interference for merely providing truthful information to one of the contracting parties." *Luttmann v. Tiffany & Co.*, No. 07-cv-3521, 2009 WL 197520, at *3 (D.N.J. Jan. 26, 2009) (citing Restatement (Second) of Torts § 772(a)). Nor may a party be held liable for providing "honest advice within the scope of a request for that advice." Restatement (Second) of Torts § 772(b) (1977); *id.* at comment c (noting that "the rule protects the amateur as well as professional advisor"). The SAC makes no attempt to overcome these obstacles.

[43] CC Ford alleges that this work was "converted to PVI and/or PVP upon PVI and/or PVP being hired by PEC." SAC ¶ 440.

[44] Bicking's and Weiler's employment did not end until May 20, 2022, and May 25, 2022, respectively. SAC ¶¶ 327 (Bicking); 316 (Weiler).

*Second*, the MSA permits work to be transferred from one vendor to another, describes how the transfer shall occur and specifies the payments that CC Ford is, and is not, entitled to receive. *See* MSA ¶ 8.7; *see also id.* at Ex. A ("No payment will be made for any work or services initiated prior to a fully executed SOW" and "[u]nder no circumstance may work begin before the SOW is fully executed"). If CC Ford believes that it is entitled to payment for certain work that was performed by Bicking or Weiler, it should have issued an invoice for the work. It did not. In any event, if PEC had disputed the charge, this would have amounted to a run-of-the-mill invoice dispute; it cannot now be recast as a tortious interference claim.

### 5. PEC and Manning Did Not Tortiously Interfere with the Non-Solicit Provisions of Ornelas-Kuh's, Bicking's, or Weiler's Contracts

CC Ford's claim that PEC and Manning tortiously interfered with the non-solicitation provisions in Bicking's, Weiler's, and Ornelas-Kuh's Duty of Loyalty Agreements should be dismissed. These provisions prohibit Bicking, Weiler and Ornelas-Kuh *from soliciting CC Ford employees only*; they do not prohibit solicitation of CC Ford *clients*. *See* SAC ¶¶ 305 (signatory may not solicit "any employee of Company or any of its Affiliates or … solicit or encourage any employee of Company or any of its Affiliates to leave the employ of Company or such Affiliate …."), 325 (same), 345 (same). Further, like the non-compete provisions, the non-solicitation provisions apply only during the period 12-month period *after* employment is terminated. Any PVI solicitation of PEC and Manning occurred on or before March 28, 2022, at which point Bicking, Weiler, and Ornelas-Kuh were still employed by CC Ford. *See* SAC ¶¶ 316, 327, 358.[45]

\*      \*      \*

---

[45] CC Ford also claims in passing that PEC and Manning tortiously interfered with Weiler's and Bicking's Confidentiality Agreements with CC Ford. SAC ¶ 441. This unsupported claim fails for all of the same reasons that CC Ford's tortious interference claim regarding Johnson's Confidentiality Agreement fails. *See supra* note 38.

For these reasons, CC Ford's tortious interference claims cannot stand, and Counts 8, 9 and 14 should be dismissed.

## VII.    CC Ford's Unfair Competition Claim Fails (Count 10)

Count 10 alleges unfair competition under New Jersey law, which is "generally defined as the misappropriation of one's property by another which has some sort of commercial or pecuniary value." *Voorhees v. Tolia*, No. 16-cv-8208, 2022 WL 18024216, at *9 (D.N.J. Dec. 31, 2022) (cleaned up).  Ordinarily, unjust enrichment "takes the form of palming off another's goods as your own." *Duffy v. Charles Schwab & Co.*, 97 F. Supp. 2d 592, 600 (D.N.J. 2000) (citation omitted).

CC Ford's allegations in support of Count 10 have no applicability to PEC or Manning. CC Ford alleges that the unfair competition was: (i) "Johnson, Bicking and Weiler's use of the [CC Ford] brand in their LinkedIn pages … to make it appear that PVI, PVP, Johnson, Bicking and Weiler would be providing services through the known entity [CC Ford] and used that practice for their own benefit" (SAC ¶ 403); (ii) "stealing of [CC Ford]'s confidential and proprietary information and trade secrets," (*id.* ¶ 404); and (iii) "PVI's hiring of Ornelas-Kuh" (*id.* ¶ 404). None of these acts involve PEC or Manning, and the claim makes no sense as to them because they do not compete with CC Ford and thus could not use information allegedly stolen by the Former CC Ford Employees to compete unfairly.[46]  *See New Jersey Optometric Ass'n v. Hillman-Kohan Eyeglasses, Inc.*, 365 A.2d 956, 965 (N.J. Ch. Div. 1976) (dismissing unfair competition claim because the parties were not competitors), *aff'd*, 388 A.2d 1299 (N.J. App. Div. 1978).

---

[46]  Similar to Count 12, it is likely that Count 10 was asserted against PEC and Manning in error. Indeed, in both instances, CC Ford requests that PEC be enjoined from doing business with itself. SAC, pp. 97-98; *see supra* note 26.

## VIII.    CC Ford's Trespass to Chattel and Conversion Claims Fail (Count 11)

CC Ford's trespass to chattel and conversion claims—both alleged in Count 11—are based on allegations similar to those underpinning its trade secret claims: "Defendants [took] CCFW's confidential and proprietary information and trade secrets without permission and have deprived [CC Ford] of same."  SAC ¶¶ 408-416.  These claims fail as a matter of law because "confidential and proprietary information and trade secrets" are intangible property, and both trespass to chattel and conversion require that the property be tangible property.[47]  *See Argush v. LPL Fin. LLC*, No. 13-cv-7821, 2014 WL 3844822, at *6 (D.N.J. Aug. 5, 2014) (characterizing "electronic files or information" as "intangible property" unfit for a conversion claim); *iPurusa, LLC v. Bank of N.Y. Mellon Corp.*, No. 22-cv-00966, 2023 WL 3072686, at *10 (D.N.J. Apr. 25, 2023) ("The tort of conversion may be applied only to interference with tangible property, and courts have consistently held that intangible property cannot be the subject of such a claim." (citation omitted)); *id.* ("Like conversion, trespass to chattels requires tangible personal property[.]").

