Steven I. Adler
Todd Nosher
**MANDELBAUM BARRETT PC**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
sadler@mblawfirm.com
tnosher@mblawfirm.com
Phone: 973-736-4600
Fax: 973-325-7467

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CC FORD GROUP WEST, LLC,<br><br>Plaintiff,<br><br>v.<br><br>JENNIFER JOHNSON, CARRIE BICKING, BETH WEILER, PROJECT VELOCITY, INC., PROJECT VELOCITY PARTNERS, LLC, MEREDITH MANNING, PHARMAESSENTIA USA CORP., MATTHEW ORNELAS-KUH, and JOHN DOES 1-10,<br><br>Defendants. | CASE NO. 3:22-cv-04143<br><br>*DOCUMENT ELECTRONICALLY FILED VIA CM/ECF* |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS JOHNSON, PVI AND PVP'S JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

# <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................... 1

II.  LEGAL AUTHORITY .......................................................................................... 3

III. ARGUMENT ......................................................................................................... 5

A. Defendants' Factual Arguments Are Irrelevant and Should be Disregarded ................... 5

B. The SAC Does not Violate Rule 8 and is not "Prolix" ........................................... 7

C. Each of Plaintiff's Causes of Action are Sufficiently Pled ...................................... 9

   1.  Breach of Contract Claims .................................................................... 9

   2.  Trade Secret Claims ........................................................................... 14

   3.  Tortious Interference Claims ................................................................ 17

   4.  Unfair Competition Claims ................................................................. 20

   6.  Plaintiff's Trespass to Chattel and Conversion Claims ............................. 23

   7.  Unjust Enrichment Claims .................................................................. 24

   8.  RICO Claims .................................................................................... 26

   9.  CFAA and NJCROA Claims ................................................................ 33

   10. Misappropriation and Fraud Claims ...................................................... 35

IV.  CONCLUSION .................................................................................................... 36

4930-5375-3093, v. 1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1899 Holdings, LLC v. 1899 Liab. Co.*,
    568 Fed. Appx. 219 (4th Cir. 2014) ............................................................5

*Am. Satellite Co. v. United States*,
    20 Cl. Ct. 710 (1990) ....................................................................................5

*AMA Realty LLC v. 9440 Fairview Ave. LLC*,
    No. CIV. 13-457 KM MCA, 2014 WL 1783099 (D.N.J. May 2, 2014) ................31

*Animal Science Products, Inc. v. China Minmetals Corp.*,
    654 F.3d 462 (3d Cir. 2011) ..........................................................................3

*Apparel Bus. Sys., LLC v. Tom James Co.*,
    No. CIV.A.06-1092, 2008 WL 858754 (E.D. Pa. Mar. 28, 2008) ...................24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................1, 2, 3, 27

*B & B Microscopes v. Armogida*,
    532 F. Supp. 2d 744 (W.D. Pa. 2007) ..........................................................34

*Beck v. Prupis*,
    529 U.S. 494 (2000) .....................................................................................28

*Beijing Gongmei Imp. & Exp. Co. v. Ijbara*,
    No. 2:10-CV-02821-SDW, 2012 WL 3228711 (D.N.J. Aug. 6, 2012) ..............25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................1, 3, 4, 5

*Beta Pharma, Inc. v. InventisBio (Shanghai) Co.*,
    No. 2022 WL 17547265 (D.N.J. Dec. 8, 2022) ............................................17

*Bimbo Bakeries USA, Inc. v. Botticella*,
    613 F.3d 102 (3d Cir. 2010) ..........................................................................15

*Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) .........................................................................4

*Casper v. Paine Webber Grp., Inc.*,
    787 F. Supp. 1480 (D.N.J. 1992) ..................................................................31

*Connelly v. Lane Const. Corp.*,
809 F.3d 780 (3d Cir. 2016)..................................................................4

*Dando v. Bimbo Food Bakeries Distribution, LLC*,
2016 WL 475262 (D.N.J. Feb. 8, 2016) ..............................................20

*Doe v. Princeton Univ.*,
30 F.4th 335 (3d Cir. 2022) ........................................................ *passim*

*EnviroFinance Grp., LLC v. Envtl. Barrier Co.*,
440 N.J. Super 325 (App. Div. 2015) ....................................................9

*Fora Fin. Holdings, LLC v. Dream Data Servs., LLC*,
No. CV2300780GCJBD, 2023 WL 6049835 (D.N.J. Sept. 15, 2023) ....................17

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009)............................................................3, 23

*Frederico v. Home Depot*,
507 F.3d 188 (3d Cir. 2007)................................................................32

*Garrett v. Wexford Health*,
938 F.3d 69 (3d Cir. 2019)...................................................................9

*Giles v. Phelan, Hallinan & Schmieg, L.L.P.*,
901 F. Supp. 2d 509 (D.N.J. 2012) .......................................................9

*Givaudan Fragrances Corp. v. Krivda*,
2013 WL 5781183 (D.N.J. Oct. 25, 2013)............................................14

*Gujja v. Inpatient Servs. of New Jersey, P.C.*,
No. CV2119416MASDEA, 2022 WL 2834998 (D.N.J. July 20, 2022) ...............25

*Hill v. Com. Bancorp, Inc.*,
2012 WL 694639 (D.N.J. Mar. 1, 2012), a*ff'd sub nom. Hill v. TD Bank, NA*,
586 F. App'x 874 (3d Cir. 2014) .........................................................19

*IDT Corp. v. Unlimited Recharge, Inc.*,
Civ. A. No. 11-4992, 2012 WL 4050298 (D.N.J. Sept. 13, 2012) ...........15

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)................................................................27

*Integrated Waste Sols., Inc. v. Goverdhanam*,
No. CIV.A. 10-2155, 2010 WL 4910176 (E.D. Pa. Nov. 30, 2010) ...............33

*Kost v. Kozakiewicz*,
1 F.3d 176 (3d Cir. 1993)....................................................................5

iii

*Kuzian v. Electrolux Home Prods., Inc.*,
  937 F. Supp. 2d 599 (D.N.J. 2013) ........................................................24

*Lamorte Burns & Co. v. Walters*,
  167 N.J. 285, 770 A.2d 1158 (2001) ......................................................18

*Lum v. Bank of Am.*,
  361 F.3d 217 (3d Cir. 2004) ...................................................................27

*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir.2009) .................................................................34

*Martinez v. UPMC Susquehanna*,
  986 F.3d 261 (3d Cir. 2021) .....................................................................3

*Mendez v. Draham*,
  182 F. Supp. 2d 430 (D.N.J. 2002) ...........................................................8

*Metro. Foods, Inc. v. Kelsch*,
  2012 WL 956178 (D.N.J. Feb. 14, 2012) ...............................................19

*In re Nickelodeon Consumer Priv. Litig.*,
  827 F.3d 262 (3d Cir. 2016)....................................................................35

*Odesser v. Continental Bank*,
  676 F. Supp. 1305 (E.D.Pa.1987) ..........................................................28

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
  998 F.2d 1192 (3d Cir. 1993).....................................................................4

*Printing Mart-Morristown v. Sharp Elecs. Corp.*,
  563 A.2d 31 (N.J. 1989)..........................................................................19

*Rodgers Grp., LLC v. Lewis*,
  No. 22-482, 2022 WL 4095785 (D.N.J. Sept. 7, 2022) ....................16, 35

*S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd.*,
  181 F.3d 410 (3d Cir. 1999)......................................................................4

*Schwartz v. Laws. Title Ins. Co.*,
  970 F. Supp. 2d 395 (E.D. Pa. 2013) ......................................................31

*Shrink Packaging Sys. Corp. v. Kist*,
  No. 22-CV-04967, 2023 WL 5664733 (D.N.J. Sept. 1, 2023) ...............14

*Stratis v. BMW of N. Am.*,
  LLC, No. 222CV06929BRMJRA, 2023 WL 3092188 (D.N.J. Apr. 26, 2023) .................4, 11

iv

*Volpe v. Abacus Software Sys. Corp.*,
  No. CV2010108RMBKMW, 2021 WL 2451968 (D.N.J. June 16, 2021) .............................33

*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996)....................................................................................................7, 8

*Zakheim v. Curb Mobility LLC*,
  No. CV 22-4594, 2023 WL 5339606 (E.D. Pa. Aug. 18, 2023)............................................28

**Statutes**

18 U.S.C. § 1832(a) .........................................................................................................28, 31

18 U.S.C. § 1030(a)(5)(B)(i).....................................................................................................35

18 U.S.C. § 1030(c)(4)(A) ....................................................................................................33, 34

18 U.S.C. § 1030(e)(8)...............................................................................................................34

18 U.S.C. § 1030(e)(11)........................................................................................................34, 35

18 U.S.C. § 1341 ..................................................................................................................28, 31

18 U.S.C. § 1343 ..................................................................................................................28, 31

18 U.S.C. § 1839 .......................................................................................................................14

18 U.S.C. § 1839(3) ...................................................................................................................15

18 U.S.C. § 1961(4) ...................................................................................................................27

18 U.S.C. § 1962(c) ..............................................................................................................27, 31

Computer Fraud and Abuse Act ....................................................................................33, 34, 35

Defend Trade Secrets Act ..............................................................................................14, 15, 16

N.J.S.A. § 2C:20-3(b) ...............................................................................................................31

N.J.S.A. § 2C:20-25 ...................................................................................................................31

N.J.S.A. § 2C:20-3(b) ...............................................................................................................28

N.J.S.A. § 2C:20-25 ...................................................................................................................28

New Jersey Computer Related Offenses Act, N.J. Stat Ann. § 2A:38A–3 .................................35

New Jersey Trade Secrets Act .....................................................................................................14

4930-5375-3093, v. 1

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ....................................26

**Court Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................ *passim*

Rule 8 ......................................................................................................7, 8, 9

Rule 8(d)(2)............................................................................................25

Rule 9 ....................................................................................................31

Rule 9(b) ..............................................................................................32

Rule 11 ..............................................................................................2, 18

Rule 12(d) ..........................................................................................1, 4

4930-5375-3093, v. 1

## I.  __INTRODUCTION__

Plaintiff CC Ford Group West, LLC ("Plaintiff" or "CC Ford"), by and through its undersigned counsel, Mandelbaum Barrett P.C., respectfully submits this brief in opposition ("Opposition") to the  joint motion of Defendants Jennifer Johnson ("Johnson"), Project Velocity Inc. ("PVI"), and Project Velocity Partners, LLC's ("PVP") (collectively, "Defendants") to dismiss Plaintiff's Second Amended Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6) ("Motion"). Defendants Carrie Bicking ("Bicking") and Beth Weiler ("Weiler") have adopted the brief and supporting papers of Johnson, PVI and PVP for the purposes of the Bicking and Weiler motion to dismiss. This Opposition is, therefore, in response to both Johnson, PVI and PVP's Motion and Bicking and Weiler's Motion.

