**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CC FORD GROUP WEST, LLC, | |
| Plaintiff, | Civil Action No. 22-4143 (MAS) (TJB) |
| v. | **MEMORANDUM OPINION** |
| JENNIFER JOHNSON, *et al.*, | |
| Defendants. | |

**SHIPP, District Judge**

　　This matter comes before the Court on several motions to dismiss Plaintiff CC Ford Group West, LLC's ("Plaintiff" or "CCFW") Second Amended Complaint ("SAC") (ECF No. 92). Defendants PharmaEssentia USA Corporation ("PEC") and Meredith Manning ("Manning" and together with PEC, the "PEC Defendants") filed a motion to dismiss. (ECF Nos. 115, 116.) Defendants Jennifer Johnson ("Johnson"), Project Velocity Inc. ("PVI"), and Project Velocity Partners, LLC ("PVP") filed a motion to dismiss. (ECF No. 118.) Defendants Carrie Bicking ("Bicking") and Beth Weiler ("Weiler" and together with Bicking, Johnson, PVI, and PVP, the "PVI Defendants") have moved to join arguments asserted by Johnson, PVI, and PVP. (ECF No. 119.) Plaintiff opposed the PVI Defendants' motion (ECF No. 124) and the PEC Defendants' motion (ECF No. 125). The PVI Defendants and the PEC Defendants replied, respectively. (ECF Nos. 128, 129.)

The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1(b).[1] For the reasons set forth below, the Court grants in part and denies in part the PVI Defendants' Motion to Dismiss and grants the PEC Defendants' Motion to Dismiss.

## I. **BACKGROUND**[2]

### A. **Factual Background**

The length and breadth of the operative pleading notwithstanding,[3] the dispute in this case—at its core—is quite simple. (*See generally* SAC, ECF No. 92.)

This case concerns allegations of an unlawful scheme to misappropriate confidential information, solicit clients and employees, and unfairly compete with CCFW by several of its former employees, as well as an executive at one of its largest clients, PEC. (*See generally id.*)

---

[1] As an initial housekeeping matter, Plaintiff's counsel is reminded that their conduct in this litigation is governed by the Local Civil Rules for the District Court of New Jersey. Local Civil Rule 7.2 provides that: (1) briefs "shall not exceed 40 ordinary typed or printed pages"; (2) the 40-page limit "becomes 30 pages" when 12-point font is used; and (3) "[a]ll margins shall not be less than one inch on sides, top, and bottom." L. Civ. R. 7.2(b)-(d). Plaintiff's opposition briefs violate the rules with respect to page length. Although the Court will entertain Plaintiff's opposition briefs in this instance, Plaintiff would do well to abide by Rule 7.2 in future submissions to the Court. *See, e.g.*, *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 558 n.6 (D.N.J. 2001) (motion denied without prejudice for failure to comply with Local Civil Rule 7.2(b)). Should Plaintiff's counsel desire to file an overlength brief in the future, they should apply for leave of Court as the rules require. *See* L. Civ. R. 7.2(b) ("Briefs of greater length will only be accepted if special permission of the Judge is obtained prior to submission of the brief.").

[2] For the purpose of considering the instant motions, the Court accepts all factual allegations in the SAC as true. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[3] Plaintiff's SAC spans 108 pages and contains 452 paragraphs, excluding exhibits. (*See generally* SAC.)

### 1.    *The Parties and Relationships*

CCFW is a healthcare communications firm and a wholly owned subsidiary of CC Ford Group, LLC ("CC Ford") owned by John Studdiford ("Studdiford") and Cathleen Studdiford. (*Id.* ¶¶ 1, 117.) CCFW has worked with many pharmaceutical clients over the years, including PEC. (*Id.* ¶¶ 2, 8.)

Johnson was employed by CCFW for approximately two decades and held the title of Managing Director from about 2013 until her resignation in March 2022, at which time she became a consultant to CCFW.[4] (*Id.* ¶¶ 32, 112.) Ornelas-Kuh served as Vice President of Client Services at CCFW. (*Id.* ¶ 2.) Bicking and Weiler were employees of CCFW. (*Id.* ¶¶ 7, 19.) Each of these individuals were subject to restrictive covenants, confidentiality agreements, and/or fiduciary obligations during their employment with CCFW. (*See id.* ¶¶ 7, 112-20.)

PEC, a pharmaceutical company, was one of CCFW's largest clients. (*See id.* ¶¶ 2, 8.) Manning held senior executive roles at PEC, including General Manager and President of the Americas. (*Id.* ¶¶ 5, 8.) Upon information and belief, PEC's legal and compliance functions were overseen in part by Janice Crum ("Crum"), an advisor and regulatory attorney.[5] (*Id.* ¶ 9.)

According to Plaintiff, Manning and Johnson had a long-standing personal friendship and had vacationed together, including trips to Cabo San Lucas in July 2021 and Kiawah Island in December 2021. (*Id.* ¶¶ 36-41, 50-51.) Plaintiff alleges that this relationship influenced later business dealings between PEC and a company that Johnson later formed—PVI. (*Id.* ¶¶ 5-7, 19, 52-54.) PVI is purportedly a shell company created by Johnson—formerly Managing Director of

---

[4] Johnson began working for CCFW's parent company, CC Ford, in 2003. (SAC ¶ 117.) In 2013, when CCFW was established, Johnson served as a managing director and employee until her resignation in 2023. (*Id.* ¶ 1.)

[5] The Court notes that Crum is not a named defendant in the instant case. (*See generally* SAC.)

CCFW—with the covert assistance of Manning, Bicking, and Weiler. (*Id.* ¶¶ 7, 18, 21, 24, 65.) Plaintiff further alleges that "[u]pon information and belief, PVI was started as a sham company into which PEC could deposit funds for Johnson, Bicking[,] and Weiler (in the form of payments for CCFW work that was remitted to PVI), even before they left CCFW." (*Id.* ¶ 21.) Relatedly, Plaintiff asserts that PVP is a shadow entity created by Johnson and Ornelas-Kuh to conceal continued violations of contractual obligations. (*Id.* ¶ 23.)

### 2.    *Contractual Agreements*[6]

Central to the dispute is a series of employment-related agreements between CCFW and its former employees—namely, Johnson, Bicking, and Weiler.[7] (*See generally id.*)

#### a.    **Johnson**

Johnson entered into three distinct contractual agreements with CC Ford and/or its subsidiary, CCFW, each of which she is alleged to have breached. (*Id.* ¶¶ 112, 117.)

The first agreement Johnson entered into was an Employee Non-Competition, Non-Solicitation, Confidentiality, and Dispute Resolution Agreement, executed on August 31, 2003 ("Johnson's Non-Compete Agreement"). (*Id.* ¶ 117.) Johnson's Non-Compete Agreement, originally signed with CC Ford and later assigned to CCFW, among other things, prohibited

---

[6] Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). But where a document is "integral to or explicitly relied upon in the complaint," it "may be considered without converting the motion to dismiss into one for summary judgment" under Rule 56. *Doe v. Univ. Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) (quoting *id.* at 1426). Because the contractual agreements at issue are "integral to" and "explicitly relied upon in the [SAC]," consideration is appropriate. But consideration only goes so far. *See Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) ("When the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail.").

[7] As Ornelas-Kuh has not moved to dismiss, the Court will not regurgitate all facts pertaining to him.

Johnson from engaging in or owning any "competitive business" for one year following the termination of her employment. (*Id.* ¶ 118.) Johnson's Non-Compete Agreement also barred her from soliciting any clients or employees of the company for two years post-employment and imposed obligations of confidentiality and non-disparagement. (*Id.* ¶ 119.) Despite these restrictions, Johnson allegedly formed and operated a competing entity, PVI, within the prohibited period. (*Id.* ¶¶ 6, 21, 66.) She is further alleged to have solicited key CCFW employees, including Bicking, Weiler, and Ornelas-Kuh, and to have diverted confidential client and business information for her own benefit. (*Id.* ¶¶ 20, 23, 27, 79, 87.)

The second agreement Johnson entered into was a Consulting Agreement, signed on March 26, 2022, following her resignation as a CCFW employee ("Johnson's Consulting Agreement"). (*Id.* ¶¶ 112, 115.) Johnson's Consulting Agreement, with a term through July 17, 2022, required Johnson to avoid any business activities that would create a conflict of interest and to notify CCFW immediately, in writing, of any actual or potential conflict of interest. (*Id.* ¶ 115.) It also prohibited her from soliciting any CCFW clients, customers, or employees for business unrelated to the agreement during its term. (*Id.*) The SAC asserts that, while bound by this agreement, Johnson continued working with PEC, a major CCFW client, through her new entity, PVI, and secretly coordinated with other CCFW employees to funnel business to PVI in violation of these terms. (*Id.* ¶¶ 20, 21, 25, 125.)

The third agreement, a Confidentiality Agreement, was executed concurrently with Johnson's Consulting Agreement on March 26, 2022 ("Johnson's Confidentiality Agreement"). (*Id.* ¶ 116.) This agreement, with a ten-year term, required Johnson:

> to retain in confidence all Confidential Information disclosed to [her] by or on behalf of CC Ford Group, whether or not in writing or recorded in electronic of other format. [Johnson] further agrees that she "will not, either directly or indirectly, use any Confidential

Information for any purpose other than to discharge her duties under the Consulting Agreement without the prior written consent of CC Ford Group." Confidential Information is defined in the Confidentiality Agreement as "All technical data, materials, and/or information, as well as all studies, analyses and/or copies derived therefrom, and any other nonpublic information of CC Ford Group provided to [Johnson] in the performance of her services." CC Ford Group includes all subsidiaries and affiliated companies including CCFW.

(*Id.*) Johnson is accused of breaching this contract by taking and using CCFW's confidential and proprietary documents—such as Statements of Work ("SOWs"), budgetary data, and marketing materials—to benefit PVI. (*Id.* ¶¶ 20, 96-97.) The SAC asserts that these materials were located on her laptop after her departure and were used in the operation of her competing business, in direct contravention of the agreement. (*Id.* ¶ 98.)