## IX.    CC Ford's Unjust Enrichment Claim Fails (Count 16)

The SAC also fails to plead the elements of unjust enrichment, namely that: "(1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it."  *Mason v. Coca-Cola Co.*, No. 09-cv-0220, 2010 WL 2674445, at *7 (D.N.J. June 30, 2010).  The only allegation in support of the unjust enrichment claim is that "Defendants received benefits from Plaintiff including, *inter alia*, income and COBRA payments, access to Company documents including

---

[47]  Count 11 also alleges trespass to chattel and conversion against Johnson and Ornelas-Kuh based upon Johnson not returning to CC Ford her "Company laptop, keys, and American Express credit card" and Ornelas-Kuh taking "confidential documents."  SAC ¶¶ 409, 412.  Obviously, these allegations are against Johnson and Ornelas-Kuh only.  *See* SAC ¶ 413.

client and vendor lists and proprietary pricing and marketing information, and thus were unjustly enriched." SAC ¶¶ 450-452. This claim should be dismissed as to PEC and Manning for the following reasons:

*First*, there are no allegations specific to PEC or Manning. They are not alleged to have received "income and COBRA payments" from CC Ford, nor is it alleged that either had access to, or received a benefit from CC Ford's "documents including client and vendor lists and proprietary pricing and marketing information."[48] SAC ¶ 451.

*Second*, CC Ford does not allege any direct benefit conferred on PEC or Manning (nor could it). And any benefit purportedly conferred upon another Defendant, such as PVI, PVP, or the Former CC Ford Employees, cannot be imputed on PEC or Manning as "a plaintiff must have conferred a *direct* benefit on the defendant." *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 459 (D.N.J. 2012) (emphasis added).

*Third*, a claim for unjust enrichment "requires a plaintiff to show that it expected remuneration from the defendant *at the time it performed or conferred a benefit* on defendant."[49] *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994) (emphasis added). Here, CC Ford does not allege that it expected remuneration from PEC or Manning at the time that any benefit was purportedly conferred. *See Cafaro v. HMC*, No. 07-cv-2793, 2008 WL 4224801, at *12 (D.N.J. Sept. 8, 2008) (dismissing unjust enrichment claim where "plaintiffs could not have anticipated—let alone expected—remuneration").

---

[48] As clients of CC Ford—not competitors—they would have no use for "client and vendor lists and proprietary pricing and marketing information." SAC ¶ 451. Any information potentially beneficial to them would have been PEC's property under the MSA, so any benefit from accessing its own property would not have been at *CC Ford's* expense. *See* MSA ¶¶ 6.1, 6.3, 7.2.

[49] Unjust enrichment is not an independent tort cause of action. *Mason*, 2010 WL 2674445, at *7. Rather, it requires a quasi-contractual relationship, and courts routinely dismiss unjust enrichment claims that are merely tort claims. *E.g.*, *id.*; *Cafaro*, 2008 WL 4224801, at *12.

**X.    Leave to Replead Should be Denied, and the Case Should be Dismissed With Prejudice**

This case should be dismissed with prejudice as to PEC and Manning.  Repleading would be futile—the case is already nearly three years old, and the parties have already conducted discovery.  Indeed, fact discovery closed nearly one year ago.  If CC Ford cannot state viable claims after all this time, and following years of discovery, repleading will surely be futile.  *See Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 74 (3d Cir. 1994) (noting, where plaintiff sought to add facts to a twice-amended complaint, "three attempts at a proper pleading is enough"); *Higgins v. Route 17 Auto., LLC*, No. 11-cv-6240, 2012 WL 3284846, at *4 (D.N.J. Aug. 10, 2012) (dismissing with prejudice where "plaintiff has been granted leave to amend his pleadings numerous times—most recently in April of this year, when discovery was well underway" and noting that "the availability of discovery readily supports this Court's finding of futility"); *Zavala*, 447 F. Supp. 2d at 388 (dismissing second amended RICO claim with prejudice as "the absence of a viable theory . . . is clear" and repleading would be futile), *aff'd*, 691 F.3d 527 (3d Cir. 2012).

## <u>CONCLUSION</u>

For the foregoing reasons, all claims against PEC and Manning in the SAC should be dismissed with prejudice—and any request for leave to replead should be denied.

Respectfully submitted this 18th day of November 2024,

ARNOLD & PORTER KAYE SCHOLER LLP


 s/ Samuel Lonergan
Samuel Lonergan
250 West 55th Street
New York, NY 10019-9710
(212) 836-7591
Fax:  (212) 836-8689
samuel.lonergan@arnoldporter.com

*Attorney for Defendant PharmaEssentia USA Corp.*


LAVIN, CEDRONE, GRAVER, BOYD & DISIPIO

 s/ Michael J. Quinn
Michael J. Quinn
Bloom Court Suite 307
1300 Route 73 South
Mount Laurel, NJ 08054
(856) 778-5544 X 6217
mobile: (856) 296-7152

Nicole Gueron (*pro hac vice pending*)
Clarick Gueron Reisbaum LLP
220 Fifth Avenue, 14th Floor
New York, NY 10001

*Attorneys for Defendant Meredith Manning*

46