Defendants' scattered Motion fails to apply the operative standard under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Motion also impermissibly looks well beyond the four-corners of the challenged pleading, attempting to rely on, *inter alia*, Defendants' lengthy—yet irrelevant—rebuttal facts and argument, which despite taking up nearly half of Defendants' brief (*i.e.*, pages 1-11), have absolutely no bearing on the sufficiency of Plaintiff's amended pleading.[1]

Defendants also rely on an equally irrelevant comparison of the SAC with the initial New Jersey State Court pleading filed in May 2022.[2] But it is unclear why a comparison of two pleadings submitted in different courts under different procedural rules is "useful," considering the

---

[1] *Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022) ("Factual claims and assertions raised by a defendant are not part of [the 12(b)(6)] scrutiny. Otherwise, every motion to dismiss would become one for summary judgment, a step permitted only under the process outlined in Rule 12(d)").

[2] Motion at 9 ("[i]t is useful, however, to compare the SAC to CCFW's May 2022 Complaint, because the SAC is—in many ways—inconsistent with that initial pleading.").

original complaint filed by predecessor counsel is no longer the operative pleading, having been twice amended in view of subsequent and compelling discovery. And while Defendants conclude this irrelevant tangent by stating the SAC is "180-degrees from the initial Complaint, and largely incompatible with the vestigial claims that remain," that, once again, is not the standard governing this Motion. Complaint at 11.

Ultimately, Defendants come nowhere close to meeting their burden of demonstrating how the SAC lacks sufficient factual matter to state a claim that is plausible on its face, *i.e.*, setting forth factual content that allows the court to draw the reasonable inference that Defendants are liable for each claim alleged. *Iqbal*, 556 U.S. at 678. This is particularly true because Plaintiff's well-pleaded allegations are, for the purposes of Defendants' Motion, accepted as true and all reasonable inferences are drawn in Plaintiff's favor. Recognizing the infirmity of their dismissal arguments and the inability to meet their burden, Defendants instead devote their brief to scattered, irrelevant and false allegations ranging from threats of Rule 11 sanctions and exceedingly emotional, yet weak, rebuttals of fact—to repeating *ad nauseum* the SAC's page and paragraph counts and making general complaints about the age of this case.[3]

Defendants also try their hand at misdirection, stating over and over again that this is "a fourth iteration of the Complaint," as if to suggest that Plaintiff previously asserted unsuccessful claims. But Plaintiff has amended each of its prior pleadings voluntarily—not because of any successful motion to dismiss. That discovery since the initial filing of this case has led to a significant amount of compelling evidence against Defendants supporting additional claims and

---

[3] The latter claim is curious given Defendants' agreement to two mediations, repeated attempts to delay discovery, failure to produce the clearly discoverable hard drive in Johnson's possession confirming her theft of CCFW's confidential information and trade secrets, and the pending threat to file new counterclaims in response to the SAC.

the need to supplement Plaintiff's pleading—speaks merely to the strength of Plaintiff's case—not to any pleading deficiencies. Similarly, Defendants incorrectly suggest that this Court has already concluded that the 2003 agreement was not operative. But as this Court well-knows, that is not what it held, and no determination has ever been made concerning the validity or enforceability of any of the contracts in dispute.

Each of Defendants' arguments fails to meet the threshold burden for dismissal under Rule 12(b)(6). Plaintiff addresses each of Defendants' failed arguments in turn below.

## II. <u>LEGAL AUTHORITY</u>

Fed. R. Civ. P. 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. As this Court knows, when evaluating a motion to dismiss under this rule, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotations and citations omitted). A complaint will, therefore, survive a motion to dismiss if it contains enough factual matter to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The moving party bears the burden of demonstrating a failure to state a claim. *Animal Science Products, Inc. v. China Minmetals Corp*., 654 F.3d 462, 469 n. 9 (3d Cir. 2011). Importantly, a complaint need only contain a short and plain statement of the claim showing that the pleader is entitled to relief. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021). Although the plausibility standard "does not impose a probability requirement, it does require a

pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp*., 809 F.3d 780, 786 (3d Cir. 2016). In weighing a motion to dismiss, the court ultimately asks, "not whether a plaintiff will ultimately prevail <u>but whether the claimant is entitled to offer evidence to support the claim</u>." *Twombly*, 550 U.S. at 563 n.8 (emphasis added).

Moreover, the court must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits and matters of judicial notice. *S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd*., 181 F.3d 410, 426 (3d Cir. 1999). Although a court may on occasion consider certain narrowly defined materials without converting the motion to dismiss under Rule 12(d), it may do so only for a "document integral to or explicitly relied upon in the complaint" which is undisputedly authentic. *Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993). To be clear, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, <u>the facts in the complaint must prevail</u>." *Princeton Univ*., 30 F.4th at 342 (emphasis added).

Accordingly, a movant's factual claims, arguments and assertions are not part of the court's 12(b)(6) analysis. *Princeton Univ*., 30 F.4th at 340. Otherwise, every motion to dismiss would become one for summary judgment, a step permitted only under the process outlined in Rule 12(d). *Id*. "In assessing plausibility, the court may not consider any factual claims and assertions raised by a defendant." *Stratis v. BMW of N. Am*., LLC, No. 222CV06929BRMJRA, 2023 WL 3092188, at *3 (D.N.J. Apr. 26, 2023). Indeed, "the proper place to resolve factual disputes is not on a motion to dismiss, but on a motion for summary judgment." *Princeton Univ*., 30 F.4th at 342.

### III. <u>ARGUMENT</u>[4]

#### A. <u>Defendants' Factual Arguments Are Irrelevant and Should be Disregarded</u>

Defendants spend a significant part of their Motion disputing Plaintiff's well-pled facts. But Plaintiff's facts must be accepted as true for the purpose of Defendants' Motion as a matter of law. *See, e.g., Twombly*, 550 U.S. at 570. One example of the many improper fact disputes raised in their Motion is Defendants' challenge to the validity and enforceability of the operative contracts in this case. Here, Defendants claim that dismissal is required because "the alleged 2003 Non-compete Agreement is <u>not enforceable</u> by CCFW," the "2022 Consulting Agreement is expired", "<u>does not bar the alleged conduct</u> [and] in fact…expressly contemplates and <u>authorizes competition</u>." Motion at 2 (emphasis added). But these are textbook factual disputes that courts routinely reject as a basis for dismissal under Rule 12(b)(6). *See, e.g.*, *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (on a 12(b)(6) motion to dismiss, the Court cannot decide facts disputed by the parties). Their arguments, in any event, ring hollow. The Consulting Agreement, as pled in the SAC, was in effect at the time of Johnson's (and the other Defendants') wrongdoing and it is undisputed that she failed to seek CCFW's consent to compete as required by the Consulting Agreement. Her Confidentiality Agreement also undeniably was in effect. SAC ¶ 113.

Courts throughout the country consistently reject factual disputes—including disputed contracts and contractual interpretation—as the basis for a 12(b)(6) dismissal. *See e.g., Princeton Univ.,* 30 F.4th at 340*; 1899 Holdings, LLC v. 1899 Liab. Co.*, 568 Fed. Appx. 219, 224 (4th Cir. 2014) (the construction of contractual provisions is a factual determination that precludes dismissal on a motion for failure to state a claim.); *Am. Satellite Co. v. United States*, 20 Cl. Ct. 710, 713

---

[4] Plaintiff incorporates by reference Plaintiff's Opposition to defendants Manning and PEC's motion to dismiss and corresponding arguments as if set forth herein. That opposition is being filed simultaneously with this Brief.

(1990) ("Construction of a contract is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim."). This Court must likewise reject Defendants' factual disputes here.

Despite this black letter law, Defendants' Motion is replete with factual arguments and disputed facts not suitable for a 12(b)(6) motion. Below is just a sampling of such arguments, and the Court can disregard all of them because, as Defendants come right out and admit, they contravene the well-pleaded facts of the SAC and are irrelevant to the analysis governing the Motion:

- As set forth in Ms. Johnson's answer and counterclaims, this was an anti-competitive lawsuit from the start. Motion at 4.