### b.    Bicking and Weiler

Both Bicking and Weiler signed loyalty and confidentiality agreements with CC Ford and all owned, subsidiary, and affiliated companies, including, but not limited to, CC Ford, CCFW, Index Medical Communications, LLC, and Decile Ten, LLC. (*See id.* ¶¶ 297, 318.) Beginning with the loyalty agreements, Bicking's loyalty agreement was effective as of February 19, 2019 ("Bicking's Loyalty Agreement"). (*Id.* ¶ 319.) Weiler's loyalty agreement was effective as of December 2, 2020 ("Weiler's Loyalty Agreement," and together with Bicking's Loyalty Agreement, the "Loyalty Agreements"). (*Id.* ¶ 299.) Pursuant to Section 2 of the Loyalty Agreements, Bicking and Weiler agreed to keep confidential all Confidential Information (defined therein) of the Company for a period of one (1) year subsequent to their employment termination. (*Id.* ¶¶ 300, 320.) Pursuant to Section 3 of the Loyalty Agreements, Bicking and Weiler agreed to not interfere with CCFW's business relationships, directly or indirectly, for a period of one (1) year subsequent to their employment's termination. (*Id.* ¶ 302.) Pursuant to Section 4 of the

Loyalty Agreements, Bicking and Weiler agreed to be prohibited from soliciting CCFW's clients for a period of one (1) year subsequent to their employment's termination. (*Id.* ¶¶ 304, 324-25.) Pursuant to Section 1(d), Bicking and Weiler agreed to be bound by the restrictive covenants, and all provisions contained within the Loyalty Agreements, for a period of twelve (12) months after the termination of their employment. (*Id.* ¶¶ 306, 326.)

Bicking and Weiler also signed confidentiality agreements with CC Ford, and all owned, subsidiary, and affiliated companies, including, but not limited to, CC Ford, CCFW, Index Medical Communications, LLC, and Decile Ten, LLC. (*See id.* ¶¶ 297, 318.) Bicking's confidentiality agreement was effective as of February 19, 2019 ("Bicking's Confidentiality Agreement"). (*Id.* ¶ 329.) Weiler's confidentiality agreement was effective as of December 2, 2020 ("Weiler's Confidentiality Agreement," and together with Bicking's Confidentiality Agreement, the "Confidentiality Agreements"). (*Id.* ¶ 299.) Pursuant to the Confidentiality Agreements, Bicking and Weiler agreed to not "either directly or indirectly, use Information" (as defined therein) for a non-CCFW purpose. (*Id.* ¶¶ 310, 330.) Pursuant to Section 1 of the Confidentiality Agreements, Bicking and Weiler agreed to be bound by these restrictive covenants, and all provisions, contained within the Confidentiality Agreements, for a period of ten (10) years after the agreements' effective date. (*Id.* ¶¶ 311, 331.) Obligations under Weiler's Confidentiality Agreement extend until December 1, 2030. (*Id.* ¶ 312.) Obligations under Bicking's Confidentiality Agreement extend until February 18, 2029. (*Id.* ¶ 332.)

### 3.    *Coordination and Planning*

Plaintiff alleges that, as early as 2019, Johnson and Ornelas-Kuh began conspiring to form a competing company. (*Id.* ¶¶ 2-3.) By February 2020, the two had purportedly started stealing proprietary and confidential information from CCFW and its clients. (*Id.*) Plaintiff asserts that it

is evident this was the beginning of the conspiracy because, in February 2020, email messages were forwarded from Ornelas-Kuh to Johnson where Ornelas-Kuh had an exchange with Janssen's vendor management affiliate, Worksense, inquiring about the best way to change entity names and tax IDs with minimal business disruption. (*Id.* ¶¶ 89-91.) At that time, CCFW, however, was neither contemplating nor discussing changing its name or entity in any way. (*Id.* ¶ 89.)

Throughout 2021, the alleged plan purportedly progressed. Johnson began discussing with Manning a potential acquisition of CCFW and received coaching on how to present her interest to Studdiford. (*Id.* ¶¶ 44-45, 49.) Plaintiff alleges that, in December 2021, "[w]hen on the Kiawah Island Trip, Manning and Johnson and presumably Crum sat at a meal and conspired on a plan, approach and communication strategy/points for Johnson to demand that she be given total control of CCFW from CC Ford . . . and Studdiford." (*Id.* ¶ 49.) An audio recording of that conversation between Johnson and Crum and/or Manning was discovered on Johnson's company laptop. (*Id.* ¶¶ 50-54.)

To carry out this plan, Manning, with help from Crum, prepared a script for Johnson to assert ownership of CCFW during her conversation with Studdiford. (*Id.* ¶ 52.) Then, on December 29, 2021, Johnson sent Manning a draft email message to be sent to Studdiford, demanding sole ownership of CCFW, much of which was lifted verbatim from the scripted language and/or the audio recording. (*Id.* ¶¶ 60-61.) On December 31, 2021, Johnson sent the scripted email to Studdiford, and after receiving the email message, Studdiford set up a call with Johnson to discuss her demands and offer her several positive alternatives. (*Id.* ¶¶ 63-64.) Johnson then demanded to buy CCFW from Studdiford, but purportedly lacked the financial means to do so. (*Id.* ¶ 64.) Nevertheless, both CCFW and Johnson moved forward, allowing their respective lawyers to engage in the next steps to facilitate the purchase of CCFW. (*Id.*) Plaintiff asserts that Johnson's

8

efforts were a pretext to buy time and gain internal information while she prepared to launch her competing business, PVI. (*Id.* ¶ 65.)

### 4.    *Resignation, Formation of PVI, and Continued Engagement With CCFW*

On February 28, 2022, Johnson filed articles of incorporation for a new business entity, PVI, without disclosing this to CCFW. (*Id.* ¶¶ 6, 75-76.) That same day, she submitted a letter of resignation to CCFW, effective March 25, 2022. (*Id.*) Despite her impending departure and the undisclosed formation of a competing business, Johnson continued to serve in her role and maintained access to internal company systems, records, and confidential client data through the end of her employment. (*Id.* ¶¶ 19-20, 67-70, 96-98.) On March 26, 2022—the day after her resignation became effective—Johnson executed her Consulting Agreement and Confidentiality Agreement with CCFW. (*Id.* ¶¶ 112-13.)

In early March 2022, while still formally serving as CCFW's Managing Director, Johnson emailed CCFW's leadership team—excluding Studdiford—and requested a comprehensive accounting of all signed SOWs for 2022 by client and project. (*Id.* ¶ 96.) Plaintiff alleges that this was part of her effort to prepare for the launch of PVI by gathering competitive intelligence, financial projections, and client-specific budgets. (*Id.*)

In addition to gathering internal data from CCFW, Johnson allegedly remained in frequent contact with PEC personnel during this transition period. (*Id.* ¶¶ 102-06.) Internal PEC email messages show that as late as March 21, 2022—just days before her resignation became effective—Johnson was actively engaged in PEC business, including medical affairs goal planning, conference scheduling, and internal strategic meetings. (*Id.* ¶¶ 103-06.) For instance, she emailed PEC executives about a "payer taskforce" and discussed 2022 strategy deliverables. (*Id.*

¶ 104.) She was also included on email messages discussing approval of invoices and internal compliance processes, despite no longer being a CCFW employee. (*Id.* ¶ 108.)

Even after her formal resignation from CCFW, Johnson purportedly reached out to Pamela Stephenson ("Stephenson"), Chief Operating Officer of Albireo Pharmaceuticals ("Albireo")—another CCFW client—on March 25, 2022, to inform Stephenson of her departure and position herself as a future contact. (*Id.* ¶ 114.) Plaintiff contends that Johnson's outward posture of assisting CCFW was part of a coordinated misdirection. (*Id.* ¶¶ 98-103.) On March 23, 2022, Johnson emailed senior PEC executives, including Manning, suggesting that CCFW remain PEC's "execution partner" moving forward. (*Id.* ¶ 99.) Plaintiff, however, asserts that this message allegedly concealed the fact that Johnson, Bicking, and Weiler—while still on CCFW's payroll—were already working behind the scenes to route PEC business to PVI. (*Id.* ¶¶ 20-21, 125-28.) Manning simultaneously restricted internal PEC access to CCFW's shared files and instructed that only Johnson, Bicking, and Weiler be permitted to access them. (*Id.* ¶ 67.) Manning also directed PEC employees to communicate exclusively with her regarding CCFW-related matters. (*Id.* ¶¶ 100-02.) Plaintiff alleges that these actions were designed to enable the seamless transfer of PEC business to PVI, all the while deceiving CCFW into believing that the client relationship remained intact. (*Id.* ¶¶ 19-21, 68-74, 125-27.) On March 28, 2022, Manning held a Zoom call with Studdiford, during which she offered reassurances that PEC still intended to work with CCFW, only later to cancel all pending SOWs on April 29, 2022. (*Id.* ¶¶ 121-24.)

Johnson's conduct during this time—while simultaneously serving as a CCFW consultant, forming PVI, communicating with clients, and retaining confidential business information—is alleged to have directly violated Johnson's Non-Compete Agreement, Johnson's Consulting Agreement, and Johnson's Confidentiality Agreement. (*Id.* ¶¶ 117-20.)

### 5.    *Diversion of PEC Business and Involvement of Other Employees*

Following Johnson's resignation from CCFW, two employees—Bicking and Weiler—remained employed by CCFW, but allegedly participated in continuing efforts to divert CCFW's business to PVI. (*Id.* ¶¶ 7, 19-21, 125-28.) Despite remaining on CCFW's payroll, Bicking and Weiler allegedly collaborated with Johnson to continue performing work on behalf of PEC through PVI. (*Id.* ¶ 125.) Plaintiff further alleges that, in the weeks following Johnson's resignation, Johnson, Bicking, and Weiler collectively exploited CCFW's proprietary systems, budgets, and documentation to further the transition of PEC work to PVI. (*Id.* ¶¶ 96-98, 114.)

On April 7, 2022, shortly after Johnson's resignation became effective, Bicking informed Studdiford that PEC had confirmed SOWs for several projects, including a Field Training Project running through December 2022, the POA2 Project Management for September 2022, and the 2023 President's Club. (*Id.* ¶ 123.) In reliance on these statements, Studdiford continued to support Bicking and PEC personnel on project deliverables and preparations. (*Id.* ¶ 102.) On April 29, 2022, PEC notified CCFW by way of a Zoom call that it would not be proceeding with the projects. (*Id.* ¶ 124.) On May 2, 2022, Studdiford updated Bicking that PEC had pulled all CCFW work and instructed her to stop immediately and wrap-up billing. (*Id.* ¶ 128.) Plaintiff alleges that Bicking's representations in early April were knowingly false and were intended to buy time for Defendants to finalize the redirection of PEC's business to PVI. (*Id.* ¶¶ 123-24, 127.) Rather than discontinuing work on the PEC projects, as Studdiford instructed, Bicking and Weiler allegedly continued to perform services—but now covertly under the PVI umbrella while still receiving compensation from CCFW. (*Id.* ¶ 128.) For example, on May 3, 2022, Weiler sent PEC's Director of Sales Training and Development, Kristin Page, an email message from Bicking's PEC email address, which stated that "(This is Beth, Carrie asked me to email you from her PEC account.)" (*Id.* ¶ 129.)