- The SAC's allegations were utterly unsupportable, and flatly contradicted by the discovery record, which demonstrates—uniformly—that Ms. Johnson was the pivotal managing executive and driver of business for CCFW…Motion at 7-8.

- CCFW has concocted a convoluted story to turn this dispute into a vast conspiracy including RICO and computer hacking offenses…Motion at 10.

- Defendants provided detailed examples of CCFW's own discovery to date utterly refuting the proposed allegations that painted Ms. Johnson in an unprofessional light. Motion at n. 8.

- Onto these baseless personal attacks, CCFW grafts a sprawling, disjointed, and inchoate conspiracy. Motion at 11.

- Ms. Johnson attempted to open a dialogue regarding buying Mr. Studdiford out of CCFW and purchasing the company—especially because Studdiford had been uninvolved in the day-to-day of business development, operational project delivery, or client service for nearly ten years. Motion at 3.

- Studdiford, however, had been unwilling to provide financial information or negotiate in good faith, leading to Ms. Johnson's resignation and then CCFW's lawsuit. Motion at 4.

- Ms. Johnson had supposedly breached a non-compete agreement when she left CCFW to start her own business and caused irreparable injury to CCFW when several clients followed Ms. Johnson to her newly formed company, PVI. Motion at 4.

6

- the unhinged allegations levied by CCFW (many of which are echoed in the instant SAC) were utterly contradicted by the discovery record to date. Motion at 7.

- The SAC now departs substantially from the allegations in the Complaint (without actually removing the baseless core allegations that discovery proved unfounded). Motion at 10.

Defendants' comparison of the SAC and Plaintiff's original state court pleading filed over two years ago is equally irrelevant. Again, it remains unclear why a comparison of two pleadings submitted in different courts under different procedural rules is "useful." Regardless, it is just another factual dispute that cannot and does not support dismissal.

### B. __The SAC Does not Violate Rule 8 and is not "Prolix"__

As the <u>lead argument</u> to their Motion, Defendants curiously suggest that the SAC is "prolix" and "runs afoul of FCRP [sic] 8(a)(2)". Motion at 12. Notably, this position is not shared by any of the other moving defendants in this Action, who instead believe the opposite, *i.e.*, that the pleading is insufficient and bare. *See* Dkt. No. 92.

As a preliminary matter, Defendants' prolix argument rests on <u>a misstatement of law which requires correction</u>. In support of their position, Defendants cite *In re Westinghouse* and provide the court with the following parenthetical: "dismissal with prejudice under Rule 8 'does not seem to us to constitute an abuse of discretion; indeed, it makes a tremendous amount of sense.'"

But that is not what the *Westinghouse* decision holds.[5] *Compare with In re Westinghouse Sec. Litig.*, 90 F.3d 696, 703 (3d Cir. 1996). The court's "tremendous amount of sense" statement relates not to any dismissal <u>with prejudice</u>, but instead references the court's agreement with the lower court's decision "dismissing the viable portion of count I, <u>without prejudice</u> to pleading,

---

[5] Defendants' misstatements of law and selective quotations are not isolated to this particular instance—and are found in other sections of the Motion.

pursuant to Rule 8." *Westinghouse*, F.3d at 703 (3d Cir. 1996) (emphasis added). The following

excerpt of *Westinghouse* from Westlaw makes this point clear.[6]

> 3    Having reviewed plaintiffs' second amended complaint, we cannot say that the district court abused its discretion in dismissing the viable portion of count I, without prejudice to repleading, pursuant to Rule 8. The second amended complaint is unnecessarily complicated and verbose. The text of the complaint rambles for more than 600 paragraphs and 240 pages, including a 50-plus page "overview" of the alleged wrongful conduct. The district court, through the two rounds of difficult motions, had narrowed plaintiffs' claims. The court then ordered plaintiffs to submit a third amended complaint containing only those allegations relevant to what were, in the court's view, the remaining viable claims. This does not seem to us to constitute an abuse of discretion; indeed, it makes a tremendous amount of sense. See generally 🚩 *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1544 (9th Cir.1994) (en banc) ("We see nothing to prevent the district court, on remand, from requiring, as a matter of prudent case management, that plaintiffs streamline and reorganize the complaint before allowing it to serve as the document controlling discovery, or, indeed, before requiring defendants to file an answer.").

In fact, the only dismissal <u>with prejudice</u> in *Westinghouse* was for claims that were

voluntarily withdrawn by plaintiff. *Id*. "([w]e further hold that <u>the district court did not abuse its</u>

<u>discretion when it dismissed with prejudice the otherwise viable claims from Count I following</u>

**<u>plaintiffs' decision not to replead those claims</u>** in accordance with Rule 8… The district court

expressly warned plaintiffs that failure to replead the remaining claims in compliance with Rule 8

would result in the dismissal of those claims. The dismissal with prejudice that followed plaintiffs'

decision not to amend was not an abuse of discretion.") (emphasis added).

Therefore, Defendants' characterization of *Westinghouse*—which forms the basis of their

prolix argument—is at best sloppy and at worst a misrepresentation of the law.

Defendants' remaining case citations are equally inapposite and generally relate to motions

to strike, which even in cases where such motions were granted, the courts provided plaintiffs

leave to further amend consistent with Rule 8. *See Mendez v. Draham*, 182 F. Supp. 2d 430, 433

---

[6] The dismissal was only after "two rounds of difficult motions…" *Id*.

(D.N.J. 2002) ("I will grant the Defendants' Motion to Strike the Complaint. The Plaintiffs may seek leave to refile an Amended Complaint within 30 days of the date of this Opinion and Order."); *Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, 901 F. Supp. 2d 509, 531 (D.N.J. 2012) ("The Giles' RICO claim will be stricken without prejudice and with leave to amend."). In fact, in the *Garett* decision cited by Defendants, the Third Circuit actually found "that the District Court <u>abused its discretion in ordering dismissal [for a purported prolix complaint]</u>". *Garrett v. Wexford Health*, 938 F.3d 69, 94 (3d Cir. 2019) ("the District Court abused its discretion in ordering dismissal here.").

Therefore, Defendants cite no authority—and indeed there is no authority—supporting the baseless argument that the SAC should be dismissed with prejudice for failure to comply with Fed. R. Civ. P. 8 or otherwise being "prolix." Repeating the SAC's page and paragraph count *ad nauseum* does not change this fact.

**C.  <u>Each of Plaintiff's Causes of Action are Sufficiently Pled</u>**

Defendants' remaining arguments as to each asserted cause of action likewise fail to meet the threshold for dismissal under Fed. R. Civ. P. 12(b)(6). Each challenged cause of action is addressed in turn below.

**1.  <u>Breach of Contract Claims</u>**

To sufficiently plead breach of contract under New Jersey law, a plaintiff must only allege "a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and a breach causing the Plaintiff to sustain damages." *EnviroFinance Grp., LLC v. Envtl. Barrier Co.*, 440 N.J. Super 325, 345 (App. Div. 2015). The SAC easily meets these requirements. *See, e.g.*, SAC ¶¶ 293-363.

Indeed, the SAC alleges, *inter alia*, that:

294.    As set forth above, Johnson's 2003 Non-Compete Agreement and 2003 Confidentiality Agreement, Johnson's March 2022 Consulting Agreement, and Johnson's March 2022 Confidentiality Agreement constitute valid and enforceable contracts between Plaintiff and Johnson.

295.    Johnson intentionally breached the aforementioned agreements as set forth above and herein and, in breach of the Consulting Agreement, failed to inform the Company that she was engaging in work during the Consulting period that was a conflict of interest with the work she was performing for the Company.

296.    Johnson also breached her agreement with CCFW by failing to reimburse it for up-front monthly payments it made for her COBRA coverage. Despite repeated requests, Johnson has failed to reimburse CCFW for the monthly premiums since January 2023 and owes CCFW $7,331.22.

119.    Pursuant to Johnson's Non-Compete Agreement, Johnson also agreed for a period of two years not to solicit for any "competitive business" (defined therein), directly or indirectly, any account, client or customer with whom CC Ford Group had conducted business or for whom it had performed services during the one-year period prior to Johnson's termination. Pursuant to Johnson's Non-Compete Agreement, Johnson also agreed not to solicit CCFW employees and not to disparage CC Ford Group in a manner resulting in harm to or loss of the CC Ford Group's business subsequent to her employment's termination.

120.    At no point did Johnson abide by these agreements.

125.    Thereafter, Johnson, while a CCFW consultant, and Bicking and Weiler, as CCFW employees, continued to clandestinely work on PEC projects that Manning and PEC had just terminated CCFW from performing. Unbeknownst to the Studdifords, PEC and Manning directed Johnson, Bicking and Weiler to continue working on those very PEC projects on behalf of PVI even though all three remained on CCFW's payroll and continued to work at CCFW.

10

363.    As a direct and proximate result of Johnson, Weiler, Bicking and Ornelas- Kuh's breaches, as aforesaid, they have caused Plaintiff, and will cause Plaintiff, irreparable loss of good will, profits, revenue and business opportunities, including the loss of customers and related business, unless they immediately are enjoined and restrained, and said Defendants also have caused Plaintiff other substantial damage.

These paragraphs alone sufficiently plead a breach of contract claim. Recognizing this fact, Defendants ignore the sufficiency of Plaintiff's claim, and instead, raise issues of disputed fact, namely challenging the validity and enforceability of the operative contracts. *See, e.g.*, Motion at 16 ("there is no enforceable contract at issue."). But these factual disputes are not appropriate for a 12(b)(6) motion to dismiss and should not be considered here. *Princeton Univ.*, 30 F.4th at 340; *Stratis*, 2023 WL 3092188 at *3.