11

The email message also discussed working on a PEC project, POA 2, workshop deck, for which CCFW did not have a signed SOW. (*Id.*) Then, on May 12, 2023, Weiler sent an email message to Rob Kavanaugh of PEC regarding her working on an ongoing PEC project. (*Id.* ¶ 130.) Bicking, on May 16, 2022, sent an email message asking if "everything [was] all set" for workshops related to a PEC project POA 2. (*Id.* ¶ 131.)

In email messages sent in March 2022, Johnson had requested detailed summaries of all active SOWs and budgets. (*Id.* ¶ 96.) Bicking responded to Johnson, sending her a highly confidential internal CCFW budget tracking spreadsheet with 2022 budgets for various CCFW clients, including PEC and six others. (*Id.* ¶ 97.) Similarly, on March 18, 2022, Ornelas-Kuh sent Johnson a proprietary and confidential CCFW marketing presentation that Studdiford had recently sent him, as well as additional information on upcoming Janssen work. (*Id.*) Moreover, on April 30, 2022, Bicking used her personal email account to send CCFW's confidential information concerning client documents and proprietary job descriptions to Johnson's personal email address. (*Id.* ¶ 77.)

In May 2023, it was discovered that Ornelas-Kuh—who had resigned from CCFW earlier that year following an audit revealing fraudulent expense practices—had joined PVI as a Managing Director. (*Id.* ¶¶ 80-87.) Shortly thereafter, in July 2023, an affiliated entity with PVI, PVP, was incorporated. (*Id.* ¶ 23.) Ornelas-Kuh began using an email address associated with PVP to conduct work related to PVI. (*Id.*) Plaintiff alleges this was done to obscure Ornelas-Kuh's involvement, given his prior fiduciary obligations to CCFW. (*Id.*) Plaintiff asserts that an online search for "Project Velocity Partners" redirects users to PVI's website, which supports its claim that PVI and PVP are part of a common enterprise. (*Id.*) Plaintiff alleges that the diversion of business was planned to occur covertly, using employees still under contract with CCFW to perform services

under PVI's name, thereby depriving CCFW of both revenue and client goodwill. (*Id.* ¶¶ 19-21, 125-29.) This purported enterprise allegedly enabled PVI to quickly scale its operations without incurring the normal costs associated with acquiring clients or hiring staff, relying instead on misappropriated personnel, infrastructure, and proprietary business information. (*Id.* ¶¶ 19, 77, 98.) Ultimately, Plaintiff contends that the alleged scheme succeeded in redirecting millions of dollars in PEC work to PVI over a 12-month period. (*Id.* ¶ 10.) More specifically, Plaintiff asserts that "PEC paid PVI close to $5 million, if not more, in just the first year, March 2022 – March 2023, and likely paid it close to $10 million prior to PVI being fired by PEC along with Manning and other PEC senior executives." (*Id.*)

### B.    Procedural History

The Court next turns to the long, protracted procedural history of the case. On May 12, 2022, CC Ford commenced the progenitor of this action, *CC Ford v. Johnson*, SOM-L-521-22 (N.J. Super. Ct. Somerset County), solely against Johnson. (*See* ECF No. 1-1.) On June 17, 2022, Johnson removed the action to this Court, invoking the Court's diversity jurisdiction. (*See* ECF No. 1.) On September 20, 2022, Plaintiff filed its first amended complaint ("FAC"), which added, among other things, claims against Bicking, Weiler, and PVI. (*See generally* FAC, ECF No. 9.) In the FAC, CCFW was substituted as plaintiff for CC Ford, its parent corporation. (*See generally id.*) Alongside the FAC, CCFW moved for a temporary restraining order to bar Weiler, Bicking, and PVI from allegedly violating restrictive covenants and to compel them to return or destroy CCFW's trade secrets. (*See* ECF No. 9-6.) The Court, in turn, denied CCFW's motion. (*See* ECF Nos. 29, 30.)

On July 27, 2023, CCFW moved to amend the FAC (ECF No. 52), which it superseded with a second motion to amend the FAC on July 26, 2024 (ECF No. 85). The Court granted

CCFW's second motion to amend the FAC on August 22, 2024 and directed CCFW to file and serve its SAC by September 6, 2024. (ECF No. 90.) On September 6, 2024, CCFW filed the SAC, which added, among other things, claims against PEC, Ornelas-Kuh, and PVP. (*See generally* SAC.) More specifically, Plaintiff filed the SAC asserting the following sixteen causes of action: (1) Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO") and N.J. Stat. Ann. § 2C:41 ("NJRICO") Enterprise against all Defendants ("Count One"); (2) RICO and NJRICO Conspiracy against all Defendants (18 U.S.C. § 1962(d) & N.J. Stat. Ann. § 2C:41-2(d)) ("Count Two"); (3) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and misappropriation of trade secrets under the New Jersey Trade Secrets Act ("NJTSA") against all Defendants ("Count Three"); (4) New Jersey Computer Related Offenses Act ("CROA") and the federal Computer Fraud and Abuse Act ("CFAA") against all Defendants ("Count Four"); (5) breach of contract against Johnson, Bicking, Weiler, and Ornelas-Kuh ("Count Five"); (6) breach of fiduciary duty against Johnson ("Count Six"); (7) breach of the duty of undivided loyalty and violations of the faithless servant doctrine against Johnson, Bicking, Weiler, and Ornelas-Kuh ("Count Seven"); (8) tortious interference with contractual relationships against all Defendants ("Count Eight"); (9) tortious interference with prospective economic advantage against all Defendants ("Count Nine"); (10) unfair competition against all Defendants ("Count Ten"); (11) trespass to chattel/conversion against all Defendants ("Count Eleven"); (12) theft of trade secrets and misappropriation of confidential information against all Defendants ("Count Twelve"); (13) tortious interference against Johnson, PVI, and PVP ("Count Thirteen"); (14) tortious interference with contract and prospective economic advantage against PEC and Manning ("Count Fourteen"); (15) misappropriation and fraud against Ornelas-Kuh and PVP

14

("Count Fifteen"); and (16) unjust enrichment against all Defendants ("Count Sixteen"). (*See generally id.*)

## II.     LEGAL STANDARDS

### A.     Federal Rule of Civil Procedure 12(b)(5)[8]

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). Under Rule 12(b)(5), a party may file a motion asserting insufficient service of process as a defense.

Rule 4 establishes the procedural requirements that must be met for proper service under Rule 12(b)(5). "When a party moves to dismiss under Rule 12(b)(5), the party making the service has the burden of demonstrating its validity." *Laffey v. Plousis*, No. 05-2796, 2008 WL 305289, at *3 (D.N.J. Feb. 1. 2008) (quoting *Carpenter v. Young*, No. 04-927, 2004 WL 1858353, at *2 (E.D. Pa. Aug. 3, 2004)), *aff'd*, 364 F. App'x 791 (3d Cir. 2010).

### B.     Rule 12(b)(6)

Rule 12(b)(6) provides that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion to dismiss for failure to state a claim, the moving party "bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)); *Haney v. USA Gymnastics, Inc.*, No. 21-7213, 2022 WL 909871, at *2 (D.N.J. Mar. 29, 2022). When reviewing a motion to dismiss for failure to state a claim, courts first separate the factual and legal elements of the claims and accept all of the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

---

[8] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

While Rule 8(a)(2) does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips*, 515 F.3d at 231-32 (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

## III.    DISCUSSION

### A.    Motion to Dismiss Under Rule 12(b)(5)—Insufficient Service

In moving to dismiss, the PEC Defendants first argue that the SAC should be dismissed under Rule 12(b)(5) because Plaintiff failed to effectuate timely service as required by the Court's August 22, 2024 Text Order. (PEC Defs.' Moving Br. 8-9, ECF No. 115.) The August 22, 2024 Text Order directed "Plaintiff [to] file and serve its [SAC] by 09/06/2024." (Text Order, ECF No. 90.) Although Plaintiff timely filed its SAC, the PEC Defendants argue that it failed to serve them (which were newly added) by the Court-ordered deadline. (PEC Defs.' Moving Br. 8-9.) Rather, Plaintiff contacted defense counsel for the PEC Defendants on September 9, 2024—three days after the SAC was to be "file[d] and serve[d]"—inquiring whether the PEC Defendants would agree to accept service. (*Id.* at 8-9.) While the PEC Defendants waived service, they argue that they preserved their objection to improper service. (*Id.*)

16

Plaintiff, on the other hand, argues that the PEC Defendants waived service by execution of the AO 399 form entitled "Waiver of the Service of Summons," which forecloses the relief sought by the PEC Defendants. (Pl.'s Opp'n Br. to PEC Defs.' Moving Br. 5-6, ECF No. 125.) Plaintiff further argues that dismissal under Rule 12(b)(5) is "only [permissible] '[w]hen a plaintiff fails to effect proper service upon a defendant and the defendant does not waive service of process pursuant to Rule 4(d).'" (*Id.* at 6 (quoting *Telkamp v. Vitas Healthcare Corp. Atl.*, No. 15-726, 2016 WL 777906, at *3 (D. Conn. Feb. 29, 2016)).)

Here, the Court agrees with Plaintiff that not only does the PEC Defendants' waiver of service foreclose their objection to service, but also that dismissal would only be appropriate under Rule 12(b)(5) when service is not properly effectuated upon the defendant and that said defendant does not waive service.[9] *See, e.g., Kohar v. Wells Fargo Bank, N.A.*, No. 15-1469, 2016 WL 1449580, at *3 n.7 (W.D. Pa. Apr. 13, 2016) ("The [c]ourt notes that [although the defendant] initially moved to dismiss under Rule 12(b)(5), that aspect of the motion is moot, given that it . . . waived service."); *Rogers v. Frazier*, No. 15-714, 2016 WL 11475117, at *1 (E.D. Tex. Feb. 8, 2016) ("Because [the defendant] has waived service of the summons and complaint in this matter[,] the request for dismissal for insufficient service pursuant to Rule 12(b)(5) should be [denied] as moot." (citation omitted)). Accordingly, the PEC Defendants' motion to dismiss under Rule 12(b)(5) is denied.

---

[9] Furthermore, the PEC Defendants do not argue that they suffered prejudice as a result of receiving the SAC three days after the Court-ordered deadline. (*See generally* PEC Defs.' Moving Br.) Moreover, the PEC Defendants do not cite any authority that supports the proposition that Plaintiff was obligated to formally serve the *newly added defendants* on the same day it filed its SAC on CM/ECF. (*See generally id.*)

**B.      Motion to Dismiss Under Rule 12(b)(6)—Failure to State a Claim**

The PEC Defendants next move to dismiss under Rule 12(b)(6). At the outset, the PEC Defendants move to dismiss the SAC on the grounds that it is group pled and therefore fails to meet Rule 8(a) because it fails to provide each defendant with "fair notice" of the claims against them and the grounds upon which each claim rests. (PEC Defs.' Moving Br. 9-11.) Plaintiff, on the other hand, argues that the SAC "does not rely on group pleading to assert any of [its] causes of action against Defendants . . . and are pled with striking detail." (Pl.'s Opp'n Br. to PEC Defs.' Moving Br. 12.)