Defendants also conflate the standards for a temporary restraining order and a motion to dismiss and—in doing so—misstate the history and import of the rulings of this case.  Motion at 16 ("as the Court already determined when it [sic] Plaintiff's TRO request, there is no enforceable contract at issue."). That is simply false. The Court did not "determine…there is no enforceable contract at issue." Rather, in applying the TRO standard and looking at Plaintiff's irreparable harm (which is inapplicable to these motions to dismiss), the Court questioned, on an interim basis and very limited record, the contractual enforceability of just one agreement. But to be clear, the Court made no finding on the issue of enforceability of any contract in this case—nor could it on the nominal record of a TRO application.

Moreover, because the parties dispute the existence of valid enforceable contracts, Defendants' arguments challenging enforceability are irrelevant to this Motion and cannot support dismissal.  Indeed, Plaintiff only needs to sufficiently plead the elements of breach at this stage

11

which it has clearly done. Defendants' arguments of disputed facts are irrelevant, misplaced and must be rejected.

Defendants further argue that "[t]he 2022 Consulting Agreement is expired and does not bar the conduct alleged, and there is no allegation that Johnson breached the 2022 Confidentiality Agreement." But again, arguments as to what a contract purportedly allows are clear issues of fact and irrelevant to the Court's 12(b)(6) analysis. Defendants' timing arguments, *i.e.*, alleging that the contract has expired (notwithstanding Plaintiff's allegations of breach occurring well before the purported expiry date, *see* SAC at ¶ 295 quoted *supra*) are, aside from being wrong, also fact disputes irrelevant to Defendants' Motion. Furthermore, Defendants' argument that there is no allegation that Johnson breached the 2022 Confidentiality Agreement is blatantly false. *See* SAC ¶295, quoted *supra*.

Defendants' arguments regarding contract construction are equally unavailing. Motion at 18 ("there is no allegation of any contractual obligation to reimburse those premium payments, and the underlined contracts contain no such agreement."). *Id.* (emphasis added). Defendants are free to argue their interpretation of the operative contracts at the appropriate time. But that challenge is neither timely nor appropriate here. Defendants finally suggest that Plaintiff fails to "specify some information that was allegedly misused." *Id.* This argument is belied by the SAC, which recites the litany of Defendants' misuse of CCFW proprietary materials. *See, e.g.*, SAC at ¶¶ 67-98, 217-228, 241-255:

- Johnson illegally retained the laptop for six months, until finally she was ordered to return it by the Court in this litigation on September 28, 2022. Furthermore, a review of the laptop revealed the extensive theft of CCFW Confidential Information for Johnson's own gain and that of the other Defendants. Johnson reviewed about 670 files residing on a USB that Johnson owned but was at times attached to her CCFW laptop. Nearly half of the files on the USB drive at one point had been on Johnson's laptop and were CCFW's Confidential Information and proprietary client files, documents or trade …They also included CCFW SOWs, vendor forms and mutual NDAs. These documents contain commercial

12

information, strategies and other valuable information that were not generally known to competitors, and not readily ascertainable through proper and lawful means. SAC at ¶¶ 219-221.

- Valuable intellectual property and proprietary information and intelligence on CCFW's SOWs and their associated budgets, which include highly proprietary, competitive, business-sensitive information and trade secrets on pricing, vendors and processes, among other things, would allow Defendants to target clients and use pricing information to unfairly compete with and/or divert work from CCFW. All these materials and others were CCFW work product that were later found on Johnson's laptop that she took with her when she left CCFW. With the SOWs and budgets in hand and a plan to steal work from CCFW, Defendants began counting their ill- gotten gains before PVI was even established, and before one client was legitimately acquired or one stitch of work was performed by it. SAC at ¶ 98.

- Johnson was emailing, from a personal Gmail account, with Ornelas-Kuh, and received from him a copy of his Duty of Loyalty Agreement, which barred him from competing with CCFW for one year from whatever date he left the Company. Nevertheless, on or about February 27, 2022, March 18, 2022 and March 30, 2022, Ornelas-Kuh brazenly sent CCFW Confidential Information to Johnson while he knew she was leaving, and in or about mid- June 2022 set up a meeting between them at Johnson's house in Brewster, New York. SAC at ¶ 79.

- In early March 2022, after Johnson had informed Studdiford she was resigning and while still working as Managing Director of CCFW, but before she purportedly informed others in the Company she was leaving, Johnson sent an email to the CCFW leadership team, without copying Studdiford, requesting an accounting of all signed SOWs for 2022 by client and by project. Clearly this active theft of information, information Johnson knew she and the other Defendants were not entitled to, was to support her/PVI's theft of CCFW clients, Confidential Information, all in an effort to steal and leverage this highly business sensitive information to advance her own company, PVI, the other Defendants and engage in illegal and criminal unfair competitive practices through a pattern of racketeering activities. SAC at ¶ 96.

- Fully on board with their plot and an active participant apparently from the beginning, Bicking responded to Johnson right away, sending her a highly confidential internal CCFW budget tracking spreadsheet with 2022 budgets for various CCFW clients including PEC and six others. Similarly on March 18, 2022, days before the last day of Johnson's tenure as Managing Director, Ornelas-Kuh sent Johnson a proprietary and confidential CCFW marketing presentation that Studdiford had recently sent him, as well as additional information on upcoming Janssen work. That day Ornelas-Kuh was also helping Johnson script her departure emails. In response to one of the draft departure emails Ornelas-Kuh sent her, Johnson responded, "Makes me smile and feel appreciated. We make a pretty AMAZING team." It is unclear from Johnson's response whether she was referring just to herself and Ornelas-Kuh as a "team" or to the broader association-in-fact enterprise involved in the illicit and criminal activities. SAC at ¶ 97.

13

At bottom, the SAC undeniably pleads the existence of enforceable contracts that were breached thereby causing Plaintiff to sustain damages. This alone defeats dismissal.

### 2. <u>Trade Secret Claims</u>

The SAC more than sufficiently pleads Defendants' trade secret violations under the federal Defend Trade Secrets Act ("DTSA"), the New Jersey Trade Secrets Act ("NJSTA") and common law. In attacking Plaintiff's trade secret pleadings, Defendants primarily cite summary judgment decisions which neither address nor involve a claim under the DTSA. *See* Motion at 15 (citing *Talon Indus., LLC v. Rolled Metal Prod., Inc.* and *Givaudan Fragrances Corp. v. Krivda*, 2013 WL 5781183 (D.N.J. Oct. 25, 2013) (which predates the DTSA).[7] This omission and Defendants' general disregard for the law governing DTSA claims are fatal to the Motion.

To be clear, the DTSA only requires a plaintiff to plead: (1) the existence of a trade secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret. *See* 18 U.S.C. § 1839; *Shrink Packaging Sys. Corp. v. Kist*, No. 22-CV-04967, 2023 WL 5664733, at *7 (D.N.J. Sept. 1, 2023).

Courts evaluate several factors in deciding whether information is a trade secret, including: (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the

---

[7] *See* No. CV 15-4103 at Dkt. No. 57 (Plaintiff's Amended Complaint asserting only NJSTA and common law trade secret claims)

information could be acquired or duplicated legitimately by others. *See, e.g.*, *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010). But these are all facts that will be sorted out in discovery. The SAC makes clear that there is ample evidence that what was stolen by Johnson and the other Defendants included valuable confidential information of CCFW that it guarded to keep secret and in compliance with the operative trade secret statutes. *See, e.g.*, SAC at ¶¶ 222-224, 281-286.

Tellingly, Defendants' Motion seeks to narrow the scope of trade secrets. Motion at 15. But the DTSA specifically defines a trade secret—providing the following intentionally broad definition as codified under 18 U.S.C. § 1839(3): "the term trade secret means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

Additionally, and contrary to Defendants' argument seeking to require heightened specificity for this claim, "[t]here is no heightened pleading standard for a misappropriation of trade secrets claim." *See IDT Corp. v. Unlimited Recharge, Inc.*, Civ. A. No. 11-4992, 2012 WL 4050298, at *7 (D.N.J. Sept. 13, 2012). Indeed, "the <u>standard is one of notice, not of detail</u>, and this District has been clear that a plaintiff is not required to articulate each individual trade secret

15

by name and description at the pleading stage." *Rodgers Grp., LLC v. Lewis*, No. 22-482, 2022 WL 4095785, at *4 (D.N.J. Sept. 7, 2022) (emphasis added).

The SAC articulates at length the types of trade secrets that were misappropriated here. *See, e.g.*, SAC at ¶¶ 6, 42, 98, 148, 217-229, and 281-286("intellectual property and proprietary information and intelligence on CCFW's SOWs and their associated budgets, which include highly proprietary, competitive, business-sensitive information and trade secrets on pricing, vendors and processes, among other things, would allow Defendants to target clients and use pricing information to unfairly compete with and/or divert work from CCFW. All these materials and others were CCFW work product that were later found on Johnson's laptop that she took with her when she left CCFW. With the SOWs and budgets in hand and a plan to steal work from CCFW.)"