Here, although the SAC is a staggering 108 pages and contains 452 paragraphs replete with conclusory and unnecessary allegations, the Court does not find that it is insufficiently group pled to warrant dismissal. The Court, however, does note that the SAC appears unnecessarily long-winded, and often times, redundant. "The [mere] fact [CCFW] asserts . . . RICO claims does not justify . . . [its] verbose complaint." *See Pahmer v. Greenberg*, 926 F. Supp. 287, 294 n.2 (E.D.N.Y. 1996), *aff'd sub nom.*, *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997) (citation omitted). The Court, therefore, reminds Plaintiff that "although RICO complaints often might need to be somewhat longer than many complaints, RICO complaints must meet the requirements of Rule 8(a)(2) and Rule 8(e)(1)." *Id.* (citation omitted).

Having concluded that the allegations contained in Plaintiff's 108-page SAC are not insufficiently "group pled" to warrant dismissal, the Court next evaluates whether the claims therein adequately state a claim as to the PEC Defendants and the PVI Defendants.

18

### 1.     Count One: Section 1962(c) RICO and NJRICO—Enterprise

The RICO Act provides for "civil damages for 'any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962].'" *Tabas v. Tabas*, 47 F.3d 1280, 1289 (3d Cir. 1995) (quoting 18 U.S.C. § 1964(c)). Under the RICO Act, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *see Dongelewicz v. PNC Bank Nat'l Ass'n.*, 104 F. App'x 811, 816-17 (3d Cir. 2004) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Under 18 U.S.C. § 1962(a), it is "unlawful for any person [to] receive[] any income derived, directly or indirectly," from a violation of § 1962(c). And under 18 U.S.C. § 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a) . . . or (c) of this section."

To plead a civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege: "(1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity."[10] *D'Ambly v. Exoo*, No. 20-12880, 2021 WL 5083816, at *3 (D.N.J. Nov. 1, 2021) (citing *Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 166, 173 (D.N.J. 1998)). "Moreover, where the plaintiff presents a fraud-based RICO claim, he must plead with particularity the circumstances of the alleged fraud." *Mierzwa v. Safe & Secure Self Storage, LLC*, 493 F. App'x 273, 276 (3d Cir. 2012) (citations omitted). To satisfy the "enterprise" element, the plaintiff must show "a 'structure,' that is, a common 'purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *In re Ins. Brokerage*

---

[10] The federal and New Jersey RICO statutes are substantively similar. *Sharp v. Kean Univ.*, 153 F. Supp. 3d 669, 674 (D.N.J. 2015).

*Antitrust Litig.*, 618 F.3d at 368; *see also Miller-Bell v. Hall*, No. 23-924, 2023 WL 5153677, at *7 (W.D. Pa. Aug. 9, 2023) ("While [plaintiffs] need not prove [their] claims at the pleading stage, the existence of . . . an enterprise must be plausible based on the facts alleged."). "To set forth a pattern of racketeering activity, a plaintiff must show that *each defendant has committed* at least two acts of racketeering activity[.]" *Dougherty v. Adams-Dougherty*, No. 15-8541, 2016 WL 5219460, at *6 (D.N.J. Sept. 21, 2016) (emphasis added).

          a.        **The PEC Defendants**

The PEC Defendants argue that Plaintiff's RICO claim fails because the SAC fails to sufficiently allege: (1) two predicate acts; and (2) facts to suggest that an "enterprise" existed. (PEC Defs.' Moving Br. 13-19.)

Here, the SAC is devoid of any allegations that PEC committed any predicate act—let alone two. This is fatal to Plaintiff's RICO claim as to PEC. *See Capers v. FedEx Ground*, No. 02-5352, 2012 WL 2050247, at *4 (D.N.J. June 6, 2012) (dismissing RICO claims for pleading deficiencies, including "not adequately alleg[ing] that each alleged member committed at least two acts of racketeering activity . . . and which predicate acts they committed" (citations omitted)). As it pertains to Manning, the SAC alleges that:

> Manning . . . [was] stealing and/or otherwise misappropriating, over a number of years and while [she] was employed at various pharmaceutical companies prior to PEC, various confidential and/or proprietary information and/or trade secrets belonging to various pharmaceutical companies that were used by the Enterprise to conduct its business in violation of, inter alia, N.J.S.A. [§] 2C:20-3(b) (criminal theft of property, which includes trade secrets, information and data), and 18 U.S.C. [§] 1832(a) (theft of trade secrets)[.]

(SAC ¶ 265(a).) The SAC, however, fails to allege two predicate acts as they pertain to Manning.[11] Because the SAC fails to allege two predicate acts committed by Manning, Plaintiff's RICO claim as to Manning necessarily fails.[12]

### b.    The PVI Defendants

The PVI Defendants argue that the SAC fails to allege: (1) two predicate acts; (2) proximate causation with respect to the alleged damages; and (3) any damage to any computer infrastructure. (PVI Defs.' Moving Br. 3, ECF No. 118.) Plaintiff, on the other hand, contends that the SAC sufficiently alleges "two predicate acts . . . : 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); theft by deception; N.J.S.A. [§] 2C:20-3(b) (criminal theft of property, which includes trade secrets, information and data); 18 U.S.C. [§] 1832(a) (theft of trade secrets); N.J.S.A. [§] 2C:20-25 (computer criminal activity) and fraud." (Pl.'s Opp'n Br. to PVI Defs.' Moving Br. 30-31, ECF No. 124.)

"A common thread running throughout § 1962 is that an injured party must demonstrate that the defendant was engaged in a 'pattern of racketeering activity.'" *Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165, 167 (3d Cir. 2013) (citation omitted). "A pattern of racketeering activity requires at least two predicate acts of racketeering[,]" which "may include, *inter alia*, federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." *Lum v. Bank of Am.*,

---

[11] Moreover, the SAC's allegation of "theft" in violation of 18 U.S.C. § 1332(a) fails to plead the requisite elements of the criminal stealing of trade secrets. *See Ricale Assocs., LLC v. McGregor*, No. 15-541, 2015 WL 5781063, at *5 (D.N.J. Sept. 30, 2015) ("Merely listing . . . predicate acts is not sufficient to state a RICO claim. Plaintiff must adequately plead the elements of each predicate act.").

[12] Furthermore, Plaintiff alleges that Manning's purported "theft" occurred *before* PVI came into existence. (*See* SAC ¶¶ 93, 201-210.) The SAC does not allege facts to suggest that Manning's alleged "theft" occurred in furtherance or in coordination with the purported enterprise's other members.

361 F.3d 217, 223 (3d Cir. 2004), *abrogation on other grounds recognized by In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 323 n.22. When "plaintiffs rely on mail and wire fraud as a basis for a RICO violation, [as here,] the allegations of fraud must comply with [Rule] 9(b), which requires that allegations of fraud be pled with specificity." *Id.* (citation omitted).

Here, the Court finds that the SAC lacks sufficient allegations to demonstrate that the PVI Defendants each committed two predicate acts under Rule 9(b)'s pleading standard.[13] Despite its length, the SAC fails to plead with specificity the "what, when, where," or "how" of any alleged fraud underlying Plaintiff's RICO claims. This dooms Plaintiff's RICO claims as to the PVI Defendants. *See, e.g.*, *Lakhani v. Patel*, No. 15-7794, 2016 WL 1588085, at *2 (D.N.J. Apr. 20, 2016) (dismissing RICO claim where plaintiff failed to include "sufficient facts detailing the 'what, when, where, and how' of the alleged fraud").

Even if the Court were to find the SAC sufficiently alleges facts to plausibly establish two predicate acts by the PVI Defendants, the SAC—108 pages and 452 paragraphs of content—is bereft of connective tissue plausibly alleging an "enterprise structure" tying together the various actors—that is, "something more than the fact that individuals were all engaged in the same type of illicit conduct during the same time period[.]" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 370 (citation to quoted source omitted). The breadth of the claimed association(s) results in Plaintiff's own undoing. While the pleadings contain assertions of legal conclusions, in the guise of factual averments, there are no plausible allegations that the numerous individuals and entities acted together as a RICO "enterprise." The Court, therefore, dismisses Plaintiff's RICO claims as

---

[13] The SAC is silent on the predicate acts that were purportedly committed by PVP. (*See generally* SAC.)

to the PVI Defendants. The Court also finds good cause to require Plaintiff to file a RICO case statement in the format required by Local Civil Rules, Appendix O.

### 2. *Count Two: Section 1962(d) and NJRICO—Conspiracy*

To plead a claim for RICO conspiracy under § 1962(d), a plaintiff must allege that the defendant "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001). This standard may be met "even if the defendant did not personally agree to do, or to conspire with respect to, any particular element" of the RICO enterprise. *Id.* at 537 (footnote omitted). A defendant must only "opt[] into or participate[] in a conspiracy" to be liable for the acts of co-conspirators in violation of § 1962(c). *Id.* If, however, a plaintiff's substantive RICO § 1962(c) claim is dismissed, any RICO conspiracy claim necessarily fails. *Irish v. Ferguson*, 970 F. Supp. 2d 317, 362 (M.D. Pa. 2013) ("[I]f the pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim also fails." (citation to quoted source omitted)). Here, because the Court finds that the SAC fails to state a substantive RICO claim, the Court also finds that Plaintiff fails to allege a RICO conspiracy claim. *See id.* The Court, accordingly, dismisses Plaintiff's RICO conspiracy claims.

### 3. *Counts Three and Twelve: Trade Secrets and Confidential Information*

In Counts Three and Twelve, the SAC asserts DTSA and NJTSA claims ("Trade Secret Claims") as to the PEC Defendants and PVI Defendants, which are premised on the claim that they misappropriated CCFW's trade secrets, "including, but not necessarily limited to . . . budgets, vendor lists, SOWs and work product performed for CCFW clients[.]" (SAC ¶ 283 (alleging for Count Three); (SAC ¶ 418 (alleging for Count Twelve that the defendants improperly accessed Plaintiff's "business data compilations, methods, techniques, [and] designs").)

Because "[c]ourts in this district 'fold' the DTSA analysis into the NJTSA review[,]" the Court considers the two claims together. *Corp. Synergies Grp., LLC v. Andrews*, No. 18-13381, 2019 WL 3780098, at *3 (D.N.J. Aug. 12, 2019) (quoting *Scherer Design Grp., LLC v. Schwartz*, No. 18-3540, 2018 WL 3613421, at *4 (D.N.J. July 26, 2018), *aff'd sub nom.*, *Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147 (3d Cir. 2019)). Notably, there is no heightened pleading standard for a misappropriation of trade secrets claim. *See IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-4992, 2012 WL 4050298, at *7 (D.N.J. Sept. 13, 2012); *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 913 (3d Cir. 2021).