This alone would be more than sufficient to state a claim for trade secret misappropriation under DTSA, NJTSA and common law, but the SAC goes even further, averring that Johnson misappropriated, among other things: "a Power Point presentation belonging to CCFW client Albireo, clearly marked *confidential* and for *Internal Publication Only*," and "close to 200 [files] in directories with such names as "Carrie Samples," "Albireo," "Merz," "PEC," "PharmaEssentia," and "Project Velocity." The Carrie Samples directory included files such as: No 19_PEC-037-22_CC Ford Group West LLC SOW Field Training Project Management.docx; Versiti Statement of Work_2022 Innovation Summit.docx; and Copy of Midwest_Account_Management Tracker_MASTER.xls. All of this information provided Defendants unfair advantages." SAC at ¶ 220. Plaintiff could not be any more specific here.[8] Moreover, why else would Johnson have downloaded this information onto a hard drive at the end

---

[8]Plaintiff notes the irreconcilable positions taken by Defendants in this Motion. On one hand, Defendants complain that the SAC is too long and prolix. Yet Defendants simultaneously argue that the Complaint is not detailed enough.

of her term as an employee—and why is she so concerned about her theft of trade secrets that she continues to refuse to provide Plaintiff access to this hard drive?

Defendants nonetheless claim that the allegations in SAC are "too general to state a claim". Motion at 15. But controlling authority makes clear that Plaintiff's allegations are more than sufficient. *See, e.g*., SAC ¶ 98 ("CCFW's SOWs and their associated budgets, which include highly proprietary, competitive, business-sensitive information and trade secrets on pricing, vendors and processes, among other things"). Indeed, courts routinely find this same material to be deserving of trade secret protection. *See, e.g., Beta Pharma, Inc. v. InventisBio (Shanghai) Co*., No. 2022 WL 17547265, at *3 (D.N.J. Dec. 8, 2022) ("Trade secrets may include proprietary business information like customer lists, pricing information, and marketing techniques.").[9]

### 3. Tortious Interference Claims

A plaintiff asserting a claim for tortious interference under New Jersey law must plead "(1) that it had a reasonable expectation of economic advantage; (2) which was lost as a direct result of [defendant's] malicious interference, and (3) that it suffered losses thereby." *Fora Fin. Holdings, LLC v. Dream Data Servs., LLC*, No. CV2300780GCJBD, 2023 WL 6049835, at *5 (D.N.J. Sept.

---

[9] Among other pled facts, Johnson also conspired with a then-existing CCFW IT vendor to assist in her misappropriation. *See* SAC at ¶¶ 231-239 ("CCFW learned that Johnson was colluding with Rodriguez since at least January 18, 2022, when she asked him for help creating archives of CCFW files, to be transferred to "a new laptop" that was not associated with CCFW. Specifically, the IT vendor told Johnson: "I need to put your archives on online archive so you don't lose them when we switch computers. I have in my notes that we did some but not all." Johnson continued to work with Rodriguez while still employed at CCFW in February and March 2022, getting his help to purchase and set up her new PVI laptop and PVI's website domain… CCFW has since fired Rodriguez as its IT Vendor for facilitating Johnson's theft of files and working with Johnson and PVI, and that vendor admitted to the Studdifords that Johnson never thought Defendants would be caught or that CCFW would ever sue her, PVI or PEC. Johnson also told Rodriguez that the lawsuit blindsided her and that she was "completely shocked" when CCFW and the Studdifords found out.").

15, 2023). The SAC meets each of these requirements. Still, Defendants argue that the SAC fails to sufficiently plead malice.

As a preliminary matter, this is a notably strange position given Defendants' repeated complaints about purported "defamatory allegations" and threats of Rule 11 sanctions based on the existing malice allegations. Nevertheless, Defendants' argument is substantively without merit as the SAC sufficiently pleads not only malice, but all requisite elements for tortious interference (including interference of both existing and prospective business relations).

Here, Defendants argue that "the advancement of one's own "interest and financial position" does not "establish the necessary malice or wrongful conduct."[10] *See* Motion at 19 (quoting *Matrix* "where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury"). In quoting the *Patel* summary judgment[11] decision, Defendants further state that "the line must be drawn where one competitor interferes with another's economic advantage through conduct which is fraudulent, dishonest, or illegal." Motion at 19.

Unlike the inapposite cases cited by Defendants, the alleged conduct here is far from healthy competition. *Compare with Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 770 A.2d 1158, 1170 (2001) ("When determining whether a defendant acted with malice, a court considers "whether the conduct was sanctioned by the rules of the game, for where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury."). To

---

[10] Defendants also make arguments on behalf of Defendants Bicking and Weiler but their conduct was equally malicious, including the outright theft of CCFW's work product. *See* SAC at ¶¶ 77, 125, 128, 151 and 225.

[11] Many of the decisions cited in this section of the Motion are summary judgment decisions involving different analyses and standards. Once again, Plaintiff need only plead sufficient facts establishing its claim to survive a motion to dismiss.

the contrary, Defendants' conduct as explicitly alleged in the SAC is fraudulent, dishonest, illegal, criminal and performed with malice. *See, e.g*., SAC at ¶¶ 13, 67-77, 107-141.

"An action for tortious interference with a prospective business relations protects the right to pursue one's business, calling or occupation free from undue influence or molestation." *Printing Mart-Morristown v. Sharp Elecs. Corp*., 563 A.2d 31, 36 (N.J. 1989) (internal quotation omitted). Importantly, "what is actionable is [t]he luring away, by devious, improper and unrighteous means, of the customer of another." *Id*. (internal quotation omitted). That is exactly what the SAC pleads here.

Defendants, citing yet another summary judgment decision, suggest that pleading malice is a "high bar." Motion at 20. But courts in this district disagree. *See, e.g., Hill v. Com. Bancorp, Inc*., 2012 WL 694639, at *16 (D.N.J. Mar. 1, 2012), a*ff'd sub nom. Hill v. TD Bank, NA*, 586 F. App'x 874 (3d Cir. 2014) ("[t]he "malice" standard enforced by New Jersey courts for a showing of tortious interference is not an overwhelmingly rigorous one…if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant, at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, ... and an actionable act if injury ensues from it.") (emphasis added) citing *Wear-Ever Aluminum, Inc. v. Townecraft Indus., Inc*., 75 N.J. Super. 135, 141, 182 A.2d 387 (Ch. Div. 1962) (internal citations omitted).

Here, the SAC sufficiently pleads malice, including without limitation: SAC at ¶¶ 13, 67-77, 107-141. That is more than sufficient to withstand Defendants' Motion. *Metro. Foods, Inc. v. Kelsch*, 2012 WL 956178, at *5 (D.N.J. Feb. 14, 2012). In fact, their conduct was criminal and were predicate acts supporting CCFW's RICO claims.

Defendants finally argue that "the claimed loss of unknown customers does not, standing alone, state a claim for tortious interference." But Plaintiff clearly does not have some "unknown

loss." Rather, Plaintiff lists, without limitation, actual, specific clients and prospective customers targeted and taken by Defendants. *See* SAC at ¶ 396 (reproduced below).

| 396. | Such clients include, but are not limited to, Albireo and PEC. |
|---|---|

Other customers include Actelion and Merz. SAC at ¶ 221.

### 4. Unfair Competition Claims

Next, Defendants argue that Plaintiff's unfair competition claim should be dismissed as duplicative of the tortious interference claims because the underlying factual bases are the same. Motion at 21. Defendants cite *Dando* to support this argument. But *Dando* did not involve an unfair competition claim. Instead, the subject claim was "unfair restraint of trade" which was significant to the court's decision in that it is not a recognized cause of action in this state. *Dando v. Bimbo Food Bakeries Distribution, LLC*, 2016 WL 475262, at *4 (D.N.J. Feb. 8, 2016) ("Plaintiff has not provided, and the Court has not uncovered, any New Jersey case law supporting an independent tort claim of 'unfair restraint of trade.'") (quotations in original).

Moreover, and contrary to Defendants' argument, Plaintiff's tortious interference and unfair competition claims do not rest solely on the same set of allegations. SAC ¶ 403 makes this clear by averring: "[a]mong other things, Johnson, Bicking and Weiler's use of the CCFW brand in their LinkedIn pages, and otherwise, was a palming and/or passing off of CCFW's good name and reputation to make it appear that PVI, PVP, Johnson, Bicking and Weiler would be providing services through the known entity CCFW and used that practice for their own benefit.") (emphasis added). Even worse, this palming off went so far as the Enterprise signing contracts on behalf and as a purported representative of CCFW. SAC at ¶¶ 187-190 ("The Westin contract lists CC Ford Healthcare as the organization contracting for this PEC event. That it was actually signed on behalf of CCFW by a PEC employee, without CCFW's knowledge, is outrageous.").

The SAC is replete with additional allegations of unfair competition, including without limitation: SAC at ¶ 19 ("Defendants' fraudulent scheme was for PVI, Johnson, Bicking and Weiler to perform the work as if Johnson, Bicking and Weiler were acting in their roles at CCFW, trading off CCFW's good name, stellar reputation in the industry, strong balance sheet and large network of suppliers and experts, and for Manning to pressure various PEC employees to send additional PEC work to them at CCFW, all the while giving those PEC employees the mistaken impression that the work would be performed by PEC's long-time and preferred partner CCFW. Their ultimate plan was to actively rip the work from CCFW and deliver it directly to the shell company PVI, which they subsequently accomplished."); ¶¶ 196-198 ("in June 2022, Johnson was still working for CCFW as a consultant and Bicking was still bound by her Duty of Loyalty Agreement. PVI ran the May 2023 event for PEC with Johnson and Bicking being listed as the Project Team for PVI in the SOW. It is, thus, clear from the above that PVI and the other Defendants were trading off of the good name and reputation of CCFW to their financial benefit."); ¶ 265 ("[t]he Enterprise utilizing CCFW's employees, resources, reputation and/or good will in or about 2022 to surreptitiously perform work on behalf of the Enterprise, and to provide services to, among others, PEC, knowing that CCFW would not be paid for same," and "obtaining or transferring CCFW's Confidential Information and utilizing CCFW's employees, resources, reputation and/or good will while denying CCFW due compensation for same, through use of the mail."); ¶ 403 ("Johnson, Bicking and Weiler's use of the CCFW brand in their LinkedIn pages, and otherwise, was a palming and/or passing off of CCFW's good name and reputation to make it appear that PVI, PVP, Johnson, Bicking and Weiler would be providing services through the known entity CCFW and used that practice for their own benefit.").