To survive a motion to dismiss under both the DTSA and NJTSA, a plaintiff must adequately allege: (1) "the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret[;]" (2) that the trade secret is "related to a product or service used in, or intended for use in, interstate or foreign commerce[;]" and (3) "the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret." *Oakwood Lab'ys LLC*, 999 F.3d at 905; *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 355 (D.N.J. 2019) (explaining that the "NJTSA contains virtually identical definitions of trade secret, misappropriation, and improper means" as the DTSA). "The essential inquiry for a trade secret is whether the information derives economic value, the information is not readily ascertainable by other means, and the holder endeavors for it to remain confidential." *Scherer Design Grp., LLC*, 2018 WL 3613421, at *4. Critical to the confidentiality analysis is whether the plaintiff has taken "precautions to maintain the secrecy of the trade secret." *Id.* (quoting *Mu Sigma, Inc. v. Affine, Inc.*, No. 12-1323, 2013 WL 3772724, at *8 (D.N.J. July 7, 2013)). The test to determine whether a plaintiff took steps to

maintain the confidentiality of the trade secret is one of reasonableness. *See Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. 11-1857, 2012 WL 5554543, at *9 (D.N.J. Nov. 14, 2012).

Courts in this District considering trade secrets claims look to whether the alleged trade secrets are "identified with enough specificity to place a defendant on notice of the bases for the claim being made against it." *Ho-Ho-Kus, Inc. v. Sucharski*, No. 23-1677, 2023 WL 7403539, at *6 (D.N.J. Nov. 9, 2023). Although "[t]he listing of relatively broad categories of information can be acceptable at the pleading stage," *id.*, a plaintiff may not merely "make generalized claims that leave a defendant wondering what the secrets at issue might be." *Oakwood Lab'ys LLC*, 999 F.3d at 907; *see also, e.g., Givaudan Fragrances Corp. v. Krivda*, No. 08-4409, 2013 WL 5781183, at *4 (D.N.J. Oct. 25, 2013) ("[A] plaintiff in a misappropriation of trade secrets case must identify with precision the trade secrets at issue at the outset of the litigation.").

Here, the Court finds that Plaintiff plausibly alleges facts for a trade secrets claim.[14] Beginning with the existence of trade secrets, Plaintiff alleges that its trade secrets included, but were not limited to, "budget, vendor lists, SOWs, and work product performed for CCFW clients." (SAC ¶ 283.) Plaintiff further alleges that this information derived independent economic value from remaining confidential and was subject to reasonable measures to protect its secrecy, which included non-disclosure agreements and contractual confidentiality clauses. (*Id.* ¶¶ 222-24, 281-86.) Plaintiff further alleges that such information derives independent economic value from not being publicly known and provides Plaintiff a competitive advantage in the pharmaceutical marketing industry. (*Id.* ¶¶ 16, 98.) Taken together, these facts sufficiently plead that trade secrets

---

[14] The second element—that the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce—is not disputed by the parties. Accordingly, the Court finds this element sufficiently pled. (*See* SAC ¶ 223 (alleging that the documents contain information that was used in, or intended to be used in, interstate and/or foreign commerce).)

existed, and Plaintiff took reasonable steps to maintain their secrecy. *See, e.g.*, *Sunbelt Rentals, Inc. v. Love*, No. 20-17611, 2021 WL 82370, at \*24 (D.N.J. Jan. 11, 2021) (stating that customer lists, among other things, "indisputably constitute[] trade secrets"); *see also Alpha Pro Tech. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 437-38 (E.D. Pa. 2013) (determining whether reasonable steps were taken "requires consideration of, but not entire reliance on, confidentiality agreements, which are but one factor of the analysis"). As such, the Court finds that these allegations, taken as true, are sufficient to plausibly allege the existence of trade secrets under both the DTSA and NJTSA. *See Oakwood Lab'ys LLC*, 999 F.3d at 907 (finding that, among other things, confidential client pricing and strategy documents constitute protectable trade secrets); *see also Beta Pharma, Inc. v. InventisBio (Shanghai) Co.*, No. 21-5103, 2022 WL 17547265, at \*3 (D.N.J. Dec. 8, 2022) (explaining that "[t]rade secrets may include proprietary business information like customer lists, pricing information, and marketing techniques").

Having found that the SAC adequately alleges trade secrets that were related to services used in interstate commerce, the Court need only ascertain whether the SAC sufficiently alleges that the PEC Defendants and the PVI Defendants misappropriated those trade secrets. Under the DTSA and NJTSA, misappropriation occurs where a person who acquires a trade secret by improper means, or discloses or uses a trade secret without consent when they knew or had reason to know it was acquired by improper means, was subject to a duty to maintain its secrecy, or obtained the trade secret from someone who owed such a duty. 18 U.S.C. § 1839(5); N.J. Stat. Ann. § 56:15-2; *see also Austar Int'l Ltd.*, 425 F. Supp. 3d at 355.

### a.     The PEC Defendants

In moving to dismiss Plaintiff's Trade Secret Claims, the PEC Defendants argue that: (1) the SAC fails to allege that PEC or Manning were aware of the theft of any of Plaintiff's

trade secrets; and (2) to the extent that CCFW tries to identify PEC-related documents misappropriated by the former CCFW employees, that information is PEC's trade secrets or confidential information, and not CCFW's secrets. (PEC Defs.' Moving Br. 24-26.) Plaintiff, on the other hand, contends that the PEC Defendants knowingly participated in the misappropriation and facilitated the unlawful scheme. (Pl.'s Opp'n Br. to PEC Defs.' Moving Br. 23.)

Here, the Court finds that the SAC fails to adequately state Trade Secret Claims against the PEC Defendants. That is, Plaintiff fails to adequately allege that PEC or Manning misappropriated CCFW's trade secrets. The only allegation in the SAC that pertains to Manning is that she used her position as PEC's General Manager to facilitate the transfer of CCFW's client work to PVI while knowing that PVI's founders were CCFW employees or consultants at the time.[15] (SAC ¶¶ 5-10, 69-72.) With regards to PEC, Plaintiff alleges that PEC benefited from the use of such information in servicing its launch of the drug BESREMi, and that PEC executives other than Manning were at least aware of the transfer of business to PVI. (*Id.* ¶¶ 10-11, 104-07) The SAC, however, is devoid of factual allegations to suggest that PEC was aware of or participated in the theft of Plaintiff's trade secrets. As such, the Court finds that the SAC fails to adequately state Trade Secret Claims as to the PEC Defendants. *See Ho-Ho-Kus, Inc.*, 2023 WL 7403539, at *16 (explaining that a complaint must contain allegations to suggest that the defendants "have knowledge or reason to know, of the improper acquisition of the secrets").

### b.    The PVI Defendants

In the SAC, Plaintiff alleges that "'a Power Point presentation belonging to CCFW client Albireo, clearly marked confidential and for Internal Publication Only,' and 'close to 200 [files]

---

[15] CCFW concedes, in its opposition, that PEC and Manning are distinct parties and that whether Manning's purported acts during the time that she was president of PEC can be imputed to PEC is "too early to adjudicate." (*See* Pl.'s Opp'n to PEC Defs.' Moving Br. 18.)

in directories with such names as "Carrie Samples,'" 'Albireo,' 'Merz,' 'PEC,' 'PharmaEssentia,' and 'Project Velocity'" were misappropriated by Johnson. (*Id.* ¶¶ 205, 220.) The SAC also alleges that Ornelas-Kuh forwarded confidential CCFW documents to Johnson before her resignation, including a marketing presentation and project details from the Janssen account. (*Id.* ¶ 97.) The SAC further asserts that "Johnson reviewed about 670 files residing on a USB [drive] that Johnson owned but was at times attached to her CCFW laptop [and m]ost of those files [which contained confidential information] were reviewed between March and May 2022." (*Id.* ¶ 220.) Here, construing the facts in a light most favorable to Plaintiff, the Court finds that the SAC adequately alleges that the PVI Defendants misappropriated Plaintiff's trade secrets. *See Rodgers Grp., LLC v. Lewis*, No. 22-482, 2022 WL 4095785, at *4 (D.N.J. Sept. 7, 2022) (finding allegations that the defendant misappropriated confidential data by acquiring information without authorization before and after resigning were sufficient to withstand motion to dismiss). As such, the Court finds that these allegations, taken as true, adequately state Trade Secret Claims against the PVI Defendants.

### c.    Bicking and Weiler

The Court likewise finds that the SAC sufficiently states Trade Secrets Claims against Bicking and Weiler. In the SAC, Plaintiff alleges that Bicking sent Johnson, before her resignation date, a "highly confidential internal CCFW budget tracking spreadsheet with 2002 budgets for various CCFW clients[,] including PEC and six others." (SAC ¶ 97.) Plaintiff further alleges that while on CCFW's payroll, Bicking and Weiler allegedly collaborated with Johnson to continue performing work on behalf of PEC through PVI. (*Id.* ¶ 125.) Plaintiff further alleges that, in the weeks following Johnson's resignation, Johnson, Bicking, and Weiler collectively exploited CCFW's proprietary systems, budgets, and documentation to further the transition of PEC work to PVI. (*Id.* ¶¶ 96-98, 114.) The SAC also alleges that Bicking and Weiler continued to perform

services for PEC (while PEC had a Master Services Agreement with PVI) after they were instructed not to do so by CCFW. (*Id.* ¶¶ 128, 142.) Viewing these allegations in light most favorable to Plaintiff, the Court finds that such facts give rise to an inference of misappropriation by Bicking and Weiler.[16]

### 4.    *Count Five: Breach of Contract*

In Count Five, Plaintiff asserts a breach of contract claim against Johnson, Bicking, and Weiler. (*Id.* ¶¶ 293-363.) To state a claim for breach of contract under New Jersey law, a plaintiff must allege: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (citation omitted). So long as a plaintiff points to a contractual provision and alleges the requisite elements, a breach of contract claim will survive a motion to dismiss. *See StrikeForce Techs., Inc. v. WhiteSky, Inc.*, No. 13-1895, 2013 WL 3508835, at *6 (D.N.J. July 11, 2013) (denying a motion to dismiss where the plaintiff referenced the specific contractual provision at issue).

### a.    Johnson

In moving to dismiss Plaintiff's breach of contract claim, Johnson argues that: (1) Johnson's Non-Compete Agreement is not enforceable by CCFW; (2) Johnson's Consulting Agreement has expired; and (3) Johnson's Consulting Agreement does not bar the alleged conduct. (PVI Defs.' Moving Br. 2.)