21

Stated differently, Plaintiff's unfair competition claims rest on, *inter alia*, Defendants' improper attempt of palming and passing off of CCFW's good name and reputation. This alone negates dismissal. But that is not all. The SAC also pleads other facts supporting the unfair competition claims separate from the facts supporting tortious interference, including without limitation, Defendants' theft of CCFW's trade secrets, stealing CCFW's work product, misrepresentations, violating restrictive covenants, signing a contract (on behalf of CCFW) with a hotel without authorization from CCFW, deleting without permission over 1000 computer files belonging to CCFW and the like. *See, e.g.*, SAC ¶¶ 77, 87, 96, 99, 188 and 217.

### 5. Breach of Fiduciary Duty, Breach of Duty of Undivided Loyalty and Faithless Servant Doctrine Claims

Defendants' arguments on breach of fiduciary duty, duty of undivided loyalty and faithless servant doctrine fail for the same reason its breach of contract arguments fail: Defendants' arguments rest solely on disputed issues of fact. *See* Motion at 22 ("As with the claims discussed above, the fiduciary duty claim fails. Because Johnson was not bound by a non-compete agreement, her engaging and prevailing in competition for customers was wholly proper.") (emphasis added). This, however, is an untrue statement of the law, as noted above, as one can compete unlawfully regardless of whether one has a restrictive covenant. In any event, the well-pleaded allegations of the SAC make clear that Johnson was bound by a non-compete agreement as well as a contractual obligation in the Consulting Agreement not to go after CCFW's clients without permission from Plaintiff and a Confidentiality Agreement precluding the stealing and use of CCFW's confidential information. SAC at ¶ 113.

Because the Parties dispute this fact, the allegations of the pleading control. *Princeton Univ.*, 30 F.4th at 342. Defendants are entitled to challenge this fact during discovery. But as a matter of law, a dispute over whether Johson was bound by a non-compete cannot and does not

support dismissal under Fed. R. Civ. P. 12(b)(6). Defendants' arguments will ultimately fail because they ignore that Johnson needed CCFW's consent to compete under the Consulting Agreement, something she did not seek before stealing CCFW's customers.

### 6. <u>Plaintiff's Trespass to Chattel and Conversion Claims</u>

Defendants also take issue with Plaintiff's trespass to chattel and conversion claims, arguing that for "the keys and credit card, the only suggestion that Johnson took such items are <u>bald references</u> in Count 11." Motion at 23 (emphasis added). It remains unclear what "bald references" are or how such references fail to meet the operative pleading standards. What is clear, however, is that Plaintiff's well-pleaded facts must be accepted as true. *Fowler*, 578 F.3d at 210. This, of course, includes the SAC allegations in ¶¶ 409-411 that state that, *inter alia*, Johnson took her company laptop, keys and American Express credit card," as well as "CCFW's confidential and proprietary information and trade secrets." SAC at ¶ 409.

Recognizing the sufficiency of Plaintiff's conversion and trespass to chattel pleadings, Defendants pivot and make the irrelevant argument that "CCFW was of course able to cancel Johnson's CCFW credit card," and "even if she did not return those items, they do not give rise to actionable claims." Motion at 23. These remediation arguments have nothing to do with the sufficiency of Count 11—though under Defendants' curious theory, there could be no conversion or trespass to chattel claims for credits cards ever because the owner could simply cancel the card thus negating the claim. That, of course, is nonsensical and not the law.

Defendants also argue that there is no conversion because Plaintiff's confidential and proprietary information and trade secrets "are not tangible property." Motion at 23. This ignores the SAC's allegation that Johnson took her <u>company-issued laptop</u> which is indisputably tangible

property that is alleged to hold the foregoing confidential and proprietary information and trade secrets.[12]

The *Apparel Bus.* decision highlights this important distinction. *Apparel Bus. Sys., LLC v. Tom James Co.*, No. CIV.A.06-1092, 2008 WL 858754, at *19 (E.D. Pa. Mar. 28, 2008). In distinguishing between tangible and non-tangible property, the court noted that "the defendant in [the *Stenograph*] case was found liable for conversion for taking and refusing to return <u>a software key, a physical object</u> that had to be inserted into the machine in order to run the software," and that "defendants have not carried off a disk containing the plaintiff's program and refused to give it back." *Id.*

But unlike in *Apparel Bus.*, that is exactly what happened here. Johnson took her company laptop—tangible property—and all the confidential and proprietary information and trade secrets in it. She then refused to return the device until after Plaintiff filed this case and this Court ordered its return. Even worse, Johnson only returned the laptop after transferring its contents to an external hard drive, another tangible object, that she still retains but refuses any inspection thereof through discovery.

### 7. <u>Unjust Enrichment Claims</u>

Next, Defendants wrongfully suggest that Plaintiff's unjust enrichment claim is duplicative of its breach of contract claim. This argument, however, ignores controlling precedent making clear that "unjust enrichment may be pleaded in the <u>alternative</u> where there is a bona fide <u>dispute whether a relevant contract exists</u> or covers the dispute at issue." *Kuzian v. Electrolux Home*

---

[12] Though not relevant to the court's analysis here, it should be noted that Johnson used that same laptop to extract and transfer highly sensitive CCFW information to an external hard drive that remains in Johnson's possession and that she refuses to turnover to CCFW for inspection forcing CCFW to request that the magistrate judge order said relief.

*Prods., Inc.*, 937 F. Supp. 2d 599, 618 (D.N.J. 2013) (emphasis added); *see also Beijing Gongmei Imp. & Exp. Co. v. Ijbara*, No. 2:10-CV-02821-SDW, 2012 WL 3228711, at *5 (D.N.J. Aug. 6, 2012).

Defendants clearly dispute the existence, enforceability and/or validity of the contracts alleged in the SAC. Plaintiff can therefore plead unjust enrichment in the alternative.

Defendants' reliance on this Court's *Guija* decision simply confirms this point. Indeed, in *Guija*, Your Honor made clear that "pleading in the alternative is permissible under Rule 8(d)(2)," and that "courts in this District regularly dismiss unjust enrichment claims that are duplicative of a complaint's breach of contract claims when the governing agreement is undisputed." *Gujja v. Inpatient Servs. of New Jersey, P.C.*, No. CV2119416MASDEA, 2022 WL 2834998, at *3 (D.N.J. July 20, 2022) (emphasis added). But that is not the case here. The Motion itself acknowledges that Defendants vigorously dispute the existence and enforceability of the agreements alleged in the SAC. Therefore, Defendants cannot seek dismissal of Plaintiff's unjust enrichment count on the basis of duplication.

Defendants' additional argument that Plaintiff "fails to plead any inequitable benefit" is equally unavailing. Indeed, Plaintiff explicitly pleads that "Defendants received benefits from Plaintiff including, *inter alia*, income and COBRA payments, access to Company documents including client and vendor lists and proprietary pricing and marketing information, and thus were unjustly enriched." SAC ¶ 451. Defendants may dispute whether their retention of the foregoing benefits was inequitable, but that is not a sufficient basis for a 12(b)(6) dismissal. Regardless, the SAC explains at length how Defendants' retention of benefits—particularly CCFW's client and vendor lists, and pricing and marketing information, was inequitable. *See, e.g.*, SAC ¶¶ 217-230. And while Defendants argue that Johnson received such benefits as a "part of her work for

CCFW," Johnson was certainly not entitled to keep such benefits beyond the term of her employment and consulting position. That is, in part, why retention of such benefits is inequitable here.

### 8.  RICO Claims

The SAC alleges multiple RICO claims, including Defendants' violations of both the federal and New Jersey state RICO statutes, *i.e.*, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1962 ("RICO") and N.J.S.A. 2C:41 ("NJRICO") (collectively, the "RICO Claims"). This includes both conspiracy and enterprise violations. *See, e.g.*, SAC Counts I and II respectively. Defendants' Motion addresses these claims together and, therefore, Plaintiff will do so as well.

Defendants' RICO challenge is limited to the following arguments: (1) "plaintiff does not plausibly present a racketeering conspiracy," and (2) "Plaintiff does not plead the requisite RICO conduct, nor plead with specificity the 'what, when, where' or 'how' of any alleged fraud. Motion at 26. Both arguments fail for the reasons below.

Defendants' first argument is wholly devoid of any substance demonstrating the insufficiency of a conspiracy pleading. The entirety of Defendants' contentions, consisting of emotional and conclusory arguments, reproduced below, makes this clear.

> Here, despite the prolix nature of the complaint, it does not state a RICO violation. First, plaintiff does not plausibly present a racketeering conspiracy: plaintiff has proliferated the proceedings over the last two years, stemming from simple allegations of a purported breach of contract and breach of fiduciary duty, and now dressed them up with more than a hundred pages of disjointed allegations that do not amount to a plausible racketeering conspiracy—only an angry litigant, unable to meet simple pleading requirements, throwing inconsistent, disjointed, and unhinged allegations at everyone within range, but all ultimately pointing to the same circumstances underlying plaintiff's initial Complaint: Plaintiff's frustration with Ms. Johnson's resignation, starting a new business, and competing for clients. To the extent there are breach of fiduciary duty or breach of contract claims pleaded, the Court should reject efforts to recast those claims as RICO. *See, e.g.,* *Snow and Ice Mgt. Co. of PA*, 2023 WL 4551689, at *3.