---

[16] In Count 15, Plaintiff asserts a claim of "misappropriation and fraud" against PVP. (SAC ¶¶ 445-49.) New Jersey, however, does not appear to recognize a standalone tort of "misappropriation" separate from misappropriation of trade secrets under the NJSTA. Nor do the parties cite cases to suggest New Jersey does. Although the Court allows Plaintiff's Trade Secret Claims to proceed, the Court will dismiss Plaintiff's "misappropriation and fraud" claim.

In the SAC, Plaintiff alleges that Johnson is liable for breaching "Johnson's Non-Compete Agreements, [Johnson's] Consulting Agreement, and [Johnson's] . . . Confidentiality Agreement." (SAC ¶¶ 294-95.) The Court considers each contract in turn.

First up is Johnson's Non-Compete Agreement. Here, the SAC alleges that Johnson's Non-Compete Agreement was later assigned from CC Ford to CCFW. (*Id.* ¶ 117.) The SAC further alleges that Johnson breached her Non-Compete Agreement by "faili[ng] to inform . . . [CCFW] that she was engaging in work during the [c]onsulting period that was a conflict of interest with the work she was performing for the CCFW." (*Id.* ¶ 295.) Because Johnson's Non-Compete Agreement was purportedly assigned to CCFW and required Johnson, "among other things, not to compete or own, directly or indirectly, any 'competitive business' . . . with CC Ford . . . during [her] employment and for a period of one (1) year subsequent to her employment's termination," (*id.* ¶ 118), the Court finds that Plaintiff sufficiently states a breach of contract claim based on Johnson's Non-Compete Agreement.

Next up is Johnson's Consulting Agreement. Here, the Court finds that the SAC likewise sufficiently states a breach of contract claim. Johnson's Consulting Agreement provided that:

> [Johnson] agrees, for the duration of the term of this agreement, not to pursue any business opportunities that will create a conflict of interest with . . . [CCFW], and to notify. . . [CCFW] immediately, in writing, of any actual or potential conflict of interest. [Johnson] also agrees, for the duration of the term of this Agreement, not to solicit any client, customer, or employee of . . . [CCFW] to engage in any business relationship with [Johnson] other than in furtherance of the objectives of this Agreement.

(*Id.* ¶ 115.) Again, Plaintiff alleges that "Johnson . . . breached . . . the Consulting Agreement, [by] fail[ing] to inform [CCFW] that she was engaging in work during the [c]onsulting period that was a conflict of interest with the work she was performing for [CCFW]." (*Id.* ¶ 295.) Although Johnson argues that Johnson's Consulting Agreement "expressly recognized that CCFW

30

'expect[ed] that . . . [Johnson] will pursue other business opportunities during the term of this Agreement,'" (PVI Defs.' Moving Br. 17-18), the Court finds that this is a dispute regarding contract interpretation that is not appropriate to address at the motion to dismiss stage. As such, the Court finds that the SAC adequately pleads a breach of contract claim as to Johnson's Consulting Agreement.

Last up is Johnson's Confidentiality Agreement. Johnson's Confidentiality Agreement provides, in pertinent part, that:

> [Johnson] agrees, for a period of ten (10) years following the Effective Date, to retain in confidence all Confidential Information disclosed to [Johnson] by or on behalf of CC Ford Group, whether or not in writing or recorded in electronic of other format. Consultant further agrees that she "will not, either directly or indirectly, use any Confidential Information for any purpose other than to discharge her duties under the Consulting Agreement without the prior written consent of CC Ford Group."
>
> Confidential Information is defined in the Confidentiality Agreement as "All technical data, materials, and/or information, as well as all studies, analyses and/or copies derived therefrom, and any other nonpublic information of CC Ford Group provided to [Johnson] in the performance of her services." CC Ford Group includes all subsidiaries and affiliated companies including CCFW.

(SAC ¶ 116.) In the SAC, Plaintiff alleges that "Johnson . . . retained the laptop for six months, until finally she was ordered to return it by the Court in this litigation on September 28, 2022." (*Id.* ¶ 219.) Plaintiff further alleges that:

> a review of the laptop revealed the extensive theft of CCFW Confidential Information for Johnson's own gain and that of the other Defendants. Johnson reviewed about 670 files residing on a USB that Johnson owned but was at times attached to her CCFW laptop. Most of those files were reviewed between March and May 2022 . . . . Nearly half of the files on the USB drive at one point had been on Johnson's laptop and were CCFW's Confidential Information and proprietary client files, documents or trade secrets.

31

(*Id.* ¶¶ 220-21.) Construing these allegations in light most favorable to Plaintiff, the Court finds that the SAC sufficiently states a breach of contract claim as it pertains to Johnson's Confidentiality Agreement.

### b.    Bicking and Weiler

In Count Five, the SAC also asserts claims for breach of contract against Bicking and Weiler (SAC ¶¶ 293-363.) Here, the Court finds that Plaintiff sufficiently states breach of contract claims as to Bicking and Weiler based on their loyalty and confidentiality agreements. In the SAC, Plaintiff alleges that "Bicking and Weiler . . . continue[d] to perform PEC work surreptitiously while at CCFW and while still on its payroll[,] but for the benefit of PVI, in breach of their duties of loyalty." (*Id.* ¶ 20.) Plaintiff further alleges that "Weiler [and] Bicking . . . were or are stealing CCFW's customers, interfering with its relationships with vendors and suppliers, and exploiting CCFW's substantial investments in customer cultivation, market testing and promotion." (*Id.* ¶ 362.) A reasonable inference arises from these pleaded facts to permit Plaintiff's breach of contract claims as to Bicking and Weiler to go forward. As such, the Court denies the PVI Defendants' Motion to Dismiss Plaintiff's breach of contract claims as to Bicking and Weiler.

### 5.    *Counts Six and Seven: Breach of Fiduciary Duty and Faithless Servant Doctrine*

In Count Six, Plaintiff alleges breach of fiduciary duty against Johnson. (*Id.* ¶¶ 364-72.) In Count Seven, Plaintiff alleges breaches of duty of undivided loyalty and violations of the faithless servant doctrine against Johnson, Weiler, Bicking, and Ornelas-Kuh. (*Id.* ¶¶ 373-78.) Because New Jersey does not recognize a "faithless servant" claim from a duty of loyalty claim, the Court construes Plaintiff's "servant" claim as a duty of loyalty claim. *See Schweikert v. Baxter Healthcare Corp.*, No. 12-5876, 2015 WL 4578443, at *23 (D.N.J. Jul. 29, 2015) (determining

that the faithless servant doctrine has no basis in New Jersey law because New Jersey courts analyze faithless servant claims under "the breach of [fiduciary] duty doctrine").

To plead a breach of fiduciary duty, a plaintiff must allege: "(1) a fiduciary relationship comprised of two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship, and (2) a violation of that trust." *Wiatt v. Winston & Strawn, LLP*, No. 10-6608, 2011 WL 2559567, at *9 (D.N.J. June 27, 2011) (citation modified). "The threshold inquiry in any breach of fiduciary analysis is, therefore, whether a fiduciary relationship exists between the parties." *Equiom (Isle of Man) Ltd. v. Jacobs*, No. 16-4362, 2017 WL 6550481, at *3 (D.N.J. Dec. 22, 2017) (citing *SalandStacy Corp. v. Freeney*, No. 11-3439, 2012 WL 959473, at *12 (D.N.J. Mar. 21, 2012)).

The New Jersey Supreme Court has defined the elements of a claim for breach of fiduciary duty as follows:

> The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship.

*McKelvey v. Pierce*, 800 A.2d 840, 859 (N.J. 2002) (citation modified).

### a.    Breach of Fiduciary Duty (Count Six) and Breach of Duty of Undivided Loyalty and Faithless Servant Claim (Count Seven) Against Johnson

In moving to dismiss, Johnson argues that Plaintiff's breach of fiduciary duty claim should be dismissed because: (1) she was not bound by a non-compete agreement; and (2) her engaging and prevailing in competition for customers was wholly proper. (PVI Defs.' Moving Br. 22.) In opposition, Plaintiff asserts that, by virtue of being "bound by a non-compete agreement as well as a contractual obligation in [Johnson's] Confidentiality Agreement," Johnson breached her

fiduciary duty by going after CCFW's clients without permission and stealing and using CCFW's confidential information. (Pl.'s Opp'n Br. to PVI Defs.' Moving Br. 22 (citing SAC ¶ 113).)

Here, the Court finds that the SAC sufficiently states a breach of fiduciary duty claim against Johnson. Plaintiff alleges that "Johnson, as [CCFW]'s Managing Director, owed certain fiduciary duties to, among others, [CCFW]." (SAC ¶ 365.) Plaintiff further alleges that as a fiduciary, Johnson owed Plaintiff the "utmost duties of loyalty, honesty and care[,]" and that she breached these duties "by soliciting Plaintiff's customers and diverting [] business from [CCFW] on specific jobs for which those customers sought originally to engage [CCFW], while Johnson was still employed by and/or consulting for [CCFW]." (*Id.* ¶¶ 366-68.) Plaintiff also alleges that Johnson breached her fiduciary duties by using CCFW's "confidential and proprietary information and trade secrets, obtained in the course and scope of [her] employment and/or consulting arrangement with Plaintiff, to solicit [CCFW]'s customers to work with Johnson." (*Id.* ¶ 369.) Accordingly, Plaintiff has sufficiently pled a breach of fiduciary duty against Johnson. The Court, however, dismisses Plaintiff's faithless-servant and undivided-loyalty claims.[17]

### b.    Breach of Fiduciary Duty Against Bicking and Weiler (Count Seven)

For the same reasons that the Court denies Bicking and Weiler's motion to dismiss Plaintiff's breach of contract claims as to Bicking and Weiler, the Court denies their motion to dismiss Plaintiff's breach of fiduciary duty claims.

---

[17] The Court notes that, in opposition, Plaintiff does not dispute that New Jersey does not recognize faithless-servant or undivided-loyalty claims independent of duty of loyalty claims (*see generally* Pl.'s Opp'n Br. to PVI Defs.' Moving Br.); *see Leisure Pass N. Am., LLC v. Leisure Pass Grp.*, No. 12-3375, 2013 WL 4517841, at *4 (D.N.J. Aug. 23, 2013) (explaining that claims not addressed in opposition are abandoned and should be dismissed).