This argument comes nowhere close to meeting the movants' burden of demonstrating how the SAC lacks sufficient factual matter to state a RICO claim that is plausible on its face, *i.e.*, setting forth factual content that allows the court to draw the reasonable inference that Defendants are liable for under the federal and state RICO statutes.[13] *Iqbal*, 556 U.S. at 678. To the contrary, the SAC sufficiently pleads its RICO claims including: the challenged "racketeering conspiracy," and the challenged predicate act and specificity.

To plead a conspiracy under the RICO statute, a plaintiff must aver that (1) two or more persons agreed to participate in an endeavor that, if completed, would constitute a RICO violation and (2) a member of the conspiracy committed an overt act that constituted a predicate act of

---

[13] The federal RICO statute makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010). Additionally, § 1962(d) makes it unlawful "for any person to conspire to violate § 1962(c)." Id. To plead a RICO claim under § 1962(c), the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004)). An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

racketeering to further the conspiracy. *See, e.g.*, *Beck v. Prupis*, 529 U.S. 494, 503-07 (2000); *Zakheim v. Curb Mobility LLC*, No. CV 22-4594, 2023 WL 5339606, at *4 (E.D. Pa. Aug. 18, 2023); *see also Odesser v. Continental Bank*, 676 F. Supp. 1305, 1312–13 (E.D.Pa.1987) (To plead conspiracy adequately, a plaintiff must set forth allegations that address (1) the period of the conspiracy; (2) the object of the conspiracy; and (3) the certain actions of the alleged conspirators taken to achieve that purpose." In addition, plaintiff must allege that defendant knowingly participated in the conspiracy. *Odesser* at 676 F. Supp at 1312.

Here the SAC sufficiently pleads at least two predicate acts, with the last one being within a ten (10) year span after the commission of the previous act including without limitation: 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); theft by deception; N.J.S.A. 2C:20-3(b) (criminal theft of property, which includes trade secrets, information and data); 18 U.S.C. 1832(a) (theft of trade secrets); N.J.S.A. 2C:20-25 (computer criminal activity) and fraud. SAC at passim and ¶ 265. Those predicate acts are set forth in intricate detail in at least the following paragraphs of the pleading. *See, e.g.*, SAC at ¶¶ 13, 67-77, 107-141.

Defendants' challenge adopts the central theme that neither Johnson, nor PVP or PVI—— were involved in any of the alleged claims, including their roles in the Enterprise. But the SAC's well-pled facts foreclose this theory. Again, the SAC avers, *inter alia*, that the "fraudulent scheme was for PVI, Johnson, Bicking and Weiler to perform the work as if Johnson, Bicking and Weiler were acting in their roles at CCFW, trading off CCFW's good name, stellar reputation in the industry, strong balance sheet and large network of suppliers and experts, and for Manning to pressure various PEC employees to send additional PEC work to them at CCFW, all the while giving those PEC employees the mistaken impression that the work would be performed by PEC's long-time and preferred partner CCFW. Their ultimate plan was to actively rip the work

from CCFW and deliver it directly to the shell company PVI, which they subsequently accomplished." SAC at ¶ 19. The SAC further alleges that:

- Johnson and Manning, participated in this conspiracy and pattern of racketeering and otherwise tortious activity, and/or aided and abetted their pattern of racketeering and tortious activity, and provided legal and regulatory guidance to Manning/PEC, Johnson/PVI and others to support their theft.

- Manning's and PEC's poisonous and deliberate actions delivered the plan, free- ranging and unchecked opportunity, as well as virtually unlimited funding for Johnson, Bicking and Weiler to leave CCFW, steal CCFW's Confidential Information, and for Johnson and likely others to create a shell company in PVI that would then receive millions in PEC payments for work that was supposed to be performed (and in part was actually performed) by CCFW.

- As part of the scheme, Manning/PEC, Johnson and others were conspiring and planning for Johnson's cronies, Bicking and Weiler, to continue to perform PEC work surreptitiously while at CCFW and while still on its payroll but for the benefit of PVI, in breach of their duties of loyalty, and for Manning/PEC to thereafter terminate PEC's relationship with CCFW (and not pay it for its services rendered), and only thereafter would Bicking and Weiler perform work on PVI's dime once they considered it "safe" to have PVI come out of the shadows and operate in the open. Upon Bicking's and Weiler's departure in May 2022, Defendants then aggressively implemented their plan to take millions of dollars of guaranteed CCFW work, while Johnson, Bicking and Weiler were breaching their various agreements and obligations and stealing CCFW's Confidential Information, all for their personal financial gain.

- Manning and PEC were fully aware of the duties, restrictive covenants and confidentiality agreements the other individual Defendants had with CCFW that precluded them from taking Confidential Information, and from competing with CCFW for business, but they still actively pursued the plan to extract active PEC business from CCFW and deliver it to PVI, for the benefit of Defendants.[14]

- Likewise, Johnson, PVI and others were fully aware of similar duties, agreements and obligations that Ornelas-Kuh had with CCFW, yet even after Johnson and PVI were sued in this litigation, they still had the audacity to have PVI hire Ornelas-Kuh as a Managing Director. To hide Johnson's malicious and tortious interference with CCFW's non-competition and confidentiality agreements with Ornelas-Kuh, and his own violations of same, Johnson and Ornelas-Kuh set up a shadow company, PVP, registered in Delaware on or about July 25, 2023, to hide Ornelas-Kuh's work with Johnson and PVI and their joint efforts to lure CCFW clients to PVI. To further hide these violations Ornelas-Kuh uses a shadow PVI email address in his work for PVI and PVP; mornelas-Kuh@projectvelocitypartners.com. And an online search of "Project Velocity Partners" takes a user to PVI's website, further confirming that PVP is connected to PVI.

---

[14] Indeed, Plaintiff's counsel sent these agreements to Defendants' counsel well before Plaintiff moved to amend its pleading to add those parties to put Defendants on notice of Plaintiff's contractual interests—but Defendants continued their tortious acts nonetheless.

- When Johnson and Manning realized that Studdiford was not going to just hand the keys of his Company over to Johnson, and always knowing Johnson would never be able to raise the funds for purchase (although, again, CCFW / Studdiford would have considered a purchase offer), Defendants led by Johnson and Manning shifted focus to Johnson starting another company, PVI, and to Manning diverting PEC's business away from CCFW to PVI, even as Johnson, Bicking and Weiler still were working for and being paid by CCFW.

- Johnson sent Manning CCFW's budget estimates for the work CCFW would be performing for PEC in 2022. The estimates were large as were the fees to be earned by CCFW. Although this amount was a conservative budget estimate, it was significant enough to spur Manning and Johnson into thinking about how to keep that business for themselves and/or the other Defendants. At that time, Johnson emailed Manning stating "[w]e don't want to miss the boat!" evidently referring to the two of them and PEC. More importantly, with the pending potential approval of BESREMi during late 2021, Manning and Johnson knew that the flood gates of PEC cash could open, and they could fraudulently secure huge budgets for PVI due to the PEC launch of BESREMi – a standard pharmaceutical marketing approach of providing a high level of funding for marketing, sales and educational activities to improve drug launch awareness and success. Thus, the conspiracy to steal CCFW's business through a pattern of racketeering activity and tortious misconduct clearly was underway by the Fall of 2021 but likely started a year or two earlier.

- Thereafter, Johnson, while a CCFW consultant, and Bicking and Weiler, as CCFW employees, continued to clandestinely work on PEC projects that Manning and PEC had just terminated CCFW from performing. Unbeknownst to the Studdifords, PEC and Manning directed Johnson, Bicking and Weiler to continue working on those very PEC projects on behalf of PVI even though all three remained on CCFW's payroll and continued to work at CCFW. Defendants knew that CCFW had been promised all SOWs but, because there were no signed SOWs for these projects, CCFW would never be paid by PEC.

- Johnson was deliberate in her deceit as further evidenced by emails from her personal email account where she corresponded with various potential vendors about her plans to take CCFW employees. Specifically, on March 23, 2022 at 12:28 PM she emailed a vendor to provide her new contact information and forecasted her plans to hire Bicking.

- With their tortious scheme quickly advancing, on December 29, 2021, Johnson sent Manning an email to her personal Gmail account with the subject line "Review," containing draft language of an email to be sent to Studdiford demanding her sole ownership of CCFW. This was phase one of their conspiratorial plan to wrest control of CCFW from Studdiford. Much of Johnson's draft email was lifted verbatim from the language Crum and/or Manning had scripted for Johnson as heard in the audio file

- Despite repeated demands to Johnson to return the CCFW-owned laptop it had issued her, Johnson illegally retained the laptop for six months, until finally she was ordered to return it by the Court in this litigation on September 28, 2022. Furthermore, a review of the laptop revealed the extensive theft of CCFW Confidential Information for Johnson's own gain and that of the other

Defendants. Johnson reviewed about 670 files residing on a USB that Johnson owned but was at times attached to her CCFW laptop

*See also* SAC at ¶¶ 256-275.

Next, Defendants argue that the SAC pleads neither the requisite RICO conduct, "nor plead with specificity the 'what, when, where," or 'how' of any alleged fraud. Again, Defendants are wrong on both counts.