6.      *Count Four: Computer Fraud Claims*

The CFAA criminalizes intentional access to a computer "without authorization." *Van Buren v. United States*, 593 U.S. 374 (2021) (citing 18 U.S.C. § 1030(a)(2)). But those with authorization do not violate the CFAA even if they have "improper motives for obtaining information that is otherwise available to them." *Id.* at 378. To state a claim under the CFAA, a plaintiff must allege that the defendant: (1) accessed a "protected computer;" (2) has done so without authorization or by exceeding such authorization as was granted; (3) has done so "knowingly" and with "intent to defraud"; and (4) as a result has "further[ed] the intended fraud and obtain[ed] anything of value." *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (quoting 18 U.S.C. § 1030(a)(4)). A plaintiff must also plead facts that plausibly demonstrate: (1) loss or damage that exceeds or equals $5,000 in value; and (2) that the defendant caused the loss or damage by violating the CFAA. *Christine v. Nat'l Inst. for Newman Stud.*, No. 16-6572, 2019 WL 1916204, at *4 (D.N.J. Apr. 30, 2019). Although the Third Circuit generally treats the CROA and CFAA similarly, and Plaintiff brings both causes of action, the CFAA has an independent loss threshold that warrants separate discussion. *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, No. 09-2751, 2011 WL 6088611, at *4 (E.D. Pa. Dec. 7, 2011) (noting $5,000 loss element in CFAA private cause of action).

Without alleging damages or monetary loss exceeding $5,000, a claim under the CFAA cannot survive a motion to dismiss. *Volpe v. Abacus Software Sys. Corp.*, No. 20-10108, 2021 WL 2451968, at *6 (D.N.J. June 16, 2021) ("A plaintiff must allege that the defendant's actions, in violating the CFAA, 'caused damage or loss to the plaintiff in excess of $5,000 in a one-year period.'") (citation omitted). The CFAA defines loss as "any reasonable cost to any victim,

35

including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). To plead damage or loss under the CFAA, a plaintiff can allege that the defendant damaged or impaired a computer system. *Volpe*, 2021 WL 2451968, at *6 (quoting *Sealord Holdings, Inc. v. Radler*, No. 11-6125, 2012 WL 707075, at *4 (E.D. Pa. Mar. 6, 2012)). Put differently, most district courts in the Third Circuit require that "the 'loss' must generally be 'in some way related to functionality of the protected computer at issue.'" *Id.* (quoting *Clinton Plumbing*, 2011 WL 6088611, at *5). Grievances that consist of "lost business opportunities, damaged reputation, loss of assets, and other missed revenue, however," are insufficient to satisfy the CFAA's loss requirement. *Sealord Holdings, Inc.*, 2012 WL 707075, at *4.

### a.    The PEC Defendants

In moving to dismiss Plaintiff's Computer Fraud Claims, the PEC Defendants make five arguments: (1) there are no allegations that the PEC Defendants accessed or tampered with CCFW's systems; (2) the only claim involving the PEC Defendants is a vague, unsupported conspiracy allegation; (3) the data in question was accessed by employees who were authorized to do so; (4) CFAA and CROA do not apply to web-based accounts like SharePoint; and (5) the CFAA claims are time-barred by the two-year statute of limitations. (PEC Defs.' Moving Br. 27-29.)

Plaintiff, on the other hand, argues that it articulates at length how "Johnson at the direction of Manning, PEC and the entire Enterprise: (1) accessed a CCFW protected computer; (2) without authorization or by exceeding such authorization as was granted; (3) did so knowingly and with

intent to defraud; and (4) as a result furthered the intended fraud and obtained anything of value." (Pl.'s Opp'n Br. to PEC Defs.' Moving Br. 33.)

Here, the Court finds that the SAC fails to adequately plead claims under the CFAA and CROA against PEC and Manning. The SAC is devoid of any allegations that PEC and Manning ever accessed, or even had access to, any CCFW computer or server, nor that either altered, damaged, accessed, or obtained data from any CCFW computer without authorization. This, alone, is fatal to Plaintiff's Computer Fraud Claims as to PEC and Manning. *See CollegeSource, Inc. v. AcademyOne, Inc.*, 597 F. App'x 116, 129 (3d Cir. 2015) ("Common to all . . . claims under the CFAA [and the CROA] is the requirement of proof that the defendant accessed information 'without authorization' or 'exceed[ed] authorized access.'"). To the extent that Plaintiff alleges that Defendants "conspir[ed]" together (SAC ¶ 289), this is insufficient. *See In re Vertis Holdings, Inc.*, 536 B.R. 589, 619 (Bankr. D. Del. 2015), *aff'd*, No. 12-51176, 2016 WL 7031282 (D. Del. Nov. 30, 2016) ("[A] plain reading of the [CROA] supports the conclusion that the New Jersey legislature intended that the statute covered only those 'actors' who directly accessed the computer at issue."). As such, the Court dismisses Plaintiff's Computer Fraud Claims as to the PEC Defendants.

b.      **The PVI Defendants**

The PVI Defendants argue that Plaintiff's Computer Fraud Claims should be dismissed because: (1) Plaintiff fails to allege any impairment or damage to its systems by the PVI Defendants; and (2) the PVI Defendants were authorized to access the systems. (PEC Defs.' Moving Br. 27-28.) Plaintiff counters that the PVI Defendants' arguments fail because "the SAC confirms that Johnson not only stole information onto a hard drive but also deleted without

permission over 1000 computer files belonging to CCFW." (Pl.'s Opp'n Br. to PVI Defs.' Moving Br. 33-34 (citing SAC ¶ 217).)

Here, the Court finds Plaintiff fails to adequately state its CFAA claim as to the PVI Defendants. In the SAC, Plaintiff alleges that "Johnson, Bicking, [and] Weiler . . . had access to said [trade secrets and confidential and proprietary information] as it was necessary to use same in relation to their job duties." (SAC ¶¶ 419-20.) Plaintiff further alleges that, when reviewing Johnson's CCFW laptop, it showed that over 1,000 files were deleted, and she did not seek permission to delete such files. (*Id.* ¶ 217-18.) Plaintiff also alleges that the "[PVI] Defendants have . . . taken CCFW's confidential and proprietary information and trade secrets without permission and have deprived CCFW of same." (*Id.* ¶ 414.) The SAC, however, is devoid of allegations that suggest the purported deletion of the files caused damages in excess of $5,000. As such, without further factual allegations—such as, which of the PVI Defendants' actions caused monetary damages, how, to what extent, and how that damage was remediated—the Court is unable to find that Plaintiff plausibly alleged the minimum amount of damages required to sustain a claim under the CFAA. *Sealord Holdings, Inc.*, 2012 WL 707075, at *4. The Court, therefore, dismisses Plaintiff's CFAA claim as to the PVI Defendants.

As to Plaintiff's CROA claim against the PVI Defendants, Plaintiff alleges that Johnson accessed and deleted data on the laptop without authorization. (SAC ¶¶ 217-18.) The CROA "makes it unlawful to alter, damage, access, or obtain data from a computer without authorization." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 277 (3d Cir. 2016). The SAC alleges that Johnson resigned as of March 24, 2022, and that she deleted data on the laptop on March 25 and 26, 2022—the days after her termination. (SAC ¶¶ 107, 217.) The SAC further alleges that "Johnson did not seek permission to destroy these documents as she knew CCFW would never

38

authorize these deletions." (*Id.* ¶ 218.) Plaintiff also asserts that Johnson stole CCFW's confidential information and proprietary client files, which she put on a USB drive that she owned. (*See id.* ¶¶ 220-22.) As to alleged damages, "the []CROA allows for a broader allegation of damages than the CFAA, which can include losses unrelated to the damage or impairment of a computer system." *Rodgers Grp., LLC*, 2022 WL 4095785, at *8 (citing N.J. Stat. Ann. § 2A:38A-3). But, still, "[t]o recover under CROA, a plaintiff must show [it] was 'damaged in business or property by the defendant's violation of the act.'" *Lexpath Techs. Holdings, Inc. v. Welch*, 744 F. App'x 74, 82 (3d Cir. 2018). In the SAC, Plaintiff alleges, at length, the business damages it suffered as a result of Johnson deleting and taking CCFW's proprietary information. (*See generally* SAC.) As such, Plaintiff's CROA claim sufficiently alleges damages. *Rodgers Grp., LLC*, 2022 WL 4095785, at *8 (finding that allegations pertaining to business damages suffered as a result of a defendant's taking were sufficient to allege damages under CROA).

As to whether Johnson was authorized to access the trade secrets and confidential information while employed, that remains a factual question. The parties appear to contest whether Johnson was authorized to access the trade secrets while employed by CCFW, and presumably while serving as a consultant. Because the answer to that question may be no, particularly if Johnson accessed the information improperly or for non-CCFW purposes, the Court finds it inappropriate to decide these fact-specific inquiries on the pleadings. *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 407 (E.D. Pa. 2009) ("[T]he quality or extent of a particular individual's authorization to access a computer is informed by the facts of the case."). The Court, accordingly, denies the PVI Defendants' motion to dismiss Plaintiff's CROA claim as to PVI, PVP, and Johnson.

### c.    Bicking and Weiler

As to Bicking and Weiler, the Court finds that the SAC fails to adequately allege the Computer Fraud Claims. Other than vague allegations that the "Defendants[] through their purposeful, knowing and substantial involvement in the activities constituting or resulting from taking of data or altering, damaging and/or destroying it from, or accessing," (SAC ¶ 290) the SAC fails to allege that Bicking and Weiler acted without authorization and caused a damage or loss. For this reason, the Court dismisses Plaintiff's Computer Fraud Claims as to Bicking and Weiler. *See Mu Sigma, Inc. v. Affine, Inc.*, No. 12-1323, 2013 WL 3772724, at *10 (D.N.J. July 17, 2013) (finding that bare allegations of CFAA and CROA violations are insufficient where "[p]laintiff does not specify how or whether [d]efendants allegedly stole its data or what in particular was stolen, much less alleged that [d]efendants did so with purpose or knowledge").

### 7.    *Counts Eight, Nine, Thirteen, and Fourteen: Tortious Interference Claims*

"[T]o state a claim for tortious interference with contractual relations and/or prospective economic advantage," a plaintiff must adequately allege:

> (1) the existence of a contract or of a "reasonable expectation of economic advantage;" (2) an intentional and unjustifiable interference with the contract or expectation by defendant; (3) the interference caused the loss of contract or prospective gain; and (4) the injury caused the damage to the plaintiff.

*Dando v. Bimbo Food Bakeries Distrib., LLC*, No. 14-2956, 2016 WL 475262, at *4 (D.N.J. Feb. 8, 2016) (citations omitted); *see also Centennial Plaza Prop, LLC v. Trane U.S. Inc.*, No. 22-1262, 2023 WL 7403640, at *3 (D.N.J. Nov. 9, 2023) (citing *Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 679 F. Supp. 3d 53, 111 (D.N.J. 2023)). "A plaintiff need not identify multiple lost business opportunities to establish a cause of action for tortious interference, but it

must identify at least one." *Austar Int'l Ltd.*, 425 F. Supp. 3d at 358 (citing *Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.*, 332 F. App'x 787, 790 (3d Cir. 2009)).