Plaintiff has sufficiently plead the requisite RICO conduct, *i.e.* the predicate acts. A RICO claim brought pursuant to 18 U.S.C. § 1962(c) requires a predicate act constituting racketeering activity. *AMA Realty LLC v. 9440 Fairview Ave. LLC*, No. CIV. 13-457 KM MCA, 2014 WL 1783099, at *4 (D.N.J. May 2, 2014). Here the SAC sufficiently pleads at least two predicate acts, with the last one being within a ten (10) year span after the commission of the previous act including without limitation: 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); theft by deception; N.J.S.A. 2C:20-3(b) (criminal theft of property, which includes trade secrets, information and data); 18 U.S.C. 1832(a) (theft of trade secrets); N.J.S.A. 2C:20-25 (computer criminal activity) and fraud. SAC at *passim* and ¶ 265. Those predicate acts are set forth in intricate detail in at least the following paragraphs of the pleading. *See, e.g.*, SAC at ¶¶ 13, 67-77, 107-141.

Additionally, the SAC more than alleges Defendants' fraudulent acts with specificity in accordance with Rule 9. *See Casper v. Paine Webber Grp., Inc.*, 787 F. Supp. 1480, 1505 (D.N.J. 1992) ("The Amended Complaint provides adequate specificity as to the allegations of fraud in this case. The allegations are straightforward. The Amended Complaint describes the nature of the alleged fraudulent tax schemes implemented by the Defendants, the persons involved or who approved them and the time period during which they were carried out."); *Schwartz v. Laws. Title Ins. Co.*, 970 F. Supp. 395, 406 (E.D. Pa. 2013) ("the SAC describes the predicate acts, when

31

the overcharging of Plaintiffs for insurance occurred, the amount of the overcharge, and the elements of the RICO violation with enough specificity to comply with the requirements of Rule 9(b)"); *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

Here, the SAC meets Rule 9's time and place requirements and provides even more specificity as to Plaintiff's allegations of fraud as follows. *See, e.g.*, SAC at ¶¶ 25-28,67-73, 185 256-275. ("PEC and Manning authorized, and Defendants schemed for, Johnson, Bicking and Weiler to use PEC email addresses to hide their illicit activities and issued PVI Statements of Work ("SOWs"), which likely did not go through the normal regulatory, legal and financial channels typically required at a pharmaceutical company, so that PVI could bill PEC for the work performed by Johnson, Bicking and Weiler while still employed by CCFW and thereafter" and "Manning and Johnson knew that the flood gates of PEC cash would open, and they could fraudulently secure huge budgets for PVI due to the PEC launch of BESREMi – a standard pharmaceutical marketing approach of providing a high level of funding for marketing, sales and educational activities to improve drug launch awareness and success. Thus, the conspiracy to steal CCFW's business through a pattern of racketeering activity and tortious misconduct clearly was underway by the Fall of 2021 but likely started a year or two earlier."). The SAC further alleges that:

• Johnson and Manning, participated in this conspiracy and pattern of racketeering and otherwise tortious activity, and/or aided and abetted their pattern of racketeering and tortious activity, and provided legal and regulatory guidance to Manning/PEC, Johnson/PVI and others to support their theft.

• Manning's and PEC's poisonous and deliberate actions delivered the plan, free- ranging and unchecked opportunity, as well as virtually unlimited funding for Johnson, Bicking and Weiler to leave CCFW, steal CCFW's Confidential Information, and for Johnson and likely others to create a shell company in PVI that would then receive millions in PEC payments for work that was supposed to be performed (and in part was actually performed) by CCFW.

*See also* SAC at ¶¶ 265-275 ("The above-described acts were all clearly related, as they were committed for the purpose of damaging CCFW and/or funding, launching and/or operating the Enterprise, and involved the same victim, participants, methods of commission and result.").

The SAC further pleads the relationships among those associated with the enterprise. SAC at ¶¶ 259-272. Indeed, Plaintiff's articulate at length the longstanding relationship between those associated with the Enterprise, including most importantly for this Motion, Johnson and Manning SAC at ¶¶ 29-80. The specific relationship between Johnson and Manning is set forth in detail at SAC ¶¶ 29-46 ("Manning's relationships with Johnson and Bicking are so close that she, and therefore PEC, knew they had various agreements with CCFW that precluded them from competing with it and from misappropriating its confidential and proprietary business information and trade secrets."). And lastly, the SAC pleads the requisite longevity. SAC ¶¶ 29-46.

### 9. CFAA and NJCROA Claims

To state a Computer Fraud and Abuse Act ("CFAA") claim, a plaintiff must plead that a defendant: (1) has accessed a protected computer; (2) has done so without authorization or by exceeding such authorization as was granted; (3) has done so knowingly and with intent to defraud; and (4) as a result has furthered the intended fraud and obtained anything of value. *See, e.g., Volpe v. Abacus Software Sys. Corp.,* No. CV2010108RMBKMW, 2021 WL 2451968, at *7 (D.N.J. June 16, 2021); *Integrated Waste Sols., Inc. v. Goverdhanam*, No. CIV.A. 10-2155, 2010 WL 4910176, at *7 (E.D. Pa. Nov. 30, 2010); 18 U.S.C. § 1030(c)(4)(A). The SAC sufficiently pleads each of these elements.

Defendants challenge Count Four based on the suggestion that "the SAC alleges <u>no loss based on impairment or damage to any computer system</u>," and does not allege unauthorized access, "but rather…[that] Defendants "had access to said [trade secrets and confidential information] as

it was necessary to use same in relation to their job duties" Motion at 28 (emphasis added). Defendants are wrong on both arguments. But these arguments do not hold water. The SAC confirms that Johnson not only stole information onto a hard drive but also deleted without permission over 1000 computer files belonging to CCFW. *See* SAC at ¶217.

To be clear, the CFAA was designed in part to address those who access computers to steal information. *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130–31 (9th Cir.2009) ("the CFAA was designed to target hackers who access computers to steal information or to disrupt or destroy computer functionality, as well as criminals who possess the capacity to access and control high technology processes vital to our everyday lives." (quoting H.R. Rep. 98–894, 1984 U.S.C.C.A.N. 3689, 3694 (July 24, 1984). That is exactly what is pled here.

Indeed, the SAC articulates at length how Johnson: (1) has accessed a CCFW protected computer; (2) without authorization or by exceeding such authorization as was granted; (3) has done so knowingly and with intent to defraud; and (4) as a result has furthered the intended fraud and obtained anything of value. 18 U.S.C. § 1030(c)(4)(A). *See, e.g*., SAC at ¶¶ 217-230.

Importantly, Congress defined the term "damage" to mean "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). The CFAA further defines the term "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id*. § 1030(e)(11). In applying CFAA and these definitions, courts have routinely found conduct similar to Defendants' actions here to be sufficient. *See, e.g., B & B Microscopes v. Armogida*, 532 F. Supp. 2d 744, 759

34

(W.D. Pa. 2007) ("the loss of the data from [company issued] laptop constituted an interruption of service within the meaning of 18 U.S.C. § 1030(e)(11) and 18 U.S.C. § 1030(a)(5)(B)(i).").

Defendants' loss arguments are even more unavailing with respect to Plaintiff's NJCROA claims. The New Jersey Computer Related Offenses Act, N.J. Stat Ann. § 2A:38A–3, provides that "A person or enterprise damaged in business or property as a result of any of the following actions may sue the actor therefor in the Superior Court and may recover compensatory and punitive damages as the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation: The purposeful or knowing, and unauthorized altering, damaging, taking or destruction of any data, data base, computer program, computer software or computer equipment existing internally or externally to a computer, computer system or computer network." (emphasis added).

Significantly, "the NJCROA allows for a broader allegation of damages than the CFAA, which can include losses unrelated to the damage or impairment of a computer system. *See* N.J. Stat. Ann. § 2A:38A-3; *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 277 (3d Cir. 2016). ("[the NJCROA] permits '[a] person or enterprise damaged in business or property' to sue for compensatory and punitive damages, as well as fees and costs.); *see also Rodgers Grp., LLC v. Lewis*, No. CV 22-482 (MAS) (TJB), 2022 WL 4095785, at *8 (D.N.J. Sept. 7, 2022). Defendants do not—and cannot—articulate how the SAC fails to plead this claim.

### 10. <u>Misappropriation and Fraud Claims</u>

The SAC more than sufficiently pleads misappropriation and fraud here. Defendants' Motion spends one short paragraph otherwise—but falls well short of meeting its burden. Specifically, Defendants rely on their argument regarding the trade secret claims for dismissal of

35

Count 15. But for the same reasons Defendants' challenge to Plaintiff's trade secret claims fail, their argument here is equally infirm.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion in its entirety.

4930-5375-3093, v. 1

Respectfully submitted,

*/s/ Steven I. Adler*
Steven I. Adler
Todd Nosher
**MANDELBAUM BARRETT PC**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
sadler@mblawfirm.com
tnosher@mblawfirm.com
Phone: 973-736-4600
Fax: 973-325-7467

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that copies of Plaintiff's Opposition to Defendants' Motion to Dismiss was served on all counsel of record and/or parties via electronic mail on this 9th day of December 2024:

Respectfully submitted,

*/s/ Steven I. Adler*
Steven I. Adler
Todd Nosher
**MANDELBAUM BARRETT PC**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
sadler@mblawfirm.com
tnosher@mblawfirm.com
Phone: 973-736-4600
Fax: 973-325-7467

*Counsel for Plaintiff*

4930-5375-3093, v. 1