In the SAC, Plaintiff asserts tortious interference claims against the PEC Defendants based on: (1) its contractual relationships with clients, vendors, and suppliers, and with potential future relationships with clients and vendors (Counts 8 and 9); (2) its employment contracts with Johnson (Counts 8 and 14); and (3) its employment contracts with Bicking, Weiler, and Ornelas-Kuh (Counts 8 and 14). (*See generally* SAC.) Similarly, Plaintiff asserts the following tortious interference claims against the PVI Defendants: (1) tortious interference with contracts and existing business relationships (Count 8); (2) tortious interference with prospective economic advantage (Count 9); and (3) tortious interference with Bicking, Weiler and Ornelas-Kuh's employment contracts[18] (Count 13). (*See id.*)

For starters, "[a] cause of action for tortious interference with [a] contract cannot be directed against a defendant who is a party to the contract." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 173 (3d Cir. 2001) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37-38 (N.J. 1989)). As such, any claims against PEC for interfering with its own contract must be dismissed. Furthermore, where a plaintiff alleges the same underlying conduct for its tortious interference and contract claims (as CCFW does here for Johnson, Bicking, and Weiler), the economic loss doctrine bars the plaintiff's tortious interference claim. *See Dando*, 2017 WL 1362022, at *3.

This leaves the Court with only the tortious interference claims against PEC Defendants, specifically those pertaining to interference with the business and contractual relationships with

---

[18] Count 13, however, only asserts tortious interference claims against Johnson, PVI and PVP. (SAC ¶¶ 428-33.)

Johnson, Bicking, Weiler, Albireo, and Merz. (SAC ¶ 380.) Here, the SAC is deficient because it fails to allege that the PEC Defendants had actual knowledge of any of CCFW's relationships and/or contracts with Johnson, Bicking, Weiler, Albireo, and Merz.[19] *See Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013) ("Actual knowledge of the [business relationship or] contract with which a defendant supposedly interfered is a prerequisite to making out a claim for tortious interference."); *LY Berditchev, Corp. v. Truss Cosms. Corp.*, No. 22-4242, 2023 WL 334539, at *6 (D.N.J. Jan. 20, 2023) ("To state a claim for tortious interference [with prospective economic advantage] under New Jersey law, a plaintiff must allege . . . the defendant's knowledge of that expectancy."). The Court, therefore, dismisses Plaintiff's tortious interference claims.

### 8.    *Count Eleven: Trespass to Chattel and Conversion Claims*

"In New Jersey, conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Cap. Health Sys. v. Veznedaroglu*, No. 15-8288, 2017 WL 751855, at *10 (D.N.J. Feb. 27, 2017) (quoting *Ricketti v. Barry*, No. 13-6804, 2015 WL 1013547, at *8 (D.N.J. Mar. 9, 2015)); *see Chi. Title Ins. Co. v. Ellis*, 978 A.2d 281, 283 (N.J. Super. Ct. App. Div. 2009). Common law conversion consists of the following elements: "(1) the existence of property[;] (2) the right to immediate possession thereof belonging to [the] plaintiff[;] and (3) the wrongful interference with that right by [the] defendant." *Cap. Health Sys.*, 2017 WL 751855, at *10.

---

[19] CCFW does not plausibly allege that PEC or Manning knew about the individual employment agreements with Bicking or Weiler—nor that PEC or Manning intentionally induced a breach of those agreements. *See Perti v. McRoberts Protective Agency, Inc.*, No. 14-7459, 2015 WL 5089570, at *4 (D.N.J. Aug. 27, 2015) ("A claim for tortious interference requires [allegations] 'that the defendant caused a third party to breach a contract' with the plaintiff.").

The tort of conversion developed historically with respect to chattels, but it has also been applied to money. *See, e.g., Hirsch v. Phily*, 73 A.2d 173, 177 (N.J. 1950); *Glenfed Fin. Corp., Com. Fin. Div. v. Penick Corp.*, 647 A.2d 852, 861 (N.J. Super. Ct. App. Div. 1994), *cert. denied*, 655 A.2d 444 (1995). Still, it does not extend to the intangibles alleged here. Allegations that a defendant "misappropriated [plaintiff's] intangible trade secrets and applied them to [defendant's] business operation" is insufficient to state a claim for conversion "because [plaintiff did] not allege that [d]efendants are in possession of any of [plaintiff's] tangible property." *Premio Foods, Inc. v. Purdue Farms, Inc.*, No. 11-4968, 2012 WL 3133791, at *6 (D.N.J. July 30, 2012).

In the SAC, Plaintiff alleges that it "had possessory rights and/or interests in the [CCFW] laptop, keys, and American Express credit card used by Johnson, in connection with their employment with [CCFW]. Plaintiff also had possessory rights and/or interests in CCFW's confidential and proprietary information and trade secrets." (SAC ¶ 409.) Beginning with Plaintiff's allegation surrounding its confidential information, proprietary information, and trade secrets, the SAC fails to state a conversion claim based on its proprietary information and trade secrets because it fails to allege that Johnson, Bicking, Weiler, PVP, and PVI "are in possession of any of [Plaintiff's] tangible property." *Premio Foods, Inc.*, 2012 WL 3133791, at *6; *Thomas v. Keough*, No. 22-5758, 2024 WL 414041, at *23 (D.N.J. Feb. 5, 2024) ("[C]onfidential and proprietary information . . . , including price lists and customer lists, [are] not tangible property."); *see also Argush v. LPL Fin. LLC*, No. 13-7821, 2014 WL 3844822, at *6 (D.N.J. Aug. 5, 2014) (characterizing "electronic files or information" as "intangible property" unfit for a conversion claim). Turning to Plaintiff's allegations concerning a laptop, keys, and credit card that were purportedly taken by Johnson, the SAC is devoid of allegations that it had a "right to immediate

43

possession" of those tangible items, which is required for a conversion claim.[20] *See SMP Props., LLC v. Encore Realty, LLC*, No. 20-6676, 2023 WL 9002658, at *3 (D.N.J. Dec. 28, 2023). As such, the Court finds that Plaintiff fails to sufficiently allege its conversion claims. The Court, therefore, dismisses Plaintiff's conversion claims as to the PVI Defendants and the PEC Defendants.

### 9.    Counts Ten and Sixteen: Unfair Competition and Unjust Enrichment

In the SAC, Plaintiff alleges, for its unfair competition claims, that the unfair competition was: (1) "Johnson, Bicking and Weiler's use of the [CC Ford] brand in their LinkedIn pages . . . to make it appear that PVI, PVP, Johnson, Bicking[,] and Weiler would be providing services through the known entity CCFW and used that practice for their own benefit" (SAC ¶ 403); (2) the "stealing of CCFW's confidential and proprietary information and trade secrets," (*id.* ¶ 404); and (3) "PVI's hiring of Ornelas-Kuh" (*id.* ¶ 404). Plaintiff alleges, for its unjust enrichment claims, that "Defendants received benefits from Plaintiff including, *inter alia*, income and COBRA payments, access to [CCFW] documents including client and vendor lists and proprietary pricing and marketing information, and thus were unjustly enriched." (*Id.* ¶¶ 451.)

Under New Jersey law, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust and that the plaintiff expected remuneration and the failure to give remuneration unjustly enriched the defendant." *EnviroFinance Grp., LLC v. Env't Barrier Co.*, 113 A.3d 775, 790 (N.J. Super. Ct. App. Div. 2015) (internal quotation marks and citation omitted).

---

[20] While it may seem obvious that an employee must return such property, absent factual allegations suggesting that is indeed the case, the Court declines to find that Plaintiff adequately states a conversion claim.

Under New Jersey law, unfair competition is "generally defined as the misappropriation of one's property by another which has some sort of commercial or pecuniary value." *Voorhees v. Tolia*, No. 16-8208, 2022 WL 18024216, at *9 (D.N.J. Dec. 31, 2022) (cleaned up). Ordinarily, unjust enrichment "takes the form of 'palming off' another's goods as your own." *Duffy v. Charles Schwab & Co., Inc.*, 97 F. Supp. 2d 592, 600-01 (D.N.J. 2000) (citation omitted). "[U]nfair competition[, however,] historically has been considered a subspecies of the class of torts known as tortious interference with business or contractual relations . . . . [and] under New Jersey law, '[t]here is no distinct cause of action for unfair competition.'" *Diversified Indus., Inc. v. Vinyl Trends, Inc.*, No. 13-6194, 2014 WL 1767471, at *6 (D.N.J. May 1, 2014). Courts, therefore, generally "dismiss[] unfair competition claims where they are duplicative of claims for tortious interference." *Id.*

Here, the Court dismisses Plaintiff's unfair competition and unjust enrichment claims as to the PEC Defendants for the same reason: the SAC is devoid of any allegations that pertain to PEC or Manning. As to the unfair competition claims, the SAC is silent on allegations that suggest the PEC Defendants are unfairly competing with CCFW. As to the unjust enrichment claims, the SAC does not allege that the PEC Defendants have received "income and COBRA payments" from CCFW, nor is it alleged that either had access to, or received a benefit from CCFW's "documents, including client and vendor lists and proprietary pricing and marketing information." (SAC ¶ 451.) Moreover, the SAC fails to suggest that CCFW expected renumeration from the PEC Defendants at the time that it purportedly performed or conferred any benefit. *See Cafaro v. HMC*, No. 07-2793, 2008 WL 4224801, at *12 (D.N.J. Sep. 8, 2008) (dismissing unjust enrichment claim where "[p]laintiffs could not have anticipated—let alone expected—remuneration").

45

Plaintiff's unfair competition and unjust enrichment claims also fail as to the PVI Defendants. Because the allegations underpinning Plaintiff's unfair competition and unjust enrichment claims are generally the same as its breach of contract and tortious interference claims, respectively, the Court finds that the claims are impermissibly duplicative. *See, e.g.*, *Gujja v. Inpatient Servs. of N.J., P.C.*, No. 21-19416, 2022 WL 2834998, at *3 (D.N.J. July 20, 2022) ("[C]ourts in this District regularly dismiss unjust enrichment claims that are duplicative of a complaint's breach of contract claims."); *see also Dando*, 2016 WL 475262, at *4 ("[T]his cause of action is factually duplicative of [p]laintiff's tortious interference claim and therefore will be dismissed with prejudice for the same reasons."). As such, the Court dismisses Plaintiff's unfair competition and unjust enrichment claims as to the PVI Defendants as duplicative.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the Court grants in part and denies in part the PVI Defendants' Motion to Dismiss and grants the PEC Defendants' Motion to Dismiss. As to the claims dismissed herein, the Court will grant Plaintiff leave to amend to correct the deficiencies identified in this Memorandum Opinion in any third amended complaint. The Court will enter an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE